CERTIFIED ENGLISH TRANSLATION OF


A STATEMENT OF CLAIM


DATED 18 JULY 2008



Price v. Facebook, Inc.   Doc. 43 Att. 2

CMS Hasche Sigle
Partnerschaft von Rechtsanwälten
und Steuerberatern
Postfach 70 02 65
D-70572 Stuttgart
Schöttlestraße 8
D-70597 Stuttgart

Tel.: +49 (0) 711/97 64-0
Fax: +49 (0) 711/97 64-900
www.cms-hs.com

**Dr Klaus Ikas**
**Unser Zeichen:** sik-sad-sco/sstb
2008/11842
Sekretariat: Elvira Aldinger
Tel.: +49 (0) 711/9764-204
Fax: +49 (0) 711/9764-924
klaus.ikas@cms-hs.com

Stuttgart Regional Court
17. Zivilkammer
Urbanstraße 20
70182 Stuttgart

18 July 2008

# ACTION FOR A NEGATIVE DECLARATORY JUDGMENT

In the legal matter

**studivz Ltd.**, legally represented by its directors, Dennis Bemmann, Michael Brehm and Marcus Riecke, Saarbrückerstraße 38, 10405 Berlin

- Claimant -

Counsel:             Rechtsanwälte CMS Hasche Sigle,
                            Schöttlestraße 8, 70597 Stuttgart

v

**FACEBOOK Inc.**, legally represented by its board members Mark Zuckerberg, Jim Breyer, Peter Thiel and Marc Andreessen, 471 Emerson Street, CA 94301-1605 Palo Alto, USA

- Defendant -

Agent for service of process:             C T Corporation System, 818 West Seventh St, Los
                                                                Angeles, CA 90017

for a declaratory decision (copyright, trade mark law, German Unfair Competition Act
(*Gesetz gegen den unlauteren Wettbewerb*))

Ann Stewart-Bendorf
Öffentlich bestellte
und beeidigte
Urkundenübersetzerin
der englischen Sprache für
Baden-Württemberg
Stuttgart

Dispute value: preliminary estimate: EUR 100,000

we hereby inform you that we are litigation counsel for the Claimant and request on behalf of the Claimant that the statement of claim and the three certified English translations attached be served in accordance with the Hague Convention on the service abroad of judicial and extrajudicial documents in civil or commercial matters both by registered letter with return confirmation-of-receipt coupon and also via the Central Authority to the agent for service of process of the Defendant. We also request that a date be set for an oral hearing and we request that such date be no later than four months after service of the statement of claim. In the oral hearing we shall **r e q u e s t** that

1. the Court pronounce a declaratory decision stating that

    a) the Claimant does not infringe the following rights of the Defendant through operation of website www.studivz.net.

        - The Defendant's rights under German trade mark number 306632713; and/or

        - the Defendant's rights under the German Copyright Act (*Urheberrechtsgesetz*) in the graphic design of the www.facebook.com website, in the current version pursuant to Exhibit K 3 and/or the previous version pursuant to Exhibit K 4, in each case in the German and/or English version, and/or in software produced for operation thereof and/or in the data accessible through this website; and/or

        - the Defendant's rights under a nonregistered Community registered design in the graphic design of the www.facebook.com website in the current version pursuant to Exhibit K 3 and/or the previous version pursuant to Exhibit K 4, each in the German and/or English version;

    b) that the Claimant's www.studivz.net website does not constitute unfair imitation of the www.facebook.com website in the current version pursuant to Exhibit K 3 and/or the previous version pursuant to Exhibit K 4, each in the German and/or English version, pursuant to §§ 3, 4 no. 9 of the Unfair Competition Act;

    c) that the Claimant has not infringed the agreed conditions for the use of www.facebook.com website;

2. the Defendant bear the costs of the proceedings;

3. as far as costs are concerned the decision be declared provisionally enforceable – against provision of security (bank guarantee);

if necessary, the Claimant not be required to avert enforcement proceedings for costs against provision of security (bank guarantee).

## GROUNDS

### I. Facts

1. <u>The parties</u>

The Claimant is a company established under the laws of England and Wales, registered in England, and is a company belonging to the German Holtzbrinck group. Its business premises are at Saarbrückerstraße 38, 10405 Berlin. It operates the studivz.net website which was developed in 2005. Extracts of a current colour printout of the website is attached as

**- Exhibit K 1 -.**
(still to be submitted)

At the moment there is no English version of the website.

The Defendant, whose registered office is in California, operates the facebook.com website which was developed in 2004. Extracts of a current colour printout of the homepage of this website is attached as

**- Exhibit K 2 -.**

The Defendant's website has only ever existed in English. According to wikipedia it was not translated into other languages, including German, until the spring of 2008. We have attached an extract of the German version which can be accessed under the internet address de.facebook.com as

**- Exhibit K 3 -.**

(still to be submitted)

Before the Defendant gave the website its current design the website was designed
as shown in

- **Exhibit K 4 -.**

The platforms of the parties are social networks which enable people to maintain
and establish personal contacts.

2. Official warnings (*Abmahnungen*)

The Defendant maintains that the Claimant has infringed its rights in the design of
the studivz.net website. For this reason it instructed its Californian lawyers to write
to Verlagsgruppe Georg von Holtzbrinck GmbH; this letter was dated 9 July 2008.

- **Exhibit K 5 -.**

Verlagsgruppe Georg von Holtzbrinck GmbH is the general partner
(*Komplementärin*) of Georg von Holtzbrinck GmbH & Co. KG, which holds the
majority of the shares in the Claimant via subsidiaries. Amongst other things, the
letter demands that the graphic design of the studivz.net user interface be changed
within 30 days and that all content, design and functions be deleted which were
taken from the facebook.com website.

This is the third and not the first official warning from the Defendant.

The first official warning from the Defendant to the Claimant regarding the design
of the studivz.net website was sent by German law firm Lovells on 8 June 2006.

Evidence:    Letter from Defendant of 8 June 2006 (copy)

- **Exhibit K 6 -.**
(still to be submitted)

The Claimant did not comply with this official warning. The Defendant did not
pursue the official warning through the courts. This was probably because of talks

which were held between the Claimant's then shareholders and the applicant regarding the acquisition of the Claimant by the Defendant.

After these talks had failed and the Claimant had been sold to the Holtzbrinck group, on 3 January 2007 the Defendant sent the Claimant a second official warning.

Evidence:   Letter from law firm Liechtenstein & Körner of 3 January 2007 (copy)

**- Exhibit K 7 -.**
(still to be submitted)

In that letter it again complained that its rights were being infringed by the studivz.net website. Again the Claimant did not comply. Again, the Defendant did not respond with judicial action.

On the contrary, the Defendant seemed more interested in acquiring the Claimant. In so doing it wishes to obtain access to the German target group of studivz.net. In the second quarter of 2008 negotiations therefore took place between it and the Holtzbrinck group on sale of the Claimant to the Defendant. After the negotiations had broken off, Defendant then tried again to further its interest in acquisition by sending another, i.e. the third, official warning (Exhibit K 5).

Thus, the Defendant has issued three official warnings (*Abmahnungen*) regarding the same accusations within the two-year period. It is currently alleging infringement of its copyrights and trade mark rights and unfair imitation of its facebook.com website and infringement of its terms of use.

3.  Production of studivz.com website

In its most recent official warning (Exhibit K 5) the Defendant maintains that its rights of use, which are protected by copyright, have been infringed by the Claimant allegedly copying the user interface of the Defendant's website. Absolutely no details were provided regarding the specifics of the infringement. There is merely a blanket allegation that the user interface of the Claimant's website gives the impression of slavishly imitating the user interface of the Defendant's website, which - according to the Defendant - could only have occurred through unauthorised access to the Defendant's server.

A comparison between the Defendant's website (Exhibits K 3 and 4) and the Claimant's website (Exhibit K 1) shows without a doubt that the user interfaces of both websites differ in all important design features. The structure, design, colouring and linguistic content of the two websites differ substantially. For this reason alone the allegation is unjustified.

The Claimant has absolutely no knowledge of the computer program which is operated on the Defendant's server and which generates the Defendant's website. At no time have the Claimant, its representatives and employees had access to knowledge of this computer program and its source code.

Evidence:  1.   Statement from Dr Jan Wergin, to be summoned through the Claimant
           2.   Testimony of Dennis Bemmann, director of Claimant, to be summoned by Claimant

Mr Bemmann was personally involved in the development of studivz.net. The computer program which is operated on the Claimant's server and which generates the Claimant's website was created independently from scratch by a team of developers of the Claimant.

Evidence:  1.   Statement from Dr Jan Wergin, product manager, to be summoned through the Claimant
           2.   Testimony of Dennis Bemmann, director of Claimant, to be summoned by Claimant

There is therefore no correlation in the code of the computer programs of both parties.

4.  Defendant's trade mark rights

In its most recent official warning (Exhibit K 5) the Defendant alleges that its trade marks are infringed but does not even state which trade marks these are.

Online research into registered trade marks of the Defendant which enjoy protection in Germany revealed that the Defendant only has one registered trade mark which is currently in effect. This is German figurative mark 3066327

shows various horizontal bars, in which upper area a double bar is linked to an area on the left which shows a head.

Evidence:    Online printout from the DPinfo database of the German Patent and Trademark Office of 15 July 2008.

**- Exhibit K 8 -.**
(still to be submitted)

The uppermost area with the head on the left also formed the subject of another German figurative mark held by the Defendant, figurative mark no. 30663270.5. This mark was cancelled on 19 November 2007 pursuant to § 50 of the Trade Mark Act on the grounds of nullity owing to absolute obstacles to protection (*Nichtigkeit wegen absoluter Schutzhindernisse*).

Evidence:    Online printout from the DPinfo database of the German Patent and Trademark Office of 15 July 2008.

**- Exhibit K 9 –**
(still to be submitted)

The same mark is the subject of Community trade mark application 005841077. According to the status information displayed in the CTM online database, the trade mark has not yet been registered.

Evidence:    Online printout from the CTM-Online database of the Office for Harmonization of 15 July 2008

**- Exhibit K 10 –**
(still to be submitted)

5. <u>Double-bar design of website is not an indicator of origin</u>

To the extent that one element of the Defendant's trade mark is a double bar, consisting of various shades, it should be noted that this is a design element which is absolutely usual for websites and also for network portals of this type. We submit as

**- Bundle of Exhibits K 11 –**
(still to be submitted)

the print-outs of the current homepages of various websites for social networks produced on 15 July 2008.

As these pages show, graphical elements of this type are a generally widespread design principle typically to be found at the upper edge of website. Users do not regard bars of this type of as an indicator of origin.

Evidence:    Expert report – consumer poll

Moreover, it is striking that other portals such as unister.de and elsa-germany.org/de, have also given their websites a three-section structure whereby the menu bars are generally at the edges of the pages with the actual content of the website in the centre. This is a typical website structure which is suggested in any manual on website design and structure. It is the result of the intended function.

Evidence:    1.    Scanned extract from manual
                    The CSS Anthology: 101 Essential Tips, Tricks & Hacks
                    (Paperback) by Rachel Andrew

                    **- Exhibit K 12 -**

           2.    Expert report

6.  Alleged infringement of facebook.com's terms of use

The Defendant alleges an infringement of the terms of use for its website as a result of unauthorised access to the server. However, there are no agreements whatsoever between the parties which incorporate the Defendant's terms of use. For this reason alone the Claimant cannot have committed an infringement. Nor has the Claimant induced any third party to commit a breach of contract.

**II.   Procedural matters**

1.  Service

We would suggest that the Statement of Claim be served via the Central Authority in accordance with the provisions of the Hague *Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or*

*Commercial Matters*[1] and for the purpose of accelerating service be sent **in addition** by registered letter with return confirmation-of-receipt coupon. This complies with the Convention. Under German law double service is possible.

Under Article 2 of the Convention each contracting state is required to designate a **Central Authority** to carry out requests for service for other contracting states. In the USA the Central Authority is the US Department of Justice in Washington. However, in 2003 the US Department of Justice transferred the duties of the Central Authority to the company *Process Forwarding International*, which is registered in Seattle. This means that requests for service must be sent to *Process Forwarding International* at 633 Yesler Way, Seattle, WA 98104, USA. A copy of the letter from the USA of 21 August 2003 (see http://hcch.e-vision.nl) is attached as

### - Exhibit K 13 -.

The documents to be served together with the exhibits must be translated and sent in duplicate with two copies of the *"request for service abroad"* form. An advance on costs of USD 95.00 (crossed cheque, bank transfer, credit card receipt, etc.) must also be enclosed. Otherwise the request for service will be disregarded and returned (see page 3, Exhibit K 13).

§ 183 (1) no. 1 of the German Code of Civil Procedure (*Zivilprozessordnung*) as read with Article 10 of the Convention also permits service to be made directly by **registered letter with return confirmation-of-receipt coupon.** Article 10 a) of the Convention also expressly states that judicial documents may be sent abroad by postal channels provided that the country of destination does not object. As the USA has not objected service can be made directly by registered letter with return confirmation-of-receipt coupon (see *Roth* in Stein/Jonas, ZPO, 22nd edition 2005, § 183 paragraph 11 with reference to acknowledgement of service in this manner by the US courts similarly in *Ackermann v. Levine* 788 F.2d 830, 838 ff.). Service shall be made to the **agent for the service of process named in the rubric.**

2. Scheduling

---

[1] Translator's note: For the purpose of this translation the Hague Convention on the service abroad of judicial and extrajudicial documents in civil or commercial matters will also be referred to hereinafter as the "Convention".

In view of the continuing official warnings from the Defendant the Claimant needs to have legal clarity as soon as possible, particularly since it is currently involved in a sale. For this reason we kindly request that when the Statement of Claim is served a date also be set for a hearing which should be no more than <u>four months</u> after service of the statement of claim.

## III. Legal appraisal

### 1. <u>Competence</u>

The court which would be competent for an action for performance if the rubric were the other way around, with the intention of gaining injunctive relief with respect to the contested product, would be the local court (Cologne Higher Regional Court GRUR 1978, 658 – *Immer jünger*).

The place of jurisdiction for a tortious act pursuant to § 32 of the German Code of Civil Procedure would apply to such action for performance. Such place of jurisdiction can be anywhere where the contested website can be accessed by a specific target group. It can be accessed throughout Germany, therefore also in Stuttgart.

In as far as the claim also refers to the German trade mark of the Defendant, the place of jurisdiction is also that specified in § 23 German Code of Civil Procedure (place of jurisdiction concerning assets). This emerges from § 96 (3) Trade Mark Act as the representatives appointed by the Defendant have their business premises in Stuttgart according to Exhibit K 8.

### 2. <u>Entitlement to Sue</u>

The Claimant is entitled to sue because it received official warnings from the Defendant in 2006 and 2007 and because now its parent company has been contacted with the unequivocal request to change its website otherwise the court action will be taken. It is clear that this court action will be taken against the Claimant as the latter developed and operates the website. The claim will therefore be made against Claimant.

### 3. <u>Standing to be Sued</u>

It is just as clear that the Defendant is capable of being sued as all warning letters were sent by it or in its name.

4. <u>Interest in a declaratory judgement</u>

The Defendant is now complaining for the umpteenth time about the graphics on the user interface of studivz.net which has basically remained unchanged and the alleged takeover of functionalities provided here. The legal interest of the Claimant arises from the accusation made in the three warning letters of the infringement of intellectual property of the Defendant, of unfair competition and of breach of contract.

5. <u>No claims from copyright law</u>

The Claimant does not infringe any copyrights of the Defendant:

a) *Protection of the computer program generating the website of the Defendant pursuant to § 69a (1) as read with § 2 (1) no. 1 Copyright Act*

Although the computer program generating the website of the Defendant enjoys copyright protection pursuant to § 69a (1) as read with § 2 (1) no. 1 Copyright Act, this has not been infringed by the Claimant as the Claimant has not copied the computer program either in whole or in part. As a rule the computer program is localised on the servers of the provider which in turn are in well-secured special premises to which only a very small number of close employees have access. As the Defendant is a US company which has its registered office in Palo Alto/California the Claimant would have had to physically break into the server premises of the Defendant and overcome all security systems (alarm systems, passwords, etc.) in order to gain possession of the source code of the computer program of the Defendant. This is completely absurd and obviously not the case.

b) *No protection of the user interface of the Claimant as computer program pursuant to § 69a (1) as read with § 2 (1) no. 1 Copyright Act.*

aa) No computer program protected by copyright law

The user interface (Graphical User Interface) of the Defendant is not a computer program within the meaning of § 69a (1) Copyright Act. For a computer program to be considered to be a computer program within the meaning of the provision control commands are necessary, i.e. a number of commands which, after entry into a machine-readable carrier, are capable of making a machine with information-processing capabilities show, carry out or achieve a certain function, task or result. User interfaces, including the underlying HTML text, on the other hand are generated by running the program and are therefore only the result of the operation of the program but not of computer programs themselves (see e.g. Wandtke/Bullinger, Urheberrecht, 2nd ed., Munich 2006, § 69a marginal no. 3, 14 with further references.; Frankfurt/Main Higher Regional Court, decision of 22.03.2005, case no. 11 U 64/04).

The following considered deliberation of Düsseldorf Higher Regional Court (decision of 29.06.1999 (20 U 85/98)) demonstrates this: It is technically possible to create one and the same text or graphical reproduction on screen with various computer programs. Therefore one single website does not form a computer program not even as a "multimedia product". This is because the creative content of a multimedia product is incorporated in the thought communicated in language, pictures and possibly sound but not in the computer program required for operation and reproduction (see also Schricker/Loewenheim, UrhR, 2nd ed., § 2 marginal no. 201).

Therefore different computer programs from different providers can generate identical HTML source code texts as the source texts of HTML websites as "descriptive language" (and not programming language) only document the general structure and external appearance of an HTML website. The similarity or identity of source texts in an HTML website therefore does not lead to any conclusions about the similarity or identity of the underlying computer programs.

Evidence: expert report

bb)  No infringement of rights

Therefore from the outset it can be said that the computer program of the Defendant has not been taken over for the reasons set out above under aa).

c) *No protection as database pursuant to § 87a and b Copyright Act (related property right)*

Nor in the present case is there any database protection pursuant to § 87a ff. Copyright Act

aa) No database

The legal definition of a database as set out in § 87a (1) sentence 1 Copyright Act is a collection of works, data or other independent elements which are systematically or methodically organised and can be accessed individually with the help of electronic means or otherwise the creation, review or illustration of which requires a considerable investment in terms of nature or scope.

Looking at the website of the Defendant the collective character required for a database is not present. The website of the Defendant only contains rudimentary information in this respect. At most it can be assumed that the website of the Defendant is a type of internet portal/forum or platform by means of which people are able to themselves develop social networks with other people. However, this in no way fulfils the statutorily defined conditions for a database.

Furthermore, the fact that this is a social network on which the members first-have to register and log in means that it is not the Defendant which collects and organises any works, data or other independent elements. If at all, this is done by the registered users themselves by setting up their own profiles and providing their own details (pictures, text, films, etc.) independently publishing and managing data as is common practice on online social networks ("user-generated content").

However, if the users themselves decide when to publish, process and again remove which data and if the Defendant does not systematically or methodically organise the individual data under copyright law that is only

a collection of "raw data" alias "data piles" i.e. it is not a database (Wandtke/Bullinger, op. cit., § 87a marginal no. 17).

At the same time this means that the Defendant did not have to make any investment to procure this data. There are also no other indications whether, and if so what considerable investment in terms of nature or scope is supposed to have been made in this case in connection with the collection of the data. Consequently there is no database.

bb) No infringement of rights

There is no infringement of rights. There is no basis at all for claims owing to the infringement of rights of the producer of the database.

d) *No protection as database work pursuant to § 2 (2) as read with § 4 (2) Copyright Act*

No copyright has been infringed from the legal aspect either.

aa) No database work protected by copyright law

As far as content is concerned the legal definition of database works pursuant to § 4 (2) Copyright Act corresponds to the legal definition of the database pursuant to § 87a (1) sentence 1 Copyright Act (related property rights). In this respect reference is made to the above remarks.

Moreover, the Defendant has in no way illustrated that the selection and organisation of data constitutes a *personal intellectual creation* within the meaning of § 4 (1) as read with § 2 (2) Copyright Act. It is not even clear what type of details are meant at all which could have led in their selection and organisation to the creation of a work worthy of protection under copyright law. Therefore in this case the – compared with the related protected rights --additional copyright law condition of *personal intellectual creation* pursuant to § 4 (1) as read with § 2 (2) Copyright Act is not satisfied.

Therefore the website of the Defendant is not a database work protected under copyright law. Such protection of its website can be excluded from the outset.

However, even if it were to be wrongly assumed that there is a *personal intellectual creation* within the meaning of copyright law the Defendant itself would not be the originator as it was not the Defendant but at best the registered users who were the originators of the respective *personal intellectual creation*.

bb)  No infringement of rights

There is no infringement of rights. In this respect reference is made to the comments above.

e)  *No other copyright law protection of user interface of Defendant*

Any other infringement of copyright law is also excluded in this case. The website of the Defendant does not constitute a work to be protected under copyright law outside the above categories, for example a written work, because the required level of creation has not been achieved by far. In other respects there is no infringement of any right owing to the lack of correspondence of the content of the website of the two parties.

6. No claims from trade mark law

The graphics on the studivz.net website do not infringe the sole trade mark of the Defendant's registered trade mark DE 306632713, which is protected in Germany **owing to the lack of risk of confusion**. Under current case law the risk of confusion is determined taking into consideration the distinctive nature of the trade mark and the similarity of the marks and the goods and services offered under such, taking into further consideration the interplay between these three criteria (see for example Ströbele/Hacker, Markengesetz, 8th ed. § 9 marginal no. 26).

The sole possible element indicating origin of the sole relevant trade mark of the Claimant is the head depicted top left. The other elements of the trade mark, i.e the bar-like areas, do not have any function indicating origin, as already illustrated. The internet user only sees this as geometrical areas with functional background

which are commonplace on internet pages. This applies most particularly to
elements such as the square areas placed in pairs beside one another on the bottom
and left-hand edges of the trade mark which are clearly supposed to represent
menu buttons. Therefore at best the trade mark can be attributed **distinctive
character** owing to the head element. However, even this is questionable, as is
shown by the cancellation of the German figurative mark 306632705 owing to
absolute obstacles to registration. However, even if one wished to attribute
distinctive character to the upper double bar this could only be so slight that the
protected area of the trade mark would be restricted to identical designs.

The sole possible element of the figurative mark of the Defendant capable of
having distinctive character on its own, i.e. the head, is and was not used either in
identical or similar form on studivz.net. As far as the other elements - which do not
have individual distinctive character in the view of the claimant - of the trade mark
are concerned, the buttons arranged in pairs beside one another are and were not
used. The Claimant only uses a double bar in shades of red on the upper edge of its
website. However, this has different proportions to the trade mark, i.e. the bars are
of different widths and this is also clearly rounded off in the right upper corner.
The bar design is also so to speak continued on the studivz.net website on the
lower edge of the cage in a lighter red. On some pages (see Exhibit K 1) there are
even more than three reddish bars. Overall the bar design on studivz.net can be
clearly distinguished from the registered trade mark. If it were to be attributed any
function indicating origin at all, the mark does not have **any similarity**. There is
therefore no risk of confusion (§ 14 (2) no. 2 Trade Mark Act).

If the risk of confusion between the trade mark of the Defendant and the bar design
on studivz.net were affirmed the Defendant would not be entitled to any trade
mark claims either. Instead it would be the Claimant who would be the owner of
such claims against the Defendant. This is because the Claimant then would have a
**trade mark acquired by use** with older priority. It has been using the bar design
about which the Defendant will presumably continue to make complaints since the
start of studivz.net, i.e. from the beginning of autumn 2005. Within a very short
time the website became the largest online community for students in this market.
At the end of 2006 it already had more than one million users in the student circles
concerned. This corresponds to a market saturation of 46 %.

Evidence:  1.    Screenshots with figures from the statistical federal offices
of Germany, Austria and Switzerland, 2005

- **Bundle of Exhibits K 14 -**

2.     expert report

Owing to this high market saturation the web design of the Claimant as a trade mark acquired by use gained outstanding trade mark law distinctive character. Application for registration of the oldest trade mark of the Defendant on the other hand was not made until 18.10.2006. Clearly the trade mark acquired by use of the Claimant already existed on this date.

7.   No unfair competition law claims

   a)   *No unfair imitation*

         aa)  With respect to products not protected by intellectual property rights the **principle of the freedom to imitate** applies under unfair competition law. Imitation of products with "competition law originality" is only unfair subject to the provisions set out in § 4 no. 9 of the Unfair Competition Act. The Claimant does not satisfy these conditions. It is therefore not acting unfairly.

         bb)  The website of the Defendant does not have **the originality required under unfair competition law**. Originality in terms of unfair competition law is considered to exist if the specific design or certain features of the product are appropriate to draw the attention of the appropriate market to its origin or its special features (case law, see only BGH WRP 2007, 1076 text no. 25 - *Handtaschen*). When ascertaining the individual nature under unfair competition law it is only the alleged **assumed** features which are important and only those design features which are **externally** recognisable (BGH GRUR 2002, 820, 822 – *Bremszangen*). The Defendant did not illustrate in detail such features in its most recent letter (Exhibit K 5). The only possible feature is the light/dark double bar on the upper edge of the screen in the above trade mark. All the facts not recognisable to the user on the screen, such as computer programs running in the background, are therefore excluded from the outset. With respect to the double bar, however it would not be the Unfair Competition Act which would apply but trade mark law would take precedence as *lex*

*specialis* (Hefermehl/Köhler/Bornkamm, Unfair Competition Act 26th ed., § 4 marginal no. 9.9 with further references to case law.), as the Defendant is also claiming trade mark protection for this design element. Furthermore, the Defendant does not use this element on its current web site at all. Finally, this design principle can be found on numerous other online social networks which have existed in Germany for a long time such as unister.de, studentum.de, studentenforum.net, nurstudenten.de, uni24.de or el§a unter elsa-germany.org/de (see Exhibit K 11). A website with double bars on the upper edge of the screen therefore does not distinguish itself in any way whatsoever from other comparable internet offers. There is no indication to origin or the special nature of the product.

cc) The studivz.net website does not lead to **avoidable confusion as to origin** either (§ 4 no. 9 a. of the Unfair Competition Act). The condition for falsification of origin is that the allegedly imitated product has a certain notoriety in the circles for which it is intended. The definitive date for this notoriety is the market introduction of the alleged imitation ((BGH GRUR 2002, 275, 277 – *Stufenleitern*; Hefermehl/Köhler/Bornkamm, Unfair Competition Act 26th ed., § 4 marginal no. 9.41). When studivz.net was introduced to the market at the end of 2005 facebook was not known to the circles addressed by studivz.net, i.e. students from German-speaking countries. Instead facebook.com was directed toward English-speaking students in English-speaking countries outside Germany. It is denied that facebook later achieved adequate notoriety in Germany, which anyway could only have become the case in the German version not available until 2008. In the end this is irrelevant because the German version did not go online until long after the definitive date.

dd) For the above reasons set out under cc) the element of **exploitation of reputation** does not apply either (§ 9 no. 4 b. Unfair Competition Act).

ee) Lastly the conditions of § 9 no. 4 c Unfair Competition Act do not apply either.

7. <u>No claims from registered design law</u>

In the second warning letter the Defendant also appealed to a community registered design within the meaning of Regulation (EC) 6/2002 not registered

with respect to the double bar used by the Claimant on its web site. There is no such right. This design element does not have either the required originality or the required novelty in view of other websites which use it (Exhibit K 11). Horizontal double bars at the upper edge of the screen of a website are nothing new. The version originally used by the Defendant does not have any special features worth mentioning either. Even if the element had been novel and had original character the statutory term of the community registered design of three years since first public access within the Community (Art. 11 (1) Regulation (EC) 6/2002) would have expired. This is because facebook.com has existed since 2004 and this website could be accessed from any internet connection in the Community, in particular by English users.

8. <u>No breach of contract</u>

There are no contractual relationships between the parties relating to the use of facebook. There are therefore no contractual claims in this respect.

Please find attached cheque payment on account of court fees in the amount of
   EUR 2,568.

Rechtsanwalt

Dr Ikas



I hereby certify that the above text is a true and accurate translation of a statement of claim dated 18 July 2008 written in the German language, presented to me and attached hereto.



Ann Stewart-Bendorf M.A. (Hons.) MCIL
Publicly appointed and sworn translator for English
for the courts in Baden-Württemberg
Stuttgart, 18.07.08

# C/M/S/ Hasche Sigle

Rechtsanwälte Steuerberater

CMS Hasche Sigle
Partnerschaft von Rechtsanwälten
und Steuerberatern
Postfach 70 02 65
D-70572 Stuttgart
Schöttlestraße 8
D-70597 Stuttgart

Tel.: +49 (0) 711/97 64-0
Fax: +49 (0) 711/97 64-900
www.cms-hs.com

**Dr. Klaus Ikas**
**Unser Zeichen:** sik-sad-
2008/11842
Sekretariat: Elvira Aldinger
Tel.: +49 (0) 711/9764-204
Fax: +49 (0) 711/9764-924
klaus.ikas@cms-hs.com

Landgericht Stuttgart
17. Zivilkammer
Urbanstraße 20
70182 Stuttgart

18. Juli 2008

## NEGATIVE FESTSTELLUNGSKLAGE

In der Rechtssache

**StudiVZ Ltd.**, gesetzlich vertreten durch die Geschäftsführer Dennis Bemmann, Michael Brehm und Marcus Riecke, Saarbrückerstraße 38, 10405 Berlin

- Klägerin -

Prozessbevollmächtigte:  Rechtsanwälte CMS Hasche Sigle,
Schöttlestraße 8, 70597 Stuttgart

gegen

**FACEBOOK Inc.**, gesetzlich vertreten durch die Board-Mitglieder Mark Zuckerberg, Jim Breyer, Peter Thiel und Marc Andreessen, 471 Emerson Street, CA 94301-1605 Palo Alto, USA

- Beklagte -

Zustellungsbevollmächtigt:  C T Corporation System, 818 West Seventh St, Los Angeles, CA 90017

wegen Feststellung (Urheberrecht, Markenrecht, UWG)

Gegenstandswert: vorläufig geschätzt EUR 100.000

CMS Hasche Sigle Partnerschaft von Rechtsanwälten und Steuerberatern, AG Charlottenburg PR 316 B

CMS (EWIV): CMS Hasche Sigle Berlin, Düsseldorf, Frankfurt, Hamburg, Köln, Leipzig, München, Stuttgart, Dresden, Brüssel, Moskau, Shanghai
CMS Adonnino Ascoli & Cavasola Scamoni Rom, Mailand CMS Albiñana & Suárez de Lezo Madrid, Marbella, Sevilla CMS Bureau Francis Lefebvre Paris, Algier, Brüssel, Buenos Aires, Bukarest, Casablanca, Lyon, Madrid, Montevideo, Moskau, Shanghai, Straßburg CMS Cameron McKenna LLP London, Aberdeen, Bristol, Brüssel, Budapest, Bukarest, Moskau, Peking, Prag, Sofia, Warschau CMS DeBacker Brüssel, Antwerpen CMS Derks Star Busmann Utrecht, Amsterdam, Arnheim CMS von Erlach Henrici Zürich CMS Reich-Rohrwig Hainz Wien, Bratislava, Brüssel, Kiew, Prag, Sofia, Zagreb
CMS Reich-Rohrwig Hasche Sigle d.o.o. Belgrad

bestellen wir uns als Prozessbevollmächtigte der Klägerin und bitten in deren Namen um Zustellung der Klage sowie der drei beigefügten beglaubigten englischen Übersetzungen gemäß dem Haager Zustellungsübereinkommen sowohl per Einschreiben mit Rückschein als auch über die Zentrale Behörde an den Zustellungsbevollmächtigten der Beklagten. Ferner bitten wir um Anberaumung eines Termins zur mündlichen Verhandlung, der nicht später als vier Monate nach Zustellung der Klage liegt. Im Termin zur mündlichen Verhandlung werden wir **b e a n t r a g e n**

1.  festzustellen,

    a)  dass die Klägerin durch den Betrieb der Website www.studivz.net folgende Rechte der Beklagten nicht verletzt:

    -   Die Rechte der Beklagten aus der deutschen Marke Nr. 306632713; und/oder

    -   die Rechte der Beklagten nach dem Urheberrechtsgesetz an der graphischen Gestaltung der Website www.facebook.com in gemäß Anlage K 3 aktueller und/oder gemäß Anlage K 4 vormaliger Version, jeweils in deutscher und/oder englischer Fassung, und/oder an der zu deren Betrieb erstellten Software und/oder an dem über diese Website abrufbaren Datenbestand; und/oder

    -   die Rechte der Beklagten aus einem nicht eingetragenen Gemeinschaftsgeschmacksmuster an der graphischen Gestaltung der Website www.facebook.com in gemäß Anlage K 3 aktueller und/oder gemäß Anlage K 4 vormaliger Version, jeweils in deutscher und/oder englischer Fassung;

    b)  dass die Website www.studivz.net der Klägerin keine unlautere Nachahmung der Webseite www.facebook.com in gemäß Anlage K 3 aktueller und/oder gemäß Anlage K 4 vormaliger Version, jeweils in deutscher und/oder englischer Fassung, gemäß §§ 3, 4 Nr. 9 UWG ist;

    c)  dass die Klägerin nicht gegen mit ihr vereinbarte Nutzungsbedingungen der Webseite www.facebook.com verstoßen hat;

2.  der Beklagten die Kosten des Verfahrens aufzuerlegen;

3. das Urteil im Hinblick auf die Kosten – gegebenenfalls gegen Sicherheitsleistung (Bankbürgschaft) – für vorläufig vollstreckbar zu erklären;

notfalls der Klägerin nachzulassen, die Zwangsvollstreckung wegen der Kosten gegen Sicherheitsleistung (Bankbürgschaft) abzuwenden.

## BEGRÜNDUNG

### I.    Sachverhalt

#### 1.   Die Parteien

Die Klägerin ist eine zur deutschen Holtzbrinck Gruppe gehörende Gesellschaft nach englischem Recht mit juristischem Sitz in England. Ihre Geschäftsräume befinden sich in der Saarbrückerstraße 38, 10405 Berlin. Sie betreibt die im Jahr 2005 entwickelte Website studivz.net. Ein aktueller Farbausdruck der Website ist auszugsweise beigefügt als

**- Anlage K 1 -.**
(wird nachgereicht)

Eine englischsprachige Version der Website existiert bislang nicht.

Die Beklagte mit Sitz in Kalifornien betreibt die im Jahr 2004 entwickelte Website facebook.com. Ein aktueller Farbausdruck der Homepage dieser Website ist auszugsweise beigefügt als

**- Anlage K 2 -.**

Die Website der Beklagten existierte seither nur in einer englischsprachigen Version. Sie wurde laut wikipedia erst im Frühjahr 2008 auch in andere Sprachen, unter anderem Deutsch übersetzt. Einen Auszug der unter der Internetadresse de.facebook.com erreichbaren deutschen Version fügen wir bei als

**- Anlage K 3 -.**
(wird nachgereicht)

Bevor die Beklagte ihrer Website das aktuelle Design verlieh, hatte die Website das aus

**– Anlage K 4 –**

ersichtliche Design.

Bei den Plattformen der Parteien handelt es sich um sogenannte soziale Netzwerke, über welche persönliche Kontakte gepflegt und geknüpft werden können.

2. <u>Abmahnungen</u>

Die Beklagte wirft der Klägerin die Gestaltung der Website studivz.net unter Verletzung ihrer Rechte vor. Sie ließ daher die Verlagsgruppe Georg von Holtzbrinck GmbH von ihren kalifornischen Rechtsanwälten unter dem 09.07.2008 anschreiben.

**– Anlage K 5 –**

Die Verlagsgruppe Georg von Holtzbrinck GmbH ist die Komplementärin der Georg von Holtzbrinck GmbH & Co. KG, die über Tochtergesellschaften die Mehrheit der Anteile an der Klägerin hält. In dem Schreiben wird unter anderem verlangt, dass innerhalb von 30 Tagen die Grafik der Benutzeroberfläche von studivz.net geändert wird und alle Inhalte, Gestaltungen und Funktionen gelöscht werden, soweit sie von der Website facebook.com übernommen wurden.

Dies ist nicht die erste derartige Abmahnung der Beklagten, sondern bereits die dritte.

Die Beklagte ließ die Klägerin wegen der Gestaltung der Website studivz.net erstmals bereits mit Schreiben vom 08.06.2006 der deutschen Anwaltskanzlei Lovells abmahnen.

<u>Beweis:</u>     Schreiben der Rechtsanwälte Lovells vom 08.06.2006 in Kopie

**– Anlage K 6 –**
(wird nachgereicht)

Dieser Abmahnung unterwarf die Klägerin sich nicht. Die Beklagte hat die Abmahnung darauf hin nicht gerichtlich weiter verfolgt. Grund hierfür waren vermutlich Gespräche zwischen den damaligen Gesellschaftern der Klägerin und der Antragstellerin über einen Erwerb der Klägerin durch die Beklagte.

Nachdem diese Gespräche gescheitert waren und die Klägerin an die Holtzbrinck Gruppe verkauft worden war, übersandte die Beklagte unter dem 03.01.2007 eine zweite Abmahnung an die Klägerin.

Beweis:  Schreiben der Rechtsanwälte Liechtenstein & Körner vom 03.01.2007 in Kopie

**- Anlage K 7 –**
(wird nachgereicht)

Darin rügte sie erneut die Verletzung ihrer Rechte durch die Website studivz.net. Die Klägerin unterwarf sich erneut nicht. Es folgten wiederum keine gerichtlichen Schritte der Beklagten.

Die Beklagte zeigte sich vielmehr weiterhin interessiert am Erwerb der Klägerin. Sie will hierdurch Zugang zu der deutschsprachigen Zielgruppe von studivz.net erhalten. Im zweiten Quartal 2008 fanden daher Verhandlungen zwischen ihr und der Holtzbrinck Gruppe über eine Veräußerung der Klägerin an die Beklagte statt. Nachdem diese Verhandlungen abgebrochen wurden, versucht die Beklagte nun erneut, ihre Erwerbsinteressen durch die Versendung einer weiteren, nunmehr dritten Abmahnung (Anlage K 5) zu fördern.

Die Beklagte hat also wegen derselben Vorwürfe nunmehr innerhalb von zwei Jahren dreimal abgemahnt. Sie erhebt aktuell erneut den Vorwurf der Verletzung ihrer Urheber- sowie Markenrechte und behauptet eine unlautere Nachahmung ihrer Website facebook.com sowie die Verletzung ihrer Nutzungsbedingungen.

3. Zur Erstellung der Website studivz.com

Die Beklagte behauptet in ihrer jüngsten Abmahnung (Anlage K 5) die Verletzung ihrer urheberrechtlichen Nutzungsrechte durch angebliches Kopieren der Benutzeroberfläche der Website der Beklagten durch die Klägerin. Es werden keinerlei nähere Angaben darüber gemacht, worin die Verletzung im Einzelnen bestehen soll. Es wird lediglich pauschal behauptet, dass die Benutzeroberfläche der Websi-

te der Klägrin den Eindruck erwecke, die Benutzeroberfläche der Website der Beklagten sklavisch nachzuahmen, was nur aufgrund eines nicht autorisierten Zugangs zu dem Server der Beklagten geschehen sein könne.

Wie ein Vergleich der Website der Beklagten (Anlagen K 3 und 4) mit der Website der Klägerin (Anlage K 1) zweifelsfrei zeigt, unterscheiden sich die Benutzeroberflächen beider Websites in allen maßgeblichen Gestaltungsmerkmalen. Aufbau, Design, Farbgebung sowie die sprachlichen Inhalte beider Websites weichen erheblich voneinander ab. Bereits aus diesem Grund ist der erhobene Vorwurf unberechtigt.

Das Computerprogramm, das auf dem Server der Beklagten betrieben wird und mit dem die Website der Beklagten generiert wird, ist der Klägerin völlig unbekannt. Die Klägerin, ihre Vertreter und Mitarbeiter hatten zu keinem Zeitpunkt Zugang zu oder Kenntnis von diesem Computerprogramm und dessen Quellcode.

Beweis:   1.   Zeugnis des Herrn Dr. Jan Wergin, zu laden über die Klägerin
          2.   Parteivernehmung des Herrn Dennis Bemmann, Geschäftsführer der Klägerin, zu laden über diese

Herr Bemmann war an der Entwicklung von studivz.net persönlich beteiligt. Das Computerprogramm, das auf dem Server der Klägerin betrieben wird und mit dem die Website der Klägerin generiert wird, wurde von einem Entwicklerteam der Klägerin unabhängig neu geschaffen.

Beweis:   1.   Zeugnis des Herrn Dr. Jan Wergin, Produktmanager, zu laden über die Klägerin
          2.   Parteivernehmung des Herrn Dennis Bemmann, Geschäftsführer der Klägerin, zu laden über diese

Übereinstimmungen des Codes der Computerprogramme beider Parteien existieren deshalb nicht.

4.   Markenrechte der Beklagten

Die Beklagte behauptet in ihrer jüngsten Abmahnung (Anlage K 5) die Verletzung ihrer Marken, ohne auch nur anzugeben, welche Marken verletzt sein sollen.

Bei einer Online-Recherche der Schutz in Deutschland entfaltenden eingetragenen Marken der Beklagten lies sich lediglich eine in Kraft befindliche eingetragene Marke der Beklagten finden. Dies ist die deutsche Bildmarke 30663271.3. Sie zeigt verschiedene horizontale balkenartige Flächen, wobei sich an die oberste Fläche, die als Doppelbalken gestaltet ist, links ein Feld anschließt, in dem ein Kopf abgebildet ist.

Beweis:     Online-Ausdruck aus der DPinfo-Datenbank des Deutschen Patent und Markenamts vom 15.07.2008

**- Anlage K 8 –**
(wird nachgereicht)

Diese oberste Fläche mit links angefügtem Kopf war auch Gegenstand einer weiteren deutschen Bildmarke 30663270.5 der Beklagten. Diese Marke wurde am 19.11.2007 nach § 50 MarkenG aufgrund Nichtigkeit wegen absoluter Schutzhindernisse gelöscht.

Beweis:     Online-Ausdruck aus der DPinfo-Datenbank des Deutschen Patent und Markenamts vom 15.07.2008

**- Anlage K 9 –**
(wird nachgereicht)

Dasselbe Zeichen ist Gegenstand der Gemeinschaftsmarkenanmeldung 005841077. Laut Statusverlauf gemäß der Datenbank CTM-Online ist die Eintragung der Marke bislang nicht erfolgt.

Beweis:     Online-Ausdruck aus der CTM-Online Datenbank des Harmonisierungsamtes vom 15.07.2008

**- Anlage K 10 –**
(wird nachgereicht)

5.  Fehlende Eignung von Doppelbalken-Designs auf Websites als Herkunftshinweis

Soweit die Marke der Beklagten als Element einen farblich abgestuften Doppelbalken aufweist, sei darauf hingewiesen, dass dies ein für Websites, auch für derartige Netzwerkportale, absolut übliches Gestaltungselement ist. Wir legen als

**- Anlagenkonvolut K 11 –**

(wird nachgereicht)

die am 15.07.2008 erstellten Ausdrucke von aktuellen Homepages verschiedener Websites von sozialen Netzwerken vor.

Wie diese Seiten zeigen, sind derartige grafische Elemente auf einem Netzwerk-portal ein allgemein verbreitetes Gestaltungsprinzip, das typischerweise am oberen Rand einer Website umgesetzt wird. Derartige Balken werden daher von den Nut-zern nicht als Herkunftshinweis aufgefasst.

Beweis:     Sachverständigengutachten durch Verkehrsbefragung

Auffällig ist im Übrigen, dass auch andere Portale, etwa unister.de und elsa-germany.org/de, die Website in drei Seitenbereiche gegliedert haben, wobei die Menü-Leisten typischerweise an den Rändern der Websites angebracht sind und der eigentliche Inhalt des Website-Angebots im mittleren Feld. Dieser typische Website-Aufbau lässt sich jedem Anleitungsbuch zur Gestaltung und Strukturie-rung von Websites entnehmen. Er ist funktional bedingt.

Beweis:     1.     gescannter Auszug aus dem Anleitungsbuch
                     The CSS Anthology: 101 Essential Tips, Tricks & Hacks (Pa
                     perback) by Rachel Andrew

                     **- Anlage K 12 -**

            2.     Sachverständigengutachten

6. Angebliche Verletzung der Nutzungsbedingungen von facebook.com

Die Beklagte behauptet eine Verletzung der Bedingungen für die Nutzung ihrer Website durch nicht vertragsgemäßen Serverzugriff. Zwischen den Parteien beste-hen indessen gar keine Vereinbarungen, deren Gegenstand die Nutzungsbedingun-gen der Beklagten sind. Eine Verletzung durch die Klägerin kann schon deshalb nicht vorliegen. Die Klägerin hat auch keinen Dritten zum Vertragsbruch verleitet.

**II.     Prozessuales**

1. Zustellung

Wir regen an, die Klage nach den Bestimmungen des *Haager Übereinkommen über die Zustellung gerichtlicher und außergerichtlicher Schriftstücke im Ausland in Zivil- oder Handelssachen* vom 15.11.1965 (HZÜ) über die Zentrale Behörde zuzustellen und zum Zwecke der Beschleunigung der Zustellung **zusätzlich** per Einschreiben mit Rückschein. Beides entspricht der HZÜ. Eine Doppelzustellung ist nach deutschem Recht zulässig.

Nach Art. 2 HZÜ hat jeder Vertragsstaat eine **Zentrale Behörde** ("Central Authority") zu bestimmen, die auf Ersuchen eines anderen Vertragsstaates Zustellungen vornimmt. In den USA ist die Central Authority das US Department of Justice mit Sitz in Washington. Im Jahre 2003 hat das US Justizministerium jedoch die Aufgaben der Central Authority an die Firma *Process Forwarding International* mit Sitz in Seattle übertragen. Zustellungsersuchen sind daher an die *Process Forwarding International* mit Sitz in 633 Yesler Way, Seattle, WA 98104, USA zu übermitteln. Die diesbezügliche Mitteilung der USA vom 21.08.2003 (abrufbar unter http://hcch.e-vision.nl) ist beigefügt in Kopie als

<div align="center">

**- Anlage K 13 -.**

</div>

Die zuzustellenden Schriftstücke einschließlich Anlagen sind zu übersetzen und in zweifacher Ausfertigung zusammen mit zwei Ausfertigungen des Formblattes "*request for service abroad*" zu übermitteln. Ebenfalls beigefügt werden muss ein Kostenvorschuss (Verrechnungsscheck, Banküberweisung, Kreditkartenbeleg, etc.) über USD 95,00. Andernfalls wird das Zustellungsgesuch unbearbeitet zurückgesandt (vgl. Anlage K 13, Seite 3 unten).

Gemäß § 183 Abs. 1 Nr. 1 ZPO i. V. m. Art. 10 HZÜ kann die Zustellung in die USA auch unmittelbar per **Einschreiben mit Rückschein** vorgenommen werden. Art. 10 lit. a HZÜ sieht die direkte Zustellung ins Ausland per Post ausdrücklich vor, soweit der Bestimmungsstaat hiergegen keinen Widerspruch erklärt hat. Da die USA keinen Widerspruch erklärt haben, ist eine Zustellung unmittelbar per Einschreiben mit Rückschein zulässig (vgl. dazu *Roth* in Stein/Jonas, ZPO, 22. Aufl. 2005, § 183 Rn. 11 mit Verweis auf Anerkennung einer derartigen Zustellung durch US-Gerichte, so etwa im Fall *Ackermann v. Levine* 788 F.2d 830, 838 ff.). Die Zustellung hat an den **im Rubrum benannten Zustellungsbevollmächtigten** zu erfolgen.

2. <u>Terminierung</u>

Die Klägerin benötigt angesichts der fortdauernden Abmahnungen durch die Beklagte möglichst rasch Rechtssicherheit, zumal sie sich in einem Verkaufsprozess befindet. Es wird daher höflich darum gebeten, mit der Zustellung der Klage zugleich zu Terminieren und einen Verhandlungstermin festzusetzen, der nicht später als vier Monate ab Zustellung liegt.

## III. Rechtsausführungen

### 1. Zuständigkeit

Örtlich Zuständig ist das Gericht, das bei umgekehrtem Rubrum auch für eine Leistungsklage, gerichtet auf ein Unterlassen im Hinblick auf das angegriffene Produkt zuständig wäre (OLG Köln GRUR 1978, 658 – Immer jünger).

Für eine derartige Leistungsklage wäre der Gerichtsstand der unerlaubten Handlung gemäß § 32 ZPO eröffnet. Ein solcher Gerichtsstand besteht überall dort, wo die angegriffene Website bestimmungsgemäß aufrufbar ist. Das ist sie bundesweit, also auch in Stuttgart.

Soweit die Klage sich auf die deutsche Marke der Beklagten bezieht, besteht zudem der Gerichtsstand des § 23 ZPO (Gerichtsstand des Vermögens). Dies ergibt sich aus § 96 Abs. 3 MarkenG, da die von der Beklagten ausweislich Anlage K 8 bestellten Vertreter ihre Geschäftsräume in Stuttgart haben.

### 2. Aktivlegitimation

Die Klägerin ist aktivlegitimiert, weil sie schon in den Jahren 2006 und 2007 Abmahnungen von der Beklagten erhielt und nunmehr ihre Konzernmuttergesellschaft angeschrieben wurde mit der unmissverständlichen Aufforderung unter Androhung gerichtlicher Schritte, ihre Website zu ändern. Es ist klar, dass diese gerichtlichen Schritte sich gegen die Klägerin richten, da diese die Website entwickelt hat und betreibt. Die Klägerin soll also in Anspruch genommen werden.

### 3. Passivlegitimation

Ebenso eindeutig ist, dass die Beklagte passiv legitimiert ist, da alle Abmahnschreiben von ihr oder in ihrem Namen versandt wurden.

4.  Feststellungsinteresse

Die Beklagte beanstandet zum wiederholten Male die im Wesentlichen unverän-
derte Grafik der Benutzeroberfläche von studivz.net und die angebliche Übernah-
me dort vorgesehener Funktionalitäten. Das rechtliche Interesse der Klägerin er-
gibt sich aus dem in den drei Abmahnungen enthaltenen Vorwurf der Verletzung
Geistigen Eigentums der Beklagten sowie unlauteren Verhaltens und Vertragsver-
letzung.

5.  Keine Ansprüche aus Urheberrecht

Die Klägerin verletzt keine Urheberrechte der Beklagten:

a)  *Schutz des die Website der Beklagten generierenden Computerprogramms
    gem. § 69a Abs. 1 i.V.m. § 2 Abs. 1 Nr. 1 UrhG*

Zwar genießt das die Website der Beklagten generierende Computerprogramm
Urheberrechtsschutz gem. § 69a Abs. 1 i.V.m. § 2 Abs. 1 Nr. 1 UrhG. Es fehlt
jedoch an einer Rechtsverletzung durch die Klägerin, da diese das Computer-
programm weder insgesamt noch in Teilen kopiert haben. Das Computerpro-
gramm ist regelmäßig auf den Servern des Anbieters lokalisiert, welche ihrer-
seits in gut gesicherten speziellen Räumlichkeiten untergebracht sind, zu denen
überhaupt nur eine sehr begrenzte Anzahl von engen Mitarbeitern Zugang ha-
ben. Da es sich bei der Beklagten um ein US-amerikanisches Unternehmen
handelt, das seinen Sitz in Palo Alto / Kalifornien hat, müsste die Klägerin also
physisch in die Serverräume der Beklagten eingebrochen sein und sämtliche
Sicherheitssysteme (Alarmanlagen, Paßwörter etc.) überwunden haben, um in
den Besitz des Quellcodes des Computerprogramms der Beklagten gelangt zu
sein. Das ist vollkommen abwegig und selbstredend nicht der Fall.

b)  *Kein Schutz der Benutzeroberfläche der Klägerin als Computerprogramm
    gem. § 69a Abs. 1 i.V.m. § 2 Abs. 1 Nr. 1 UrhG*

aa)  Kein urheberrechtlich geschütztes Computerprogramm

Bei der Benutzeroberfläche (Graphical User Interphase) der Beklagten
handelt es sich nicht um ein Computerprogramm i.S.d. § 69a Abs. 1

UrhG. Für ein Computerprogramm im Sinne der Vorschrift sind Steuerbe-
fehle notwendig, das heißt eine Folge von Befehlen, die nach Aufnahme
in einen maschinenlesbaren Träger fähig sind zu bewirken, dass eine Ma-
schine mit informationsverarbeitenden Fähigkeiten eine bestimmte Funk-
tion oder Aufgabe oder ein bestimmtes Ergebnis anzeigt, ausführt oder er-
zielt. Benutzeroberflächen, einschließlich des zugrunde liegenden HTML-
Texts, hingegen werden erst durch den Programmablauf generiert und
sind damit lediglich das Ergebnis des Programmbetriebs, nicht jedoch
Computerprogramme selbst (vgl. z.B. Wandtke/Bullinger, Urheberrecht,
2. Auflage, München 2006, § 69a Rn 3, 14 m.w.N.; OLG Frankfurt/Main,
Urteil vom 22.03.2005, Az. 11 U 64/04).

Die folgende Kontrollüberlegung des OLG Düsseldorf (Urteil vom
29.06.1999 (20 U 85/98)) veranschaulicht dies: Es ist technisch möglich,
mit verschiedenen Computerprogrammen ein und dieselbe textliche oder
graphische Abbildung auf dem Bildschirm zu erzeugen. Eine einzelne In-
ternetseite bildet daher auch als sog. Multimedia-Erzeugnis kein Compu-
terprogramm. Denn der schöpferische Gehalt eines Multimedia-
Erzeugnisses verkörpert sich in der durch Sprache, Bild und gegebenen-
falls Ton vermittelten gedanklichen Aussage, aber nicht in dem für den
Ablauf und die Wiedergabe erforderlichen Computerprogramm (so auch
Schricker/Loewenheim, UrhR, 2. Aufl., § 2 Rn. 201).

Unterschiedliche Computerprogramme von unterschiedlichen Anbietern
können demnach identische HTML-Quelltexte generieren, da die Quell-
texte von HTML-Websites als „Beschreibungssprache" (nicht etwa: Pro-
grammiersprache) nur den generellen Aufbau und die äußere Erschei-
nungsform einer HTML-Website dokumentieren. Aus der Ähnlichkeit oder
Identität von Quelltexten einer HTML-Website kann also kein Rückschluss
auf die Ähnlichkeit oder Identität der dahinter stehenden Computerpro-
gramme gezogen werden.

Beweis:   Sachverständigengutachten

bb)   Keine Rechtsverletzung

Eine Übernahme des Computerprogramms der Beklagten scheidet aus den
unter aa) genannten Gründen deshalb von vornherein aus.

c) *Kein Schutz als Datenbank gem. § 87a und b UrhG (verwandtes Schutzrecht)*

Auch ein Datenbankschutz nach § 87a ff. UrhG kommt vorliegend nicht in Betracht.

aa) Keine Datenbank

Eine Datenbank ist nach der Legaldefinition des § 87a Abs. 1 S.1 UrhG eine Sammlung von Werken, Daten oder anderen unabhängigen Elementen, die systematisch oder methodisch angeordnet und einzeln mit Hilfe elektronischer Mittel oder auf andere Weise zugänglich sind, und zu deren Beschaffung, Überprüfung oder Darstellung eine nach Art oder Umfang wesentliche Investition erforderlich ist.

Der für eine Datenbank erforderliche Sammlungscharakter ist bei Betrachtung der Website der Beklagten nicht erkennbar. Auf der Website der Beklagten finden sich insoweit lediglich rudimentäre Angaben. Daraus kann allenfalls abgeleitet werden, dass es sich bei der Website der Beklagten um eine Art von Internet-Portal / -Forum oder -Plattform handeln soll, über die Menschen in die Lage versetzt werden sollen, selbst soziale Netzwerke mit anderen aufzubauen. Das jedoch erfüllt noch in keiner Weise die gesetzlich definierten Voraussetzungen für eine Datenbank.

Ferner folgt aus der Eigenschaft als soziales Netzwerk, bei dem sich Mitglieder zunächst registrieren und einloggen müssen, dass es gerade nicht die Beklagte ist, welche etwaige Werke, Daten oder andere unabhängige Elemente sammelt und anordnet. Wenn überhaupt, tun dies die registrierten Nutzer (User) selbst, die durch Erstellung eigener Profile und Einstellen eigener Daten (Bilder, Texte, Filme etc.) selbständig Daten veröffentlichen und verwalten, wie dies bei sozialen Netzwerken im Online-Bereich üblich ist (sog. User Generated Content).

Entscheiden die Nutzer jedoch selbst darüber, wann sie welche Dateninhalte veröffentlichen, bearbeiten und wieder entfernen, und erfolgt demnach gerade keine systematische oder methodische Anordnung der einzelnen Daten durch die Beklagte, handelt es sich urheberrechtlich lediglich um

eine Ansammlung von sog. Rohdaten *alias* „Datenhaufen", also gerade keine Datenbank (Wandtke/Bullinger, a.a.O., § 87a Rn. 17).

Daraus folgt zugleich, dass für die Beschaffung dieser Dateninhalte auch keine Investition der Beklagten erforderlich war. Auch im Übrigen liegen keinerlei Anhaltspunkte dafür vor, ob und ggf. welche nach Art oder Umfang wesentliche Investition vorliegend im Zusammenhang mit einer Datensammlung getätigt worden sein soll. Mithin liegt keine Datenbank vor.

bb) Keine Rechtsverletzung

Eine Rechtsverletzung liegt nicht vor. Ansprüche wegen Verletzung der Rechte des Datenbankherstellers entbehren jeglicher Grundlage.

d) *Kein Schutz als Datenbankwerk gem. § 2 Abs. 2 i.V.m. § 4 Abs. 2 UrhG*

Auch unter diesem rechtlichen Gesichtspunkt liegt keine Urheberrechtsverletzung vor.

aa) Kein urheberrechtlich geschütztes Datenbankwerk

Die Legaldefinition der Datenbankwerke gem. § 4 Abs. 2 UrhG stimmt mit der Legaldefinition der Datenbank gem. § 87a Abs. 1 S.1 UrhG (verwandte Schutzrechte) inhaltlich überein. Insoweit kann auf obige Ausführungen verwiesen werden.

Überdies hat die Beklagte in keiner Weise dargetan, dass die Auswahl und Anordnung von Daten eine persönliche geistige Schöpfung i.S.d. § 4 Abs. 1 i.V.m. § 2 Abs. 2 UrhG darstellen soll; es ist noch nicht einmal ersichtlich, welche Art von Daten überhaupt gemeint sein sollen, die in ihrer Auswahl und Anordnung zur Schöpfung eines urheberrechtlich geschützten Werks geführt haben könnten. Vorliegend ist also auch die gegenüber den verwandten Schutzrechten zusätzliche urheberrechtliche Voraussetzung der persönlichen geistigen Schöpfung gem. § 4 Abs. 1 i.V.m. § 2 Abs. 2 UrhG nicht erfüllt.

Folglich handelt es sich bei der Website der Beklagten nicht um ein urheberrechtlich geschütztes Datenbankwerk, ein derartiger Schutz ihrer Website scheidet von vorneherein aus.

Doch selbst unter der nicht zutreffenden Annahme, dass eine persönliche geistige Schöpfung im urheberrechtlichen Sinn vorläge, wäre die Beklagte nicht Urheberin derselben, da nicht sie, sondern allenfalls die registrierten Nutzer die Urheber der jeweiligen persönlichen geistigen Schöpfung wären.

bb) Keine Rechtsverletzung

Eine Rechtsverletzung liegt nicht vor. Insoweit wird auf obige Ausführungen verwiesen.

e) *Kein sonstiger urheberrechtlicher Schutz der Benutzeroberfläche der Beklagten*

Auch eine anderweitige Urheberrechtsverletzung scheidet vorliegend aus. Die Website der Beklagten stellt kein urheberrechtlich geschütztes Werk außerhalb der oben genannten Kategorien, beispielsweise ein Schriftwerk, dar, weil die hierfür erforderliche Schöpfungshöhe bei weitem nicht erreicht wird. Im Übrigen fehlt es an einer Rechtsverletzung mangels Übereinstimmung der Inhalte der Websites beider Parteien.

6. Keine Ansprüche aus Markenrecht

Die Grafik der Website studivz.net verletzt **mangels Verwechslungsgefahr** nicht die einzige eingetragene Marke DE 306632713 der Beklagten mit Schutz in Deutschland. Die Verwechslungsgefahr wird nach ständiger Rechtsprechung unter Berücksichtigung der Kennzeichnungskraft der Marke und der Ähnlichkeit der Zeichen sowie der unter diesen angebotenen Waren oder Dienstleistungen unter Berücksichtigung der Wechselwirkung zwischen diesen drei Kriterien ermittelt (vgl. etwa Ströbele/Hacker, Markengesetz, 8. Aufl. § 9 Rn 26).

Die einzige relevante Marke der Klägerin weist als einziges möglicherweise herkunftshinweisendes Element den links oben abgebildeten Kopfausschnitt auf. Die anderen Elemente der Marke, nämlich die balkenförmigen Flächen, haben, wie

dargelegt, keinerlei herkunftshinweisende Funktion. Der Internetnutzer sieht darin lediglich auf Internetseiten vielfach verwendete geometrische Flächen mit funktionalem Hintergrund. Das gilt in ganz besonderem Maße für Elemente, wie die am unteren und am linken Rand der Marke jeweils paarweise nebeneinander angeordneten rechteckigen Flächen, die offensichtlich Menü-Buttons darstellen sollen. **Kennzeichnungskraft** kann der Marke somit allenfalls aufgrund des Kopfelementes zukommen; sogar dies ist aber fraglich, wie die Löschung der deutschen Bildmarke 306632705 wegen absoluter Eintragungshindernisse zeigt. Selbst wenn man aber auch dem oberen Doppelbalken Kennzeichnungskraft beimessen wollte, könnte diese nur so gering sein, dass der Schutzbereich der Marke auf identische Gestaltungen beschränkt wäre.

Auf studivz.net wurde und wird das einzige möglicherweise selbständig kennzeichnende Element der Bildmarke der Beklagten, der Kopfausschnitt, weder in identischer noch in ähnlicher Form benutzt. Was die übrigen – nach diesseitiger Ansicht nicht selbständig kennzeichnenden - Elemente der Marke betrifft, wurden und werden auch die paarweise nebeneinander angeordneten Schaltflächen nicht benutzt. Allein am oberen Rand ihrer Website benutzt die Klägerin einen in Rottönen gehaltenen Doppelbalken. Dieser weist allerdings andere Proportionen als die Marke auf, nämlich unterschiedlich dicke Balken, und hat überdies eine markante Abrundung an der rechten oberen Ecke. Ferner wird das Balkendesign auf der Website studivz.net am unteren Rand der Seite in blasserem Rot quasi fortgesetzt; auf manchen Seiten (vgl. Anlage K 1) sind sogar mehr als drei rötliche Balken zu sehen. Insgesamt weist das Balkendesign auf studivz.net somit einen deutlichen Abstand zu der eingetragenen Marke auf. Es handelt sich dabei, wollte man ihm überhaupt herkunftshinweisende Funktion zuerkennen, um ein **nicht ähnliches Zeichen**. Somit fehlt es zumindest an einer Verwechslungsgefahr (§ 14 Abs. 2 Nr. 2 MarkenG).

Würde man eine Verwechslungsgefahr zwischen der Marke der Beklagten und dem Balkendesign auf studivz.net bejahen, stünden der Beklagten ebenfalls keine markenrechtlichen Ansprüche zu. Vielmehr wäre dann die Klägerin Inhaberin solcher Ansprüche gegenüber der Beklagten. Denn die Klägerin verfügte dann über eine **prioritätsältere Benutzungsmarke**. Sie benutzt das von der Beklagten vermutlich weiterhin monierte Balkendesign seit dem Start von studivz.net, also von Herbst 2005 an. Die Website ist innerhalb kürzester Zeit zur größten Online-Community für Studenten in diesem Markt gewachsen. Sie verfügte Ende 2006

schon über mehr als eine Million Nutzer in den betreffenden Studentenkreisen. Dies entsprach einer Verkehrsdurchsetzung von 46 %.

Beweis:     1.     screenshots mit Zahlen der statistischen Bundesämter Deutschland, Österreich und Schweiz 2005/2006

**- Anlagenkonvolut K 14 -**

2.     Sachverständigengutachten

Aufgrund dieser hohen Verkehrsdurchsetzung hat das Webdesign der Klägerin als Benutzungsmarke eine überragende markenrechtliche Unterscheidungskraft erlangt. Die älteste Marke der Beklagten wurde dagegen erst am 18.10.2006 angemeldet. Ersichtlich existierte zu diesem Zeitpunkt bereits die Benutzungsmarke der Klägerin.

7. <u>Kein wettbewerbsrechtlichen Ansprüche</u>

a) *Keine unlautere Nachahmung*

aa) Bezüglich nicht sonderrechtlich geschützter Produkte gilt wettbewerbsrechtlich der **Grundsatz der Nachahmungsfreiheit.** Nur unter den in § 4 Nr. 9 UWG geregelten Voraussetzungen ist eine Nachahmung von Produkten mit sogenannter wettbewerblicher Eigenart unlauter. Diese Voraussetzungen werden von der Klägerin nicht erfüllt. Sie handelt daher nicht unlauter.

bb) Der Website der Beklagten fehlt bereits die **wettbewerbliche Eigenart.** Wettbewerbliche Eigenart liegt vor, wenn die konkrete Ausgestaltung oder bestimmte Merkmale des Erzeugnisses geeignet sind, die angesprochenen Verkehrskreise auf seine betriebliche Herkunft oder seine Besonderheiten hinzuweisen (st. Rspr., vgl. nur BGH WRP 2007, 1076 Tz 25 - Handtaschen). Bei der Feststellung der wettbewerblichen Eigenart kommt es nur auf die angeblich **übernommenen** Merkmale an und nur auf solche Gestaltungsmerkmale, die **äußerlich** erkennbar sind (BGH GRUR 2002, 820, 822 – Bremszangen). Die Beklagte hat solche Merkmale in ihrem jüngsten Schreiben (Anlage K 5) nicht näher dargelegt. Allein in Betracht kommt der auch in der oben genannten Marke enthaltene hell-dunkle

Doppelbalken am oberen Bildschirmrand; sämtliche für den Nutzer nicht
auf dem Bildschirm erkennbaren Sachverhalte, etwa im Hintergrund lau-
fende Computerprogramme scheiden dagegen von vornherein aus. Hin-
sichtlich des Doppelbalkens wäre aber ohnehin das UWG nicht anwend-
bar, vielmehr wäre das Markenrecht als *lex specialis* vorrangig (Hefer-
mehl/Köhler/Bornkamm, UWG 26. Aufl., § 4 Rn. 9.9 m.w.N. zur st.
Rspr.), da die Beklagte für dieses Design-Element zugleich Markenschutz
in Anspruch nimmt. Ferner benutzt die Beklagte dieses Element auf ihrer
aktuellen Website gar nicht. Schießlich findet sich dieses Gestaltungs-
prinzip auf zahlreichen anderen schon seit langem in Deutschland existie-
renden online sozialen Netzwerken, so etwa auf unister.de, studentum.de,
studentenforum.net, nurstudenten.de, uni24.de oder auch el§a unter elsa-
germany.org/de (vgl. Anlage K 11). Eine Website mit Doppelbalken am
oberen Bildschirmrand hebt sich daher in keiner Weise von anderen ver-
gleichbaren Internetangeboten ab. Ein Hinweis auf die Herkunft oder die
Besonderheit des Produkts liegt darin nicht.

cc) Die Website studivz.net führt ferner nicht zu **vermeidbaren Herkunfts-
verwechslungen** (§ 4 Nr. 9 lit. a UWG). Voraussetzung für eine Her-
kunftstäuschung ist, dass das angeblich nachgeahmte Erzeugnis einen ge-
wissen Bekanntheitsgrad bei den von ihm angesprochenen Verkehrskrei-
sen hat. Maßgeblicher Zeitpunkt für diese Bekanntheit ist die Marktein-
führung der angeblichen Nachahmung (BGH GRUR 2002, 275, 277 –
Stufenleitern; Hefermehl/Köhler/Bornkamm, UWG 26. Aufl., § 4 Rn.
9.41). Im Zeitpunkt der Markteinführung von studivz.net Ende 2005 war
facebook aber bei den von studivz.net angesprochenen Verkehrskreisen,
nämlich Studenten aus dem deutschsprachigen Raum, nicht bekannt.
Vielmehr richtete sich facebook.com an englischsprachige Studenten im
englischsprachigen Ausland. Es wird bestritten, dass facebook später ei-
nen in Deutschland hinreichenden Bekanntheitsgrad erreicht hat, was al-
lenfalls durch die erst im Jahr 2008 eröffnete deutsche Version der Fall
gewesen sein könnte. Darauf kommt es aber letztlich nicht an, weil die
Inbetriebnahme der deutschen Version eben lange nach dem maßgebli-
chen Zeitpunkt stattfand.

dd) Aus den oben cc) dargestellten Gründen scheitert der Tatbestand der **Ruf-
ausbeutung** (§ 9 Nr. 4 lit. b UWG) ebenfalls.

ee) Schließlich liegen auch die Voraussetzungen von § 9 Nr. 4 lit. c UWG nicht vor.

7. <u>Keine Ansprüche aus Geschmacksmusterrecht</u>

Die Beklagte hat sich in der zweiten Abmahnung bezüglich des von der Klägerin auf ihrer Website verwendeten Doppelbalkens auch auf ein nicht eingetragenes Gemeinschaftsgeschmacksmuster im Sinne der VO (EG) Nr. 6/2002 berufen. Ein solches Recht besteht nicht. Weder verfügt dieses Gestaltungselement angesichts anderer Websites, die es benutzen (Anlage K 11), über die erforderliche Eigenart noch über die nötige Neuheit. Horizontale Doppelbalken am oberen Bildschirmrand einer Website sind nichts Neues. Die von der Beklagten ursprünglich benutzte Variante weist auch keine nennenswerten Besonderheiten auf. Selbst wenn aber sowohl Neuheit als auch Eigenart vorgelegen hätten, wäre die gesetzliche Laufzeit des Gemeinschaftsgeschmacksmusters von drei Jahren seit dem ersten öffentlichen Zugänglichmachen innerhalb der Gemeinschaft (Art. 11 Abs. 1 VO) abgelaufen. Denn facebook.com gibt es seit 2004, und diese Website konnte von jedem Internetanschluss in der Gemeinschaft aus aufgerufen werden, insbesondere auch von englischen Nutzern.

8. <u>Keine Vertragsverletzung</u>

Zwischen den Parteien bestehen keine Vertragsbeziehungen über die Nutzung von facebook. Auch vertragliche Ansprüche bestehen somit nicht.

Ein Gerichtskostenvorschuss über EUR 2.568 ist als Scheck beigefügt.

Rechtsanwalt

Dr. Ikas

Anlage № 2

**facebook**

Email:

Password:

☐ Remember me

[Login]

Forgot Password?

Facebook is a social utility that connects you
with the people around you.

Use Facebook to...

🧑 Keep up with friends and family

📷 Share photos and videos

🔒 Control privacy online

👥 Reconnect with old classmates

**Find your Friends on Facebook**

Search by Name

⊙ Use the Friend Finder ›

**Sign up for Facebook**
It's free and anyone can join.

Full Name:

Your Email:

New Password:

I am:   [Select Sex: ▾]

Birthday:   [Month: ▾] [Day: ▾] [Year: ▾]

[Sign Up]

By clicking Sign Up, you are indicating that
you have read and agree to the Terms of Use
and Privacy Policy.

Facebook © 2008   |   English ▾

About   Find Friends   Advertising   Developers   Terms   Privacy   Help

Fertig   Internet

Start   Novel GroupWise - Malbox   5 Internet Explorer   1507Bauding_screensh...   Dokument7 - Microsoft...   Dokument8 - Microsoft...   16:27

Anlage K 4

Facebook | Welcome to Facebook - Microsoft Internet Explorer bereitg...

Datei   Bearbeiten   Ansicht   Favoriten   Extras   ?

Zurück   Suchen   Favoriten   Medien

Adresse http://www.facebook.com/

## facebook
Welcome to Facebook!

Email:

Password:

Login

Login or Sign up here

**Facebook is a social utility that connects you with the people around you.**

Facebook is made up of many networks, each based around a company, region, high school or college.

You can use Facebook to:

- Share information with people you know.
- See what's going on with your friends.
- Look up people around you.

▶ Register
Everyone can join.

▶ Take the Tour
Learn about Facebook.

about   blog   developers   jobs   terms   privacy   advertise
a Mark Zuckerberg production
Facebook © 2007

Fertig   Internet

Start   Novell GroupWise - Mailbox   Microsoft Word   Facebook | Welcome ...   15:20

11.01.2007 H:\Texte\UK1\G1\10107facebook.Doc

# O
## ORRICK

Anlage U5

ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 MARSH ROAD
MENLO PARK, CALIFORNIA 94025

tel  +1-650-614-7400
fax  +1-650-614-7401

www.ORRICK.com

## FAX TRANSMISSION

DATE  7/9/08

NO. OF PAGES
(INCLUDING COVER SHEET)          4

### FROM

| name | tel |
| --- | --- |
| I. Neel Chatterjee | (650) 614-7356 |

### TO

| name | company/firm | tel | fax |
| --- | --- | --- | --- |
| Dr. Anka Reich | Verlagsgruppe Georg von Holtzbrinck GmbH | +49-(0)711-2150282 | +49-(0)711-2150249 |
| General Counsel | Holtzbrinck Networks GmbH | +49-(0)89 206077-0 | +49-(0)89 206077-42 |
| General Counsel | Holtzbrinck Ventures GmbH | +49-(0)89 206077-0 | +49-(0)89 206077-42 |

RE   **Facebook Intellectual Property**

### MESSAGE

Please see attached correspondence dated July 9, 2008.

---

C-M-A    16069-2004-4793                          Originals Will Follow By Regular Mail

**IF YOU DO NOT RECEIVE ALL PAGES, PLEASE CALL KAREN MUDURIAN AT 650-614-7396 AS SOON AS POSSIBLE.**

*notice to recipient*
THE INFORMATION CONTAINED IN THIS FACSIMILE TRANSMISSION IS INTENDED TO BE SENT ONLY TO THE STATED ADDRESSEE OF THE TRANSMISSION. IT MAY BE PROTECTED FROM UNAUTHORIZED USE OR DISSEMINATION BY THE ATTORNEY-CLIENT PRIVILEGE, THE ATTORNEY WORK-PRODUCT DOCTRINE, OR ANY OTHER APPLICABLE PRIVILEGE. IF YOU ARE NOT THE STATED ADDRESSEE, YOUR RECEIPT OF THIS TRANSMISSION WAS UNINTENDED AND INADVERTENT, AND YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, USE, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. YOU ARE ALSO ASKED TO NOTIFY US IMMEDIATELY BY TELEPHONE AND TO RETURN THE ORIGINAL DOCUMENT TO US IMMEDIATELY BY MAIL AT THE ADDRESS ABOVE. THANK YOU IN ADVANCE FOR YOUR COOPERATION.
OHS WEST:260470544.1



# ORRICK

ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 MARSH ROAD
MENLO PARK, CALIFORNIA 94025-1015

tel +1-650-614-7400
fax +1-650-614-7401

WWW.ORRICK.COM

July 9, 2008

J. Neel Chatterjee
(650) 614-7365
nchatterjee@orrick.com

*VIA FACSIMILE AND MAIL*
*FAX: +49-(0)711-2150249*

Dr. Anka Reich
General Counsel/SVP
Verlagsgruppe Georg von Holtzbrinck GmbH
Gänsheidestraße 26
70184 Stuttgart, Germany

Re:   Facebook Intellectual Property

Dear Dr. Reich:

I am writing today on behalf of Facebook, Inc. We understand that your company owns the business operating the website StudiVZ.com. Facebook has grave concerns about StudiVZ's unauthorized acquisition and use of Facebook technology and intellectual property.

StudiVZ's social networking website copies Facebook's graphical user interface in violation of numerous laws, including copyright, trademark, unfair competition and computer trespass statutes. Through this letter, Facebook demands that StudiVZ immediately cease and desist all use of Facebook's intellectual property and technology, change its graphical user interface, and otherwise comply with all terms set forth in this letter. Anything short of complete cooperation in addressing this matter will result in serious actions by Facebook, including potential legal action seeking an injunction shutting down all aspects of the StudiVZ website that violate Facebook's proprietary rights. By and through this letter, we also demand that you take measures to preserve all relevant evidence related to the matters raised by this letter (as required under United States law) and provide us with a binding undertaking within seven days of receipt of this letter.

The evidence of unauthorized copying by StudiVZ is substantial. For example, the StudiVZ graphical user interface appears to slavishly copy from the graphical user interface of Facebook. In addition, we have learned that many features of the StudiVZ website return similar error messages to those that appear on Facebook. This cannot be a coincidence and could arise only from direct copying through unauthorized access.



O R R I C K

StudiVZ
July 9, 2008
Page 2

As a direct result of this copying, StudiVZ has created a competing website that is confusingly similar to Facebook in violation of Facebook's trademark rights. Your creation and continued use of this website may cause confusion in the marketplace and falsely identifies the origin of the StudiVZ website design.

In order to copy Facebook's graphical user interface, StudiVZ must have accessed the Facebook website in violation of Facebook's terms of use. In every version of the Facebook terms of use, Facebook has forbidden access to its website for the purpose of copying site content, particularly with respect to those seeking a commercial benefit. StudiVZ's unauthorized access to, and copying of, Facebook site content appears to give rise to claims under California Penal Code §502(c), the Computer Fraud and Abuse Act, as well as other statutes around the world.

Facebook's graphical user interface is central to Facebook's business model. As a result, the damage to Facebook resulting from StudiVZ's actions is enormous. These violations have caused, and continue to cause, Facebook great harm. Facebook's legal claims against StudiVZ would entitle it to injunctive relief and substantial damages, potentially including damages for the entire value of the StudiVZ business.

Facebook would prefer not to be forced to litigate this dispute. However, it will protect its rights if necessary. To avoid further disputes, Facebook demands the following:

1.   that StudiVZ restructure its graphical user interface within 30 days so that it no longer resembles Facebook's graphical user interface;

2.   that StudiVZ eliminate any content, designs or features taken or copied from Facebook's website within 30 days;

3.   that StudiVZ provide a detailed identification of the names and dates associated with its access to the Facebook servers, website and/or its underlying technology, as well as the circumstances and reasons for such access;

4.   that StudiVZ provide a description of all measures taken to avoid any use of Facebook's technology or designs, including measures you intend to take in the future.

OHS West:260470537.1



ORRICK

StudiVZ
July 9, 2008
Page 3

Your prompt attention to this serious matter is needed. We expect a response and binding undertaking within 7 days. Please do not hesitate to call me with questions.

Very truly yours,

I. Neel Chatterjee

cc:    General Counsel
Holtzbrinck Networks GmbH
Bayerstraße 21
80335 München, Germany
Fax: +49-(0)89 206077-42

General Counsel
Holtzbrinck Ventures GmbH
Bayerstraße 21
80335 München, Germany
Fax: +49-(0)89 206077-42

260

8 CSS-Positionierung und -Layout



*Abb. 8-31*
*Dreispaltige Layouts mit CSS erstellen ist einfach.*

*Beispiel 8-36*
*3col.html*

```
<!DOCTYPE html PUBLIC "-//W3C//DTD XHTML 1.0 Transitional//EN"
   "http://www.w3.org/TR/xhtml1/DTD/xhtml1-transitional.dtd">
<html xmlns="http://www.w3.org/1999/xhtml">
<head>
<title>Erfolgreiche Kochrezepte</title>
<meta http-equiv="content-type"
   content="text/html; charset=iso-8859-1" />
<link rel="stylesheet" type="text/css" href="3col.css" />
</head>
<body>
<div id="content">
<h1>Erfolgreiche Kochrezepte</h1>
<p>…</p>
</div>
<div id="side1">
<h3>Rezepte durchsuchen</h3>
<form method="post" action="">
<input type="text" name="textField" class="textField" /><br />
```

```
</div>
<div i
<h3>
<div
<div
</div>
</body>
</html>

body {
  margi
  paddi
  backg
  backg
  backg
}
p {
  font-
  paddi
  margi
}
form {
  margi
  paddir
}
#content
  margin
  paddin
}
#content
  text-a
  paddin
  font:
  color:
}
#side1 {
  positi
  width:
```

# Authorities

| USA - Central Authority & practical information |
| --- |

**Central Authority(ies):**

**Central Authority:**
U.S. Department of Justice
Civil Division
Office of International Judicial Assistance
WASHINGTON, D.C. 20530
United States of America
tel.: +1 (202) 514 7455
fax: +1 (202) 514 6584
(language of communication: English)

**Outsourcing of Central Authority's activities to Process Forwarding International:**
*Extract of letter dated 21 August 2003 sent by the United States to the Depositary (i.e. the Ministry of Foreign Affairs of the Netherlands).* To view the complete letter click here:

"(…) The Department of Justice of the United States of America has informed the Department of State that it is delegating the service of process function to a private contractor, **Process Forwarding International** of Seattle in the state of Washington. This procedural change does not imply the formal designation of a new Central Authority for either the Hague Service Convention or the Inter-American Convention on Letters Rogatory, but simply reflects the outsourcing of certain activities conducted by the Central Authority, which formally remains the U.S. Department of Justice.

**Process Forwarding International** will be the only private process server company authorized to act on behalf of the United States to receive requests for service, proceed to serve the documents, and complete the certificate of service. Process Forwarding International will be responsible for executing requests for service of process in the following areas: the United States (the fifty states and the District of Columbia), Guam, American Samoa, Puerto Rico, the U.S. Virgin Islands and the Commonwealth of the Northern Mariana Islands (…)" (emphasis added).

| Contact details: | |
| --- | --- |
| Address: | Process Forwarding International<br>633 Yesler Way<br>Seattle, WA 98104<br>USA |
| Telephone: | +1 206 521 2979 |
| Fax: | +1 206 224 3410 |
| E-mail: | info@hagueservice.net |
| General website: | http://www.hagueservice.net/ |

| Contact person: | *Rick Hamilton*<br>Director of Operations<br>rickh@abclegal.com<br>Phone: +1 206-521-2979<br>Fax: +1 206-224-3410<br><br>*Karen Adams*<br>Payment Processing<br>Phone: +1 206-521-2946<br>Fax: +1 206-224-3410<br>karena@abclegal.com |
|---|---|
| Languages spoken by staff: | English |

| **Practical Information:**<br>*(The following information was provided by the relevant State authorities or was obtained from the replies to the 2003 Service Convention Questionnaire)* | |
|---|---|
| Forwarding authorities (Art. 3(1)): | The persons and entities within the United States competent to forward service requests pursuant to Article 3 include any court official, any attorney, or any other person or entity authorized by the rules of the court. |
| Methods of service (Art. 5(1)(2)): | *Formal Service* (Art. 5(1)(a))<br>The United States Central Authority has outsourced to a private contractor, Process Forwarding International, the responsibility for making all formal service pursuant to Article 5(1). Under this contract, Process Forwarding International will execute all service requests using personal service. In the event personal service is impossible to effect, Process Forwarding International will serve such other method or methods as may be permitted under the law of the jurisdiction, including mail service, if authorized.<br><br>Requests for service must be transmitted in duplicate with an appropriate translation (one set will be served and the other will be returned by Process Forwarding International with a certificate of service). The full name and street address for the person or entity to be served must be included.<br><br>*Informal delivery* (Art. 5(2))<br>Informal service is authorized within the |

| Address | | |
|---|---|---|
| | | United States in a variety ways: through members of diplomatic or consular missions in the United States, through the mails or by private persons if that would be effective under applicable law, provided no compulsion is used. The requesting authority would make arrangements for service using one of these informal means.<br><br>*Service by a particular method* (Art. 5(1) (b))<br>We are presently unaware of "special requests" that would require service by a means other than those discussed above. |
| | Translation requirements (Art. 5(3)): | Although all formal requests for the service of documents made pursuant to Article 5(1), and submitted to Process Forwarding International, must be translated into English, along with a translation of the underlying documents, there is no similar requirement that service made through informal means such as mail, consular channels or privately retained process services be translated. Some courts may rule, however, and typically only if challenged by the defendant, that service of documents not translated into English and made through these informal mechanisms may not provide the recipient with sufficient notice of the nature of the proceeding and an opportunity to respond, and, therefore, not be enforceable as a matter of due process. |
| | | All formal service under Article 5(1) must be sent directly to Process Forwarding International and are assessed a flat fee. The cost of personal service or service by mail is: $95.00 (2006-2007).<br><br>Payment of fees may be made by Visa, Mastercard, most international credit cards, bank transfers, international money orders and government-issued checks payable to Process Forwarding International. Personal checks are not accepted. All service requests must comply with the payment schedule and method of payment described. All service requests unaccompanied by proper payment in the manner indicated will be returned without processing. The website |

| | |
|---|---|
| | for Process Forwarding International provides specific guidance on methods of payment. It will also be possible to check on the status of a service request on the website. |
| Costs relating to execution of the request for service (Art. 12): | The United States notes, however, that there is no requirement under U.S. federal law that request for judicial assistance be referred to the Department of State or the Department of Justice's contractor for execution through Process Forwarding International. The United States has no objection to the informal delivery of such documents by members of diplomatic or consular missions in the United States, through the mails or by private persons if that would be effective under applicable law, provided no compulsion is used. The costs or fees associated with the use of privately contracted authorized persons to effect service, would be individually negotiated, and unknown to the United States government. |
| Time for execution of request: | Process Forwarding International is required to complete service of documents for return to the foreign requesting authority within six weeks of receipt. |
| Judicial officers, officials or other competent persons (Art. 10(b)): | The United States does not have a system of transmission between *huissiers*. That said, we would have no objection to *huissiers* contacting Process Forwarding International directly. Attorneys in the United States are authorized to perform legal functions in the State to which they are admitted to the bar. |
| Any person interested in a judicial proceeding and judicial officers, officials or other competent persons (Art. 10(c)): | We have no difficulties with interested parties initiating service through mail service or through any person or official authorized by the rules of the United States courts. |
| Oppositions and declarations (Art. 21(2)): | Click here to read all the declarations and reservations made by the United States under this Convention |
| Art. 8(2): | No opposition Consular officers of the United States are prohibited by regulation from serving |

| | legal process or appointing other persons to do so (see declarations). |
|---|---|
| Art. 10(a): | No opposition |
| Art. 10(b): | No opposition |
| Art. 10(c): | No opposition |
| Art. 15(2): | Declaration of applicability |
| Art. 16(3): | Declaration of applicability |
| Derogatory channels (bilateral or multilateral agreements or internal law permitting other transmission channels) (Arts. 11, 19, 24 and 25) **Disclaimer:** *Information may not be complete or fully updated – please contact the relevant authorities to verify this information.* | - Inter-American Convention on Letters Rogatory (Panama City, 13 January 1975). - Additional Protocol to the Inter-American Convention on Letters Rogatory (Montevideo, 8 May 1979) www.oas.org |
| Useful links: | U.S. Department of State - Judicial Assistance / Service of Process Abroad U.S. Department of State - Hague Service Convention Process Forwarding International - Hague Service Convention |

(This page was last updated on 9 January 2007)

| **Conventions** | • Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters [14] |
|---|---|