

(„We may have oriented ourselves along the lines of the Face-
book layout.")

**Beweis:** Spiegel International „StudiVZ Takes on Facebook", 11.7.2006
**(Anlagenkonvolut K 13, Seite 28)**

30    Der fotografische Vergleich der Webseiten illustriert diese Komplettüber-
nahmen eindrucksvoll:

Eingangsseiten von Facebook (Oktober 2005) und StudiVZ (Dezember
2005)



ⓗ

Login-Seiten Facebook (Oktober 2005) und StudiVZ (Dezember 2005)

Registrierung Facebook (Oktober 2005) und StudiVZ (Dezember 2005)



# Allgemeine Geschäftsbedingungen Facebook (Oktober 2005) und Stu-diVZ (Dezember 2005)



**facebook**                    login | register | about | help

**Terms of Use**

These Terms of Use are effective as of October 3, 2005.

E-mail

Password

[ Login ] [ Register ]

## Introduction

Welcome to the Facebook, an online directory that connects people through networks of academic and geographic centers. The Facebook service is operated by the Facebook network ("Facebook"). By using the Facebook web site (the "Web site") you signify that you have read, understand and agree to be bound by these Terms of Use (this "Agreement"). We reserve the right, at our sole discretion, to change, modify, add, or delete portions of these Terms of Use at any time without further notice. If we do this, we will post the changes to these Terms of Use on this page and will indicate at the top of this page the Terms of Use's effective date. Your continued use of the Web site after any such changes constitutes your acceptance of the new Terms of Use. If you do not agree to abide by these or any future Terms of Use, please do not use or access Web site. It is your responsibility to regularly review these Terms of Use.

## Eligibility

You must be thirteen years of age or older to register as a member of Facebook or use the Web site. If you are under the age of 13, you are not allowed to register and become a member of Facebook or access Facebook content, features and services on the Web Site. Membership in the Service is void where prohibited. By using the Web site, you represent and warrant that you agree to and to abide by all of the terms and conditions of this Agreement. Facebook may terminate your membership for any reason, at any time.

## Member Conduct

You understand that the Web site is available for your personal, non-commercial use only. You agree that no materials of any kind submitted through your account will violate or infringe upon the rights of any third party, including copyright, trademark, privacy or other personal or proprietary rights; or contain libelous, defamatory or otherwise unlawful material. You further agree not to harvest or collect email addresses or other contact information of members from the Web site by electronic or other means for the purposes of sending unsolicited emails or other unsolicited communications. Additionally, you agree not to use automated scripts to collect information from the Web site or for any other purpose. You further agree that you may not use Web site in any unlawful manner or in any other manner that could damage, disable, overburden or impair Web site. In addition, you agree not to use the Web site to:

- upload, post, email, transmit or otherwise make available any content that we deem to be harmful, threatening, abusive, harassing, vulgar, obscene, hateful, or racially, ethnically or otherwise objectionable;

- impersonate any person or entity, or falsely state or otherwise misrepresent yourself or your affiliation with any person or entity.

- upload, post, email, transmit or otherwise make available any unsolicited or unauthorized advertising, promotional materials, "junk mail," "spam," "chain letters," "pyramid schemes," or any other form of solicitation;

- upload, post, email, transmit or otherwise make available any material that contains software



**STUDIVERZEICHNIS**              einloggen | einrichten/ändern | über uns | hilfe

**Allgemeine Geschäftsbedingungen**

ALLGEMEINE GESCHÄFTSBEDINGUNGEN FÜR DIE NUTZUNG VON STUDIVZ (www.studivz.net)
Stand: 22. November 2005

Mit einer Anmeldung bei studiVz oder studiverzeichnis (www.studivz und www.studiverzeichnis.net erschließen/in allen dazugehörigen Länder- und Sub-Domains) (nachfolgend "Betreiber" genannt) erklärst Du Dich mit den hier aufgeführten Nutzungsbedingungen einverstanden. Du erklärst Dein Einverständnis, indem Du im Rahmen des Anmeldeprozesses Kenntnisnahme und Zustimmung zu den Allgemeinen Nutzungsbedingungen bestätigst.

Wenn Du mit den Allgemeinen Nutzungsbedingungen nicht einverstanden bist, musst Du folglich von einer Anmeldung absehen. Des weiteren sollen nur solche Leute bei Service nutzen, die das 18. Lebensjahr vollendet haben und im wesentlichen als Student oder Studentin (nachfolgend "Studierende" oder "Student" genannt) gelten.

Der Betreiber behält sich vor, diese Nutzungsbedingungen jederzeit und ohne Nennung von Gründen zu ändern. Die geänderten Bedingungen werden dem Nutzer dann per E-Mail zwei Wochen vor ihrem Inkrafttreten zugesandt. Wenn der Nutzer innerhalb von zwei Wochen nach Empfang per E-Mail nicht widerspricht, so gelten die geänderten Bedingungen als angenommen. Der Betreiber wird den Nutzer in der E-Mail, die die geänderten Bedingungen enthält, auf die Bedeutung der Zwei-Wochen-Frist gesondert hinweisen.

### § 1 Gültigkeit

(1) Für den Verkehr zwischen dem Betreiber und der die studiverzeichnis nutzenden Person (nachfolgend "Nutzer" genannt) gelten die nachstehenden Allgemeinen Nutzungsbedingungen. Abweichende Bedingungen des Nutzers, die mit diesen Allgemeinen Nutzungsbedingungen in Widerspruch stehen, finden keine Berücksichtigung.

(2) Im Rahmen des Vertragsverhältnisses mit dem Betreiber haben die Allgemeinen Nutzungsbedingungen Gültigkeit, selbst wenn bei der Inanspruchnahme weiterer Dienste, beispielsweise bei dem Kauf eines SMS-Dienstes zur Nachrichtenübermittlung, nicht nochmals darauf verwiesen wird.

### § 2 Vertragsabschluss und Laufzeit

(1) Der Nutzer versichert gegenüber dem Betreiber, das 18. Lebensjahr vollendet zu haben.

(2) Der Betreiber ist berechtigt, die Personalien des Nutzers anhand geeigneter amtlicher Papiere zu prüfen und den Account des Nutzers gegebenenfalls ohne Nennung von Gründen zu löschen.

(3) Der Vertrag ist geschlossen, sobald der Nutzer sich erfolgreich bei studivz angemeldet hat.

### § 3 Beschreibung des Services bzw. Leistungsumfang

(1) Der Betreiber betreibt eine Social Networking- (Mapping) und Kommunikations-Plattform im Internet, über die überwiegend als Studierende geltende Nutzer für den Aufbau und Pflege von Freundschaften oder Bekanntschaften miteinander Kontakt aufnehmen und kommunizieren können. Ein Nutzer hat die Möglichkeit, sich anzumelden, weitere Bekannte oder Freunde in sein Netzwerk einzuladen und innerhalb der Plattform nach anderen Personen (düngend) zu suchen, deren Profile in einer zentralen Datenbank abgelegt sind. Die Mitglieder können sich die Profile anderer Mitglieder ansehen und mit diesen in Kontakt treten, Hierbei sind jedoch stets die guten Sitten und Umgangsformen zu wahren. Ebenfalls letztens Verletzungen einer fremden Identität und strafbarer, herabsetzende oder rassistische Äußerungen untersagt und können zivil- oder strafrechtliche Verfolgung nach sich ziehen.

(2) studivz bietet die Dienste seiner Plattform ausschließlich für private Zwecke an. Eine gewerbliche Nutzung ist somit ausgeschlossen, ist der Anmeldung verpflichtet sich jedes Mitglied, die Dienste nur für private Zwecke zu nutzen.

### § 4 Preise

(1) Die Anmeldung bei studivz ist kostenlos. Die auf weiteren bleiben auch alle Dienste und Features von studivz kostenlos. Der Betreiber behält sich jedoch das Recht vor, die Nutzung von bestimmten Diensten (z.B. SMS-Versand) auf der Plattform zur gegebenen Zeit entgeltlich zu gestalten und/oder über Werbung Einnahmen zu erzielen. Bei kostenpflichtigen von entgeltlichen Diensten akzeptiert der Nutzer die durch verbundene Zahlungsverpflichtung durch Klicken auf das in diesem Fall angezeigte Bestätigungsfeld.

### § 5 Datennutzung und Datenschutz

(1) Der Nutzer erklärt sich durch die Anmeldung mit den unternehmerischen Regelungen zur Verwendung seiner persönlichen Informationen durch studivz einverstanden.

(2) studivz speichert persönliche Informationen der Nutzer auf verschiedene Art und Weise. Diese Informationen entstehen durch Angabe des Nutzers sowie durch eine Nutzung der angebotenen Dienste. Der Nutzer erklärt sich damit einverstanden, dass seine persönlichen Daten vom Betreiber in elektronischer Form gespeichert werden.



## Profilseiten Facebook (Mai 2006) und StudiVZ (November 2008)





ⓗ

**5. Frühe Plagiatsvorwürfe gegen die Beklagte in der „community"**

31      Der nahezu identische „Look & Feel" der Beklagten zur Klägerin ist we-
        der der Presse noch der Internet-Community mit ihren zahlreichen Blog-
        gern (Internetnutzern, die ein Internettagebuch oder Kommentarseiten
        betreiben) entgangen, weshalb sich die Beklagte seit einem frühen Zeit-
        punkt massiver Kritik und Plagiatsvorwürfen ausgesetzt sieht. Einige die-
        ser Berichte und Kommentare werden zur Arbeitserleichterung untenste-
        hend zitiert.

**Beweis:** Spiegel International „StudiVZ Takes on Facebook", 11.07.2006
        **(Anlagenkonvolut K 13, Seite 28)**

        Kommentare zum Artikel „Das digitale Poesiealbum: 400.000
        Studenten im StudiVerzeichnis" auf readers-edition.de,
        28.08.2006 (insbesondere Kommentare Nr. 9, Nr. 19, Nr. 35, Nr.
        39, Nr. 43, Nr. 44, Nr. 46, Nr. 50, Nr. 53, Nr. 55, Nr. 63, Nr. 65)
        **(Anlagenkonvolut K 13, Seite 1)**

        Blog „Der Bumi", Michael Bumann, „StudiVZ in original Face-
        book-Farben...", 03.10.2006 **(Anlagenkonvolut K 13, Seite 31)**

        Blog „Sebbis Blog", Sebastian Herp, „Einziger Deutscher bei
        Facebook", 04.10.2006 **(Anlagenkonvolut K 13, Seite 46)**

        Blog "Basic Thinking", Robert Basic, „Web + Klonen = 2.0, Fa-
        cebook = Klonschaf StudiVZ", 06.10.2006 **(Anlagenkonvolut K
        13, Seite 51)**

        Blog „Alltagskakophonie", Kai Uhlemeyer, „Plagiate und was
        mir schon lange am Herzen liegt", 09.10.2006 **(Anlagenkonvo-
        lut K 13, Seite 59)**

        Screenshots von Kai Uhlemeyer „Find the differences" auf iper-
        nity.com **(Anlagenkonvolut K 13, Seite 60)**

        Frankfurter Allgemeine Zeitung „Wir sind eine Alternative zu
        Sat.1 und Co.", 24.10.2006 **(Anlagenkonvolut K 13, Seite 62)**

Technology Review „Ich war damals nicht dabei", 13.11.06 (**Anlagenkonvolut K 13, Seite 65**)

Spiegel Online „Peinliche Pannen bringen StudiVZ in Verruf", 15.11.2006 (**Anlagenkonvolut K 13, Seite 69**)

32 So hat Spiegel International in einem Artikel vom 11.07.2006 über die Beklagte berichtet (Übersetzung durch die Unterzeichnerin):

> „Tatsächlich, nach der Schwerfälligkeit ist die Ähnlichkeit der Seite zu Facebook die meistgeäußerte Kritik an StudiVZ. [...] Aber ansonsten liegen die Unterschiede nur in der Bezeichnung. Zum Beispiel können Nutzer auf Facebook einander „poken"; auf StudiVZ hat Dariani den Begriff „gruscheln" verwendet -- ein beliebtes Wort unter Nutzern, aber die Funktion ist nichtsdestotrotz identisch mit dem „poke"."

> („Indeed, after the slugishness, the site's similarity to Facebook is the most common criticism of StudiVZ. [...] Otherwise, however, the differences are in name only. For example, on Facebook users can "poke" one another; on StudiVZ, Dariani coined the term "gruscheln" -- a popular word among users, but the function is nonetheless identical to the "poke".")

**Beweis:** Spiegel International „StudiVZ Takes on Facebook", 11.07.2006 (**Anlagenkonvolut K 13, Seite 28**)

33 Ferner hat ein Nutzer unter dem Namen „Volker" einen Artikel über die Beklagte auf readers-edition.de am 28.08.2006 mit den Worten kommentiert:

> „Als ich zum ersten mal Werbung ueber diese Seite gesehen habe (besser Spam Mail an einen Verteiler) ist mir eins aufgefallen: das Layout und die Funktionien ist das gleiche wie bei FaceBook (was ich schon vorher kannte)."

**Beweis:** Kommentar Nr. 19 zum Artikel „Das digitale Poesiealbum: 400.000 Studenten im StudiVerzeichnis" auf readers-edition.de, 28.08.2006 (**Anlagenkonvolut K 13, Seite 1**)

34 Beispielhaft sei noch ein drittes Zitat angebracht. In dem Internet-Blog alltagskakophonie.de schreibt Kai Uhlemeyer am 09.10.2006:

„Als letztens mein iPod ausgetauscht wurde stand auf der
Schutzfolie groß und unüberlesbar "Don't steal Music".
Nein, mit Musik hat dieser Eintrag nun gar nichts zu tun - aber
mit "leihen"/"ausborgen" (freundlich ausgedrückt) wenn man
das deutsche StudiVZ und das englische Facebook mal ver-
gleicht. Mein persönlicher Plagiat-Award geht deshalb an die
Urheber von StudiVZ. Vielleicht hätte man auch eine Schutzhül-
le mit dem Schiftzug "Don't copy design so offensichtlichly" auf
Facebook kleben sollen. Dann wäre den Herren bei StudiVZ si-
cherlich aufgefallen, dass sie es geschafft haben eine 1:1-Kopie
des Vorbilds Facebook zu erstellen. Ich persönlich finde die
Übereinstimmungen schon wirklich sehr offensichtlich. Eine
kleine Gegenüberstellung und jeder Kommentar erübrigt sich."

**Beweis:** Blog „Alltagskakophonie", Kai Uhlemeyer, „Plagiate und was
mir schon lange am Herzen liegt", 09.10.2006 (**Anlagenkonvo-
lut K 13, Seite 59**)

35      Es gibt <u>keine technischen oder funktionalen Gründe</u>, die eine solch detail-
getreue Nachahmung der klägerischen Webseiten erklären oder rechtfer-
tigen könnten. Die unten abgebildeten und die als **Anlagenkonvolut K 8**
beigefügten Screenshots anderer Sozialer Netzwerke zeigen, dass es eine
Vielzahl verschiedener Gestaltungsformen und möglicher „Look & Feel"
gibt.

**Beweis:** Privatgutachten des US-amerikanischen Experten für Soziale
Netzwerke Assistant Professor Clifford Lampe (**Anlage K 11**)

Privatgutachten des ö.b.u.v. EDV-Sachverständigen Dipl.-Prog.
Bernward Schrader, Seiten 18 ff. (**Anlage K 12**)

Sachverständigengutachten



## LinkedIn Profil-Seite



## Xing Profil-Seite



## Wer-kennt-wen Profil-Seite





MySpace Profil-Seite



36  So zeigt das Soziale Netzwerk MySpace (Abbildung oben und im **Anlagenkonvolut K 7**) einen sehr bunten und unübersichtlichen „Look & Feel", der dafür von jedem Nutzer für seine eigene Profilseite vollständig individualisiert werden kann – etwas das die Klägerin und damit auch die Beklagte nicht bieten. Der von der Klägerin aufgrund der negativen Feststellungsklage der hiesigen Beklagten am Landgericht Stuttgart beauftragte renommierte öffentlich bestellte und vereidigte Sachverständige Diplom-Programmierer Bernward Schrader hat zu einem Vergleich der Präsentationen von Klägerin, Beklagter und MySpace festgestellt (Seite 19 des Gutachtens in **Anlage K 12**):

> *„Die weiteren Untersuchungen haben ergeben, dass sich die Präsentation „myspace.com" vollständig von den Präsentationen „facebook.com" und „studiVZ.de" unterscheidet. Sowohl hinsichtlich der Layouts, des Look&Feels sowie der Funktionalitäten können keine signifikanten Übereinstimmungen von mir festgestellt werden."*

37  Ferner hat der Gutachter die Sozialen Netzwerke Xing und LinkedIn betrachtet. Er kommt zu dem Schluss (Seite 19 des Gutachtens in **Anlage K 12**):

> *„Eine Darstellung der von mir getroffenen Feststellungen auf Grafiken in Anlagen erübrigt sich hier, da ich bei meinen Feststellungen auf keine signifikanten Übereinstimmungen dieser*



*Präsentationen Dritter mit facebook.com und studiVZ.de getroffen bin. Die drei von mir untersuchten Präsentationen von Drittanbietern sind dem gegenüber so unterschiedlich, dass sich ein Vergleich in keiner Weise bemühen lässt. Ein Vergleich wäre schlicht und einfach unsinnig. Diese drei genannten Präsentationen sind beispielhaft in keiner Weise mit den von mir untersuchten Facebook- und StudiVZ Untersuchungen übereinstimmend."*

38     Diese anderen Sozialen Netzwerke zeigen daher, dass auch vollständig andere „Look & Feel" als dieser der Klägerin möglich sind. Dies zeigt ferner, dass die extreme Ähnlichkeit der Webseite der Beklagten zu der Webseite der Klägerin nicht technisch oder funktional bedingt ist. Die Webseiten der anderen Sozialen Netzwerke erfüllen auch alle technischen und funktionalen Voraussetzungen an ein Soziales Netzwerk, aber eben auf offensichtlich möglichen vollkommen anderen Wegen.

39     Zwingende Voraussetzungen eines Sozialen Netzwerks sind einzig, dass ein Profil jedes Mitglieds vorgesehen ist sowie eine Freundesliste erstellt und eingesehen werden kann. Entscheidungen wie die Zielgruppe, welche Felder genutzt werden um das Profil zu bilden, wie die Informationen angeordnet und präsentiert werden etc. können alle frei von den Programmierern der Seite getroffen werden.

**Beweis:** Privatgutachten des US-amerikanischen Experten für Soziale Netzwerke Assistant Professor Clifford Lampe (**Anlage K 11**)

## 6. Technische Dokumentation der plagiativen Webseite

40     Die Klägerin hat, nachdem sie am 18.07.2008 von der Beklagten in Stuttgart im Wege der negativen Feststellungsklage verklagt worden ist, ein Privatgutachten bei dem renommierten <u>öffentlich bestellten und vereidigten EDV-Sachverständigen Diplom-Programmierer Bernward Schrader</u> vornehmen lassen, um genau ermitteln zu lassen, wie hoch die soeben vorgetragenen Übereinstimmungen des „Look & Feel" tatsächlich sind. Das Gutachten ist als **Anlage K 12** beigefügt.

### 6.1  Inhalt des Gutachtens

41 Der Gutachter hat seine Untersuchung dreistufig aufgebaut, um eine strukturierte Analyse anzufertigen und damit eine objektive Bewertung des Maßes der Übereinstimmung des „Look & Feel" der Webseite der Beklagten zu der klägerischen Webseite abgeben zu können.

42 **6.1.1** Zunächst hat der Gutachter eine <u>programmatische Analyse</u> vorgenommen, er hat also den Programmcode der Webseiten insbesondere hinsichtlich der Stylesheets untersucht. Solche Stylesheets sind mit Formatvorlagen eines Textverarbeitungsprogramms vergleichbare Dateien, die die Kägerrin erstellt hat, um den einheitlichen „Look & Feel" auf alle Unterseiten ihrer Webseite anwenden zu können.

43 Hier befindet sich auch die bemerkenswerteste Entdeckung des Gutachters. Der Gutachter hat die Stylesheets der aktuellen Facebook-Seite extrahiert, die noch immer die wesentlichen Parameter der ursprünglichen Facebook-Version aus dem Jahre 2005 enthalten, und auf die Seite von StudiVZ angewendet (Seite 11 des Gutachtens in **Anlage K 12**; hinsichtlich der technischen Details wird dabei auf das Gutachten verwiesen):

> *„Die programmatische Übereinstimmung der StyleSheets der StudiVZ Seite ist dabei so weit mit der ursprünglichen Facebook Programmierung identisch, dass nach Anwendung des Facebook StyleSheets auf die StudiVZ Seite gemäß Anlage A.2.2 eine hohe Deckungsrate erreicht wird. Vergleicht man diese Anlehnung an die Facebook StyleSheets dann noch mit der Anlage A.2.3, so wird ersichtlich, in welchem Maße die StudiVZ Seite an die original Facebook Präsentation aus dem Jahre 2005/2006 hinsichtlich der StyleSheets angelehnt ist.*
> *Dies bedeutet technisch, dass die StyleSheet Programmierung der StudiVZ Seite so mit der Facebook Programmierung harmoniert, dass sie bei Überlagerung mit einem Facebook StyleSheet ein Aussehen annimmt, welches in hohem Maße mit der originalen Facebook Präsentation der Anlage A.2.3 übereinstimmt. [...] Als Gegenbeispiel dazu führe ich die Anlage A.2.7 an. Dort habe ich auf einer Präsentation eines dritten Anbieters für soziale Netzwerke (myspace.com) ebenfalls das Facebook StyleSheet angewendet und festgestellt, dass auf Grund der programmatischen Unterschiedlichkeit zwischen myspace.com und Facebook keine Angleichung durch das StyleSheet erfolgt. Die Anwendung des Facebook StyleSheets auf dieser Seite bleibt ohne sichtbare Veränderungen."*

44 Zur Arbeitserleichterung sei hier die Anlage A.2.8 eingeblendet, welche die oben genannten Schritte nachvollziehbar gegenübergestellt:





**Anlage A 2.8**

Hier noch einmal zum direkten Vergleich die Genealogie der Anlagen A 2.1 – A 2.3:

Links, die original StudiVZ Seite zum Bewertungsstichtag.
Mitte, diese Seite nach (mit) der Anwendung des Facebook StyleSheet.
Rechts, eine originale Facebook Seite mit Facebook StyleSheet aus dem Zeitraum 2005 / 2006.

45    Links ist die originale Seite der (zum StudiVZ-Netzwerk gehörenden und programmatisch völlig identischen) meinVZ-Seite, in der Mitte die meinVZ-Seite mit appliziertem Facebook-Stylesheet und rechts die originale Facebook-Seite.

46    Zum Vergleich die Anlage A 2.9 des Gutachtens in **Anlage K 12**, welche zeigt, was passiert, wenn das Stylesheet auf eine programmatisch unabhängige Webseite eines Sozialen Netzwerks („www.myspace.com") gelegt wird: nämlich nichts:



**Anlage A 2.7**
Ein Beleg dafür, dass die Anwendung des StyleSheet wie es für Facebook typisch ist und wie ich es in den Anlage A 2.2 und A 2.5 auf die StudiVZ Präsentation angewendet habe, von deren programmatischen Übereinstimmung abhängig ist

Wende ich dasselbe StyleSheet, welches die Ähnlichkeit der StudiVZ Präsentation mit der Facebook Version von 2005 / 2006 belegt auf eine beliebige andere Präsentation eines „Sozialen Netzwerkes" an (hier eine Seite aus der myspace.com Präsentation) ergeben sich nahezu keine Auswirkungen, da eben die myspace Präsentation keine programmatische Übereinstimmung mit Facebook aufweist.

47      Hieran ist erkennbar, dass und wie sehr die Webseite der Beklagten programmatisch mit der Webseite der Klägerin seit 2005 bis heute identisch ist. Eine programmatisch unterschiedliche Webseite, wie die MySpace-Seite, zeigt keine Veränderungen, wenn ein fremdes Stylesheet auf sie angewendet wird. Wenn eine Seite Veränderungen zeigt, zumal so massive, wie die Webseite der Beklagten, dann bedeutet dies, dass sie mit der Webseite von der das Stylesheet stammt, eine programmatische Übereinstimmung aufweist.

48      **6.1.2** In der zweiten Stufe hat der Gutachter eine <u>funktionale Analyse</u> der Webseiten vorgenommen, insbesondere hinsichtlich der Art der Informationsvermittlung (Layout und „Look & Feel") sowie der Benutzerführung. Hierbei hat er eine Gegenüberstellung der Funktionen in der Anlage A 3 seines Gutachtens erstellt und ermittelt (Seite 14 des Gutachtens in **Anlage K 12**):

> *„Bei einem Vergleich der Funktionalitäten zwischen StudiVZ und Facebook 2005/2006 ist festzustellen, dass eine erhebliche Anzahl von Funktionalitäten der untersuchten Seiten identisch ist. Diese Identität geht so weit, dass die Bezeichnung der Funktionalität nicht nur ähnlich, sondern in weiten Teilen gleich ist (sofern man hier eine sinngemäße Übersetzung vom Englischen ins Deutsche zuläßt). Der funktionale Vergleich der StudiVZ Version 2008 mit der Facebook Version 2005/2006 fördert eine erhebliche Anzahl von Übereinstimmungen und nur eine geringe Anzahl von Abweichungen zu Tage."*

49      **6.1.3** In der dritten Stufe – und hier lag das Hauptaugenmerk der Untersuchung – hat sich der Gutachter mit den Übereinstimmungen der Benutzeroberfläche auseinandergesetzt, d.h. er hat eine <u>grafische (Layout) und typografische (schriftgesetzte) Analyse</u> durchgeführt. Er kommt in seiner Untersuchung zu folgendem Ergebnis (Seite 23 des Gutachtens in **Anlage K 12**; Hervorhebung durch die Unterzeichnerin):

> *„Der Vergleich der Merkmale und Funktionalitäten der StudiVZ (mein VZ) Präsentation ergibt mit hohem Deckungsgrad die Merkmale der Facebook Präsentation, insbesondere der ersten Generation 2005/2006. Gemäß meiner Analyse der programmatischen (StyleSheet), der funktionalen als auch der gestalterischen (Layout) Merkmale komme ich bei meinen Analysen und Beurteilungen zu einem **Gesamt-Deckungsgrad von 80 bis 85 % zwischen der StudiVZ Präsentation (auch der ak-***



*ⓗ*

*tuellen) und der Facebook Präsentation, insbesondere der ersten Generation."*

50     Dabei hat der Gutachter zur Analyse des Layouts das Grundlayout von Facebook in seine Bestandteile zerlegt (Abbildung unten und in Anlage A 4.1 des Gutachtens in **Anlage K 12**).



**Anlage A 4.1  Beispiel des Layout der Facebook-Präsentation.**

In dem Anlagenkonvolut der ScreenShots des Auftraggebers fanden sich zahlreiche Beispiele dafür, dass sich die grafischen Konstruktionen der Facebook-Präsentation 2005 / 2006 sowie die StudiVZ-Präsentation 2006 und heute auffallend ähnlich sind. Um diesen subjektiven Eindruck zu überprüfen habe ich eine Facebook-Seite der ersten Generation mit hoher Informationsdichte (Profilseite eines Teilnehmers) einer grafischen Analyse unterzogen und die grafischen Merkmale mit Rahmen sowie einige typografische Merkmale mit ihren Bezeichnungen markiert und eingegrenzt.

51     Die Profilseite der Webseite der Klägerin besteht demnach aus:

- (1) Titelzeile (Header)
- (2) Seitennavigation links mit Facebooklogo, Suchfeld und Aktionsfeldern
- (3) Werbebanner

44

- (4) linke Spalte des Infopanels mit Bildpräsentation des Teilnehmers
- (5) die rechte Spalte des Infopanels mit den Listeninformationen des Teilnehmers in kaskadiertem Layout:
  - ○ (H1) Hauptüberschrift
  - ○ (H2) Unterüberschrift
  - ○ (Liste) Kontextinformation

52    Gemäß Anlage A.4.3 hat der Gutachter dann diesen unveränderten Rahmen mit einer StudiVZ-Profilseite aus 2008 unterlegt (Abbildung unten und in Anlage A 4.3 des Gutachtens in **Anlage K 12**).



**Anlage A 4.3** Überlagerung einer StudiVZ Seite mit dem Analyserahmen.

Genau derselbe Rahmen, der die Facebook - Profilseite in ihre wesentlichen Merkmale strukturiert, wurde von mir unverändert (1:1 Kopie) auf eine StudiVZ – Profilseite gelegt. Wenn ich einmal vom Kontext des Teilnehmers und dessen Bilddarstellungen absehe, verweist die Schablone der Analyse **auf nahezu identische Merkmale des Layout** der analysierten Facebook – Seite mit der überlagerten StudiVZ. Diese Analyse erlaubt eine objektivere Beurteilung des Deckungsgrades der beteiligten Präsentationen

53    Dabei decken sich <u>alle</u> selektierten Layoutmerkmale. Der Gutachter vergleicht dann die Webauftritte von Beklagte und Klägerin nach demselben Schema mit den gemeinsamen Wettbewerbern myspace.com, xing.com

sowie linkedin.com. Er stellt fest (Seite 23 des Gutachtens in **Anlage K 12**):

> *„So nahe, wie die StudiVZ Seiten und die Facebook Seiten der ersten Generation sich in ihrem Deckungsgrad von mindestens 80 % gleichen, so stark unterscheiden sie sich von anderen Präsentationen (soziale Netzwerke) im Internet. Ich habe dazu die Präsentationen von myspace.com, xing.com und linkedin.com untersucht. Der Seitenaufbau und die Gestaltungsmöglichkeiten sind bei diesen alternativen Präsentationen gänzlich unterschiedlich aufgebaut."*

54  **6.1.4** Der Gutachter resümiert (Seite 20 des Gutachtens in **Anlage K 12**):

> *„In Bezug auf die von mir getroffenen Analysen, Feststellungen und Beurteilungen komme ich zu folgenden Deckungsgraden zwischen den streitgegenständlichen Präsentationen facebook.com und studivz.de in Bezug auf das von mir untersuchte Onlinematerial und die Grafiken des Anlagenkonvoluts sowie an Hand der von mir wiedergegebenen Beispiele in den Anlagen:*
>
> *a) Programmatische Deckung (StyleSheets) ca. **70 bis 80%***
>
> *b) Funktionale Übereinstimmung der Facebook Version 2005/2006 zu StudiVZ 2008, ca. **80 %***
>
> *c) Deckungsangabe zum grafischen und typografischen Layout, zwischen Facebook Version 2005/2006 und StudiVZ 2008 **80 bis 85 %** in Bezug auf das von mir untersuchte Onlinematerial und die Grafiken des Anlagenkonvoluts sowie an Hand der von mir wiedergegebenen Beispiele in den Anlagen."*

### 6.2 Eigene Wertung

55  Der ö.b.u.v. EDV-Sachverständige Schrader bestätigt die optische Wahrnehmung der Übereinstimmung mit technischen Mitteln. Er kommt zu dem objektiv ermittelten Ergebnis, dass eine hohe Übereinstimmung der gestalterischen Merkmale (des „Look & Feel") der beiden Webseiten vorliegt. Aufgrund der erheblichen Freiheitsgrade die ein Programmierer bei der Erstellung einer Internetseite hat, können zufällige Übereinstimmungen ausgeschlossen werden, wie auch der Vergleich mit den Auftritten der Wettbewerber, den der Gutachter durchgeführt hat, zeigt.



### 7. Die Entstehung von „StudiVZ"

**56**  Damit steht die Beklagte in einer Reihe mit der unrühmlichen „Tradition" deutscher Internet Startup-Unternehmen die Konzept, Gestaltung und Funktionsweise erfolgreicher US-amerikanischer Internet-Unternehmen übernehmen und den deutschen Markt besetzen bevor die US-amerikanischen Originale auf den deutschen Markt kommen können. So gibt es in Deutschland Pendants des US-amerikanischen Email-Portals Hotmail (Web.de, GMX), des Videoportals YouTube (MyVideo), des Geschäftskontakte-Portals LinkedIn (OpenBC) und eben des Sozialen Netzwerks Facebook (StudiVZ). Allen diesen Unternehmen ist gemein, dass der US-Anbieter zuerst sein Angebot veröffentlicht hat, aber begrenzt auf die USA, der deutsche Anbieter dann das Geschäftsmodell sowie „Look & Feel" übernommen und den deutschen Markt besetzt hat, bevor der US-Anbieter einen Fuß in den deutschen Markt setzen konnte. Der spätere Markteintritt ist für das US-Original hiernach schwierig bis unmöglich, da der Markt mit dem deutschen Pendant bereits gesättigt ist.

**Beweis:** Spiegel Online „Der Klon gewinnt immer", 20.07.2008 (**Anlagenkonvolut K 13, Seite 73**)

Blog „Basic Thinking", Robert Basic, "Die heißesten Webstartups in Deutschland?", 06.11.2006 (**Anlagenkonvolut K 13, Seite 75**)

TechCrunch „Web 2.0 in Germany: Copy/Paste Innovation or more?", 14.05.2007 (**Anlagenkonvolut K 13, Seite 77**)

Sachverständigengutachten

**57**  Im Widerspruch zu ihren eigenen Aussagen berühmten sich dennoch die seinerzeitigen Gründer der Beklagten, Dariani und Bemmann, als Teil einer umfangreichen Inszenierung und Legendenbildung verschiedentlich dreist, einzelne Funktionalitäten „selbst" beigesteuert zu haben. So behauptete einer der beiden Mitbegründer der Beklagten, Ehssan Dariani, der „Erfinder des Gruschelns" zu sein, obgleich die mit diesem Kunstwort belegte Funktion der Beklagten eine 1:1-Kopie des erwähnten „poke" der Klägerin ist. Die Klägerin besaß diese Funktion bereits mehr als 18 Monate früher.

**Beweis:** Welt Online „Frührentner dank Web 2.0", 21.04.2007 (**Anlagen-konvolut K 13, Seite 103**)

58　　In ähnlicher Weise wie Ehssan Dariani übt sich der zweite Mitbegründer der Beklagten Dennis Bemmann, der im Unterschied zu Ehssan Dariani noch heute für die Beklagte als „CTO" („Chief Technical Officer" oder schlicht Technischer Leiter) tätig ist und sich als das hinter dem Angebot der Beklagten stehende „IT-Genie" bezeichnen lässt.

**Beweis:** Kommentar Nr. 42 zu dem Artikel „Das digitale Poesiealbum: 400.000 Studenten im StudiVerzeichnis" auf readers-edition.de vom 28.08.2006 (**Anlagenkonvolut K 13, Seite 1**)

## 8. Anlehnende Übernahme vs. Dreistes Kopieren

Die Beklagte übertrifft diese deutschen Internet-Unternehmen, die – zurückhaltend ausgedrückt – ein US-amerikanisches Vorbild haben, bei weitem. Mag es vertretbar sein, eine Geschäftsidee zu übernehmen, so ist die Grenze dort überschritten, wo nicht nur die Idee als solche sondern auch die Ausgestaltung, die sie gefunden hat, bis in die Details schmarotzerisch kopiert wird.



59　　Kein anderes deutsches Internet-Startup das der Klägerin oder der Unterzeichnerin bekannt ist, hat das US-amerikanische Original derart schamlos und bis in die kleinsten Details der optischen Gestaltung und der „Look & Feel"-Elemente kopiert.

**Beweis:** Farbausdrucke der Webseite der Beklagten von Dezember 2005 (**Anlage K 2**)

Privatgutachten des US-amerikanischen Experten für Soziale Netzwerke Assistant Professor Clifford Lampe (**Anlage K 11**)

Sachverständigengutachten

Blog „Der Bumi", Michael Bumann, „StudiVZ in original Facebook-Farben...", 03.10.2006 (**Anlagenkonvolut K 13, Seite 31**)

Blog „Alltagskakophonie.de", Kai Uhlemeyer „Plagiate und was mir schon lange am Herzen liegt", 09.10.2006 (**Anlagenkonvolut K 13, Seite 59**)

Screenshots von Kai Uhlemeyer „Find the differences" auf ipernity.com (**Anlagenkonvolut K 13, Seite 60**)

Spiegel Online „Peinliche Pannen bringen StudiVZ in Verruf", 15.11.2006 (**Anlagenkonvolut K 13, Seite 69**)

FOCUS Online „Das deutsche Fakebook?", 19.07.2008 (**Anlagenkonvolut K 13, Seite 80**)

60    Diese Nachahmung erfolgte systematisch und dauerhaft:

Die Beklagte hat seit ihrer Gründung alles übernommen, was die Klägerin erfolgreich entwickelt und im Markt durchgesetzt hatte. Nicht nur dass die Beklagte den „Look & Feel" der Webseite der Klägerin im Jahr 2005 für die erste Version ihrer Webseite nachgeahmt hat: Die Beklagte hat vielmehr sämtliche Innovationen und Veränderungen auf der Webseite der Klägerin beobachtet und vielversprechende Änderungen nachvollzogen.

61    Der „Look & Feel" der Webseiten ist schon seit 2005 stets frappierend ähnlich.

**Beweis:** Gegenüberstellung von Screenshots der Webseiten der Klägerin und der Beklagten aus dem Jahr 2005 (**Anlage K 3**)

Gegenüberstellung von Screenshots der Webseiten der Klägerin und der Beklagten aus dem Jahr 2008 (**Anlage K 6**)

62    Darüber hinaus hat die Beklagte Neuerungen und Innovationen der Klägerin über die Jahre hinweg nachvollzogen und nachgebaut. Aus der



nachfolgenden Gegenüberstellung geht hervor, wann Facebook eine Innovation eingeführt und wann StudiVZ diese kopiert hat. Jeder dieser Plagiatsvorgänge ist in Pressemitteilungen der Beklagten oder in der Internet-Community dokumentiert worden und daher im Bestreitensfalle nachweisbar. Zeugenbeweis wird bereits jetzt angeboten.

| **Funktion** | **Facebook seit** | **StudiVZ seit** |
|---|---|---|
| Anlegen und Gestalten einer Profilseite mit Foto des Nutzers | Februar 2004 | November 2005 |
| Suche nach Bekannten und Freunden | Februar 2004 | November 2005 |
| Hinzufügen von Personen auf eine Freundesliste | Februar 2004 | November 2005 |
| Grüßen oder Anstupsen anderer Nutzer | Februar 2004 unter der Bezeichnung "poke" | November 2005 unter der Bezeichnung „gruscheln" |
| Versenden von persönlichen Nachrichten an andere Nutzer | Februar 2004 | November 2005 |
| Gründung oder Beitritt zu Gruppen, in denen über bestimmte Themenbereiche diskutiert werden kann | September 2004 | November 2005 |
| Pinnwand auf der Seite des Nutzers, auf der andere Nutzer Kurznachrichten hinterlassen können | September 2004 | November 2005 |
| Einstellen von Videos und Fotos | Oktober 2005 (Fotos) Mai 2007 (Videos) | November 2005 (Fotos) |
| Markieren von Personen auf Fotos | Wahrscheinlich Oktober 2005 unter der Bezeichnung "tag" | September 2006 unter der Bezeichnung „Fotos verlinken" |
| Fenster, in dem der Nutzer seinen aktuellen Status (z.B. krank, traurig etc.) für andere sichtbar angeben kann | April 2006 | Juni 2007 |
| Beobachtungsliste, die über Neuigkeiten im Freundeskreis informiert | September 2006 unter der Bezeichnung "News-Feed" | Einführung wird nach eigener Aussage geprüft |
| Einbindung von Applikationen externer Entwickler in die Webseite durch die Nutzer | Mai 2007 | Einführung durch Beitritt zur „OpenSocial"-Initiative von Google im Oktober 2008 eingeleitet |



| Chatten mit Personen von der Freundesliste (Instant Messenger) | April 2008 unter der Bezeichnung "Chat" | Oktober 2008 unter der Bezeichnung „Plauderkasten" |

**Beweis:** Mark Howitson, Justitiar der Klägerin, als

- **Zeuge** -

63    So ist die Beklagte der Klägerin auf dem Weg von einem Angebot nur für Universitätsstudenten (Facebook seit Februar 2004, StudiVZ seit Oktober 2005) über die Öffnung für Schüler (Facebook seit September 2005, SchülerVZ seit Februar 2007) hin zu einer Öffnung für alle (Facebook seit September 2006, meinVZ seit Februar 2008) penibel gefolgt.

64    Parallel dazu befindet sich die Beklagte dabei ihr deutsches Angebot auf andere Länder und Sprachversionen auszudehnen mit der Folge, dass dem Original der Klägerin nun auch dort Schäden durch Umsatzeinbußen zugefügt werden. In Frankreich (www.studiqg.fr), Spanien (www.estudiln.net), Italien (www.studiln.it) und Polen (www.studentix.pl) hat die Beklagte bereits Sprachversionen eröffnet, die mit ihrer deutschen Webseite studivz.net den identischen „Look & Feel" teilen. Auch meinVZ verfügt nicht nur über eine deutsche Sprachversion, sondern auch über eine englische. Mithin ist die Beklagte bemüht, eine internationale „Plagiats-Familie" des Originals der Klägerin zu schaffen.

65    Sogar die jüngsten Innovationen der Webseite der Klägerin, die Öffnung für Applikationen externer Entwickler und der sogenannten News-Feed, eine Beobachtungsliste, die über Neuigkeiten im Freundeskreis informiert, sind in den Fokus der „Kopiermaschinerie" der Beklagten geraten: Die Beklagte will sich laut Marcus Riecke, der bis 23.10.2008 Geschäftsführer der Beklagten war, nunmehr auch für Applikationen externer Entwickler öffnen, ferner befinde sich ein News-Feed zwar noch nicht in Planung, man prüfe dies aber gründlich.

**Beweis:** Golem.de „StudiVZ will sich mit neuer Software gegen Facebook rüsten", 28.01.2008 (**Anlagenkonvolut K 13, Seite 121**)

66    Die Beklagte hat mithin nicht nur bei ihrer Gründung die Kreativität der Klägerin für ihre eigenen Zwecke ausgenutzt, sie nutzt vielmehr ständig die Innovationskraft und die Investitionen der Klägerin in die Weiterentwicklung ihrer Webseite aus. Man könnte davon sprechen, die Beklagte versuche sich parasitär an die Klägerin anzuheften um permanent von ihr



zu zehren und zu plagiieren. Die Klägerin sieht keinen anderen Weg mehr dem Einhalt zu gebieten, als gerichtliche Hilfe in Anspruch zu nehmen. Es ist nicht länger hinnehmbar, dass die Beklagte seit vier Jahren bis heute trotz vielfältiger Versuche der Klägerin sie zu einem freiwilligen Einlenken zu bewegen sich eigene Entwicklungskosten spart und von den Investitionen der Klägerin in unlauterer Weise profitiert.

### 9. Quellcode-Diebstahl

67    Die Webseite der Beklagten und die Webseite der Klägerin weisen auffällige Übereinstimmungen auch auf Code-Seite auf. Die optische Übereinstimmung (siehe oben **II. 5.**) und die programmatischen Identitäten (siehe oben **II. 6.**) in Stylesheets sind hier sehr beachtenswert, ferner hat es Übernahmen von Funktionsbezeichnungen im Html-Code der Webseite der Beklagten von der klägerischen Webseite gegeben. So hieß das von Herrn Dariani doch angeblich erfundene „Gruscheln" im Code der Webseite der Beklagten 2006 noch „poke.php", also wie die Funktion „poke" der Klägerin.

**Beweis:** Privatgutachten des ö.b.u.v. EDV-Sachverständigen Dipl.-Prog. Bernward Schrader (**Anlage K 12**)

Blog „Kasi-Blog", Karsten Wenzlaff, „StudiVZ - The glamour is fading", 05.11.2006 (**Anlagenkonvolut K 13, Seite 126**)

Sachverständigengutachten

68    Zuletzt haben beide Webseiten bereits 2006 identische Sicherheitslücken aufgewiesen. So konnte man bei beiden Webseiten auch auf als „privat" gekennzeichnete Fotos von Nutzern zugreifen, ohne bei dem jeweiligen Sozialen Netzwerk eingeloggt zu sein. Grund hierfür ist eine identische Art und Weise des Ablegens von Bildern. Auch dies zeigt eine programmatische Übereinstimmung.

**Beweis:** Blog „Kasi-Blog", Karsten Wentzlaff, „ StudiVZ and Facebook - Huge Data Leak(s)", 20.11.2006 (**Anlagenkonvolut K 13, Seite 125**)



69 Wie die Beklagte Zugang zum Quellcode (**Anlage K 22**; wird nachgereicht) erlangt hat und welche Bearbeitung im Einzelnen erfolgt ist, entzieht sich der Kenntnis der Klägerin. Ein möglicher Weg, wie die Gründer der Beklagten an den Quellcode des der klägerischen Webseite zugrundeliegenden Programms gekommen sein könnten, ist z.B. eine gelegentlich bei vielen kommerziell betriebenen Webseiten auftretende und nicht völlig zu vermeidende Sicherheitslücke. So hat es im August 2007 einen Vorfall gegeben, bei dem Quellcode der klägerischen Webseite im Internet von einem unbekannten Dritten veröffentlicht worden ist. Dieser Dritte hat sich über eine Sicherheitslücke Zugriff auf die Server der Klägerin verschafft und Teile des Quellcodes kopiert.

**Beweis**: TechCrunch „Facebook Source Code Leaked", 11.08.2007 (**Anlagenkonvolut K 13, Seite 131**)

70 Auf eine solche Art und Weise könnten auch die Gründer der Beklagten bereits bei Erstellung ihrer Seite vorgegangen sein. Die Anzeichen für eine Quellcode-Übernahme sind insgesamt sehr deutlich.

### 10. Einräumung der Gründer der Beklagten

71 Besonders dreist ist außerdem, dass die Gründer der Beklagten sogar offen zugeben, sich ganz bewusst am „Look & Feel" der Klägerin „orientiert" zu haben. So hat Ehssan Dariani zuerst gegenüber Spiegel International im Juli 2006 geäußert (Übersetzung durch die Unterzeichnerin):

> „Es mag sein, dass wir uns am Facebook Layout entlang orientiert haben."

> („We may have oriented ourselves along the lines of the Facebook layout.")

**Beweis**: Spiegel International „StudiVZ Takes on Facebook", 11.7.2006 (**Anlagenkonvolut K 13, Seite 28**)

72 Und gegenüber der Netzeitung gab Ehssan Dariani ebenfalls 2006 an:

> „Als ich Studentennetzwerke in den USA gesehen habe, da wollte ich das auch in Deutschland haben."

73    Was er mit der ihm eigenen Bescheidenheit noch ergänzte um:

> „Eine meiner Hauptstärken ist es, das menschliche Verhalten zu prognostizieren. Ich habe immer das Gefühl gehabt, dass sich deutsche Studenten für so ein Netzwerk interessieren."

**Beweis:** Netzeitung „Die deutsche Trägheit nervt", 06.10.2006 (**Anlagenkonvolut K 13, Seite 82**)

74    Wobei angemerkt sei, dass es nicht weiter schwierig für Herrn Dariani gewesen sein dürfte das „menschliche Verhalten" im Angesicht des bereits damals im US-amerikanischen Raum überragenden Erfolgs der Klägerin zu prognostizieren.

75    Zuletzt beschrieb die Frankfurter Allgemeine Zeitung die Gründungsgeschichte der Klägerin unter Einbeziehung von Ehssan Dariani wie folgt (Hervorhebungen durch die Unterzeichnerin):

> „Der erste Plan, einen Handelsvertrieb mit Männerkosmetik sich zu eigen zu machen, scheiterte. **‚Also habe ich nach dem nächsten großen Fang gesucht. Und wo ist das Angeln am Vielversprechendsten, wenn nicht in Übersee in einem jungen Start-up-Unternehmen?'** Zwei Monate blieb Dariani im vergangenen Jahr bei der neuen amerikanischen Dependance des Leipziger Unternehmens Spreadshirt. Dort kam er schnell auf die gesuchte Idee: Ein soziales Netzwerk für Studenten zu schaffen. In den Vereinigten Staaten keine Neuheit. **‚Da dachte ich mir: Das ist gut, übernehmen, machen'**, sagt Dariani."

**Beweis:** Frankfurter Allgemeine Zeitung „Wir sind eine Alternative zu Sat.1 und Co.", 24.10.2006 (**Anlagenkonvolut K 13, Seite 62**)

76    Herr Dariani gibt also unumwunden zu, dass Layout, Gestaltung und die maßgeblichen Funktionen, alles wesentliche Bestandteile des „Look & Feel" der Webseite der Klägerin, für die Webseite der Beklagten bewusst von der Webseite der Klägerin übernommen wurden. In diesem Zusammenhang passt auch, dass die beiden Gründer der Beklagten, Ehssan Dariani und Dennis Bemmann, jeder ein Profil im Internetangebot der Klägerin besitzen.

**Beweis:** Screenshots der Ergebnisliste einer Mitgliedersuche in Facebook nach „Ehssan Dariani" und „Dennis Bemmann" (**Anlage K 14**)

77 Auch der zweite Mitbegründer der Beklagten Herr Bemmann hat sich zu den frühen Plagiatsvorwürfen geäußert und 2006 gegenüber der Frankfurter Rundschau eingeräumt:

> „Natürlich gibt es hunderte Social Networking Sites und natürlich sehen wir uns die auch sehr genau an, denn warum soll man gute Ideen nicht aufgreifen und warum das nicht besser machen, was andere schlecht gelöst haben?"

**Beweis:** Frankfurter Rundschau „StudiVZ unter Beschuss", 15.11.2006 **(Anlagenkonvolut K 13, Seite 84)**

78 Allerdings fragt sich die Klägerin was die Beklagte angesichts einer 1:1-Kopie des „Look & Feel" der Klägerin besser gemacht haben will. Erhellend wirkt hier eine Aussage von Herrn Dariani vom 19.07.2008 gegenüber der Frankfurter Allgemeinen Sonntagszeitung auf die Frage einer Verwechslungsgefahr der Webseite der Beklagten und der Webseite der Klägerin:

> „Die Farben unterscheiden sich: StudiVZ ist rot, Facebook ist blau."

**Beweis:** Frankfurter Allgemeine Zeitung „Netzwerker im Clinch: Facebook verklagt StudiVZ", 19.07.2008 **(Anlagenkonvolut K 13, Seite 86)**

79 Weitere Unterschiede im „Look & Feel" der beiden Webseiten scheint mithin nicht einmal der Mitbegründer der Beklagten erkennen zu können.

## 11. Vorsätzlichkeit der Nachahmung

80 Dass diese Nachahmung wissentlich geschah, zeigt sich nicht nur an den Einräumungen der Gründer der Beklagten sondern auch an der Übernahme von Funktionsbezeichnungen im Html-Code der Webseite der Beklagten von der klägerischen Webseite. So hieß das von Herrn Dariani doch angeblich erfundene „Gruscheln" im Code der Webseite der Beklagten 2006 noch „poke.php", also wie die Funktion „poke" der Klägerin.

81 Außerdem hatte die Beklagte die Dateien ihrer Webseite im Ordner „fakebook" abgelegt, ein eindeutiger Hinweis auf das Original Facebook.



Ferner wurde das Stylesheet der Webseite der Beklagten von dieser mit dem Dateinamen „myfb.css" versehen – dass dies für „MyFacebook" stehen soll liegt nahe.

**Beweis:** Blog „Der Bumi", Michael Bumann, „StudiVZ in original Facebook-Farben...", 03.10.2006 **(Anlagenkonvolut K 13, Seite 31)**

Screenshot „fakebook" von Spiegel Online, 15.11.2006 **(Anlagenkonvolut K 13, Seite 88)**

Blog „Kasi-Blog", Karsten Wenzlaff, „StudiVZ - The glamour is fading", 05.11.2006 **(Anlagenkonvolut K 13, Seite 126)**

Blog „Unfehlbar", „StudiVZ – Ein Plagiat als Möchtegern-YouTube", 26.10.2006 **(Anlagenkonvolut K 13, Seite 89)**

82   Diesem „Geschäftsmodell" des Abschauens und Nachbildens eines Internet-Angebots eines ausländischen Unternehmens muss Einhalt geboten werden. Hier werden in unlauterer Art und Weise die Innovationen, Leistungen und der aufgebaute gute Ruf eines potentiellen oder bestehenden Wettbewerbers ausgenutzt, oft mit dem Ziel dem ausländischen Original, das wegen des deutschen Plagiats Schwierigkeiten beim Markteintritt in Deutschland hat, das deutsche Plagiat für zwei- bis dreistellige Millionenbeträge zu verkaufen. So sieht sich die Klägerin weltweit einigen Nachahmern ihres bewährten „Look & Feel" gegenüber, wie auch die als

**Anlage K 18**

83   beigefügten Screenshots eines russischen Nachahmers der Klägerin namens „vkontakte" beweisen, welcher ähnlich dreist wie die Beklagte vorgeht. Die Klägerin befindet sich in dem Prozess gegen diese Plagiatoren vorzugehen.

## 12. Entstandene Marktverwirrung und Herkunftstäuschung

84   Die Beklagte hat durch ihre nahezu identische Übernahme des „Look & Feel" der Klägerin eine Marktverwirrung und Herkunftstäuschung bewirkt. Eine Vielzahl von Nutzern glaubt an eine wie auch immer geartete

Geschäftsbeziehung oder Verbindung, ja sogar Identität von hiesiger Klägerin und hiesiger Beklagter.

85    So hat ein Nutzer unter dem Namen „Stefan" am 29.06.2006 in einer Diskussion zu einem Artikel über die Beklagte, an der sich auch Ehssan Dariani und Dennis Bemmann beteiligt haben, gefragt:

> „Mich würde aber schon einmal interessieren (so Du darüber Auskunft geben darfst) wie Ihr vertraglich mit dem facebook verblieben seid? Wie läuft so etwas ab? Habt Ihr Nutzungsrechte der Software gekauft? Seid Ihr in Kontakt mit den facebook Inhabern? Wie kam die Idee StudiVZ und nicht facebook.de zum Bsp.?"

**Beweis:** Kommentar Nr. 23 zu dem Artikel „Das digitale Poesiealbum: 400.000 Studenten im StudiVerzeichnis" auf readers-edition.de vom 28.08.2006 (**Anlagenkonvolut K 13, Seite 1**)

86    Offensichtlich geht der Nutzer davon aus, dass StudiVZ ein deutscher Ableger der Klägerin oder zumindest ein Lizenzprodukt der Klägerin sei. Er täuscht sich damit über die Herkunft des Angebots der Beklagten.

87    Ein weiterer Nutzer unter dem Namen „Lars Minden" fragt:

> „Was ich aber gerne wissen würde ist.. Gab es zwischen euch und Facebook je kontakt? ich mein, ihr habt ja das design auch ganz bis auf die farbe übernommen?"

**Beweis:** Kommentar Nr. 37 zu dem Artikel „Das digitale Poesiealbum: 400.000 Studenten im StudiVerzeichnis" auf readers-edition.de vom 28.08.2006 (**Anlagenkonvolut K 13, Seite 1**)

88    Auch dieser Nutzer geht ganz offensichtlich davon aus, dass das Angebot der Beklagten in irgendeiner Weise von der Klägerin autorisiert worden sei. Der gute Ruf, den sich die Klägerin erworben hat, wird hier von der Beklagten ausgenutzt.

89    Dies zeigt sich auch bei einem weiteren Nutzer namens „mel", der in einem Kommentar zu „Sebbis Blog" schreibt (Hervorhebung durch die Unterzeichnerin):

> „ich find es total nervig das man **die beiden facebook** nicht verlinken kann.. ich lebe seit ein paar jahren in england und in den

staaten, habe aber auch noch freunde aus deutschland... hab mich also in beiden eingetragen, aber das studivz find ich sehr unprofessionel im vergleich zu facebook, weniger features und dann auch noch ewige ladezeiten...“

**Beweis:** Kommentar Nr. 10 zu dem Artikel „Einziger Deutscher bei Facebook?“ vom 04.10.2006 auf „Sebbis Blog“, Sebastian Herp **(Anlagenkonvolut K 13, Seite 46)**

90    Auch zu einem Artikel über die Beklagte auf dem Blog „medienrauschen, das Medienweblog“ von Jörg-Olaf Schäfers findet sich ein Kommentar, in dem ein Nutzer die Klägerin fälschlicherweise mit der Beklagten in Verbindung bringt. So fragt ein Nutzer unter dem Namen „Christoph“:

„Mich würde mal interessieren, ob StudiVZ eine Art deutsches Lizenzprodukt von http://www.facebook.com ist, oder eine der dreistesten 1:1 Kopien des Web 2.0. Bis auf Farbe und Logo gleichen sich beide Seiten aufs Haar.“

**Beweis:** Kommentar Nr. 4 zu dem Artikel „StudiVZ: Korrekturspalte für Turi 2.0?“ vom 26.10.2006 auf medienrauschen.de **(Anlagenkonvolut K 13, Seite 98)**

91    Am weitesten geht allerdings ein Nutzer namens „Sebastian“, der schreibt:

„[...] und dann, wenn alles läuft, kommt heraus: alles spaß gewesen!!! quelltext kam von facebook, beide gehören zusammen und jetzt wird alles an yahoo vertickt und die dicke kohle mit den daten der user gemacht. [...] ansonsten denke ich persönlich eher daran, dass es [Anmerkung der Unterzeichnerin: StudiVZ] eine produktion von facebook ist um den marktanteil in europa zu erhöhen.“

**Beweis:** Kommentar Nr. 44 zu dem Artikel „Das digitale Poesiealbum: 400.000 Studenten im StudiVerzeichnis“ auf readers-edition.de vom 28.08.2006 **(Anlagenkonvolut K 13, Seite 1)**

92    Der Nutzer unter dem Namen „Sebastian“ glaubt hier also tatsächlich, dass die Klägerin und die Beklagte „unter einer Decke stecken“ würden, also zusammengehörige Unternehmen eines Konzerns seien oder die Beklagte eine Tochter der Klägerin sei.

93     Zudem hat die Klägerin selbst zahlreiche Emails von Nutzern mit ähnlichen Bemerkungen oder Fragen erhalten, von denen einige beispielhaft als

**Anlagenkonvolut K 13, Seite 101**

beigefügt sind.

### 13. Beeinträchtigung des guten Rufs der Klägerin

94     Die geschilderten Herkunftsverwechslungen und die entstandene Marktverwirrung führen zu einer Beeinträchtigung des guten Rufs der Klägerin. So ist die Beklagte mit zahllosen Skandalen und massiven Bedenken in Hinsicht auf Datenschutz konfrontiert.

95     Allein der Mitbegründer der Beklagten Ehssan Dariani hat für mehrere Skandale gesorgt. Herr Dariani, der bis März 2007 Geschäftsführer der Beklagten war,

**Beweis im Bestreitensfalle:** Wikipedia-Eintrag über die Beklagte vom 19.09.2008 (wird ggf. nachgereicht)

Welt Online „Frührentner dank Web 2.0", 21.04.2007 (**Anlagenkonvolut K 13, Seite 103**)

hat unter anderem eine betrunkene und sich leicht entblößende Frau auf einer Party in Berlin auf der Toilette gefilmt und dieses Video unter dem Titel „chick auf mitte party // WC" auf YouTube im Internet veröffentlicht.

**Beweis:** Spiegel Online „Peinliche Pannen bringen StudiVZ in Verruf", 15.11.2006 (**Anlagenkonvolut K 13, Seite 69**)

Welt Online „Wie Deutschlands heißestes Start-Up vor die Wand fährt", 01.12.2006 (**Anlagenkonvolut K 13, Seite 93**)

96     Weiterhin hat Herr Dariani in äußerst geschmackloser Weise im Jahr 2006 zu einer Party eingeladen. Hierzu hat sich Ehssan Dariani die Domains www.voelkischer-beobachter.de und



www.voelkischerbeobachter.de gesichert und eine abgewandelte Fassung des Titelblatts des gleichnamigen Propagandaorgans des Nationalsozialistischen Regimes zum Geburtstag von Adolf Hitler am 20. April 1945 darauf online gestellt. Auf dem Titelblatt wurde das Hakenkreuz unter dem Reichsadler durch das Logo der Beklagten ausgetauscht, und aus der Zeile „Kampfblatt der nationalsozialistischen Bewegung Großdeutschlands" machte Ehssan Dariani die Zeile „Kampfblatt der studentischen Vernetzungsbewegung Europas". Die Schlagzeile „Deutschland steht standhaft und treu zum Führer" wurde zu „Europa steht standhaft und treu zum StudiVZ" und aus „Gebot der Pflicht am 56. Geburtstag Adolf Hitlers" machte der Mitbegründer der Beklagten „Gebot der Pflicht zum 26. Geburtstag Ehssan Darianis". Das ganze „garnierte" Herr Dariani noch mit der weiteren Schlagzeile „Feiern bis zum letzten Mann".

**Beweis:** Blog „Blogbar", Rainer Meyer („DonAlphonso"), „StudiVZ – Der Hitler-Screenshot und der Käufer Facebook", 15.11.2006 **(Anlagenkonvolut K 13, Seite 106)**

Screenshot der Dariani-Webseite voelkischer-beobachter.de (**Anlagenkonvolut K 13, Seite 111**)

97 Da die Party des Herrn Dariani in den Räumlichkeiten der Beklagten beginnen sollte und außerdem die Verbindung zu der Beklagten von Herrn Dariani selbst durch mehrfache Verwendung des Logos der Beklagten hergestellt worden ist, stellt sich dieses Verhalten des damaligen Geschäftsführers der Beklagten nicht als bloß privates Fehlverhalten dar sondern betraf unmittelbar auch den Ruf der Beklagten und damit potentiell indirekt über die von Nutzern hergestellte oder geglaubte Verbindung zu der Beklagten auch den Ruf der Klägerin.

**Beweis:** Screenshot der Dariani-Webseite voelkischer-beobachter.de (**Anlagenkonvolut K 13, Seite 111**)

Spiegel Online „Peinliche Pannen bringen StudiVZ in Verruf", 15.11.2006 **(Anlagenkonvolut K 13, Seite 69)**

Welt Online „Wie Deutschlands heißestes Start-Up vor die Wand fährt", 01.12.2006 **(Anlagenkonvolut K 13, Seite 93)**

98 Spiegel Online kommentiert das auf die Aufdeckung der verfehlten Party-Einladung folgende Verhalten von Ehssan Dariani am 01.12.2006 wie