

folgt: „Dariani verteidigte sich im Blog vorgestern noch. Er sah sich zu einem Kommentar über das deutsche Geschichtsverständnis berufen und bilanzierte, dass ich die deutsche Mentalität, die deutsche Art, wie sich die (political correct) Mehrheit mit sich und seiner Vergangenheit identifiziert, als GESCHEITERT betrachte'. Sein Vorgehen stilisiert er zur Heldentat: ‚Diese Einladung hätte im Dritten Reich meiner Einschätzung nach zu KZ-Haft geführt...'"

**Beweis:** Spiegel Online „Peinliche Pannen bringen StudiVZ in Verruf", 15.11.2006 (**Anlagenkonvolut K 13, Seite 69**)

99    Der gute Ruf der Klägerin ist durch ein solches Verhalten auf Seiten der Beklagten massiv gefährdet.

100    Ein weiterer Skandal rund um die Beklagte betraf unseriöses Geschäftsverhalten der Beklagten bei ihrer Expansion nach Frankreich. Hier hat die Beklagte, um den Bekanntheitsgrad ihres dortigen, optisch identischen Angebots StudiQG zu erhöhen, auf den Versand von Spam-Emails zurückgegriffen. Außerdem wurde von Seiten der Beklagten versucht, die Herkunft des Angebots von der Beklagten zu vertuschen und zu suggerieren, die Seite StudiQG sei von einer Gruppe französischer Studenten gegründet und entwickelt worden.

**Beweis:** Blog „Blogbar", Rainer Meyer („DonAlphonso"), „StudiVZ - StudiQG: Gerade erst in Frankreich und schon Spammer", 07.11.2006 (**Anlagenkonvolut K 13, Seite 123**)

101    Auch wurde von der Beklagten sogenanntes „Domain-Grabbing" betrieben, als sie sich 2006 ausländische Domains ihrer deutschen Konkurrenten Unister und Studylounge sicherte.

**Beweis:** Spiegel Online „Peinliche Pannen bringen StudiVZ in Verruf", 15.11.2006 (**Anlagenkonvolut K 13, Seite 69**)

Welt Online „Wie Deutschlands heißestes Start-Up vor die Wand fährt", 01.12.2006 (**Anlagenkonvolut K 13, Seite 93**)

102    Noch 2006 folgte ein weiterer Skandal rund um die Beklagte, als sich eine Gruppe von Nutzern der Beklagten mit ca. 700 Mitgliedern zusammentat, um ahnungslose weibliche Nutzer der Beklagten ohne ihr Mitwissen oder gar Einverständnis anhand ihrer Profil-Fotos für eine „Miss StudiVZ"-

Dockets.Justia.com

Wahl auszuwählen und die gewählte „Miss" dann „gemeinschaftlich zu gruscheln".

103    Anstatt gegen diese Form der organisierten Belästigung von Frauen vorzugehen, befand ein Mitarbeiter der Beklagten nach einer Beschwerde in einer Nachricht an den Gruppen-Gründer den „Foto-Contest" für „völlig ok" und bat ferner für sich und einen der Gründer der Beklagten um Aufnahme in die Gruppe.

**Beweis:** Spiegel Online „Sex-Stalker im Studentennetz", 27.11.2006 (**Anlagenkonvolut K 13, Seite 112**)

104    Auch in den folgenden Jahren war die Beklagte immer wieder Ziel von massiver Kritik. So wurden die im Jahr 2007 eingeführten neuen Allgemeinen Geschäftsbedingungen und die Datenschutz-Erklärung, in die auch Alt-Nutzer einwilligen mussten und die der Beklagten weitreichende Nutzungsmöglichkeiten der persönlichen Daten der Nutzer für personalisierte Werbung insbesondere zunächst auch per Email und SMS und zur Weitergabe an Dritte gewähren sollten, vom Bundesdatenschutzbeauftragten Peter Schaar und dem Bundesverband Verbraucherzentrale öffentlich bemängelt.

**Beweis:** Spiegel Online „Experten kritisieren Schnüffel-Passus von StudiVZ", 14.12.2007 (**Anlagenkonvolut K 13, Seite 114**)

Heise Online „Tadel für StudiVZ wegen geplanter Ausschlachtung von Nutzerdaten", 18.12.2007 (**Anlagenkonvolut K 13, Seite 117**)

105    Der Bundesverband der Verbraucherzentralen hat die Beklagte 2008 diesbezüglich schließlich sogar abgemahnt.

**Beweis:** Spiegel Online „Verbraucherschützer mahnen StudiVZ ab", 13.02.2008 (**Anlagenkonvolut K 13, Seite 118**)

**14. Wettbewerbsverhältnis der Parteien, Vermögenseinbuße der Klägerin**

106   Das Soziale Netzwerk der Klägerin war bereits seit September 2006 offen für weltweite Nutzer. Durch eine Übersetzung ins Deutsche und die domain www.facebook.de ist die Klägerin erst im März 2008 in Deutschland aufgetreten.

**Beweis:** Augenschein

Sachverständigengutachten

107   Der Markteintritt in Deutschland ist für die Klägerin aber äußerst schleppend und auffallend schlechter als in anderen Ländern verlaufen. Grund hierfür ist, dass die Beklagte als Facebook-Klon bereits 2006 große Teile des deutschen Markts besetzt hatte. So unterliegt der Markt für Soziale Netzwerke einigen Besonderheiten:

- Nutzer sind grundsätzlich nur Mitglied in einem Sozialen Netzwerk, da die Einrichtung und Pflege eines vollständigen Nutzerprofils zeitaufwändig ist.
- Neue Mitglieder eines Sozialen Netzwerks ziehen weitere neue Mitglieder aus ihren jeweiligen Bekanntenkreis an, so dass das Wachstum eines Sozialen Netzwerks bis zu einem Sättigungspunkt exponentiell verläuft. Daher hat das erste Soziale Netzwerk auf einem Markt einen erheblichen Startvorteil.
- Die Wechselwilligkeit von Nutzern eines Sozialen Netzwerks zu einem konkurrierenden Sozialen Netzwerk, die nicht miteinander verknüpft sind, ist extrem gering, da der Nutzer bei einem Wechsel alle seine Freunde und Kontakte auf dem vorher genutzten Sozialen Netzwerk verliert.

**Beweis:** Gutachten des US-amerikanischen Experten für Soziale Netzwerke Assistant Professor Clifford Lampe (**Anlage K 11**)

Sachverständigengutachten

108   Aus diesem Grunde ist ein einmal den nationalen Markt dominierendes Soziales Netzwerk nur äußerst schwer aus dieser Position zu verdrängen. Daher ist der Markteintritt in Deutschland für das Original Facebook ge-

genüber dem Plagiat StudiVZ schwierig und mit finanziellen Einbußen verbunden.

109    Die Klägerin kann, um den erlittenen Schaden zu bestimmen, auf die drei Schadensberechnungsmethoden entgangener Gewinn, Lizenzanalogie oder Herausgabe des Verletzergewinns zurückgreifen.

### 15.  Bemühungen der Klägerin um eine einvernehmliche Lösung

110    Die Klägerin ist bereits seit 2006 bestrebt, das Plagiieren ihres Angebots durch die Beklagte zu unterbinden. So hat sie am 08.06.2006 der Beklagten durch die Kanzlei Lovells das erste Mal eine Abmahnung zukommen lassen und die Beklagte zur Unterlassung des Betriebs eines Plagiats der Webseite der Klägerin aufgefordert.

**Beweis:** Abmahnung der Kanzlei Lovells vom 08.06.2006 (**Anlage K 15**)

111    Nachdem die Abmahnung fruchtlos geblieben war und zwischenzeitlich Gespräche aufgenommen worden waren ob die Lage auch ohne Rechtsstreit geklärt werden könnte, hat die Klägerin die Beklagte am 03.01.2007 durch die Kanzlei Lichtenstein, Körner & Partner ein zweites Mal abgemahnt und zur Unterlassung aufgefordert.

**Beweis:** Abmahnung der Kanzlei Lichtenstein, Körner & Partner vom 03.01.2007 (**Anlage K 16**)

112    Auch diese Abmahnung blieb fruchtlos. Nachdem sich die Klägerin auch weiterhin erfolglos um eine außergerichtliche Einigung bemüht hat, wurde mit der dritten Abmahnung vom 09.07.2008 durch die US-Anwälte der Klägerin von der Kanzlei Orrick ein letzter Versuch zur außergerichtlichen Klärung der rechtlichen Situation unternommen.

**Beweis:** Abmahnung der Kanzlei Orrick vom 09.07.2008 (**Anlage K 17**)

113    Auch diese Abmahnung blieb ohne Wirkung, so dass sich die Klägerin nunmehr zur Klageerhebung an dem für die USA zuständigen Gericht in San Jose, Kalifornien, gezwungen sah. Die Klage wurde am 18.07.2008 eingereicht.

114　Die Beklagte hat am selben Tag, dem 18.07.2008, eine negative Feststellungsklage am Landgericht Stuttgart eingereicht, obgleich sie behauptete, von der US-Klage der Klägerin erst aus der Presse erfahren zu haben.

> **Beweis:** Blog „Telagon Sichelputzer", „studiVZ wehrt sich gegen Facebook", 20.07.2008 (**Anlagenkonvolut K 13, Seite 119**)

Klageerhebung ist damit auch in Deutschland geboten.

### III.　Zur Rechtslage

115　Das Landgericht München I ist nach § 32 ZPO zuständig, da die Webseite der Beklagten bestimmungsgemäß im gesamten deutschsprachigen Raum und damit auch in München abrufbar ist (vgl. Zöller, ZPO, 26. Auflage 2007, § 32 Rdn. 17). Wir bitten daher, wie beantragt zu entscheiden.

116　Die Klägerin hat einen Anspruch gegen die Beklagte auf Unterlassung aus § 97 Abs. 1 S. 1 UrhG i.V.m. § 69a UrhG sowie auf Feststellung wegen Schadenersatzes aus § 256 ZPO, § 97 Abs. 1 UrhG i.V.m. § 69a UrhG.

117　Ferner hat die Klägerin einen Anspruch gegen die Beklagte auf Unterlassung aus § 8 UWG i.V.m. §§ 3, 4 Nr. 9 UWG sowie auf Feststellung wegen Schadenersatzes aus § 256 ZPO, § 9 UWG i.V.m. §§ 3, 4 Nr. 9 UWG.

118　Weiter hat die Klägerin einen Anspruch gegen die Beklagte auf Unterlassung aus § 14 Abs. 5 MarkenG i.V.m. § 14 Abs. 1, Abs. 2 Nr. 2, Abs. 3 Nr. 3 MarkenG sowie auf Feststellung wegen Schadenersatzes aus § 256 ZPO, § 14 Abs. 6 MarkenG i.V.m. § 14 Abs. 1, Abs. 2 Nr. 2, Abs. 3 Nr. 3 MarkenG.

119　Zuletzt hat die Klägerin einen Anspruch gegen die Beklagte auf Feststellung wegen Schadenersatzes aus § 256 ZPO, §§ 280 Abs. 1, 249 BGB.

**1. Zu den Klageanträgen 1. a. und b.**

120 Der Anspruch der Klägerin gegen die Beklagte auf Unterlassung des Vertreibens, öffentlich Zugänglichmachens und Bearbeitens des genannten „**Look & Feel**" und der angegebenen Benutzeroberfläche, ergibt sich aus dem Gesetz gegen unlauteren Wettbewerb und dem Markengesetz.

**1.1 § 8 UWG i.V.m. §§ 3, 4 Nr. 9 UWG**

121 Die Klägerin hat gegen die Beklagte einen Anspruch gemäß § 8 UWG i.V.m. §§ 3, 4 Nr. 9 UWG auf Unterlassung.

122 **1.1.1** Der ergänzende Leistungsschutz gemäß § 4 Nr. 9 UWG ist nicht durch den urheberrechtlichen und markenrechtlichen Sonderschutz ausgeschlossen. Der ergänzende wettbewerbsrechtliche Leistungsschutz greift auch bei Vorliegen eines Sonderschutzes ein, wenn besondere Begleitumstände vorliegen, die außerhalb des sondergesetzlichen Tatbestands liegen und das Verhalten als unlauter erscheinen lassen (BGH GRUR 2002, 629 [631] – Blendsegel). Dies ist hier der Fall. Die Beklagte hat nicht nur den Quellcode der Klägerin kopiert, sondern sie hat diesen genutzt um eine der Webseite der Klägerin täuschend ähnliche Webseite mit der gleichen Dienstleistung, dem Betreiben eines kostenfreien und werbefinanzierten Sozialen Netzwerks, auf den Markt zu bringen. Diese in verwerflicher Weise absichtlich herbeigeführte Herkunftstäuschung liegt außerhalb des Sonderschutzes und begründet die Anwendbarkeit des ergänzenden Leistungsschutzes nach UWG (vgl. Hefermehl/Köhler/Bornkamm, UWG, 26. Auflage 2008, § 4 Rdn. 9.11). Ferner nutzt die Beklagte durch permanentes Kopieren von Innovationen der Klägerin über Jahre hinweg die Leistung der Klägerin in einer besonders unlauteren Weise aus, die über das hinausgeht, das Urheberrecht und Markenrecht erfassen (vgl. Piper/Ohly, UWG, 4. Auflage 2006, § 4 Rdn. 9/7).

123 **1.1.2** Die Klägerin und die Beklagte stehen seit spätestens September 2006 in einem konkreten Wettbewerbsverhältnis. Die Klägerin hat zu diesem Zeitpunkt ihr Soziales Netzwerk für alle Nutzer weltweit geöffnet und damit mit ihrer Dienstleistung den deutschen Markt betreten. Die Beklagte ist seit November 2005 auf dem deutschen Markt für Soziale Netzwerke aktiv. Beide Netzwerke konzentrieren sich ursprünglich und im Kern auf akademische Nutzer, stehen aber heute darüber hinaus allen Nutzerkreisen in Deutschland offen. Sie bieten mithin ihre Dienstleistung auf dem gleichen Markt für die gleichen Endverbraucherkreise an.



124 Das Wettbewerbsverhalten der Beklagten ist geeignet, die Klägerin zu beeinträchtigen. Dies zeigt sich schon daran, dass der Markteintritt für die Klägerin in Deutschland aufgrund der beschriebenen Eigenheiten des Markts für Soziale Netzwerke und der Tatsache, dass die Beklagte zuerst mit ihrem Plagiat auf dem deutschen Markt war, auffällig schleppend verlaufen ist und verläuft.

125 Bereits vor September 2006 bestand jedoch schon ein potentielles Wettbewerbsverhältnis, was im Rahmen des § 4 Nr. 9 UWG ausreichend ist (vgl. Hefermehl/Köhler/Bornkamm, wie vor, § 4 Rdn. 9.19). Anderenfalls bliebe es der Klägerin als Erstellerin des Originals versagt, ihre Dienstleistung, welche ursprünglich auf den nordamerikanischen Markt beschränkt war, ihren finanziellen und organisatorischen Mitteln entsprechend nach und nach auf weitere Märkte auszudehnen. Es kann nicht vom Ersteller einer neuartigen Dienstleistung erwartet werden, dass er diese sofort auf alle Märkte weltweit ausdehnt, ohne Rücksicht darauf, ob dies etwa hinsichtlich Server-Kapazitäten handhabbar wäre, und ihm anderenfalls den Schutz zu versagen. In den Zeiten des Internets ist auch ein räumlich beschränktes Angebot weltweit ansehbar und damit nachahmbar. Es wäre aber unbillig, den Ersteller einer neuartigen Dienstleistung Schutz in Deutschland zu verwehren, wenn dieser noch nicht in Deutschland auf dem Markt ist. Damit bestand auch schon vor September 2006 ein Wettbewerbsverhältnis zwischen den Parteien i.S.d. § 4 Nr. 9 UWG.

126 **1.1.3** Dem Leistungsergebnis der Klägerin kommt eine wettbewerbliche Eigenart zu. Die Webseite, die die Klägerin erstellt hat, ist aufgrund ihrer ganz besonderen optischen und funktionellen Gestaltung, ihres geschilderten herausragenden „Look & Feel" geeignet, die Nutzerkreise auf die betriebliche Herkunft oder Besonderheiten dieser Dienstleistung von der Klägerin hinzuweisen (vgl. LG Köln, MMR 2008, 65 [66] – **Anlage K 21**; BGH NJW-RR 2000, 338 [339] – Rollstuhlnachbau). Die als **Anlagen K 1 und K 4** vorgelegten Farbausdrucke des prägenden „Look & Feel" der Webseite der Klägerin und die als **Anlagenkonvolut K 7** vorgelegten Farbausdrucke der Webseiten von Mitbewerbern der Klägerin und der Beklagten zeigen deutlich, wie sehr sich das Leistungsergebnis der Klägerin aus der Masse abhebt und als Herkunftshinweis geeignet ist. Es handelt sich nicht um ein „Allerweltserzeugnis" oder „Dutzendware" (vgl. LG Köln, MMR 2008, 65 [66] – **Anlage K 21**).

127 Wie sehr der „Look & Feel" der Klägerin geeignet ist, auf die Herkunft ihrer Dienstleistung von ihr hinzuweisen, zeigt sich an den zahlreichen

Presseartikeln, Blog-Artikeln, Kommentaren zu Blogs sowie Emails von Nutzern (zusammen als **Anlagenkonvolut K 13**) an die Klägerin. All diese Internet-Nutzer haben beim Blick auf die Benutzeroberfläche der Beklagten an die Webseite der Klägerin denken müssen und haben entweder empört oder verwirrt reagiert.

128    **1.1.4** Die Beklagte hat die Webseite, mit der die Klägerin ihre Dienstleistung anbietet und erbringt, nahezu identisch übernommen. Wie sich an den als **Anlagen K 3 und K 6** beigefügten Gegenüberstellungen der Webseiten der Parteien zeigt, weist die Webseite der Beklagten nur geringfügige und im Gesamteindruck unerhebliche Abweichungen vom Original der Webseite der Klägerin auf (vgl. Hefermehl/Köhler/Bornkamm, wie vor, § 4 Rdn. 9.36). So wurde das prägende Farbschema fast identisch übernommen, ebenso die weiße Schrift auf dunklem Grund im Top-Banner. Sogar identisch übernommen wurden der dreispaltige Aufbau und die Aufteilung der Informationen auf den Unterseiten der Webseite. Auch die Reihenfolge und Bezeichnungen der Schaltflächen für weitere Funktionen und Unterseiten wurden identisch übernommen. Der Gesamteindruck ist somit nahezu identisch.

129    **1.1.5** Die Nachahmung der Webseite der Klägerin durch die Beklagte führt zu einer vermeidbaren Herkunftstäuschung. Die zahlreichen Presseberichte, Blogs und Blog-Kommentare sowie die Emails von Nutzern an die Klägerin (zusammen als **Anlagenkonvolut K 13**) zeigen, dass die angesprochenen Verkehrskreise das Angebot der Klägerin und das Angebot der Beklagten gedanklich in Verbindung gebracht haben. Die Webseite der Beklagten wird von Nutzern teils für einen direkten Ableger der Klägerin gehalten, teils für ein Lizenzprodukt. Ein solcher Glaube an Zweitmarke, lizenz- oder gesellschaftsrechtliche Verbindung von Original und Nachahmung ist ausreichend (BGH GRUR 2001, 443 [445] – Viennetta). Das Angebot der Klägerin war, wie sich daran zeigt, in unmittelbarem zeitlichen Zusammenhang mit der Markteinführung des Angebots der Beklagten in weiten Kreisen der deutschen Internetnutzer bekannt. Presse und Blogger sind bereits im Juli 2006, ein halbes Jahr nach Einführung des Angebots der Klägerin, auf das entstehende Angebot der Beklagten aufmerksam geworden und haben erste Mutmaßungen über eine vermeintliche Verbindung des Angebots der Beklagten mit dem bekannten Angebot der Klägerin angestellt.

130    Dass die Beklagte einen anderen Namen und ein anderes Logo für ihr Angebot verwendet, ändert nichts an der Herkunftstäuschung (BGH



GRUR 2007, 984 [986] – Gartenliege), es kommt auf den Gesamtein-
druck an, den Original und Nachahmung bei ihrer bestimmungsgemäßen
Benutzung dem Betrachter vermitteln. Eine zergliedernde Betrachtungs-
weise, die nur einzelne Merkmale des Originals denen der Nachahmung
gegenüberstellt, ist nicht zulässig (BGH GRUR 2000, 608 [610] –
ARD-1). Zusätzlich sind die Anforderungen an die besonderen, die Un-
lauterbarkeit begründenden Umstände wie die vermeidbare Herkunftstäu-
schung niedriger, wenn ein besonders hoher Grad der Übernahme vorliegt
(BGH NJW-RR 2000, 338 [339] – Rollstuhlnachbau). Da die Beklagte
ohne technische Notwendigkeit sämtliche prägenden Elemente des „Look
& Feel" der Webseite der Klägerin übernommen hat und lediglich eine
Übersetzung ins Deutsche sowie einen Austausch der Farben
Blau/Hellblau durch Rot/Hellrot vorgenommen hat, handelt es sich hier
um eine fast identische Übernahme und mithin um einen sehr hohen Grad
der Übernahme. Geringe Abweichungen wie der Farbtausch sind ange-
sichts des fast identischen Gesamteindrucks unerheblich (vgl. Piper/Ohly,
wie vor, § 4 Rdn. 9/62). Die Webseite der Beklagten täuscht vermeidbar
über die Herkunft der Dienstleistung.

131     Im Übrigen kann es aber auch nicht darauf ankommen, ob das Angebot
der Klägerin zum Zeitpunkt der Markteinführung des Angebots der Be-
klagten in Deutschland bekannt war. Hierdurch würden innovative Unter-
nehmer weltweit schutzlos gestellt, da auch regional begrenzte Angebote
weltweit abruf- und somit plagiierbar sind. Ein Unternehmer, der in den
USA eine neue und innovative Dienstleistung aufbaut und mit seinem
neuartigen Angebot ein erhebliches finanzielles Risiko eingeht, würde
gegenüber einem schamlosen Kopisten aus Deutschland rechtlos stehen,
der dessen regional begrenztes und in Deutschland noch unbekanntes An-
gebot 1:1 übernimmt. Anderenfalls würde die Rechtsordnung auf den
Kopf gestellt, da sie dann den deutschen Plagiator, der in unlauterer Wei-
se die Leistung des ausländischen Unternehmers nachahmt, dem ausländi-
schen Unternehmer vorziehen würde. Dies kann nicht sein. Vielmehr
muss in solchen Sachverhaltskonstellationen ausreichend sein, wenn das
ausländische Angebot zur Herkunftskennzeichnung geeignet ist (so Pi-
per/Ohly, wie vor, § 4 Rdn. 9.41). Dies gilt umso mehr, wenn das auslän-
dische Angebot in seinem geographischen Raum eine überragende Be-
kanntheit erlangt hat, so wie das Angebot der Klägerin in den USA.

132     **1.1.6** Ferner liegt hier außerdem der besondere Umstand der Rufausbeu-
tung und Rufbeeinträchtigung vor.



133    Liegt eine Herkunftstäuschung vor, so ist regelmäßig auch eine <u>Rufaus-</u><u>beutung</u> gegeben (Hefermehl/Köhler/Bornkamm, wie vor, § 4 Rdn. 9.53). Die Verbraucherkreise, an die sich die Angebote von Klägerin und Beklagter richten, verbinden das Angebot der Klägerin mit positiven Assoziationen hinsichtlich Qualität und Sicherheit der Dienstleistung. Dies zeigt sich an dem überragenden Erfolg der Klägerin, deren Angebot weltweit bereits 120 Millionen Nutzer und in Deutschland mit Stand März 2008 bereits vor dem Start der deutschen Übersetzung ihres Angebots 1,26 Millionen Nutzer gewinnen konnte. Dieser Absatzerfolg der Dienstleistung der Klägerin ist ein Zeichen ihres guten Rufs (vgl. Hefermehl/Köhler/Bornkamm, wie vor, § 4 Rdn. 9.52). Die angesprochenen Verkehrskreise verwechseln das Angebot der Beklagten mit dem bekannten und gut beleumundeten Angebot der Klägerin, so dass der gute Ruf der Klägerin der Beklagten zugute kommt.

134    Eine <u>Rufbeeinträchtigung</u> ist darin zu sehen, dass die zahlreichen Skandale rund um die Beklagte aufgrund der von Teilen der angesprochenen Verkehrskreise irrig angenommenen Verbindung zwischen der Beklagten und der Klägerin den guten Ruf der Klägerin beschädigt. Wenn die Beklagte mit sexistischen und frauenfeindlichen Fehltritten ihrer Gründer und langjährigen Geschäftsführer sowie geschmacklosen Einladungen unter Anlehnung an das NS-Regime in Verbindung gebracht wird, wie dies die relevanten Verkehrskreise wie aus dem **Anlagenkonvolut K 13** ersichtlich tun, und die Beklagte StudiVZ wie aus **Anlage K 19** ersichtlich von ihren Gegnern bereits als StalkerVZ (unter Anspielung an die organisierte Belästigung von Frauen im Netzwerk der Beklagten) oder StasiVZ (unter Anspielung auf die mangelnde Datensicherheit des Angebots der Beklagten) verunglimpft wird, zieht dies auch den Ruf der Klägerin in Mitleidenschaft. Das Angebot der Beklagten und das Verhalten der Verantwortlichen der Beklagten bleiben weit hinter den Standards zurück, welche die Klägerin in ihrem Unternehmen anlegt. Hierdurch nimmt das Image der Klägerin Schaden (vgl. Piper/Ohly, wie vor, § 4 Rdn. 9/84).

135    **1.1.7** Zuletzt ist die Beklagte auch <u>auf unlautere Weise</u> an die bei der Erstellung der Nachahmung förderlichen Kenntnisse und Unterlagen gelangt. So hat sich die Beklagte offensichtlich den Quellcode der Klägerin beschafft, welcher der Webseite der Klägerin zugrunde liegt. Auf welchem Weg sich die Beklagte den Quellcode beschafft hat, sei dahingestellt. Dass sie es getan hat, ist dagegen Fakt.



**136**     **1.1.8** Nach der Rechtsprechung handelt <u>außerhalb der geschriebenen Un-</u><u>lauterkeitsmomente</u> des § 4 Nr. 9 UWG außerdem unlauter, wer ein bisher nur im Ausland bekanntes Produkt kopiert und dann im Inland auf den Markt bringt (BGH WRP 1976, 370 [371] – Ovalpuderdose, Hefermehl/Köhler/Bornkamm, wie vor, § 4 Rdn. 9.64; Piper/Ohly, wie vor, § 4 Rdn. 9/96). Aufgrund des Markeinstiegs der Beklagten 2005 ist der Markteinstieg in Deutschland für die Klägerin mit einem erheblichen unternehmerischen Risiko und reellen finanziellen Einbußen verbunden (vgl. BGH WRP 1976, 370 [371] – Ovalpuderdose; BGH GRUR 1970, 244 [246] – Spritzgußengel).

**137**     So hat die Beklagte die im Jahr 2005 bestehende Marktlücke in Deutschland für Soziale Internet Netzwerke unter Kopieren der im nordamerikanischen Raum bereits seit 2004 tätigen Klägerin besetzt, weswegen die seit 2006 andauernden Bemühungen der Klägerin, den deutschen Markt zu betreten auffallend erfolgloser verlaufen, als auf anderen nationalen Märkten. Die werbefinanzierte Klägerin ist aber auf eine hohe Anzahl von Publikumsverkehr in Form von Clicks (Maus-Klicks auf Werbeanzeigen auf ihrer Webseite) angewiesen, wobei mehr Mitglieder selbstverständlich mehr Clicks bedeuten. Die Besonderheiten des Markts für Soziale Netzwerke führen allerdings dazu, dass das erste Soziale Netzwerk am Markt auf lange Sicht auch das größte sein wird. Die Nutzer sind regelmäßig nur Mitglied in einem Sozialen Netzwerk, da die Pflege eines vollständigen Profils und der dortigen Kontakte zeitaufwändig ist. Ein Wechsel von einem Sozialen Netzwerk zu einem konkurrierenden Sozialen Netzwerk ist selten, weil der wechselnde Nutzer sämtliche Kontakte auf der vorherigen Plattform verliert. Dass ganze Nutzergruppen bzw. Freundesgruppen gleichzeitig das Netzwerk wechseln ist so unwahrscheinlich, dass dies ausgeschlossen werden kann. Mithin hat die Beklagte durch Kopieren des damals ausländischen Angebots der Klägerin und Besetzen des inländischen Marktes unlauter gehandelt. Der BGH spricht in diesem Zusammenhang von „Pionierschutz" (BGH GRUR 1970, 244 [246] – Spritzgußengel), dieser muss hier auch der Klägerin zugute kommen.

**138**     **1.1.9** Unlauter ist ferner, wie sich die Beklagte <u>planmäßig und zielgerichtet</u> an die Klägerin <u>anhängt</u> und seit Jahren ihre Innovationen kopiert. So hat der BGH bereits am 27.11.1959 (BGH GRUR 1960, 244 [246] – Simili-Schmuck) und seither viele Male, zuletzt 1999 (BGH GRUR 1999, 923 [927] – Tele-Info-CD), entschieden, dass ein solches Verhalten unlauter ist, insbesondere wenn sich der Nachahmer durch die fortgesetzte Nachahmung eigene Entwicklungskosten spart (Piper/Ohly, wie vor, § 4

Rdn. 9/93). Die Beklagte spart sich sogar nicht nur eigene Entwicklungskosten, sondern überlässt der Klägerin auch das unternehmerische Risiko, indem sie, wie aus **Anlage K 9** ersichtlich, stets abgewartet hat, ob eine neue Innovation positive Resonanz der angesprochenen Verkehrskreise erhält. Die Beklagte hat dann für eine Nachahmung bei sich jedes unternehmerische Risiko ausschließen können – auf Kosten der Klägerin.

139 So hat die Beklagte nicht nur den Wandel von einem Angebot nur für Studenten über eine Öffnung für Schüler hin zu einem Angebot für jedermann mit einem Abwarten von mehreren Monaten der Klägerin nachvollzogen, auch neue Funktionen, welche die Klägerin ihrem Sozialen Netzwerk hinzugefügt hat, wurden kopiert. Die Klägerin hat im April 2008 in ihrem Sozialen Netzwerk eine Instant Messenging-Funktion eingeführt, über welche die Nutzer sehen können, ob ihre Freunde online sind, und mit diesen dann direkt chatten können, anstatt nur wie zuvor Nachrichten zu verschicken. Die Beklagte hat zunächst abgewartet, ob die Nutzer die Funktion annehmen und wie die Resonanz ausfällt, bevor sie die Instant Messenging-Funktion nachgeahmt und am 23.10.2008 auf ihrer Webseite unter der Bezeichnung „Plauderkasten" implementiert hat. Weitere Nachahmungen sind unter **II. 8.** oben beschrieben.

140 **1.1.10** Der Klägerin steht daher ein verschuldensunabhängiger Anspruch gegen die Beklagte auf Unterlassung gemäß § 8 UWG iVm. §§ 3, 4 Nr. 9 UWG zu. Ihre Interessen als Schöpferin der Leistung gehen den Interessen der Beklagten als Plagiatorin vor.

**1.2. § 14 Abs. 5 MarkenG iVm. § 14 Abs. 1, Abs. 2 Nr. 2, Abs. 3 Nr. 3 MarkenG**

141 **1.2.1** Weiter hat die Klägerin einen Anspruch gegen die Beklagte auf Unterlassung aus § 14 Abs. 5 MarkenG i.V.m. § 14 Abs. 1, Abs. 2 Nr. 2, Abs. 3 Nr. 3 MarkenG.

142 **1.2.2** Die Klägerin ist Inhaberin der nach § 4 Nr. 1 MarkenG geschützten Bildmarke Registernummer 30663271.3. Diese Bildmarke wurde am 18.10.2006 angemeldet und am 20.11.2006 eingetragen (Markenregisterauszug anbei als **Anlage K 10**). Sie umfasst das Top-Banner des Facebook-Designs von 2005 mit dem charakteristischen Doppelbalkendesign in verschiedenen Farben, das Logo oben links neben dem Top-Banner, die



linke Leiste mit dem Login-Feldern für die Email-Adresse und das Passwort sowie Schaltflächen im unteren rechten Bereich (siehe nachfolgende Abbildung).



143    Damit umfasst die Bildmarke das Aussehen der Benutzeroberfläche der Webseite der Klägerin bis 2008.

144    **1.2.3** Diese Marke ist kennzeichnungsfähig, denn es genügt die objektive Möglichkeit, dass der Verkehr das Zeichen als Herkunftshinweis versteht (Spindler/Schuster, Recht der elektronischen Medien, 2008, § 14 MarkenG Rdn. 27). Die Kombination aus Doppelbalken und Anordnung der weiteren Felder ist ungewöhnlich und unterscheidungskräftig. Die Verwendung eines Doppelbalkens sowie die konkrete Anordnung sind kein übliches und funktional bedingtes Gestaltungselement, wie sich an den als **Anlagenkonvolut K 7** vorgelegten Farbausdrucken anderer Webseiten zeigt.

145    Die Kennzeichnungskraft der Bildmarke ist durch intensive Benutzung weiter gestiegen (vgl. Ingerl/Rohnke, MarkenG, 2. Auflage 2003, § 14 Rdn. 321). Seit der Eintragung der Marke am 20.11.2006 ist die Bekanntheit des Sozialen Netzwerks der Klägerin und damit der geschützten Grafik bis heute stark gewachsen. Die Presseberichte, Blogs und Blog-Kommentare des **Anlagenkonvolut K 13** zeigen, wie sehr die gegenständliche Grafik weit über die angesprochenen Verkehrskreise hinaus mit der Dienstleistung der Klägerin verknüpft ist.

146    Soweit die Beklagte in ihrer negativen Feststellungsklage, die Kennzeichnungskraft der Bildmarke Registernummer 30663271.3 anzuzweifeln sucht, indem sie darauf verweist, dass die deutsche Bildmarke Registernummer 30663270.5 (Abbildung nachfolgend) wegen absoluter Eintra-



gungshindernisse gelöscht worden sei, ist dieser Verweis untauglich und irreführend. Die Beklagte verschweigt, dass die Bildmarke nur deshalb gelöscht worden ist, weil die Klägerin keinen Widerspruch gegen den Löschungsantrag, der übrigens von der Beklagten stammte, eingelegt hat. Die Klägerin hat deshalb keinen Widerspruch eingelegt, weil sie aufgrund der hier gegenständlichen Bildmarke Registernummer 30663271.3 keinen Bedarf an der anderen Marke mehr für sich sah. Wie der Beklagten unzweifelhaft bekannt sein dürfte, hat das Deutsche Patent- und Markenamt mangels Widerspruch keine inhaltliche Prüfung des Löschungsantrags der Beklagten vorgenommen (vgl. Ingerl/Rohnke, wie vor, § 54 Rdn. 5). Dass die Beklagte dem Landgericht Stuttgart solche Informationen vorenthalten wollte, spricht für sich.

147 **1.2.4** Die Beklagte verwendet ein zu der Marke Registernummer 30663271.3 ähnliches Zeichen für eine identische Dienstleistung (siehe Abbildung unten).



148 Die Startseite der Webseite der Beklagten ist bis auf das Logo, die größeren Schaltflächen im unteren rechten Bereich sowie die Grafik an der rechten Seite exakt gleich aufgebaut. Das Doppelbalkendesign des Top-Banners, die Anordnung des Logos links vom Top-Banner, die Einlogg-Felder und die Platzierung der zwei Schaltflächen unten rechts sind iden-

tisch. Der maßgebliche Gesamteindruck (vgl. BGH GRUR 2000, 608 [610] – ARD-1) der Benutzeroberfläche der Webseite der Beklagten ist sehr nah an der Benutzeroberfläche der Webseite der Klägerin. Mithin verwendet die Beklagte ein zumindest ähnliches Zeichen.

**149**  **1.2.5** Die Dienstleistung der Beklagten, das Anbieten eines kostenlosen Sozialen Netzwerks für jedermann, unterfällt der Klasse 38 „Telekommunikation; Bereitstellung von Online-Gesprächsforen für registrierte Benutzer zur Übermittlung von Nachrichten in Bezug auf akademisches Leben, Kleinanzeigen, virtuelle Gemeinschaft und soziales Netz; Bereitstellung des Zugriffs auf einen Online-Verzeichnisinformationsdienst für Informationen in Bezug auf akademisches Leben, Kleinanzeigen, virtuelle Gemeinschaft und soziales Netz", für das die Bildmarke der Klägerin eingetragen worden ist. Mithin handelt es sich bei dem Angebot der Beklagten um eine identische Dienstleistung (vgl. Ingerl/Rohnke, wie vor, § 14 Rdn. 426).

**150**  **1.2.6** Die Verwendung eines der Marke ähnlichen Zeichens durch die Beklagte führt zu einer <u>Gefahr von Verwechslungen</u> i.S.d. § 14 Abs. 2 Nr. 2 MarkenG. Wie aus dem **Anlagenkonvolut K 13** ersichtlich und unter **II. 12.** oben näher ausgeführt, ist es bereits zu zahlreichen Verwechslungen zwischen den Webseiten der Beklagten und der Klägerin gekommen. Nutzer haben die Webseite der Beklagten für das deutsche Facebook oder ein Lizenzprodukt der Klägerin gehalten. Dabei wären solche tatsächlichen Verwechslungen hier gar nicht Voraussetzung, da bereits die objektive Möglichkeit von Verwechslungen ausreichend ist (Ingerl/Rohnke, wie vor, § 14 Rdn. 256). Dass tatsächliche Verwechslungen stattgefunden haben, ist aber als deutliches Zeichen für eine Verwechslungsgefahr zu werten. Der hohe Grad an Übereinstimmung der Marke der Klägerin und des Zeichens der Beklagten zeigt ebenfalls, dass objektiv eine Verwechslungsgefahr besteht. So verwendet die Beklagte auf ihrer Webseite ein Top-Banner, das exakt dem in der Marke der Klägerin entspricht. Das Logo links oben hat sie dabei durch ihr eigenes ersetzt, es aber sowohl von Position aber auch Größe genau wie in der Marke der Klägerin belassen. Auch die Positionierung der weiteren Schaltflächen und Eingabefelder ist auf der Webseite der Beklagten identisch mit der hier gegenständlichen Bildmarke.

**151**  **1.2.7** Ferner kommt es analog zu **III. 1.1.6** oben auch im Sinne des Markenrechts, nämlich § 14 Abs. 2 Nr. 3 MarkenG, zu einer <u>unlauteren Ausnutzung und Beeinträchtigung der Wertschätzung</u>, welche die Bildmarke

in Form des guten Rufs des Sozialen Netzwerks der Klägerin genießt. Daher sei hier zur Vermeidung von Widerholung auf die obigen Ausführungen verwiesen.

152    **1.2.8** Da hier die Voraussetzungen des § 14 Abs. 2 MarkenG somit vorliegen, ist es gemäß § 14 Abs. 3 Nr. 3 MarkenG insbesondere untersagt, unter dem Zeichen Dienstleistungen anzubieten, wie es die Beklagte tut.

153    **1.2.9** Es besteht auch nicht, wie von der Beklagten in dem Verfahren vor dem Landgericht Stuttgart behauptet, eine prioritätsältere Marke der Beklagten. Eine dem hier gegenständlichen Zeichen entsprechende eingetragene Bildmarke der Beklagten gibt es nicht. So beruft sich die Beklagte auch nur auf eine Marke durch Benutzung nach § 4 Nr. 2 MarkenG. Allerdings verkennt die Beklagte dabei, dass die bloße Aufnahme der Benutzung des Zeichens nicht schon zu einem Markenschutz oder Vorbenutzungsrecht führt (vgl. BGH GRUR 1998, 412 [414] – Analgin; OLG München NJWE-WettbR 1999, 156 – Rialto-Heizkörper). Eine Priorität eines verwendeten Zeichens gegenüber einer eingetragenen Marke kann sich demnach nicht so einfach ergeben, wie es die Beklagte gerne sehen würde. Insofern ist festzustellen, dass die Verwendung einer Benutzeroberfläche, die der Bildmarke der Klägerin entspricht, durch die Beklagte nicht zu einer Verkehrsgeltung zugunsten der Beklagten geführt hat.

154    So ist Verkehrsgeltung dann gegeben, wenn ein bestimmter Zuordnungsgrad zwischen einem Zeichen und der mit ihm bezeichneten Dienstleistung erreicht ist, wobei als hierbei relevante Verkehrskreise auf alle potentiellen Internet-Nutzer in Deutschland abzustellen ist (Spindler/Schuster, wie vor, § 4 MarkenG Rdn. 12, 13). Als erforderlicher Grad der Zuordnung werden als Faustregel mindestens 20 - 50 % der beteiligten Verkehrskreise angesehen (vgl. Spindler/Schuster, wie vor, § 4 MarkenG Rdn. 14), wobei im Bereich von Warenverpackungen Zuordnungsgrade am oberen Ende dieser Faustregel gefordert werden. So hat das OLG Frankfurt entschieden, dass bei Warenverpackungen ein Zuordnungsgrad von 50 % jedenfalls nicht deutlich unterschritten werden dürfe (OLG Frankfurt am Main, GRUR 1999, 591 [593] – Kabelbinderkopf). Mit einer solchen Warenverpackung ist die Benutzeroberfläche einer Webseite durchaus vergleichbar. Man spricht nicht umsonst von der „Internet-Präsentation" eines Unternehmens. Die optische Gestaltung der Webseite ist die Verpackung, in welcher die Dienstleistung eines Internet-Services angeboten wird. Ebenso wie die Warenverpackung für den Kaufanreiz mitentscheidend ist, ist auch die benutzerfreundliche und op-



tisch ansprechende Gestaltung einer Webseite entscheidend für die Frage, ob der Nutzer diese Dienstleistung in Anspruch nehmen will.

155 Im Fall der Beklagten kann keinesfalls von einem derart hohen Zuordnungsgrad des hier relevanten Zeichens zu der Beklagten unter allen potentiellen Internet-Nutzern in Deutschland oder auch nur den das Internet nutzenden Studenten ausgegangen werden. Die von der Beklagten in Stuttgart eingebrachte Anlage K 14 der dortigen Feststellungsklageschrift mit der Behauptung einer Verkehrsdurchsetzung von 46 % ist jedenfalls als Beweis untauglich. <u>Die Angabe, das Soziale Netzwerk der Beklagten habe Ende 2006 eine Million Mitglieder gezählt, ist eine durch nichts belegte Behauptung der Beklagten.</u> Diese hat aufgrund der Bedeutung von Click-Zahlen für kommerzielle Internet-Seiten schon seit je her ein Interesse daran, diese Eigenangabe der Mitgliederzahlen so hoch wie irgend möglich zu gestalten. Es ist im Internet-Angebot der Beklagten außerdem ohne weiteres möglich, sich mehrfach anzumelden, sofern man nur über mehr als eine Email-Adresse verfügt. Solche Zweitanmeldungen mit sog. „*Fake-Accounts*", also Anmeldungen unter Angabe eines falschen Namens, ist bei dem Sozialen Netzwerk der Beklagten gang und gäbe, wie sich an dem in der **Anlage K 5** enthaltenen Screenshot des Mitgliederprofils von „California Mountain Snake" im Netzwerk der Beklagten (Abbildung unten) deutlich zeigt. „California Mountain Snake" stammt ebenso wie das auf der Seite angezeigte Profilfoto aus dem Film „Kill Bill" des Regisseurs Quentin Tarantino aus dem Jahre 2003. Auch die auf dem Screenshot sichtbare „Freundin" von „California Mountain Snake", „Seven of Nine", ist eine fiktive Figur, diesmal aus der TV-Serie „Star Trek - Voyager". Und dass die Universität Paderborn eine Studentin mit Namen „Cry for Dawn" hat, mag ebenfalls zu bezweifeln sein. Die Beklagte kann angesichts dessen kaum ernsthaft behaupten, alle ihre angeblich eine Million Mitglieder seien real existierende Studenten.







156     Außerdem würde eine <u>Verkehrsdurchsetzung</u> von 46 % unter den Studen-
ten auch nichts über den <u>Zuordnungsgrad</u> aussagen. So wurde die Web-
seite der Beklagten bereits früh von den relevanten Verkehrskreisen als
Plagiat der Webseite der Klägerin erkannt und angesehen, wie sich aus
dem **Anlagenkonvolut K 13** ergibt. Bereits im Juli 2006 tauchte dieser
Vorwurf schließlich schon auf dem Internet-Auftritt des renommierten

Nachrichtenmagazins „Der Spiegel" auf, siehe **Anlagenkonvolut K 13, Seite X**. Daraus folgt, dass es zum Zeitpunkt der Anmeldung der Bildmarke Registernummer 30663271.3 der Klägerin keine prioritätsältere entsprechende Marke der Beklagten gegeben hat.

157 **1.2.10** Mithin besteht ein verschuldensunabhängiger Anspruch der Klägerin auf Unterlassung gegen die Beklagte nach § 14 Abs. 5 MarkenG.

## 2.  Zum Klageantrag 1. c.

158 Die Beklagte hat den Quellcode wie aus **Anlage K 22** (wird nachgereicht) ersichtlich ohne Einwilligung der Klägerin vervielfältigt und bearbeitet. Dadurch hat sie die Vorschriften des § 69c Nr. 1 und 2 UrhG verletzt.

159 **2.1** Das der Webseite der Klägerin zugrundeliegende Computerprogramm ist ein nach §§ 2 Abs. 1 Nr. 1, 69a UrhG geschütztes Werk (vgl. Wandtke/Bullinger, wie vor, § 69a Rdn. 18). Schon an der unter **II. 2.** beschriebenen Individualität und Schöpfungshöhe der Gestaltung zeigt sich, dass das dieser Gestaltung zugrundeliegende und diese Gestaltung entsprechend der Determinierung durch die Klägerin erzeugende Computerprogramm ein hohes Maß an Individualität aufweist sowie durch die schöpferische Leistung von Mark Zuckerberg und den weiteren Programmierern der Klägerin geprägt ist. Des Weiteren gilt auch hier der Schutz der „kleinen Münze", so dass ein Minimum an Individualität ausreichend wäre (Schricker, wie vor, § 69a Rdn. 19). Dieses Minimum wird hier weit überschritten. Das der Webseite der Klägerin zugrundeliegende Computerprogramm ist kein banales Stück Software sondern erforderte bei der Erstellung analytisch-konzeptionelle Fähigkeiten, Geschick, Einfallsreichtum und planerisch-konstruktives Denken. Die Klägerin musste verschiedene Anforderungen und konzeptionelle Überlegungen bei der Programmierung in Einklang bringen:

- Die Funktionalitäten eines Sozialen Netzwerks,

- Benutzerfreundlichkeit und Übersichtlichkeit,

- ästhetisch ansprechende Gestaltung der Benutzeroberfläche,

- Wiedererkennungswert und Alleinstellungsmerkmale gegenüber Mitbewerbern und

- die technischen Voraussetzungen des Internets.

160 So hat die Klägerin ein umfangreiches Computerprogramm erstellt, in dem die Bildschirmausgabe, also was nach der Datenverarbeitung angezeigt werden soll, festgelegt ist und welches die Webseite der Klägerin für jeden Nutzer individuell anpasst. So wird jeder Nutzer nach dem Einloggen durch eine personalisierte Seite begrüßt, die den Nutzernamen und die von ihm bekannten Informationen, z.B. regionale Angaben, berücksichtigt. Dies geschieht durch Verwendung von PHP-Skripten. Webseiten, die solche PHP-Skripte verwenden, sind als Computerprogramm urheberrechtlich geschützt, weil die Webseite ablauffähige bzw. interpretierbare Steuerbefehle enthält (vgl. Wandtke/Bullinger, wie vor, § 69a Rdn. 18).

161 **2.2** Die Beklagte hat dieses Computerprogramm ohne Zustimmung der Klägerin kopiert und auf ihre Webseite angepasst, etwa durch Übersetzung ins Deutsche und Veränderung der verwendeten Farben. Durch diese dauerhafte Vervielfältigung und Bearbeitung verstößt sie gegen die Rechte der Klägerin aus § 69c Nr. 1 und 2 UrhG.

**3.   Zum Klageantrag 2.**

162 **3.1** Wie unter **II. 11.** dargelegt, handelte die Beklagte wissentlich und damit schuldhaft. Daher besteht ein Schadenersatzanspruch der Klägerin gegen die Beklagte aus (a) Unlauterem Wettbewerb, § 9 UWG i.V.m. §§ 3, 4 Nr. 9 UWG; (b) Markenrecht, § 14 Abs. 6 MarkenG i.V.m. § 14 Abs. 1, Abs. 2 Nr. 2, Abs. 3 Nr. 3 MarkenG; sowie (c) Urheberrecht, § 97 Abs. 1 UrhG i.V.m. § 69a UrhG. Bezüglich der Voraussetzungen der Ansprüche sei auf die obigen Ausführungen unter **III. 1.** und **2.** verwiesen.

163 **3.2** Außerdem hat die Klägerin einen Schadenersatzanspruch gegen die Beklagte nach §§ 280 Abs. 1, 249 BGB. Die Beklagte hat sich zum Zwecke der Ausspähung der Webseite der Klägerin Nutzerkonten angelegt und Zugang zum Sozialen Netzwerk verschafft, siehe **Anlage K 14**. Die Nutzungsbedingungen der Webseite der Klägerin sehen allerdings vor, dass jegliches Kopieren, erneutes Veröffentlichen und Herunterladen von Seiteninhalten der Klägerin untersagt ist. So heißt es unter „Eigentumsrechte am Inhalt der Seite / eingeschränkte Lizenz":

164 „Seiteninhalte dürfen weder vollständig noch teilweise in irgend-
einer Form oder auf irgendeine Art ohne die vorherige schriftli-
che Genehmigung des Unternehmens verändert, kopiert, verteilt,
geframed, reproduziert, erneut veröffentlicht, heruntergeladen,
gescrapt, angezeigt, gepostet, übertragen oder verkauft werden,
mit der Ausnahme, dass das vorangehende nicht für deine eige-
nen Benutzerinhalte (wie unten definiert) gilt, die du auf recht-
lich zulässige Weise auf der Seite veröffentlichst. [...] Jedwede
andere Nutzung der Seiteninhalte ist strikt untersagt."

165 Genau dies hat durch das Ausspähen der Webseite der Klägerin durch die
Beklagte aber stattgefunden. Die Beklagte hat durch den Vorgang und im
Vorgang des Ausspähens Seiteninhalte der Webseite der Klägerin, näm-
lich Aufbau, Gestaltung, Funktionen und Funktionsbezeichnungen sowie
Stylesheets und grafische Designs kopiert, heruntergeladen und auf ihrer
Webseite mit geänderten Farben wieder veröffentlicht.

166 Mithin hat die Beklagte gegen die Nutzungsbedingungen der Webseite
der Klägerin verstoßen. Aus dieser Pflichtverletzung des durch die vorhe-
rige Registrierung, die für den Zugang erforderlich war, geschlossenen
Vertrags resultiert ein Schadenersatzanspruch nach § 280 Abs. 1 BGB.
Das Verschulden der Beklagten wird gemäß § 280 Abs. 1 S. 2 BGB ver-
mutet.

167 **3.3** Die Klägerin befindet sich in dem Prozess der Ermittlung der konkre-
ten Schadenshöhe, der sich der Natur der Sache nach schwierig und kom-
plex gestaltet. Ferner hat die Klägerin die Wahl zwischen den drei Scha-
densberechnungsmethoden des entgangenen Gewinns, der Lizenzanalogie
und der Herausgabe des Verletzergewinns. Bereits jetzt hat sie jedoch ei-
nen Anspruch auf Feststellung der Schadenersatzpflicht der Beklagten
dem Grunde nach. Das nach § 256 ZPO erforderliche Feststellungsinte-
resse besteht.

168 Alternativ möge das Gericht den Schaden jeweils gemäß § 287 ZPO
schätzen.

4. **Zum Klageantrag 3.**

169 Der Auskunftsanspruch der Klägerin ergibt sich aus §§ 242, 259, 260
BGB (vgl. Palandt, BGB, 66. Auflage 2007, § 261 Rdn. 16; Schricker,
UrhG, 3. Auflage 2006, § 97 Rdn. 81 ff.).



170    Eine beglaubigte und eine einfache Abschrift sind beigefügt. Sollte das Gericht weiteren Sachvortrag für erforderlich erachten, wird um einen entsprechenden richterlichen Hinweis gebeten.


Dr. Katharina Scheja
Rechtsanwältin