*On letterhead of Heymann & Partner Rechtsanwälte*

Exhibit B 1

Cologne Regional Court
Luxemburger Str. 101
50922 Cologne

0249.001 KS/CMW (please
quote in all correspondence)

Counsel:

19.11.2008

## STATEMENT OF CLAIM

**of Facebook Inc., 471 Emerson Street, CA 94301-1605 Palo Alto, USA, represented by its board members, Mark Zuckerberg, Jim Breyer, Peter Thiel and Marc Andreessen,**

**- Plaintiff -**

Counsel:

Rechtsanwälte Heymann & Partner,

Taunusanlage 1, 60329 Frankfurt am Main,

**v**

**StudiVZ Ltd., Saarbrücker Straße 38, 10405 Berlin, represented by its directors Dennis Bemmann, Michael Brehm and Dr Clemens Riedl,**

**- Defendant -**

on the grounds of ceasing and desisting, compensation and recognition from *inter alia* unfair competition law, copyright law.

**Provisional dispute value: EUR 1,000,000**

In the name of and with power of attorney for the Plaintiff we file this claim, pay the court costs in the form of a crossed check and request that the court:

1. **order the Defendant to refrain from**

  a. **Copying and/or providing access to the "Look & Feel" and the screen as set out in Exhibits A 1 to A 4 or processed versions thereof, in particular by**

   aa. **Using a double-bar design as set out in Exhibit A 1 and/or**

   bb. **Using the specific color scheme as set out in Exhibit A 2 and/or**

   cc. **Using a three-column website structure as set out in Exhibit A 3 and/or**

   dd. **Using a typography (font type and size) as set out in Exhibits A 1, A 2 and A 3 and/or**

   ee. **Using a style sheet as set out in Exhibit A 1 and/or**

   ff. **Using a poke function ("gruscheling") as specifically set out in Exhibit A 4 and/or**

   gg. **Placing buttons, function fields and information fields as set out in Exhibits A 1, A 2 and A 3,**

   **or having such acts carried out by third parties.**

    b.  **Using the pictorial mark of the Plaintiff registered number 30663271.3 (Exhibit K 10) as set out in Exhibit A 5, in particular offering or providing services with this symbol, as has happened in Bundle of Exhibits K 5,**

    c.  **Copying or having copied the source code or processed copies thereof as set out in the DVD in Exhibit K 22 (confidential, only for the court).**

**2.**    **We further request that the court finds that the Defendant is obliged to compensate the Plaintiff for all loss suffered and still to be suffered owing to the acts specified in Motion 1. for the period since 01.01.2005;**

**3.**    **that the court orders that the Defendant provide the Plaintiff with written information about the period stipulated in Motion 2. and provide an account of periods and scope of acts under Motion 1. and of the extent of the proceeds generated by the Defendant as a result of Motion 1, including but not restricted to, proceeds from advertising and cooperations with other companies and how high the overheads are compared with these proceeds;**

**4.**    **and that the court orders the Defendant to bear the costs of the proceedings;**

**5.**    **and that the court declares the decision provisionally enforceable.**

If the conditions of § 307 or § 331 of the German Code of Civil Procedure have been satisfied we now request that the court

    **issues a judgment by formal acknowledgement of the claim or a default judgment**.

**Preliminary Remark**

Since 11 November 2005 the Defendant has been operating a social network on the Internet addressed to various user groups under the names StudiVZ, SchülerVZ (since 21.02.2007) and meinVZ (since 28.02.2008). This network is a direct imitation of the website of the Plaintiff. Facebook has been active on the market in the USA since 04.02.2004 and has been trying increasingly since the beginning of 2008 to gain a foot in the German market among other markets. However, it is prevented from doing so in Germany because of the plagiaristic website of the Defendant. There is a legal dispute already pending between the parties in the USA relating to the markets there. In Stuttgart the Defendant filed a claim for a negative declaratory judgment (case no. 17 O 423/08) which is no longer allowed owing to this statement of claim.

In the following the Plaintiff will illustrate that the Defendant knowingly copies the website of the Plaintiff and for many years has simply copied and adjusted systematically without exception each of the changes made by the Plaintiff, in particular relating to new "features". The Plaintiff will prove that the nature of this assumption is unlawful from several legal points of view.

As this legal dispute concerns the core of the business activities of the Plaintiff and of the Defendant the Plaintiff considers the following pleadings are confidential and therefore requests that relevant precautions are taken. The Plaintiff will also regard all pleadings from the Defendant as confidential and handle them accordingly.

**Table of Contents**

|  | Marginal number |
|---|---|
| **I. Parties** | 1-2 |
| **II. Facts** | |
| **1.** Network of the Plaintiff | 3-6 |
| 2. Original Look & Feel | 7-18 |
| 3. Network of the Defendant | 19-28 |
| 4. Success story of Plaintiff's offer | 28-31 |
| 5. Early accusations of plagiarism against Defendant in the "community" | 31-40 |
| 6. Technical documentation of the plagiaristic website | 40-55 |
| 7. Origins of "StudiVZ" | 56-58 |
| 8. Derivative assumption v audacious copying | 59-66 |
| 9. Theft of source code | 67-70 |
| 10. Admissions of founders of Defendant | 71-79 |
| 11. Intentional nature of imitation | 80-83 |
| 12. Market confusion and deception as to origin | 84-93 |
| 13. Good reputation of Plaintiff affected adversely | 94-105 |
| 14. Competition relationship of parties, loss of income of Plaintiff | 106-109 |
| 15. Attempts of Plaintiff to achieve a mutual solution | 110-114 |
| **III.** Legal Situation | |
| Competence | 115-119 |
| 1. Motions 1. a and b. | 120 |
| 1.1 § 8 Unfair Competition Act as read with §§ 3, 4 no. 9 Unfair Competition Act | 121 - 140 |
| 1.2. § 14 (5) Trademark Act as read with § 14 (1), (2) no. 2, (3) no. 3 Trademark Act | 140 -157 |
| 2. Motion 1 c | 157-161 |
| 3. Motion 2. | 162-167 |
| 4. Motion 3. | 168-169 |

The details are as follows:

### I. Parties

1      The Plaintiff is an "incorporated" with its registered office in Palo Alto, USA. It was established in 2004 and offers under the domain www.facebook.com a free "social Internet network" in which everybody can set up a profile page after registration and make contact with other users. A color printout of the website of the Plaintiff is attached as

**Exhibits K 1 and K 4.**

2      The Defendant was established as a British limited company with its registered office in Birmingham and business premises in Berlin in October 2005 by Ehssan Dariani and Dennis Bemmann. Since 02.01.2007 Defendant has been part of the Holtzbrinck group. It also offers a free social network on the Internet which is operated under the domains "www.studivz.net","www.schuelervz.net" and www.meinvz.net. StudiVZ's offer is directed towards students, SchülerVZ's to school pupils and meinVZ's to everyone. Please find attached as

**Bundle of Exhibits K 5.**

### II. Facts

### 1. Network of the Plaintiff

3      The network of the Plaintiff with more than 120 million users (as of August 2008) is one of the largest social networks on the Internet in the world and has an unrivalled story of success.

4      The design and function of the offer of the Plaintiff originated with the then Harvard students Mark Zuckerberg (current director of the board of the Plaintiff) and Dustin Moskowitz who developed the original version of the website of the Plaintiff and published it in February 2004 (initially only for Harvard students) under the domain name "www.thefacebook.com". In 2005 Plaintiff acquired

the domain "www.facebook.com" and continued to provide its offer under this domain. The "the" also was deleted from the name so that the Plaintiff has since only been known as Facebook. A color printout of the website of the Plaintiff of October 2005 is attached as

**Exhibit K1**

and is depicted in the following.

Start page October 2005



Log-in page October 2005



Registration page October 2005



*On letterhead of Heymann*
*& Partner Rechtsanwälte*

Profile page October 2005





Messages page October 2005

Facebook | My Messages - Mozilla Firefox

File   Edit   View   Go   Bookmarks   Tools   Help

http://stanford.facebook.com/mailbox.php

Getting Started   Latest Headlines

**facebook**
My Messages

home   search   global   account   invite   help   logout

Quick Search

My Profile    edit
My Friends
My Photos
My Groups
My Places
My Events
My Messages
My Account
My Privacy

You have 56 messages. Displaying messages 1 - 20.                    1 2 3 next

Quick send to:                    Go

Incoming  Outgoing

| ☐ | Status | From | Subject | | |
|---|--------|------|---------|---|---|
| ☐ | seen | Daniel Garma | JOIN THE CAMP RISING SUN ALUMNI GROUP AT FACEBOOK | 10.18.05 12:47pm | read reply del |
| ☐ | seen | Kappa Kappa Gamma | Love from Bianca | 10.17.05 4:57pm | read reply del |
| ☐ | seen | Gary Marshal | hi | 10.17.05 | read reply del |
| ☐ | ans | Shira Pinnas | hey neon!! | 10.14.05 | read reply del |
| ☐ | seen | Luke Cohler | We might as well be friends... | 10.03.05 | read reply del |
| ☐ | seen | Kappa Kappa Gamma | Party on the Edge | 09.22.05 | read reply del |
| ☐ | seen | Anna Wolters | si | 09.13.05 | read reply del |
| ☐ | seen | Stephanie Ousts | Hey! | 08.23.05 | read reply del |
| ☐ | seen | Tom Yo | re: hiii | 08.21.05 | read reply del |
| ☐ | ans | Derek Lebedan | 760 Date Dash | 08.18.05 | read reply del |
| ☐ | ans | Eric Nguyen | Addy | 08.10.05 | read reply del |

Done







5      Using the structure of Mark Zuckerberg and Dustin Moskovitz the network of the Plaintiff is based on the circumstance that each user sets up a profile page about him- or herself on which he or she puts the information he or she wishes to put there, e.g. regional information (place of residence, university attended) or interests and hobbies. Other users may look at this page and leave messages on the virtual pin board or greet the user. The term which is used for this on the platform is "poke" in German "*anstupsen*" or "*grüßen*".

6      Each user also has a list of friends. Messages can also be sent to the users on this list of friends. A search can be carried out a subject to certain criteria (interests, hobbies, etc.) in order to make new friends. Each user can also set up a photo album in which he or she puts photographs. Many newly developed functions have been added since "thefacebook.com" started. An overview of functions of the website of the Plaintiff is attached as

**Exhibit K 8.**

## 2. Original "Look & Feel"

7      The Plaintiff's website is original because of its innovative "Look & Feel". The founders of the Plaintiff Mark Zuckerberg and Dustin Moskovitz chose on purpose a simple and particularly user-friendly interface for the website which does not distract the user with flashing advertising windows or similar. The website also does not let the user individually modify the "Look & Feel" and therefore always maintains a recognizable external appearance.

      Evidence: Private expert report from American expert for social networks Assistant Professor Clifford Lampe (**Exhibit K 11**)

**8**      The three-column structure of the profile pages which are absolutely central for Internet network websites made it possible for the user even in an earlier version in 2005 (top of page 7 and **Exhibit K 1**) to control the main functions of the website with one click on the left, to control in the middle the functions of the chosen subpage directly and to see a photograph of

the owner of the profile and on the right to record information about the user at one glance. To do so Facebook uses only very few graphics, a minimalistic style whereby the user photograph and a small advertising field on the left are the most striking graphics.

**Evidence:** Private expert report from American expert for social networks Assistant Professor Clifford Lampe (**Exhibit K 11**)

Visual inspection

Expert report

9        A key feature of the design and a novelty even in the earlier version of the website of the Plaintiff was also the unique use of a uniform color scheme. The top banner of the website of the Plaintiff was in dark blue and the one below in a lighter blue. The lettering was in white on the dark blue area and over to the far left the Plaintiff's logo could be seen (see graphic above).

10      This basic design of the website of the Plaintiff is also subject of the pictorial mark registered number 30663271.3 (printout of extract from register of the German Patent and Trademark Office is attached as

**Exhibit K 10).**

11      In the actual information area in the middle and right-hand columns the color scheme was reversed. The headings here were written in white script on the light blue of the top banner and the darker blue of the top banner was used lower down.

12      In addition, the structure of the user interface on each subpage of the website stayed the same for the typical "Look & Feel" maintained over many years so that the user him-/herself knows even on a new subpage where which function can be found. This means that the user interface of Facebook has a high recognition value and identification factor. The users feel as if they are "at home".

14

**Evidence**: Color printout of the website of the Plaintiff of October 2005 (**Exhibit K 1**)

Private expert report from American expert for social networks Assistant Professor Clifford Lampe (**Exhibit K 11**)

Private expert report from the publicly appointed and certified IT expert Dipl.-Prog. Bernward Schrader, pages 16 ff. (**Exhibit K 12**).

Expert report

13    These decisions of the Plaintiff about its "Look & Feel" and its user interface constituted a strong unique feature compared with the other social networks then active when the Plaintiff entered the market of social networks in 2004.

14    In particular a comparison with other websites from the initial period of the Plaintiff's website and therefore with social networks as a whole makes this unique nature quite clear. Many websites are overloaded with pictures, animations and various colors. On the other hand the website of the Plaintiff is pleasant, plain, uniform and easy to handle. For example the homepage of the social network MySpace, which used to be the largest social network in the world and has now been overtaken by Facebook, has more than 14 graphics whereas the homepage of Facebook only has one. This original feature is also on the profile page of the Plaintiff's website. For example Facebook has a very minimalistic style and uses very few graphics on the profile page whereby the user photograph and a small advertising window on the left-hand side are the most important graphics. MySpace on the other hand uses many very dominant graphics in order to create a "wilder" user interface. The user interface constructed on purpose with user-friendliness in mind by Facebook was a novelty when the website of the Plaintiff was first published.

**Evidence**: Color printout of website of other providers of social networks from November 2008 for comparison (**Bundle of Exhibits K 7**).

Private expert report from American expert for social networks Assistant Professor Clifford Lampe (**Exhibit K 11**)

Private expert report from the publicly appointed and certified IT expert Dipl.-Prog. Bernward Schrader, pages 16 ff. (**Exhibit K 12**).

Expert report

15  The most important unique features of the user interface of the Plaintiff can therefore be summarized as follows:

- Facebook uses few graphics and a minimalistic style,
- Facebook uses a uniform color scheme pleasing to the eye,
- Facebook uses a unique color scheme for the top banner with the dark color above and the lighter color below and the white writing on the dark background and a logo on the top left,
- Facebook uses a mirror image of the color scheme in the information area,
- Facebook uses a three-column structure for the profile pages,
- Facebook restricts the individualization of pages,
- All subpages of Facebook have a uniform design.

16  In order to retain the high recognition factor generated by the "Look & Feel" of the Plaintiff's website the Plaintiff has been very careful about the modifications made to the structure of its user interface and has left the most important recognition factors unchanged. The three-column structure of the profile page, an important factor distinguishing the website of the Plaintiff from competing offers has always been retained. The color scheme has basically remained the same and in the top banner white writing on the dark background has been consistently used throughout (see illustrations below and in **Exhibit K 4**).

**Evidence:** color printout of the website of the Plaintiff of September 2008 (**Exhibit K 4**)

Profile page September 2008



*On letterhead of Heymann & Partner Rechtsanwälte*

Messages page September 2008



17    The overwhelming element of the division of the user interface of the profile pages into three columns and the clear design used on purpose have been continued through the years on purpose just as the special color scheme and the white writing on the dark background of the top banner. This website structure is inextricably linked with the Plaintiff as far as the user is concerned.

      Evidence: Private expert report from American expert for social networks Assistant Professor Clifford Lampe (**Exhibit K 11**)

            Private expert report from the publicly appointed and certified IT expert Dipl.-Prog. Bernward Schrader, pages 16 ff. (**Exhibit K 12**).

            Expert report

18    This is why the Plaintiff did not undertake to carefully renew its website until the end of September 2008. This new website retains the most important marks of distinction.


      **3.   Network of the Defendant**

19    The website of the Defendant, initially "www.studivz.de, and later also "www.studivz.net" and "www.studivz.com", was from the outset a (German-speaking) takeover of the website of the Plaintiff. The user interface was taken over nearly on a one-to-one basis. The only change was the swap of the colors dark blue/light blue with red/light red (see illustrations below).

*On letterhead of Heymann & Partner Rechtsanwälte*

Start page December 2005



Log-in page December 2005



Registration page December 2005



20      All dominant elements of the user interface of Facebook were taken over as can be seen from the illustrations below and above:

- the intentionally particularly plain user interface easy to handle and therefore optimized for user-friendliness,
- the unique color scheme for the top banner with the dark color above and the lighter color below and the white writing on the dark background and a logo on the top left,
- the mirror image of the color scheme on the top banner in the information area,
- the three-column structure of the profile pages with the exact division of the main functions on the left, the subfunctions and the profile photo in the middle and the information on the right,
- the restricted individualization of pages,
- the uniformity of all subpages.

Evidence:  Color printout of the website of the Defendant of December 2005 (**Exhibit K 2**) and color printout of the websites of the Defendant of November 2008 (**Bundle of Exhibits K 5**).

          Comparison of screenshots of websites of Facebook and StudiVZ from 2005 (**Exhibit K 3**)

          Comparison of screenshots of websites of Facebook and StudiVZ from 2008 (**Exhibit K 6**)

Start page November 2008



Profile page November 2008



*On letterhead of Heymann & Partner Rechtsanwälte*

Messages page November 2008



Photo page November 2008 (Photo link function)

21        In particular, the three-column structure of the profile pages was copied exactly even down to the pixel width of the individual columns. The font type and size were also assumed nearly identically.

Evidence:  Color printout of the website of the Defendant of December 2005 (**Exhibit K 2**) and color printout of the websites of the Defendant of November 2008 (**Bundle of Exhibits K 5**)

Comparison of screenshots of websites of Facebook and StudiVZ from 2005 (**Exhibit K 3**)

Private expert report from American expert for social networks Assistant Professor Clifford Lampe (**Exhibit K 11**)

Private expert report from the publicly appointed and certified IT expert Dipl.-Prog. Bernward Schrader, pages 10 ff. (**Exhibit K 12**).

Expert report

In the following comparison of a Facebook profile page of May 2006 with a StudiVZ profile page of November 2008 note in particular the identical positioning of the buttons on the left and the information fields on the right, in particular "Information" and "Information", "groups" and "Gruppen" and "wall" and "Pinnwand":

*On letterhead of Heymann & Partner Rechtsanwälte*





22     The Defendant also took over parts of the text of the website of the Plaintiff word for word. For example on the start page of the website of the Claimant of October 2005 there were three points "Look up people at your school", "See how people know each other" and "Find people in your classes and groups". The Defendant has the following four points on its website of December 2005

- "Finde andere Studis an Deiner Hochschule" (which plainly is a direct translation into German of "Look up people at your school"),
- "Finde heraus, was für Leute in Deinen Lehrveranstaltungen sitzen" (which is a translation into German of "Find people in your classes and groups"),
- "Finde Kommilitonen für Lern- und Übungsgruppen" and
- "Finde heraus, wer wen kennt" (which corresponds to the "See how people know each other " of the Plaintiff).



23     The Defendant largely copied the successful concept of the Plaintiff and its website, replaced the logo of the Plaintiff with its own and translated the text into German and changed the order of it.

24       The following were also copied

- log-in area on the left-hand side with the field for the e-mail address above and password below,
- the buttons top right with the exact order of the buttons "login" (Plaintiff) and "einloggen" (Defendant), "register" (Plaintiff) and "Immatrikulieren" (Defendant), "about" (Plaintiff) and "über uns" (Defendant) and "help" (Plaintiff) and "hilfe" (Defendant).

Evidence: Color printout of the website of the Plaintiff of October 2005 (**Exhibit K 1**)

Color printout of the website of the Defendant of December 2005 (**Exhibit K 2**)

Comparison of screenshots of websites of Facebook and StudiVZ from 2005 (**Exhibit K 3**)

25       The Defendant also assiduously "used" features of the Plaintiff which constitute a major part of the "Look & Feel" as they give the user a feeling of confidence, the feeling of being "at home" as can be seen from the following comparison of the major functions of the website of the Defendant and of the Plaintiff also attached as

**Exhibit K 9.**

26       In this case the Defendant waited on each occasion for the market introduction of a new function by the Plaintiff and only assumed it if the new function was well received by the users. If the function was successful the function was then assumed by the Defendant with identical or similar structure.

**Evidence:** Mark Howitson, in-house lawyer of the Plaintiff, as

**- Witness -**

| Function | Facebook since | StudiVZ since |
|---|---|---|
| Setting up and structuring a profile page with a photo of the user | February 2004 | November 2005 |
| Find friends | February 2004 | November 2005 |
| Add people to list of friends | February 2004 | November 2005 |
| Greeting or "poking" other users | February 2004 using the term "poke" | November 2005 using the term "gruscheling" |
| Sending personal messages to other users | February 2004 | November 2005 |
| Setting up or joining groups in which specific topics can be discussed | September 2004 | November 2005 |
| Pinboard on the page of the user on which other users can leave short messages | September 2004 | November 2005 |
| Putting videos and photos on the site | October 2005 (photos) May 2007 (videos) | November 2005 (photos) |
| Marking people on photos | Probably October 2005 with the name "tag" | September 2006 using the term "link photos" |
| Window in which the user can record his/her current status (e.g. ill, sad, etc.) for others to read | April 2006 | June 2007 |
| Observation list informing friends of news | September 2006 using the term "News-Feed" | Introduction under review according to StudiVZ |
| Involvement of applications of external developers in the website by users | May 2007 | Introduction by entry into "OpenSocial" initiative of Google in October 2008. |
| Chatting with persons on the list of friends (instant messenger) | April 2008 using the term "Chat" | October 2008 using the term "Chat Box" |

27     The same applies to the newer websites of the Defendant, SchülerVZ and meinVZ. They have the same "Look & Feel" as the "parent" StudiVZ which itself is a plagiarism of the website of the Plaintiff. The Defendant only changed the color scheme red/light red (StudiVZ) to pink/light pink (SchülerVZ) and orange/light orange (meinVZ).

Evidence: color printout of the websites of the Defendant (**Bundle of Exhibits K 5**).

visual inspection of the websites "www.schuelervz.net"    and "www.meinvz.net"

### 4.  Success story of Plaintiff's offer

28     When the project started in 04.02.2004 the Internet network of the Plaintiff was only available to students at Harvard University. However, by the end of February more than half of all students at Harvard University had "joined".
The Plaintiff then began in March 2004 to make its offer available gradually to all students at universities in the USA and then in Canada. In September 2005 the offer then became available for American high school pupils and finally in September 2006 to everybody worldwide. Recently the threshold of 120 million active Facebook users worldwide was reached.

Evidence in the event that this is disputed: Mark Howitson, in-house lawyer of the Plaintiff, as

- Witness -

Wikipedia entry about the Plaintiff (to be submitted subsequently if necessary)

29     The Defendant took the opportunity of this success to market a one-to-one copy of Facebook in Germany. Its founders -- Ehssan Dariani and Marc Bemmann - made no secret of this at all. For example, Ehssan Dariani stated for the first time to Spiegel International in July 2006:

"We may have oriented ourselves along the lines of the Facebook layout."

Evidence: Spiegel International „StudiVZ Takes on Facebook", 11.7.2006
**(Bundle of Exhibits K 13, page 28)**

30      The photographic comparison of the websites is an impressive illustration of
these complete takeovers:

<u>Start pages of Facebook (October 2005) and StudiVZ (December 2005)</u>



Log-in pages of Facebook (October 2005) and StudiVZ (December 2005)



Registration Facebook (October 2005) and StudiVZ (December 2005)



<u>General business terms and conditions for Facebook (October 2005) and StudiVZ (December 2005)</u>





Profile pages Facebook (May 2006) and StudiVZ (November 2008)





**5. Early accusations of plagiarism against Defendant in the "community"**

31    The nearly identical "Look and Feel" of the Defendant compared with the Plaintiff has been missed neither by the press not by the Internet community with its numerous bloggers (Internet users who operate an Internet diary or commentary pages) which is why the Defendant has been exposed to considerable criticism and accusations of plagiarism from an early date. Some of these reports and commentaries are cited below for ease of reference.

Evidence: Spiegel International "StudiVZ Takes on Facebook", 11.07.2006 **(Bundle of Exhibits K 13, page 28)**

Commentaries on article "the digital poetry album: 400,000 students in StudiVerzeichnis" at readers-edition.de, 28.08.2006 (in particular comments no. 9, nr. 19, no. 35, no. 39, no. 43, no. 44, no. 46, no. 50, no. 53, no. 55, no. 63, no. 65) **(Bundle of Exhibits K 13, page 1)**

Blog "Der Bumi", Michael Bumann, "StudiVZ in original Facebook colors...", 03.10.2006 **(Bundle of Exhibits K13, Page 31)**

Blog "Sebbis Blog", Sebastian Herp, "Only German at Facebook", 04.10.2006 **(Bundle of Exhibits K 13, Page 46)**

Blog "Basic Thinking", Robert Basic, "Web + Klonen = 2.0, Facebook = Klonschaf StudiVZ", 06.10.2006 **(Bundle of Exhibits K 13, page 51)**

Blog "Alltagskakophonie", Kai Uhlemeyer, "Plagiarisms and what's been on my mind for a long time ", 09.10.2006 **(Bundle of Exhibits K 13, page 59)**

Screenshots from Kai Uhlemeyer "Find the differences" on ipernity.com **(Bundle of Exhibits K13, page 60)**

Frankfurter Allgemeine Zeitung "We are an alternative to Sat.l and Co.", 24.10.2006 **(Bundle of Exhibits K 13, page 62)**

Technology Review "I was not there at the time", 13.11.06 **(Bundle of Exhibits K 13, page 65)**

Spiegel Online "Awkward accidents bring StudiVZ a bad name", 15.11.2006 **(Bundle of Exhibits K13, page 69)**

**32**     This is what Spiegel International reported in an article on 11.07.2006 about the Defendant

"Indeed, after the sluggishness, the site's similarity to Facebook is the most common criticism of StudiVZ. […] Otherwise, however, the differences are in name only. For example, on Facebook users can "poke" one another; on StudiVZ, Dariani coined the term "gruscheln" — a popular word among users, but the function is nonetheless identical to the "poke".")

Evidence: Spiegel International "StudiVZ Takes on Facebook", 11.07.2006 **(Bundle of Exhibits K 13, page 28)**

33     Furthermore, a user with the name "Volker" commented in an article about the Defendant on aufreaders-edition.de on 28.08.2006 in the following words:

"When I first saw advertising about this website (to be more exact spam mail to a mailing list) one thing occurred to me: the layout and the functions are the same as Facebook (which is something I knew already)."

Evidence: Commentary no. 19 on article "The digital poetry album: 400,000 students in the StudiVerzeichnis" on readers-edition.de, 28.08.2006 **(Bundle of Exhibits K13, page 1)**

**34**     A third quote is provided as an example. In the Internet blog alltagskakophonie.de Kai Uhlemeyer wrote on 09.10.2006:

36

"When my iPod was last changed the phrase "don't steal music" was written on the protective foil in large lettering which could not be overlooked." No, my music has got nothing to do with this entry but with "lending'/'borrowing" (to put it mildly) if one compares the German StudiVZ and the English Facebook. Therefore my personal plagiarism award goes to the originators of StudiVZ. Perhaps a protective foil with the wording "Don't copy design so obviously" should have been stuck on Facebook. Then the gentleman at StudiVZ would most likely have noticed that they had managed to produce a one-to-one copy of the model Facebook. I myself find that the features in common are really very obvious. Compare the websites briefly and any commentary is superfluous."

Evidence: Blog "Alltagskakophonie", Kai Uhlemeyer, "Plagiarism and what's been on my mind for a long time ", 09.10.2006 **(Bundle of Exhibits  K 13, page 59)**

35　　　　There are <u>no technical or functional</u> reasons which could explain or justify such a detailed close imitation of the websites of the Plaintiff. The screenshots of other social networks set out below and attached as **Bundle of Exhibits K 9** show that there are many different designs and possible "Look & Feel".

**Evidence:** Private expert report from American expert for social networks Assistant Professor Clifford Lampe (**Exhibit K 11**)

Private expert report from the publicly appointed and certified IT expert Dipl.-Prog. Bernward Schrader, pages 18 ff. (**Exhibit K 12**).

Expert report

LinkedIn profile
page





Who knows whom profile
page

38

36          For example the social network MySpace (illustration above and in
            **Bundle of Exhibits K 7**) has a very colorful and complicated "Look &

MySpace profile page



Feel" which however can be totally individualized by each user for
his/her own profile page, something that the Plaintiff and therefore also
the Defendant do not offer. The renowned publicly appointed and
certified expert Dip
lom-Programmierer Bernward Schrader commissioned by the Plaintiff
owing to the action for negative declaratory judgment of this Defendant
at the Stuttgart Regional Court ascertained when comparing the
presentations of Plaintiff, Defendant and MySpace (page 19 of the expert
report in Exhibit K 12)

> *Further investigations have revealed that the presentation
> "myspace.com" is completely different from the presentations
> "facebook.com" and "studiVZ.de". I was unable to find any
> significant similarities with regard to layout, Look & Feel or
> functionality."*

37          The expert also looked at the social networks Xing and LinkedIn. He
            came to the conclusion (page 19 of the expert report in **Exhibit K 12**):

> *"There is no need for me to record my findings on graphics and
> in appendices as my research was unable to ascertain any
> significant similarities between these*

> *presentations of third parties with <u>facebook.com</u> and <u>studiVZ.de.</u> The three presentations investigated by me from third-party providers are on the other hand so different that there is no need to make a comparison. A comparison would be clearly and simply not sensible. These three presentations do not have any similarity with my investigations relating to Facebook and StudiVZ."*

38  These other social networks therefore show that it is possible to produce completely different "Look & Feel" than that of the Plaintiff. This also shows that the extreme similarity of the website of the Defendant with the website of the Plaintiff is not for any technical or functional reasons. The websites of the other social networks also satisfy all technical and functional conditions of a social network but in clearly completely different possible ways.

39  The sole indispensable conditions of a social network are that a profile of each member is provided and that a list of friends can be prepared and inspected. Decisions such as the target group, which fields are to be used in order to form the profile, how the information is to be organized and presented, etc. can all be made freely by the programmers of the site.

Evidence: private expert report from American expert for social networks Assistant Professor Clifford Lampe (**Exhibit K 11**)


**6. Technical documentation of the plagiaristic website**

**40**  Once the Plaintiff had had an action filed against it on 18.07.2008 by the Defendant in Stuttgart by means of the negative declaratory judgment the Plaintiff had a private expert report provided by the renowned <u>publicly appointed and certified IT expert</u> <u>Diplom-Programmierer Bernward Schrader</u> to ascertain exactly how close the similarities of the "Look & Feel" pleaded above actually are. The expert report is attached as **Exhibit K 12**.

**6.1 Content of expert report**

41      The expert prepared his investigation on three levels in order to provide a structured analysis and therefore to be able to objectively assess the degree of similarity of the "Look & Feel" of the website of the Defendant compared with the website of the Plaintiff.

42      6.1.1 First the expert carried out a <u>programmatic analysis.</u> Therefore he investigated the programmed code of the websites especially as regards the style sheets. Such style sheets are files which can be compared with templates of a data processing program which the Plaintiff produced in order to be able to apply the uniform "Look & Feel" on all subpages of its website.

43      This is where the expert made his most notable discovery. The expert extracted the style sheets from the current Facebook website which still includes the important parameters from the original Facebook version from 2005 and applied them to the website of StudiVZ (page 11 of the expert report in Exhibit K 12, for technical details please see the report):

> *"The programmatic consistency of the stylesheets of the StudiVZ website is so identical with the original Facebook programming that after applying the Facebook stylesheets to the StudiVZ website there is a high correlation as set out in Appendix A.2.2 .*
> *If this similarity with the Facebook stylesheets is then compared with Appendix A.2.3 the extent to which the StudiVZ website is based on the original Facebook presentation from 2005/2006 as far as the stylesheets are concerned becomes clear.*
> *From a technical point of view this means that the stylesheet programming of the StudiVZ website is so harmonized with the Facebook programming that if a Facebook stylesheet is superimposed it gains an appearance consistent to a high degree with the original Facebook presentation in Appendix A.2.3. [...] As a counterexample I have included Appendix A.2.7. In this case I also applied the Facebook stylesheet to a presentation of a third-party provider for social networks (<u>myspace.com</u>) and ascertained that the stylesheet does not lead to any alignment between <u>myspace.com</u> and Facebook because of the differences in programming. The application of the Facebook stylesheet to this website did not leave any visible changes."*

44      For ease of reference see Appendix A.2.8 which compares the above steps in a manner which is easy to follow:



**Anlage A 2.8**

Hier noch einmal zum direkten Vergleich die Genealogie der Anlagen A 2.1 – A 2.3:

Links, die original StudiVZ Seite zum Bewertungsstichtag.
Mitte, diese Seite nach (mit) der Anwendung des Facebook StyleSheet.
Rechts, eine originale Facebook Seite mit Facebook StyleSheet aus dem Zeitraum 2005 / 2006.

45      On the left is the original page of the meinVZ page (belonging to the StudiVZ network and completely identical from a programming point of view), in the middle the meinVZ page with applied Facebook stylesheet and on the right the original Facebook page.

46      For comparison see Appendix A.2.9 of the expert report in the Exhibit K 12 which shows what happens when the stylesheet is superimposed on a programmatically independent website of a social network ("www.myspace.com"): that is, nothing:



**Anlage A 2.7**

Ein Beleg dafür, dass die Anwendung des StyleSheet wie es für Facebook typisch ist und wie ich es in den Anlage A 2.2 und A 2.5 auf die StudiVZ Präsentation angewendet habe, von deren programmatischen Übereinstimmung abhängig ist

Wende ich dasselbe StyleSheet, welches die Ähnlichkeit der StudiVZ Präsentation mit der Facebook Version von 2005 / 2006 belegt auf eine beliebige andere Präsentation eines "Sozialen Netzwerkes" an (hier eine Seite aus der myspace.com Präsentation) ergeben sich nahezu keine Auswirkungen, da eben die myspace Präsentation keine programmatische Übereinstimmung mit Facebook aufweist.

47     This shows that the website of the Defendant has been identical programmatically with the website of the Claimant since 2005 and still is today and also the considerable degree to which it is identical. A website which is different from a programming point of view, such as the MySpace website, shows no changes if another stylesheet is applied to it. If a website shows changes especially so considerable as those in the website of the Defendant then this means that there is a programming consistency between it and the website from which the stylesheet originates.

48     6.1.2 In the second stage the expert undertook a <u>functional analysis</u> of the websites, in particular with regard to the way in which the information is provided (layout and "Look & Feel") and the user guidance. In so doing he prepared and investigated a comparison of the functions in Appendix A 3 of his expert report (Page 14 of the expert report in Exhibit K 12):

> *"When comparing the functionalities of StudiVZ and Facebook 2005/2006 it was ascertained that a considerable number of the functionalities on the pages reviewed is identical. This identity is so extensive that the naming of the functionality is not only similar but largely the same (in as far as this is allowed by a rough translation from English into German). The functional comparison of the StudiVZ 2008 version with the Facebook 2005/2006 version discloses a considerable number of inconsistencies and only a very low number of differences."*

49     6.1.3 In the third stage, which was also the main focus of the investigation, the expert looked at the consistencies between the user interfaces, i.e. he carried out <u>an analysis of the graphics (layout) and typography (font)</u>. In his investigation he concludes the following (page 23 of the expert report in Exhibit K 12; bold type by the undersigned):

> *The comparison of the features and functionalities of the StudiVZ (meinVZ) presentation has a high degree of similarity with the features of the Facebook presentation, in particular the first generation 2005/2006. From my analysis of the programming (stylesheet), functional and also design (layout) features I conclude from my analyses and assessments that there is an overall coverage rate of 80 to 85% between **the StudiVZ presentation (including the current one)**

*and the Facebook presentation, in particular of the first generation."*

50    Thereby the expert separated the basic layout of Facebook into its component parts in order to analyze the layout (see below and in Exhibit A 4.1 of the expert report in Exhibit K 12).



**Anlage A 4.1 Beispiel des Layout der Facebook-Präsentation.**

In dem Anlagenkonvolut der ScreenShots des Auftraggebers fanden sich zahlreiche Beispiele dafür, dass sich die grafischen Konstruktionen der Facebook-Präsentation 2005 / 2006 sowie die StudiVZ-Präsentation 2006 und heute auffallend ähnlich sind. Um diesen subjektiven Eindruck zu überprüfen habe ich eine Facebook-Seite der ersten Generation mit hoher Informationsdichte (Profilseite eines Teilnehmers) einer grafischen Analyse unterzogen und die grafischen Merkmale mit Rahmen sowie einige typografische Merkmale mit ihren Bezeichnungen markiert und eingegrenzt.

51    According to this the profile page of the website of the Plaintiff consists of the following:

- (1) Title line (header)
- (2) Page navigation on the left with Facebook logo, search field and action fields
- (3) Advertising banner

- • (4) Left column of information panel with picture presentation of person
- • (5) Right column of information panel with list information of person in cascade layout:
  O (H1) Main heading
  o (H2) Subheading
  o (List) Context information

52      In accordance with Appendix A.4.3 the expert then put a StudiVZ profile page underneath this changed framework (see below and in Appendix A.4.3 of the expert report in **Exhibit K 12**).



**Anlage A 4.3** Überlagerung einer StudiVZ Seite mit dem Analyserahmen.

Genau dieselbe Rahmen, der die Facebook - Profilseite in ihre wesentliche Merkmale strukturiert, wurde von mir unverändert (1:1 Kopie) auf eine StudiVZ – Profilseite gelegt. Wenn ich einmal vom Kontext des Teilnehmers und dessen Bilderstellungen absehe, verweist die Schablone der Analyse **auf nahezu identische Merkmale des Layout** der analysierten Facebook – Seite mit der überlagerten StudiVZ Seite. Diese Analyse erlaubt eine objektivere Beurteilung des Deckungsgrades der beteiligten Präsentationen

**53**     All selected layout features are covered thereby. The expert then compared the web appearances of the Defendant and the Plaintiff using the same plan with the joint competitors myspace.com, xing.com

and linkedin.com. He came to the conclusion (page 23 of the expert report in **Exhibit K 12**):

> *"As close as the StudiVZ pages and the Facebook pages of the first generation are to one another in that there is a correlation of 80 %, conversely there is a marked distinction from other presentations (social networks) on the Internet. In this respect I investigated the presentations of myspace.com, xing.com and linkedin.com . The page structure and design options of these alternative presentations are set out in totally different ways."*

54      **6.1.4** The expert summarized as follows: (page 20 of the expert report in **Exhibit K 12**):

> *"With respect to the analyses, findings and assessments made by me I have come to the following conclusions with respect to the correlation between the presentations face-book.com und studivz.de which form the subject of this dispute with regard to the online material reviewed by me and the graphics in the bundle of exhibits and on the basis of the examples reproduced by me in the appendices:*
>
> *a) programming correlation (stylesheets) approx.70 to 80%*
>
> *b) functional consistency of Facebook version 2005/2006 with StudiVZ 2008, approx.80%*
>
> *c) correlation with respect to graphic and typographic layout between Facebook version 2005/2006 and StudiVZ 2008 80 to 85% with respect to the online material reviewed by me and the graphics in the bundle of exhibits and on the basis of the examples reproduced by me in the appendices. "*

**6.2. Assessment of expert**

55      The publicly appointed and certified IT expert Schrader confirmed the visual perception of the consistency with technical means. He objectively concluded that there is a high consistency of the design features ("Look & Feel ") between the two websites. Given the considerable degree of freedom which a programmer has when putting together an Internet site, coincidental consistencies can be ruled out as the comparison with the presences of competitors which the expert carried out has also shown.

### 7. Origins of "StudiVZ"

56    This means that the Defendant is one of a number of German Internet start-up companies with the infamous tradition of taking over the concept, design and method of functioning of successful American Internet companies and occupying the German market before if the US originals can appear on the German market. For example in Germany there are equivalents to the American e-mail portal Hotmail (Web.de, GMX), the video portal YouTube (my video), the business contact portal LinkedIn (OpenBC) and this social network Facebook (StudiVZ). What all these companies have in common is that the US provider first published its offer but restricted to the USA, the German provider then takes over the business model and the "Look and Feel" and occupies the German market before the US provider has been able to gain a footing in the German market. Later market entry is therefore difficult if not impossible for the US original as the market is already saturated with the German equivalent.

**Evidence:** Spiegel International "The clone always wins ", 20.07.2008 **(Bundle of Exhibits K 13, page 73)**

Blog "Basic Thinking", Robert Basic, "The hottest web startups in Germany?", 06.11.2006 **(Bundle of Exhibits K 13, page 75)**

TechCrunch "Web 2.0 in Germany: Copy/Paste Innovation or more?", 14.05.2007 **(Bundle of Exhibits K 13, page 77)**

Expert report

57    In contrast to its own statements the then founders of the Defendant, Dariani and Bemmann, alleged audaciously that they had "themselves" contributed some individual functions as part of an extensive production and creation of a legend. One of the two cofounders of the Defendant, Ehssan Dariani, alleged that he was the "inventor of gruscheling" although the function attributed to this made-up word of the Defendant is a one-to-one copy of the "poke" of the Plaintiff. The Plaintiff had this function more than 18 months earlier.

Evidence: Welt Online "Early retirement thanks to Web 2.0", 21.04.2007
**(Bundle of Exhibits K 13, page 103)**

58    The second co-founder of the Defendant, Dennis Bemmann, also conducts himself, in a way similar to Ehssan Dariani. Unlike Ehssan Dariani he still works today for the Defendant as "CTO" ("Chief Technical Officer" or plain "technical officer") and refers to himself as the "IT genius" behind the offer of the Defendant.

Evidence:    Commentary no. 42 on article "The digital poetry album: 400,000 students in the StudiVerzeichnis" on readers-edition.de, of 28.08.2006 **(Bundle of Exhibits K13, page 1)**

## 8.   Derivative assumption v audacious copying

The Defendant trumps by far these German Internet companies which to put it mildly, have an American role model. Although it may be acceptable to takeover a business idea the acceptable limit is overstepped when not only the idea as itself but also the design is copied slavishly down to the very last detail.



59    As far as the Plaintiff or the undersigned is aware there is no other German Internet start-up company which has copied the American original so shamelessly down to the last detail of the visual design and the " Look & Feel " elements.

Evidence: Color printouts of the website of the Defendant of December 2005
**(Exhibit K 2)**

Private expert report from American expert for social networks Assistant Professor Clifford Lampe (**Exhibit K 11**)

Expert report

Blog "Der Bumi", Michael Bumann, "StudiVZ in original Facebook colors...", 03.10.2006 **(Bundle of Exhibits K13, Page 31)**

Blog "Alltagskakophonie.de", Kai Uhlemeyer, "Imitations and what's been on my mind for a long time ", 09.10.2006 **(Bundle of Exhibits K 13, page 59)**

Screenshots from Kai Uhlemeyer "Find the differences" on ipernity.com **(Bundle of Exhibits K13, page 60)**

Spiegel Online "Awkward accidents bring StudiVZ a bad name", 15.11.2006 **(Bundle of Exhibits K13, page 69)**

FOCUS Online "The German Fakebook", 19.07.2008 **(Bundle of Exhibits K 13, page 80)**

**60**   The imitation was systematic and long-term.

Since its formation the Defendant had taken over everything the Plaintiff developed successfully and implemented it on the market. The Defendant did not just imitate the "Look & Feel" of the website of the Plaintiff in 2005 for the first version of its website: but the Defendant also observed all innovations and modifications on the website of the Plaintiff and took on board promising changes.

61   The "Look & Feel" of the websites has been strikingly similar since 2005.

**Evidence:** Comparison of screenshots of websites of Plaintiff and Defendant from 2005 (**Exhibit K 3**)

Comparison of screenshots of websites of Plaintiff and Defendant from 2008 (**Exhibit K 6**)

**62**   The Defendant also reconstructed and copied novelties and innovations of the Plaintiff over the years. From the

following comparison it is obvious when Facebook introduced an innovation and when StudiVZ copied it. Each of these acts of plagiarism was documented in press releases of the Defendant or in the Internet community and can therefore be proved should this be disputed. We hereby offer testimony from witnesses.

| Function | Facebook since ............ | StudiVZ since |
|---|---|---|
| Setting up and designing a profile page with a photo of the user | February 2004 | November 2005 |
| Search for friends | February 2004 | November 2005 |
| Add persons to a list of friends | February 2004 | November 2005 |
| Greeting or "poking" other users | February 2004 using the term "poke" | November 2005 using the term "gruscheling" |
| Sending personal messages to other users | February 2004 | November 2005 |
| Setting up or joining groups in which specific topics can be discussed | September 2004 | November 2005 |
| Noticeboard on the page of the user on which other users can leave short messages | September 2004 | November 2005 |
| Putting videos and photos on the site | October 2005 (photos) May 2007 (videos) | November 2005 (photos) |
| Marking persons on photos | Probably October 2005 with the name "tag" | September 2006 using the term "link photos" |
| Window in which the user can record his current status (e.g. ill, sad, etc.) for others to read | April 2006 | June 2007 |
| Observation list informing friends of news | September 2006 using the term "news feed" | Introduction under review according to StudiVZ |
| Involvement of applications of external developers in the website by users | May 2007 | Introduction by entry to "OpenSocial" initiative of Google in October 2008. |

| Chatting with persons on the list of friends (instant messenger) | April 2008 using the term "chat" | October 2008 using the term "Chat Box" |
| --- | --- | --- |

**Evidence:** Mark Howitson, in-house lawyer of the Plaintiff, as

**- Witness -**

**63**    This is how the Defendant slavishly pursued the Plaintiff starting with an offer only for university students (Facebook since February 2004, StudiVZ since October 2005) going on to make the offer available to high school pupils (Facebook since September 2005, SchülerVZ since February 2007) to availability for all (Facebook since September 2006, meinVZ since February 2008).

64    At the same time the Defendant extended its German offer to other countries and language versions with the result that the original of the Claimant now also suffers loss through a drop in turnover in these countries. The Defendant has already started up language versions which share the identical "Look & Feel" of its German website studivz.net in France ([www.studiqg.fr](www.studiqg.fr)), Spain ([www.estudiln.net](www.estudiln.net)), Italy ([www.studiln.it](www.studiln.it)) and Poland ([www.studentix.pl](www.studentix.pl)). meinVZ now also has an English version as well as a German language version. Consequently the Defendant appears to the trying to create an international "plagiaristic family" of the original of the Plaintiff.

65    Even the youngest innovations of the website of the Plaintiff, the opening of applications for external developers and the "newsfeed", an observation list providing information about news among friends have fallen into the focus of the "copying machine" of the Defendant. According to Marcus Riecke, who until 23.10.2008 was director of the Defendant, the Defendant now also wants to open up for applications of external developers. A newsfeed is not yet planned but the idea is under detailed review.

**Evidence:** Golem.de "StudiVZ wants to arm itself against Facebook with new software ", 28.01.2008 **(Bundle of Exhibits K 13, page 121)**

**66**    Therefore the Defendant did not only exploit the creativity of the Plaintiff for its own purposes when setting up but it also exploits constantly the innovative force and the investments of the Plaintiff in further development of its website. It could be said that the Defendant is trying to cling on to the Plaintiff like a parasite in order to feed off it and plagiarize it

permanently. The Plaintiff sees no other way of arresting events than appealing to the courts. It is no longer acceptable that the Defendant, despite many attempts of the Plaintiff to motivate it to voluntarily renounce its conduct, has been saving its own development costs and unfairly profiting from the investment of the Plaintiff.

### 9. **Theft of source code**

**67**    The website of the Defendant and the website of the Plaintiff have striking similarities as far as the code page is concerned as well. The visual similarity (see above under II. 5.) and the programming identity (see above under II. 6.) in the style sheets are worthy of note. Function names in the HTML code of the website of the Defendant have also been taken over from the website of the Plaintiff. For example the "gruscheling" allegedly invented by Mr. Dariani was still called "poke.php", in the code of the website of the Defendant in 2006, i.e. it had the same name as the "poke" function of the Plaintiff.

> **Evidence:** Private expert report from the publicly appointed and certified IT expert Dipl.-Prog. Bernward Schrader, (**Exhibit K 12**)

> Blog "Kasi-Blog", Karsten Wenzlaff, „StudiVZ - The glamour is fading", 05.11.2006 (**Bundle of Exhibits K 13, Page 126**)

> Expert report

68    Finally both websites had identical security gaps in 2006. For example it was possible to access photos of users marked as "private" on both websites without being logged into the respective social network. The reason for this is an identical way of filing photographs. This also is a programming consistency.

> **Evidence:** Blog "Kasi-Blog", Karsten Wenzlaff, „StudiVZ and Facebook - Huge Data Leak(s)", 20.11.2006 (**Bundle of Exhibits K 13, Page 125**)

69    The Plaintiff does not know how the Defendant gained access to the source code (**Exhibit K 22**; to be submitted subsequently) or how this was processed in detail. One possible way the founders of the Defendant may have gained access to the source code of the programmed forming the basis of the website of the Plaintiff is for example a loophole which occurs occasionally in many commercially operated websites and which cannot be entirely avoided. For example in August 2007 there was an incident in which the source code of the website of the Plaintiff was published by an unknown third party on the Internet. This third party gained access to the servers of the Plaintiff through a safety loophole and copied parts of the source code.

   **Evidence:** TechCrunch „Facebook Source Code Leaked", 11.08.2007
           **(Bundle of Exhibits K 13, page 131)**

70    This is how the founders of the Defendant could also have proceeded when putting together their website. The indications are that the source code has been taken over are as a whole very clear.


**10.  Admissions of founders of Defendant**

71    It is also particularly audacious that the founders of the Defendant even openly admit that they quite consciously "based" their work on the "Look & Feel" of the Plaintiff. For example Ehssan Dariani stated for the first time to Spiegel International in July 2006

           "We may have oriented ourselves along the lines of the Facebook layout."

   **Evidence:** Spiegel International „StudiVZ Takes on Facebook", 11.7.2006
           **(Bundle of Exhibits K 13, page 28)**

72    and to Netzeitung Ehssan Dariani also stated in 2006:

           "When I saw student networks in the USA I also wanted to have them in Germany."

73    He then added with his own brand of modesty:

> "One of my main strengths is forecasting human behavior. I have always had the feeling that German students would be interested in such a network."

**Evidence:** Netzeitung "German sluggishness gets on my nerves", 06.10.2006 (**Bundle of Exhibits K 13, page 82**)

**74**    It should be noted that it probably was not difficult for Mr. Dariani to predict "human conduct" in view of the overwhelming success of the Plaintiff at that time in the United States.

75    Finally, the Frankfurter Allgemeine Zeitung described the story behind the establishment of the Plaintiff and also made reference to Ehssan Dariani as follows (bold print by undersigned):

> "The first plan to set up a trading organization with cosmetics for men failed. **"I therefore looked for the next big catch. And where is fishing at its best if not abroad in a young start-up company?"** Dariani spent two months last year at the new American branch of the Leipzig company Spreadshirt. He then quickly came across the idea he was looking for: to create a social network for students. Nothing new in the United States. **"That's when I thought: that's good, let's take up that idea, let's do it", said Dariani."**

**Evidence:** Frankfurter Allgemeine Zeitung "We are an alternative to Sat.l and Co.", 24.10.2006 (**Bundle of Exhibits K 13, page 62**)

**76**    Mr. Dariani therefore admits quite candidly that the layout, design and the important functions, all-important component parts of the "Look & Feel" of the website of the Plaintiff were consciously taken over for the website of the Defendant from the website of the Plaintiff. A further factor which fits the picture here is that both founders of the Defendant, Ehssan Dariani and Dennis Bemmann, each have a profile on the Internet offer of the Plaintiff.

**Evidence:** screenshots of the results list of a member search in Facebook for "Ehssan Dariani" and "Dennis Bemmann" (**Exhibit K 14**):

77    The second joint founder of the Defendant Mr. Bemmann made a statement about the early accusations of plagiarism and admitted in 2006 to the Frankfurter Rundschau:

> "Of course there are hundreds of social networking sites and of course we look at them very closely after all why should we not pick up good ideas and improve on things which other people have solved poorly?"

**Evidence:** Frankfurter Rundschau "StudiVZ under fire", 15.11.2006 **(Bundle of Exhibits K 13, page 84)**

78    However, the Plaintiff does ask itself the question what the Defendant maintains it improved in the view of the one-to-one copy of the "Look & Feel" of the Plaintiff. A statement from Mr. Dariani on 19.07.2008 to the Frankfurter Allgemeine Sonntagszeitung in answer to the question about the risk of confusion of the website of the Defendant with the website of the Plaintiff is enlightening:

> "The colors are different: StudiVZ is red, Facebook is blue."

**Evidence:** Frankfurter Allgemeine Zeitung "Networkers in a clinch: Facebook files action against StudiVZ", 19.07.2008 (**Bundle of Exhibits K 13, page 86**).

79    Not even the cofounders of the Defendant seemed to be able to make further distinctions between the "Look & Feel" of the two websites.


## 11. Intentional nature of imitation

80    The fact that this imitation occurred intentionally is obvious not only from the admissions of the founders of the Defendant but also from the assumption of names of functions in the HTML code of the website of the Defendant from the website of the Plaintiff. For example the "gruscheling" allegedly invented by Mr. Dariani was still called "poke.php", in the code of the website of the Defendant in 2006, i.e. it had the same name as the "poke" function of the Plaintiff.

81    The Defendant also deposited the files of its website in a "Facebook" directory, a clear reference to the original Facebook.

The stylesheet of the website of the Defendant was also provided with the filename "myfb.css". It is obvious that this stands for "my Facebook".

Evidence: Blog "Der Bumi", Michael Bumann, "StudiVZ in original Facebook colors...", 03.10.2006 **(Bundle of Exhibits K13, Page 31)**

Screenshot "fakebook" from Spiegel Online, 15.11.2006 (**Bundle of Exhibits K 13, page 88**)

Blog "Kasi-Blog", Karsten Wenzlaff, "StudiVZ - The glamour is fading", 05.11.2006 **(Bundle of Exhibits K 13, Page 126)**

Blog "Unfehlbar", „StudiVZ -A plagiarism as a Wanna-be-YouTube", 26.10.2006 **(Bundle of Exhibits K13, page 89)**

82    This business model of looking at and copying an Internet offer from a foreign company must be stopped. Here the innovations, performances and well-developed good reputation of a potential or existing competitor are exploited in an unfair way, often with the aim of selling the German imitation for tens or hundreds of millions to the foreign original which has difficulties getting a foot in the market in Germany because of the German imitation. In this way the Claimant is faced worldwide with some imitators of its tried and tested "Look and Feel" as can be seen from the screenshot attached as

Exhibit K 18

83    of a Russian imitator of the Plaintiff with the name "vkontakte" which acts in a manner similarly audacious to the Defendant. The Plaintiff is proceeding against these plagiarists before the courts.


**12.   Market confusion and deception as to origin**

**84**    By nearly identical assumption of the "Look & Feel" of the Plaintiff the Defendant has created confusion on the market and deception as to origin. Many users believe in some type of

business relationship or connection or even identity between the Plaintiff and the Defendant.

85    For example a user under the name of "Stefan" asked on 29.06.2006 in a discussion on an article about the Defendant in which Ehssan Dariani and Dennis Bemmann also participated:

> "I would definitely be interested (if you're allowed to provide the information) what your contractual arrangement is with Facebook? How does that work ? Have you purchased utilization rights in the software? Are you in contact with the owners of Facebook? How did the idea StudiVZ and not facebook.de come about for example?"

**Evidence:** Commentary no. 23 on article "The digital poetry album: 400,000 students in the StudiVerzeichnis" on readers-edition.de, of 28.08.2006 **(Bundle of Exhibits K13, page 1)**

86    Clearly the user assumes that StudiVZ is a German version of the Plaintiff or at least a licensed product of the Plaintiff. He is therefore wrong about the origin of the offers the Defendant.

87    Another user under the name "Lars Minden" asks:

> "What I would very much like to know is Has there ever been any contact between you and Facebook? I mean you took over the design with the exception of the color?"

Evidence: Commentary no. 37 on article "The digital poetry album: 400,000 students in the StudiVerzeichnis" on readers-edition.de, of 28.08.2006 **(Bundle of Exhibits K13, page 1)**

88    This user also quite clearly assumes that the offer of the Defendant has been authorized in some way by the Plaintiff. The good reputation acquired by the Plaintiff is exploited here by the Defendant.

89    This is further shown in the comments from a further user called "mel" to write in a commentary on "Sebbis Blog" (bold print by undersigned):

> "I find it really annoying that it is not possible to link up **the two facebooks** I have been living in England for a few years and

in the United States but I have friends in Germany and therefore have registered with both but I find StudiVZ very unprofessional compared with Facebook, fewer features and then it takes a long time to load…"

**Evidence:** Commentary no. 10 on the article, "Only German at Facebook", of 04.10.2006 on Sebbis Blog", Sebastian Herp **(Bundle of Exhibits K 13, Page 46)**

90    There is also a commentary on an article about the Defendant on the blog "medienrauschen,
das Medienweblog" by Jörg-Olaf Schäfers in which a user falsely links the Plaintiff and the Defendant. A user under the name "Christoph" asks:

"It would interest me find out whether StudiVZ is type of German licensed product of http://www.facebook.com or one of the most audacious one-to-one copies of Web 2.0. The two websites are alike as two pins with the exception of the color and the logo."

Evidence: Commentary no. 4 on article "StudiVZ: Correction column for Turi 2.0?" of 26.10.2006 on medienrauschen.de **(Bundle of Exhibits K 13, page 98**)

91    However, a user named "Sebastian" is the one who goes the furthest. He writes

"[…] and then when everything is running it turns out: it was all just a bit of fun!!! Source text came from facebook, both belong together and now everything is sold to yahoo and loads of money will be made with the data of the users. […] otherwise I personally think that it [comment from undersigned: StudiVZ] is a production of facebook in order to increase its market share in Europe."

Evidence: Commentary no. 44 on article "The digital poetry album: 400,000 students in the StudiVerzeichnis" on readers-edition.de, of 28.08.2006 **(Bundle of Exhibits K13, page 1)**

92    The user known here as "Sebastian" really believes that the Plaintiff and the Defendant are "in cahoots" that is that they are affiliated companies of a group or that the Defendant is a subsidiary of the Plaintiff.

93        In addition, the Plaintiff itself has received numerous e-mails from users
          with similar comments or questions some of which are attached as
          examples as

**Bundle of Exhibits K 13, page 101.**

### 13.  Good reputation of Plaintiff affected adversely

94        The confusion about origin described and the confusion in the market led
          to an adverse effect on the good name of the Plaintiff. The Defendant is
          therefore confronted with numerous scandals and major reservations with
          respect to data protection.

95        The joint founder of the Defendant, Ehssan Dariani, alone has been
          responsible for several scandals. Mr. Dariani who was director of the
          Defendant until March 2007

          Evidence in the event that this is disputed: Wikipedia entry about the
          Defendant of

                                        19.09.2008 (to follow)

                              Welt Online "Early retirement thanks to
                              Web 2.0", 21.04.2007 **(Bundle of Exhibits
                              K 13, page 103)**

          filmed among other things a drunken woman at a party in Berlin on the
          toilet as she started to undress and published this video under the title
          "chick auf mitte party // WC" on YouTube in the Internet.

          Evidence: Spiegel Online "Awkward accidents bring StudiVZ a bad name",
                    15.11.2006 **(Bundle of Exhibits K13, page 69)**

                    Welt Online "How Germany's hottest start-up goes to the wall ",
                    01.12.2006 **(Bundle of Exhibits K 13, page 93)**

96        Mr. Dariani also issued an invitation to a party in 2006 in an extremely
          tasteless way. To do so Mr. Dariani secured the domains
                         www.voelkischer-beobachter.de                    and

www.voelkischerbeobachter.de and put an amended version of the title page of the same propaganda paper of the National Socialist regime online on the birthday of Adolf Hitler on 20 April 1945. On the title page the swastika under the German eagle was replaced with the logo of the Defendant and out of the line "Fighting Gazette of the National Socialist Movement of Greater Germany" Ehssan Dariani made "Fighting Gazette of the Student Network Movement of Europe". The headline "Germany remains faithful to the Führer" was changed into "Europe remains faithful to StudiVZ" and the joint founder of the Defendant made out of "Act of duty on 56th birthday of Adolf Hitler" made "Act of duty on 26th birthday of Ehssan Dariani". Mr. Dariani "topped" the whole with a further headline "Celebrate down to the last man".

**Evidence:** Blog „Blogbar", Rainer Meyer („DonAIphonso"), „StudiVZ - the Hitler screenshot and the buyer Facebook ", 15.11.2006 **(Bundle of Exhibits K 13, page 106)**

Screenshot of the Dariani website voelkischer-beobachter.de **(Bundle of Exhibits K 13, page 111)**

97     As Mr. Dariani's party was supposed to begin in the premises of Defendant and also the link between Mr. Dariani and the Defendant was manufactured by the use on several occasions of the logo of the Defendant this conduct of the then director of the Defendant was not just private misconduct but also directly concerned the reputation of the Defendant and therefore potentially indirectly through the connection manufactured are believed to exist by users of the Defendant also concerned the reputation of the Plaintiff.

**Evidence:** screenshot of the Dariani website voelkischer-beobachter.de **(Bundle of Exhibits K 13, page 111)**

Spiegel Online "Awkward accidents bring StudiVZ a bad name", 15.11.2006 **(Bundle of Exhibits K13, page 69)**

Welt Online "How Germany's hottest start-up goes to the wall ", 01.12.2006 **(Bundle of Exhibits K 13, page 93)**

98     Spiegel Online commented on the conduct of Ehssan Dariani following the disclosure of the inappropriate party invitation on 01.12.2006 as

follows: "Dariani defended himself in the blog the day before yesterday. He felt the need to comment on German understanding of history and argued that I was regarding German mentality, German nature, as having failed as the (politically correct) majority identifies with itself and its past'. He described his conduct as the act of a hero: 'In the third Reich in my view this invitation would have led to imprisonment in a concentration camp …'"

> Evidence: Spiegel Online "Awkward accidents bring StudiVZ a bad name", 15.11.2006 **(Bundle of Exhibits K13, page 69)**

**99**    The good reputation of the Plaintiff is seriously jeopardized owing to such conduct by the Defendant.

**100**    A further scandal relating to the Defendant concerned inappropriate business behavior of the Defendant on its expansion into France. In this case, in order to increase the degree of brand awareness of its visually identical offer there StudiQG it reverted to sending spam e-mails. The Defendant also tried to hush up the origin of the offer of the Defendant and to suggest that the web page StudiQG had been established and developed by a group of French students.

> **Evidence:** Blog „Blogbar", Rainer Meyer („DonAlphonso"), „StudiVZ - StudiQG: just arrived in France and spammers already", 07.11.2006 **(Bundle of Exhibits K 13, page 123)**

**101**    The Defendant also practiced "domain grabbing" when it secured the foreign domains of its German competitors Unister and Studylounge in 2006.

> **Evidence:** Spiegel Online "Awkward accidents bring StudiVZ a bad name", 15.11.2006 **(Bundle of Exhibits K13, page 69)**
>
> Welt Online "How Germany's hottest start-up goes to the wall ", 01.12.2006 **(Bundle of Exhibits K 13, page 93)**

102    There was a further scandal associated with the Defendant in 2006 when approx. 700 users of the Defendant got together in order to select unsuspecting female users of the Defendant without their knowledge or agreement on the basis of their profile photos for a "Miss StudiVZ"

and then to "jointly gruschel" with the elected "Miss".

103  Instead of taking action against this form of organized harassment of women, an employee of the Defendant stated after a complaint in a message to the group founders that the photo contest was "quite OK" and further requested that he and one of the founders of the Defendant be included in the group.

    **Evidence:** Spiegel Online "Sex stalker in student net", 27.11.2006
      **(Bundle of Exhibits K 13, page 112)**

104  The Defendant was repeatedly the target of massive criticism in the years to come. For example, in 2007 the newly introduced general business terms and conditions and the data protection declaration to which old users also had to agree and which were supposed to give the Defendant wide-reaching options to use personal data of the users for personalized advertising, in particular first by email and SMS and to be forwarded to third parties were publicly criticized by the Federal data protection officer Peter Schaar and the Federal Consumer Association.

    **Evidence:** Spiegel Online "Experts criticize StudiVZ's snooping clause",
      14.12.2007 **(Bundle of Exhibits K13, page 114)**

      Heise Online "StudiVZ reproached for planned exploitation of
      user data", 18.12.2007 **(Bundle of Exhibits K13, page 117)**

105  The Federal Consumer Association had already issued the Defendant with a warning in this respect in 2008.

    **Evidence:** Spiegel Online "Consumer organizations warn StudiVZ ",
      13.02.2008 **(Bundle of Exhibits K 13, page 118)**

### 14. Competition relationship of parties, loss of income of Plaintiff

**106**    The social network of the Plaintiff had been opened for worldwide users since September 2006. The Plaintiff did not make its first appearance in Germany until March 2008 in the form of a translation into German and the domain www.facebook.de.

**Evidence:** visual inspection

Expert report

107    The entry into the market in Germany was extremely slow for the Plaintiff and much poorer than in other countries. The reason for this is that the Defendant had already occupied major parts of the German market in 2006 as a Facebook clone. The market for social networks is subject to some special features:

- Users are basically only members of one social network as setting up and maintaining a full user profile is time-consuming.
- New members of the social network attract further new members from their respective groups of friends so that the growth of a social network snowballs until it reaches saturation point. Therefore the first social network on the market has a considerable advantage.
- The willingness of users of a social network to change to a competing social network which is not linked with the other one is extremely low as if the user changes he or she loses all his or her friends and contacts on the previously used social network.

**Evidence:** expert report from American expert for social networks
Assistant Professor Clifford Lampe (**Exhibit K 11**)

Expert report

**108**    This is why once a social network dominates the national market it is very difficult to push it out of this position. Therefore the entry into the German market for the original Facebook as against the plagiaristic

StudiVZ is very difficult and associated with financial loss.

**109**    In order to specify the loss suffered the Plaintiff can revert to the three methods of calculation of loss, lost profit, license analogy or surrender of profit and of the infringing party.

### 15.  Attempts of Plaintiff to achieve a mutual solution

**110**    Since 2006 Plaintiff has been attempting to prevent the plagiarism of its offer by the Defendant. For example on 08.06.2006 the Defendant received for the first time a written warning from the law firm Lovells requesting that the Defendant refrain from plagiarizing the website of the Plaintiff.

**Evidence:** written warning from Lovells of 08.06.2006, (**Exhibit K 15**)

**111**    Once the written warning had had no effect and discussions had then been commenced to ascertain when the situation could be clarified without a legal dispute the Plaintiff a second time issued a written warning to the Defendant and a cease and desist order on 03.01.2007 through the law firm Lichtenstein, Körner & Partner.

**Evidence:** written warning from Lichtenstein, Körner & Partner of 03.01.2007, (**Exhibit K 16**)

**112**    This written warning was also unsuccessful. Once the Plaintiff had again tried without success to come to an understanding out-of-court, in a third written warning of 09.07.2008 issued by the US attorneys of the Plaintiff from the law firm Orrick, a last attempt was undertaken to clarify the legal situation out of court.

**Evidence:** written warning from Orrick of 09.07.2008, (**Exhibit K 17**)

**113**    This written warning also was ineffective so that the Plaintiff now felt forced to file an action at the competent court in the USA at San Jose, California. The action was filed on 18.07.2008.

**114**     On the same day, 18.07.2008, the Defendant filed action for a negative declaratory judgment with Stuttgart Regional Court although it alleged that it had just learned from the press about the US action of the Plaintiff.

> Evidence: Blog "Telagon Sichelputzer", "StudiVZ defends itself against Facebook", 20.07.2008 **(Bundle of Exhibits K13, Page 119)**

Therefore an action will also have to be filed in Germany.

### III.     Legal Situation

**115**     Pursuant to § 32 German Code of Civil Procedure Munich Regional Court is competent as the website of the Defendant can normally be retrieved in the entire German-speaking area and therefore also in Munich (see Zöller, German Code of Civil Procedure, 26th ed. 2007, § 32 marginal no. 17). We therefore request that the court decides as requested.

**116**     The Plaintiff has a claim against the Defendant to desist from § 97 (1) sentence 1 Copyright Act as read with § 69a Copyright Act and to compensation from § 256 German Code of Civil Procedure, § 97 (1) Copyright Act as read with § 69a Copyright Act.

**117**     The Plaintiff also has a claim against the Defendant to desist from § 8 Unfair Competition Act as read with §§ 3, 4 no. 9 69a Unfair Competition Act and to compensation from § 256 German Code of Civil Procedure, § 9 (1) Unfair Competition Act as read with §§ 3, 4 no. 9 Unfair Competition Act.

**118**     The Plaintiff also has a claim against the Defendant to desist from § 14 (5) Trademark Act as read with § 14, (1) (2) no 2, (3) no. 3 Trademark Act and to compensation from § 256 German Code of Civil Procedure, § 14 (6) Trademark Act as read with § 14 (1), (29 no. 2, (3) no. 3 Trademark Act.

**119**     Thus the Plaintiff has a claim against the Defendant for payment of compensation from § 256 German Code of Civil Procedure, §§ 280  1249 German Civil Code.

### 1. Motions 1. a and b.

120   The claim of the Plaintiff against the Defendant to desist from operating, giving public access to and processing the **"Look & Feel"** and the given user interface arises from the Unfair Competition Act (*Gesetz gegen unlauteren Wettbewerb*) and the Trademark Act (*Markengesetz*).

### 1.1 § 8 Unfair Competition Act as read with §§ 3, 4 no. 9 Unfair Competition Act

121   Pursuant to § 8 Unfair Competition Act as read with §§ 3, 4 no. 9 Unfair Competition Act the Plaintiff has a claim against the Defendant to cease and desist.

122   **1.1.1** The supplementary protection of achievement pursuant to § 4 no. 9 Unfair Competition Act is not ruled out by the copyright law and trademark law special protection. The supplementary competition law protection of achievement also applies in the case of special protection if there are special concomitant circumstances outside the special law elements which therefore make the conduct seem unfair (Federal Court of Justice GRUR 2002, 629 [631] - Blendsegel) This is the case here. The Defendant did not only copy the Plaintiff's source code but used this to put on the market a website confusingly similar to the website of the Plaintiff with the same service, the operation of a free social network financed by advertising. This reprehensibly intentional deception as to origin is outwith the special protection and justifies the applicability of the supplementary achievement protection pursuant to the Unfair Competition Act (see Hefermehl/Köhler/Bornkamm, Unfair Competition Act, 26th ed. 2008, § 4 marginal no. 9.11). The Defendant also uses the performance of the Plaintiff in a particularly unfair way by permanently copying innovations of the Plaintiff over many years which exceeds that covered by copyright and trademark law (see Piper/Ohly, Unfair Competition Act, 4th ed 2006, § 4 marginal no. 9/7).

123   **1.1.2** The Plaintiff and the Defendant have specifically been in competition with one another since at the latest September 2006. On this date Plaintiff opened its social network for all users worldwide and therefore entered into the German market with its service. The Defendant has been active on the German market for social networks since November 2005. Both networks concentrated originally and in essence on academic users but today extend their offer to all user circles in Germany. They therefore offer their service on the same market for the same end user groups.

**124**     The competitive conduct of the Defendant is suited to adversely affecting the Plaintiff. This is clear from the fact that the market entry for the Plaintiff in Germany was and still is remarkably slow owing to the already mentioned special features of the market for social networks and the fact that the Defendant was first on the German market with its plagiarized product.

**125**     However, there was already a potential competitive relationship before September 2006 which is adequate in the context of § 4 no. 9 Unfair Competition Act (see Hefermehl/Köhler/Bornkamm, as before, § 4 marginal no. 9.19). Otherwise the Plaintiff as producer of the original would be prevented from extending its service - which was originally restricted to the North American market - gradually in accordance with its financial and organizational means to further markets. The producer of a novel service cannot be expected to extend this immediately to all markets worldwide without taking into account whether this would be manageable as far as server capacity was concerned and whether it would otherwise be refused protection. In these times of the Internet a territorially restricted offer can be looked at worldwide and can therefore be imitated. It would be unfair however to refuse the producer of a novel service protection in Germany if this were not yet on the market in Germany. Therefore there was a competition relationship between the parties within the meaning of § 4 no. 9 Unfair Competition Act before September 2006.

126     **1.1.3** The result of the work of the Plaintiff has a competitive character. Because of its quite particular visual and functional design and the already described excellent "Look & Feel" the website which the Plaintiff produced is suited to drawing the attention of the user groups to the operational origin or special features of this service of the Plaintiff (see Cologne Regional Court, MMR 2008, 65 *[66]* - **Exhibit K 21**; Federal Court of Justice NJW-RR 2000, 338 [339] - Rollstuhlnachbau). The color printouts submitted as **Exhibits K 1 and K 4** of the characteristic "Look & Feel" of the website of the Plaintiff and the color printouts submitted as **Bundle of Exhibits K 7** of the websites of competitors of the Plaintiff and of the Defendant clearly show how much the result of the work of the Plaintiff can be distinguished from the masses and is suited as an indication of origin. This is not an "everyday product" or a "mass produced item" (see Cologne Regional Court, MMR 2008, 65 [66] – **Exhibit K 21**).

**127**     The extent to which the "Look & Feel" of the Plaintiff is suited to indicate the origin of its service can be seen from the numerous

press articles, blog articles, commentaries on blogs and e-mails from users (jointly as **Bundle of Exhibits K 13**) to the Plaintiff. When looking at the user interface of the Defendant all these Internet users were forced to think of the website of the Plaintiff and reacted either with outrage or confusion.

128    **1.1.4** The Defendant took over the website with which the Plaintiff offers and provides its service nearly identically. As can be seen from the comparisons of the websites of the parties attached as **Exhibits K 3 and K 6** the website of the Defendant only has slight changes and from an overall impression unimportant ones which depart from the original of the website of the Plaintiff (see Hefer-mehl/Köhler/Bornkamm, as before, § 4 marginal no. 9.36). So the distinguishing color scheme was taken over nearly identically and also the white lettering on the dark background in the top banner. The three-column structure and the division of information on the subpages of the website were even taken over identically. The order and the names of the buttons for further functions and subpages were taken over identically. The overall impression is therefore nearly identical.

129    **1.1.5** The imitation of the website of the Plaintiff by the Defendant leads to an <u>avoidable deception as to origin</u>. The numerous press reports, blogs and blog commentaries and e-mails from users to the Plaintiff (jointly as **Bundle of Exhibits K 13**) show that the groups addressed in their mind associated the offer of the Plaintiff with the offer of the Defendant. The website of the Defendant is considered by users partially to be a direct offshoot of the Plaintiff and by some as a licensed product. Such belief in a secondary trademark, or license or corporate law connection of the original and the competition is adequate (Federal Court of Justice GRUR 2001, 443 [445] – Viennetta). The offer of the Claimant was, as can be seen, known to wide circles of German Internet users in direct connection with the market introduction of the offer of the Defendant. Press and bloggers noticed the offer of the Defendant as early as July 2006, 6 months after introduction of the offer of the Plaintiff, and made their first presumptions about an alleged connection of the offer of the Defendant with the known offer of the Plaintiff.

130    The fact that the Defendant has another name and another logo for its offer does not change anything as regards deception as to origin (Federal Court of Justice

GRUR 2007, 984 [986] - Gartenliege), what is important is the overall impression which the original and the imitation provided when used as designated. An approach in which the aspects are looked at separately, which only compares individual features of the original with those of the imitation is not admissible (Federal Court of Justice GRUR 2000, 608 [610] -ARD-1). In addition, the requirements made of the special circumstances justifying the unfair nature, such as the avoidable deception as to origin are lower if the degree of takeover is especially high (Federal Court of Justice NJW-RR 2000, 338 [339] - Rollstuhlnachbau). As the Defendant assumed all striking elements of the "Look & Feel" of the website of the Plaintiff without any technical necessity and only translated the website into German and swopped the colors blue/light blue with red/light red this is a nearly identical assumption and therefore a very high degree of assumption. Slight changes such as the change in color are unimportant in view of the nearly identical overall impression (see Piper/Ohly, as before, § 4 marginal no. 9/62). The website of the Defendant is an avoidable deception of the origin of the service.

131      Furthermore, the decisive factor cannot be whether the offer of the Plaintiff was known in the market in Germany when the Defendant introduced its offer to the market. This would expose innovative entrepreneurs worldwide as regionally restricted offers can also be accessed worldwide and can therefore be plagiarized. An entrepreneur which builds up a new and innovative service in the USA and enters into a considerable financial risk with its novelty offer would therefore be exposed to any shameless copier from Germany without any rights which would then take over its regionally restricted offer as yet unknown in Germany on a one-to-one basis. Otherwise the legal system would be turned upside down as it would then give preference to the German plagiarist vis-à-vis the foreign entrepreneur as the former unfairly imitates the performance of the foreign entrepreneur. This cannot be. Indeed in such situations it must be enough if the foreign offer is suitable to designate origin (see Piper/Ohly, as before, § 4 marginal no. 9.41). This is all the more true if the foreign offer has gained an overwhelming profile in its geographical territory as has the offer of the Plaintiff in the USA.

132      **1.1.6** In this case there is also the special circumstance of exploitation of and adverse effect on a good reputation.

133     If there is deception as to origin then as a rule there is also <u>exploitation of</u> <u>the good reputation</u> (Hefermehl/Köhler/Bornkamm, as before, § 4 marginal no. 9.53). The consumers to whom the offers of the Plaintiff and the Defendant are addressed connect the offer of the Plaintiff with positive associations as far as quality and security of the service are concerned. This can be seen by the overwhelming success of the Plaintiff whose offer was able to win worldwide 120 million users and in Germany 1.26 million users as of March 2008 before the start of the German translation. This sales success of the service of the Plaintiff is a sign of its good reputation (Hefermehl/Köhler/Bornkamm, as before, § 4 marginal no. 9.52). The groups addressed confuse the offer of the Defendant with the well-known and well-thought-of offer of the Plaintiff so that the good reputation of the Plaintiff benefits the Defendant.

134     The <u>good reputation is adversely affected</u> in as far as the numerous scandals surrounding the Defendant on the basis of the connection wrongly assumed by some of the groups addressed between the Defendant and the Plaintiff harms the good reputation of the Plaintiff. If the Defendant is linked with sexist and misogynist mistakes of its founders and directors of many years and tasteless invitations with a clear link to the Nazi regime as the relevant groups clearly do, as can be seen from **Bundle of Exhibits K 13** and the Defendant StudiVZ is vilified as is clear from **Exhibit K 19** by its opponents as StalkerVZ (as a play on the organized harassment of women on the network of the Defendant) or StasiVZ (playing on the lack of data security of the offer of a Defendant) this also drags the reputation of the Plaintiff in the mud. The offer of the Defendant and the conduct of the responsible persons at the Defendant is far below the standards which the Plaintiff has set in its company. This damages the image of the Plaintiff (see Piper/Ohly, as before, § 4 marginal no. 9/84).

135     **1.1.7** Finally, the Defendant <u>unfairly</u> gained access to the information and documents required to produce the imitation. Clearly the Defendant obtained the source code of the Plaintiff which forms the basis of the website of Plaintiff. How the Defendant obtained the source code is irrelevant. The fact that it did so is what is relevant.

136     **1.1.8** Under case law a party which so far has copied a product only
known abroad and then markets it in Germany is also acting unfairly
<u>outside the described instances of unfairness</u> in § 4 no. 9 (Federal Court of
Justice WRP 1976, 370 [371] - Ovalpuderdose, Hefer-

mehl/Köhler/Bornkamm, as before, § 4 marginal no. 9.64; Piper/Ohly, as
before, § 4

marginal no. 9/96). Because the Defendant entered into the market in 2005
the entry into the market in Germany brought the Plaintiff considerable
entrepreneurial risk and real financial loss (see Federal Court of Justice
WRP 1976, 370 [371] - Ovalpuderdose; Federal Court of Justice GRUR
1970,

244 [246] - Spritzgußengel).

137     Therefore the Defendant took up the gap in the market in Germany for
social Internet networks in 2005 by copying the Plaintiff which had been
working in North American territory since 2004. This is why the repeated
attempts of the Plaintiff since 2006 to gain a foot in the German market are
strikingly less successful than on the other national markets. The Plaintiff
which finances its website by advertising and depending on a high number
of visits from the public and the form of clicks (mouse clicks on
advertising signs on its website). More members, of course, mean more
clicks. The special features of the market for social networks however lead
to a situation in which the first social network on the market will also be
the largest for a long time. Users are basically only members of one social
network as maintaining a full user profile and the contacts there is time-
consuming. Changing from one social network to a competing social
network does not take place often because the user changing loses all
contact on the previous platform. A situation in which the entire user
group or group of friends changes networks at the same time is so unlikely
that this can be ruled out. Therefore the Defendant acted unfairly by
copying the then foreign offer of the Plaintiff and by occupying German
market. The Federal Court of Justice refers in this connection to "pioneer
protection" (Federal Court of Justice GRUR 1970, 244 [246] -
Spritzgußengel). The Plaintiff must benefit from this.

138     **1.1.9** It is also unfair how the Defendant <u>attaches</u> itself <u>purposefully and in
a planned manner</u> to the Plaintiff and has been copying its innovations for
years. The Federal Court of Justice decided already on 27.11.1959 (Federal
Court of Justice GRUR 1960, 244 [246] - Si-mili-Schmuck) and since then
many times, for the last time in 1999 (Federal Court of Justice GRUR
1999, 923 [927] - Tele-Info-CD) that such conduct is unclear, in particular
if the imitator saves its own development costs by continuing to imitate
(Piper/Ohly, as before, § 4

marginal no. 9/93). The Defendant is saving not only its own development costs but is also leaving the entrepreneurial risks to the Plaintiff by, as can be seen from **Exhibit K 9**, always waiting to see whether a new innovation gained a positive resonance from the groups addressed. The Defendant was then able to rule out all entrepreneurial risk for an imitation at the cost of the Plaintiff.

139    Therefore the Defendant did not just implement the change from an offer only for students through access for high school pupils to an offer for everyone by waiting for several months after the Plaintiff had implemented such changes but new functions which the Plaintiff had added to its social network were also copied. In April 2008 the Plaintiff introduced an instant messaging service to its social network by means of which the users can see whether their friends are online and are then able to chat with them directly instead of only being able to send messages as before. The Defendant first waited to see whether the users would accept the function and what the reception would be before it imitated the instant messaging function and implemented it on its own website under the name "chat box" on 23.10.2008. For further imitations see above under II. 8.

140    **1.1.10** Pursuant to § 8 Unfair Competition Act as read with §§ 3, 4 no. 9 Unfair Competition Act the Plaintiff has a claim in respect of the responsibility against the Defendant to cease and desist. Its interests as creator of the performance take precedence over the interests of the Defendant as plagiarist.


**1.2. § 14 (5) Trademark Act as read with § 14 (1), (2) no. 2, (3) no. 3 Trademark Act**

141    **1.2.1** The Plaintiff also has a claim against the Defendant to cease and desist arising from § 14 (5) Trademark Act as read with § 14, (1), (2) no. 2, (3) no. 3 Trademark Act.

142    **1.2.2** The Plaintiff is the owner of the pictorial mark with the register number 30663271.3 protected under § 4 no.1 Trademark Act. This pictorial mark was applied for on 18.10.2006 and registered on 20.11.2006 (extract from the trademark register attached as **Exhibit K 10**). It covers the top banner of the Facebook design of 2005 with its characteristic double-bar design in various colors, the logo top left beside the top banner,

the left column with the log-in fields for the e-mail address and password and buttons in the lower right-hand area (see following graphic).



**143**   Therefore the pictorial mark covers the appearance of the user interface of the website of the Plaintiff until 2008.

144   **1.2.3** This trademark can be identified because the objective possibility is that the public understands the sign as an indication of origin is adequate (Spindler/Schuster, Recht der elektronischen Medien, 2008, § 14 Trademark Act marginal no. 27). The combination of the double bar and the organization of the further fields is unusual and has distinctive character. The use of a double bar and the specific organization are not usual or functional design elements as can be seen from the color printouts of other websites submitted as **Bundle of Exhibits K 7**.

145   The distinctive character of the pictorial mark has been further increased by intensive use (see Ingerl/Rohnke, Trademark Act, 2nd ed. 2003, § 14 marginal no. 321). Since registration of the trademark on 20.11.2006 the brand awareness of the social network of the Plaintiff and therefore of the protected graphic has greatly increased. The press reports, blogs and commentaries on blogs as set out in **Bundle of Exhibits K 13** show how much the graphic which forms the subject of the dispute is widely linked beyond the groups addressed with the service of the Plaintiff.

146   In as far as the Defendant attempts to cast doubt in its action for a negative declaratory judgment on the distinctive character of the pictorial mark with register number 30663271.3 by pointing out that the German pictorial mark with register number 30663270.5 (see illustration below)

was cancelled because of all the impediments to registration this reference is inappropriate and misleading. The Defendant fails to state that the pictorial mark was only cancelled because the Plaintiff did not file any objection to the application to cancel which, by the way, came from the Defendant. The Claimant therefore did not file any objection because on the basis of the pictorial mark with register number 30663271.3 it did not see any further need for the other trademark. As the Defendant undoubtedly knows the German Patent and Trademark Office did not undertake a review of content with respect to the application of the Defendant to cancel owing to the lack of objection (see Ingerl/Rohnke, as before, § 54 marginal no. 5) The fact that the Defendant wanted to withhold such information from Stuttgart Regional Court speaks for itself.



147      1.2.4 The Defendant uses a sign similar to trademark register number 30663271.3 for an identical service (see figure below).



148      With the exception of the logo, the startpage of the website of the Defendant, the larger buttons in the bottom right-hand area and the graphic on the right-hand-side have exactly the same structure. The double-bar design of the top banner, the organization of the logo to the left of the top banner, the log-in fields and the placing of the two buttons bottom left are identical.

The important overall impression (see Federal Court of Justice GRUR 2000, 608 [610] – ARD-1) of the user interface of the website of the Defendant is very close to that of the Plaintiff. Therefore the Defendant uses a sign which is at least similar.

149    1.2.5 The service provided by the Defendant, offering a free social network for everyone is covered by Class 38 "Telecommunications; providing online chat rooms for registered users for transmission of messages concerning collegiate life, classified ads, virtual community and social networking; providing access to an online directory information service featuring information regarding, and in the nature of, collegiate life, classified ads, virtual community and social networking is registered for the pictorial mark of the Plaintiff. Therefore the offer of the Defendant is an identical service (see Ingerl/Rohnke, as before, § 14 marginal no. 426).

150    **1.2.6** The use by the Defendant of a symbol similar to the trademark leads to a risk of confusion within the meaning of § 14 (4) no. 2 Trademark Act. As can be seen from **Bundle of Exhibits K 13** and as detailed above under **II.12** numerous mistakes have already been made confusing the websites of the Defendant and the Plaintiff. Users thought the website of the Defendant was the German Facebook or a licensed product of the Plaintiff. Such actual instances of confusion are not even a condition as the objective possibility of confusion is adequate (Ingerl/Rohnke, as before, § 14 marginal no. 256). That there are concerns that there were actual instances of confusion is to be considered a clear sign of a risk of confusion. The high degree of consistency of the trademark of the Plaintiff and of the sign of the Defendant also shows that there is objectively a risk of confusion. For example, the Defendant uses a top banner on its website which corresponds exactly to that in the trademark of the Plaintiff. It just replaced the logo top left with its own but left it in the same position and in the same size as that of the trademark of the Plaintiff. The position of the other buttons and entry fields is identical on the website of the Defendant with the pictorial mark here.

151    **1.2.7** Furthermore, analogous to top of **III.1.1.6** <u>unfair exploitation and adverse effect on valuation</u> which the pictorial mark enjoyed in the form of the good reputation of the social network of the Plaintiff has also taken place within the meaning of trademark law, i.e. § 14 (2) no. 3 Trademark Act.

Therefore in order to avoid repetition, in this respect reference is made to the above comments.

152    **1.2.8** As the conditions of § 14 (2) Trademark Act are therefore satisfied it is forbidden in particular pursuant to § 14 (3) no. 3 Trademark Act to offer services under the symbol as the Defendant is doing.

153    **1.2.9** Contrary to the allegations of the Defendant in the proceedings before Stuttgart Regional Court there is no trademark of the Defendant with higher ranking owing to seniority. There is no pictorial mark of the Defendant registered which corresponds to the mark in question here. For example the Defendant only appeals on the grounds of a trademark through usage pursuant to § 4 no. 2 Trademark Act. However, in so doing the Defendant failed to recognize that the mere assumption of the use of the symbol does not lead to protection of a trademark or to a right owing to prior use (see Federal Court of Justice GRUR 1998, 412 [414] - Analgin; Munich Higher Regional Court NJWE-WettbR 1999, 156 - Rialto-Heizkörper). Priority of a symbol used as against a registered trademark does not arise so simply as the Defendant would like to see. In this respect it should be noted that the use of a user interface corresponding to the pictorial mark of the Plaintiff by the Defendant did not lead to a good reputation in the eyes of the public in favor of the Defendant.

154    There is a good reputation if a member of the public can attribute to a certain degree a symbol to the service which bears the sign. In this case the relevant user groups are to be considered to be all potential Internet users in Germany ((Spindler/Schuster, as before, § 4 MarkenG marginal no. 12, 13). The rule of thumb for the required degree of recognition is that at least 20 to 50% of the user groups concerned can attribute the symbol to the service (see Spindler/Schuster, as before, § 4 Trademark Act marginal no. 14), whereby as far as the packaging of goods are concerned the degree of recognition must be at the upper end of this rule of thumb. For example Frankfurt Higher Regional Court decided that in the case of the packaging of goods the degree of recognition may not be much less than 50% (Frankfurt am Main Higher Regional Court, GRUR 1999, 591 [593] - Kabelbinderkopf). The user interface of a website is easily comparable with such packaging of goods. After all the term "Internet presentation" is used about a company. The visual design of the website is the packaging in which the service of an Internet service is provided. Just as the packaging of the goods is a contributory factor to the motivation to purchase the user-friendly

visually attractive design of a website is a decisive factor as regards whether the user will make use of the service.

155    In the event of the Defendant such a high degree of recognition of the symbol relevant here to the Defendant from all potential Internet users in Germany or only from the students using the Internet cannot be assumed. The action filed for the declaratory judgment by the Defendant in Stuttgart and submitted as Exhibit K 14 with the allegation that the mark is recognized by 46% of users is definitely not eligible as evidence. <u>The information that the social network of the Defendant had one million members at the end of 2006 is an allegation from the Defendant which is not substantiated.</u> Owing to the significance of click figures for commercial Internet pages the Defendant had always been interested in providing its own figures which were as high as possible. It is possible quite simply in the Internet offer of the Defendant to register several times if you have more than one e-mail account. Such double registrations with "fake accounts", i.e. registrations giving a false name is quite usual in the social network of the Defendant, as can be clearly seen from the screenshot attached as **Exhibit K 5** of the member profile of "California Mountain Snake" on the network of the Defendant (see below). "California Mountain Snake" and the profile photo shown on the page both come from the film "Kill Bill" directed by Quentin Tarantino in 2003. The "girlfriend" on the screenshot of "California Mountain Snake" "Seven of Nine" is a fictitious figure, this time from the TV series "Star Trek -- Voyager". It is also unlikely that the University of Paderborn has a student with the name "Cry for Dawn". The Defendant can therefore not seriously maintain in view of the above that all its alleged one million members are real students.



**156**     Moreover a <u>market saturation</u> of 46% among students would not say anything about the <u>degree of recognition</u>. For example the website of the Defendant was early on recognized and considered by the relevant groups of users to be a plagiarism of the website of the Claimant, as can be seen from **Bundle of Exhibits K 13.** In July 2006 this accusation popped up on the Internet appearance of the renowned

news magazine "Der Spiegel", see **Bundle of Exhibits K 13**,
**Page X**. This means that at the time of application for the pictorial mark with register number 30663271.3 by the Plaintiff there was no trademark of the Defendant with corresponding higher ranking owing to seniority.

157      **1.2.10** Therefore the Plaintiff has a claim irrespective of fault to request that the Defendant cease and desist pursuant § 14 (5) Trademark Act.


     **2.    Motion 1 c**

158      As can be seen from **Exhibit K 22** (to be subsequently provided) the Defendant clearly copied and processed the source code without the Plaintiff's permission. It therefore infringed the provisions of § 69c no. 1 and 2 Copyright Act.

159      **2.1** The computer program underlying the website of the Plaintiff is a work protected pursuant to § 2 (1) no. 1, 69a Copyright Act (see Wandt-ke/Bullinger, as before, § 69a marginal no. 18). The very individuality and degree of creation of the design described under II. 2. shows that the computer program produced by the Plaintiff underlying this design and the design in accordance with the determination show a high degree of individuality and is characterized by the creative performance of Mark Zuckerberg and the other programmers of the Plaintiff. Furthermore in this case the "small fry" are also protected so that a minimum of individuality would be sufficient (Schricker, as before, § 69a marginal no. 19). This minimum is exceeded by far it here. The computer program underlying the website of the Plaintiff is not a simple piece of software but required the ability to think in analytical concepts, skill, ingenuity and the ability to think and construct dearly. The Plaintiff had to bring together the various requirements and conceptual considerations when programming:

- Functionalities of a social network,

- User-friendliness and clarity,

- Aesthetically pleasing structure of the user interface,

- Recognition value and original features compared with competitors and

• Technical conditions of the Internet.

**160** So the Plaintiff produced an extensive computer program in which the screen edition, i.e. what is to be shown after data processing, is stipulated and which the website of the Plaintiff adjusts individually for each user. Thus each user is welcomed after logging in by a personalized page which takes into account the user's name and the information known about it, e.g. regional information. This is done by means of using PHP scripts. Websites which uses such php scripts are protected as computer programs under copyright because the website contains control commands which can expire or be interpreted (see Wandtke/Bullinger, as before, § 69a marginal no. 18).

**161** **2.2** The Defendant copied this computer program without the Plaintiff's permission and adjusted it for its website by translating it into German and by changing the colors used. By copying and processing the website on a long-term basis it has infringed the rights of the Plaintiff from § 69c no. 1 and 2 Copyright Act.

3. Motion 2.

162 **3.1** As illustrated under **II. 11.** the Defendant was acting knowingly and therefore culpably. Therefore the Plaintiff also is entitled to compensation from the Defendant on the grounds of (a) unfair competition law, § 9 Unfair Competition Act as read with §§ 3, 4 no. 9 Unfair Competition Act; (b) trademark law, § 14 (6) Trademark Act as read with § 14 (1), (2) no. 2, (3) no. 3 Trademark Act; and (c) copyright law, § 97 (1) Copyright Act as read with § 69a Copyright Act. See above under **III. 1. and 2.** for the conditions for the claims.

**163** **3.2** The Plaintiff is entitled to compensation from the Defendant under §§ 280 (1), 249 German Civil Code. In order to spy on the website of the Plaintiff the Defendant set up user accounts and obtained access to the social network, see **Exhibit K 14**. However, the user conditions of the website of the Plaintiff provided that any copying, renewed publishing and downloading of the content of pages of the website of the Plaintiff is forbidden. Under " Proprietary Rights in Site Content; Limited License"

164               "No Site Content may be modified, copied, distributed, framed, reproduced, republished, downloaded, scraped, displayed, posted, transmitted, or sold in any form or by any means, in whole or in part, without the Company's prior written permission, except that the foregoing does not apply to your own User Content (as defined below) that you legally post on the Site. […] Any use …… other than as specifically authorized herein, ………. is strictly prohibited."

165               However, this is exactly what took place when the Defendant spied on the website of the Plaintiff. By this process and by spying on the page content of the website of the Plaintiff the Defendant copied, downloaded and published on its website with changed colors the structure, design, functions and function names, stylesheets and graphic designs.

166               Therefore the Defendant infringed the conditions of use of the website of the Plaintiff. From this breach of duty of the agreement concluded through prior registration which was necessary for access there results a compensation claim pursuant to § 280(1) German Civil Code. The fault of the Defendant is presumed pursuant to § 280 (1) sentence 2 German Civil Code.

167               **3.3** The Plaintiff is currently determining the specific amount of the loss which is difficult and complex owing to the nature of the matter. The Plaintiff also can choose between the three methods of calculation of law, that of lost profit, license analogy and the surrender of the profit from the infringing party. However, it already has a claim to determination of the duty of the Defendant to pay compensation in principle. The interest in obtaining a declaratory judgment required pursuant to § 256 German Code of Civil Procedure is satisfied.

168               Alternatively the court may wish to estimate the loss in each case pursuant to § 287 German Code of Civil Procedure.

## 4.    **Motion 3.**

169               The Claimant's claim for information arises from §§ 242, 259, 260, German Civil Code (See Palandt, German Civil Code, *66th ed.* 2007, § 261 marginal no. 16; Schricker, Copyright Act, 3rd ed 2006, § 97 marginal no. 81 ff).

170     One certified copy and one simple executed copy are enclosed. If the
        Court considers further submissions necessary we request that the court
        informs us accordingly.


        Dr Katharina Scheja
        Rechtsanwältin