

Not Reported in F.Supp.2d    Page 1
Not Reported in F.Supp.2d, 2001 WL 1049433 (D.D.C.), 2001-2 Trade Cases P 73,338
**(Cite as: 2001 WL 1049433 (D.D.C.))**

United States District Court, District of Columbia.
In re: VITAMINS ANTITRUST LITIGATION
No. 99-197TFH.

June 20, 2001.

*MEMORANDUM OPINION Re: Merits Discovery*

HOGAN, J.

**\*1** Pending before the Court are the plaintiffs' and the foreign defendants' Rule 53 Objections to the Special Master's April 23, 2001 Report and Recommendation ("4/23/01 R & R") regarding merits discovery. Upon careful consideration of the parties' briefs, the Special Master's 4/23/01 R & R, the arguments presented at the June 14, 2001 hearing, and the entire record herein, the Court will uphold the Special Master's recommendation that merits discovery proceed under the Federal Rules of Civil Procedure ("Federal Rules") and will grant plaintiffs' request for a date certain for starting production of such discovery. However, the Court will deny the Special Master's recommendation with regard to the geographic limitation and instead will impose no such limitation on the relevant discovery requests. Additionally, the Court will adopt the first two prongs of the Special Master's test with regard to the locations for defendants' search but will not require defendants to comply with the third prong of that test at this time. Furthermore, the Court will uphold the Special Master's recommendation that the foreign defendants be required to identify all current and former officers, directors, employees and agents with contemporaneous knowledge of the conspiracy. Finally, the Court will deny without prejudice the Special Master's recommendation to compel production of documents allegedly in violation of the Swiss and German privacy laws and grant defendants' request that they be allowed to file a privacy log of documents implicated by those laws.

I. BACKGROUND

On March 27, 2000, this Court issued a Memorandum Opinion and Order allowing plaintiffs to take further jurisdictional discovery to determine whether personal jurisdiction exists over the foreign defendants. On September 20, 2000, the Court adopted the Special Master's recommendations in his August 15, 2000 Report and Recommendation that jurisdictional discovery proceed under the Federal Rules of Civil Procedure rather than under the Hague Convention. The Court also approved plaintiffs' discovery requests as detailed in the Appendix to the Special Master's August 15, 2000 Report & Recommendation, with the exception of Interrogatory 2, which was stricken.

On January 26, 2001, the Court entered orders memorializing stipulations reached by and among certain plaintiffs and certain foreign defendants that resolved the personal jurisdiction issue for the stipulating parties. Under those orders, certain foreign defendants agreed not to contest personal jurisdiction in this Court and in exchange certain plaintiffs agreed to withdraw their jurisdictional discovery requests. Paragraph 9 of those orders established the procedures for consideration and resolution of issues concerning the applicability of the Hague Convention to merits discovery. Under that paragraph, the stipulating parties agreed to an expedited briefing schedule under which they would not "file additional affidavits or other evidence regarding the effectiveness or ineffectiveness of procedures under the Hague Convention or Other Laws nor on sovereign interests that may be implicated by those laws." 1/26/01 Personal Jurisdiction Orders ¶ 9.

**\*2** On January 23, 2001, plaintiffs served the foreign defendants with merits discovery requests. On March 2, 2001, the foreign defendants filed a motion for protective order. Plaintiffs filed an opposition on March 14, 2001; the foreign defendants filed their reply on March 20, 2001; and plaintiffs filed a sur-reply on March 27, 2001. On April 2,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2001, the Federal Republic of Germany moved for leave to file an *amicus curiae* brief in support of the three German movants. Plaintiffs subsequently filed an opposition to this motion, asserting that the foreign defendants had already raised all of the arguments advanced by the *amicus curiae.* On April 5, 2001, the Special Master conducted a hearing on defendants' motion for a protective order and plaintiffs' opposition to that motion. On April 6, 2001, Degussa moved for leave to file an "Advisory Opinion" of the State Commissioner for Data Protection of Northrhine-Westphalia as Supplemental Authority in support of the German defendants. Plaintiffs opposed Degussa's motion. On April 13, 2001, plaintiffs filed a motion for leave to submit as supplemental authority the case, *United States v. Andreas,* No. 96-CR-762, 1999 WL 299314 (N.D.Ill.1999), which they asserted was relevant to the geographic scope of their discovery requests. The foreign defendants objected to plaintiffs' motion on the grounds that *Andreas* should not be admitted as supplemental authority since it was available at the time that the parties submitted their original briefs and because they believed that *Andreas* was distinguishable.

On April 23, 2001, the Special Master issued his Report and Recommendation resolving all pending issues in the foreign defendants' Motion for a Protective Order and the plaintiffs' opposition thereto. Specifically, after weighing the factors required by the Supreme Court under *Societe Nationale Industrielle Aerospatiale v. United States District Court for the Southern District of Iowa,* 482 U.S. 522 (1987) ("*Aerospatiale*" ), the Special Master recommended that merits discovery should proceed under the Federal Rules of Civil Procedure rather than under the Hague Convention and the Laws of the Non-Hague States. In his ruling that merits discovery should proceed under the Federal Rules, the Special Master recommended that the geographic scope of plaintiffs' discovery requests respecting transactional, cost, financial and conspiracy information be limited to documents and information reflecting activities directed toward the United States, including the larger geographic regions that include the United States; in making this ruling, the Special Master acknowledged the right of defendants to withhold documents relating to regions wholly outside the United States and to redact portions of relevant documents that relate to wholly foreign activities and transactions. The Special Master also approved a three-prong test as to the physical locations where foreign defendants will be required to search for responsive documents.[FN1] Additionally, the Special Master limited the time scope of plaintiffs' Interrogatory 5(B) to extend back to January 1, 1985 for all vitamins except choline chloride, and to January 1, 1983 for choline chloride.[FN2] However, the Special Master upheld plaintiffs' request for information on individuals who "had knowledge of the alleged conspiracy but who did not participate in a single conspiratorial meeting or take any other conspiratorial act and whose name did not appear on a single conspiratorial document produced by any defendant" as consistent with the language and intent of Fed.R.Civ.P. 26(b)(1) (allowing for the discovery of "the identity and location of persons having knowledge of any discoverable matter").

> FN1. Specifically, the Special Master recommended that the foreign defendants be required to search: (1) files maintained by or for the persons (a) identified in response to Interrogatory No. 5(B) who either participated in or had contemporaneous knowledge of the conspiracy, or (b) with primary decision-making authority and those with oversight responsibility for the production, pricing, sale, marketing, or distribution of vitamins, raw materials, or intermediates; (2) files maintained for specific vitamins or by vitamin producers to the extent that such files are maintained either at their headquarters or at facilities maintained by or for regional or area managers; and (3) any other area where each foreign defendant or its counsel reasonably believes responsive documents are likely to

be found.

> FN2. Neither party filed an objection to the time scope articulated by the Special Master; therefore, this ruling will be affirmed by the Court.

***3** In addition to his recommendations for use of the Federal Rules and his limitations on plaintiffs' discovery requests, the Special Master also recommended that the German and Swiss defendants FN3 be required to respond to documents requests 5(c) and 9 and Interrogatories 5 and 6, because, although they had not waived their privacy objections when they agreed to the Jurisdictional Stipulations, neither the German nor the Swiss privacy laws applies to the discovery sought and that, in any event, the disputed requests fall within those laws' safe harbors. Moreover, the Special Master stated that even if compliance with the requested discovery would violate Swiss and German privacy laws, the Court should nonetheless order compliance because defendants have not met their burden of showing that the requests here are unimportant or unnecessary and because there is a strong United States interest in requiring these foreign defendants to comply with discovery due to the importance of upholding United States antitrust laws.

> FN3. The German defendants are Degussa, BASF, and Merck; and the Swiss defendants are Lonza and F. Hoffman-La Roche.

On May 8, 2001, the foreign defendants filed Rule 53 Objections to the Special Master's 4/23/01 R & R, arguing that: (1) merits discovery should proceed in accordance with the Hague Convention and the laws of the non-Hague countries; (2) the Special Master's three-prong test as to the physical locations where foreign defendants will be required to search for responsive documents is "both confusing and overly broad and would require time-consuming and expensive searches of the Foreign Defendants' non-U.S. foreign affiliates that are not named in this lawsuit"; (3) the Special Master improperly rejected certain of the foreign defendants' objections based on Swiss and German privacy laws; and (4) compliance with Interrogatory 5(B) would "put the Foreign Defendants in the entirely untenable position of implicating their own employees in criminal conduct based on a subjective second-guessing game of who had 'knowledge' " of the conspiracy. Def's Rule 53 Obj's at 1-3. On May 7, 2001, plaintiffs filed their Objections to the Special Master's 4/23/01 R & R. Specifically, plaintiffs request that the Court adopt the Special Master's Report and Appendix in all respects except for the geographic limitation imposed by the Special Master as set forth in Definition 10 of the Appendix. FN4

> FN4. Definition 10 defines the geographic scope of certain plaintiffs' merits discovery requests and states:
>
> "Geographically relevant" means documents or information, as appropriate, discussing or concerning the United States or a portion of the United States, the world as a whole, or any geographic region of which the United States or a portion of the United States is a part, or documents or information, as appropriate, of general applicability that do not reference a geographic area.

## II. DISCUSSION

Pending before the Court are the foreign defendants' Rule 53 Objections to the Special Master's 4/23/01 R & R and the plaintiffs' objection to the geographic limitation imposed by the Special Master in that R & R. These objections require the Court to consider the following issues: (a) whether merits discovery should proceed in accordance with the Hague Convention or under the Federal Rules of Civil Procedure; (b) whether the Special Master's three-prong test detailing the scope of the foreign defendants' search for responsive documents is unreasonable and unduly burdensome; (c) whether the German and Swiss defendants should be excused from responding to document requests 5(c) and 9

and Interrogatories 5 and 6 on the grounds that production of this information would require them to violate the rights of their employees under the privacy laws of Germany and Switzerland; (d) whether plaintiffs' request in Interrogatory 5(B) that defendants identify all current and former officers, directors, employees, and agents with 'knowledge' of the alleged conspiracy is irrelevant and unduly burdensome; and (e) whether the Special Master erred in imposing the geographic limitation on the scope of plaintiffs' discovery requests seeking transactional, conspiratorial, and bid pricing and contract data.

A. Merits Discovery Under Hague or Federal Rules

**\*4** The first issue presented by the foreign defendants' Rule 53 Objections is whether the Special Master erred in holding that plaintiffs should not be required to obtain merits discovery under the Hague Convention or the laws governing discovery in countries that have not signed the Convention.FN5 The parties agree that this issue is controlled by the Supreme Court's opinion in *Aerospatiale.*Furthermore, there is no dispute that the *Aerospatiale* Court, in rejecting arguments that the Hague Convention required first-use of Convention procedures, did not set forth a bright-line rule for determining whether the Hague Convention or the Federal Rules should apply but instead left this decision to the discretion of trial courts, which it held should consider "the particular facts, sovereign interests, and likelihood that resort to [the Hague Convention's] procedures will prove effective." *Aerospatiale,* 482 U.S. at 544. However, the parties disagree about the conclusion that results from applying *Aerospatiale'* s three-part test. After balancing the *Aerospatiale* factors, the Special Master found: (1) plaintiffs' requests, as narrowed by the Special Master in his 4/23/01 R & R, were both necessary and relevant to plaintiffs' claims and were not so inordinately burdensome or intrusive as to warrant resort to Hague Convention procedures; (2) although the foreign defendants undoubtedly have significant and weighty sovereign interests in discovery proceeding according to the Hague Convention, the United States' interest in effective enforcement of its antitrust laws weighs in favor of Federal Rules discovery; and (3) it is "extremely unlikely" that resort to Hague Convention procedures would prove effective. 4/23/01 R & R at 6-21.

> FN5. Three of the foreign defendants-Takeda Chemical Industries, Ltd., Daiichi Pharmaceutical Co., Ltd., and Eisai Co., Ltd.-are corporations domiciled in Japan, a nation that is not a signatory to the Hague Convention. These defendants have presented no argument-in the briefs or affidavits or in their Rule 53 Objections-as to why discovery should proceed under the laws of Japan rather than the Federal Rules. Therefore, following this Court's earlier analysis of the laws of Japan, the Court finds that discovery as to these foreign defendants should proceed under the Federal Rules. *SeeIn Re: Vitamins Antitrust Lit.,* 120 F.Supp.2d 45, 55-56 (D.D.C.2000).

The foreign defendants contend that the Special Master erred in relying exclusively on the relevance of plaintiffs' discovery requests to justify his findings under the first prong of the *Aerospatiale* test. These defendants appear to presume that because the Special Master found the requests to be relevant, he believed that he did not have to separately consider whether they were unduly burdensome. However, this interpretation is not an accurate representation of the Special Master's analysis. The Special Master devoted considerable time and attention in his 4/23/01 R & R to the issue of undue burden. In fact, he significantly narrowed plaintiffs' discovery requests, both in regard to the geographic limitation, the locations where defendants are required to search for responsive documents, and the time scope of Interrogatory 5(B). Only after narrowing plaintiffs' discovery requests in this fashion did the Special Master conclude that the requests

are not unduly burdensome. Therefore, defendants' suggestion that the Special Master did not adequately consider the burden of plaintiffs' discovery requests is without merit.

Defendants also suggest that the Special Master erred in finding that the Hague procedures would be less effective than the Federal Rules. Specifically, defendants contend that their prior submissions in response to the Hague issue with respect to jurisdictional discovery established the availability of alternate procedures under the Convention that would result in plaintiffs obtaining the evidence they require. However, both the Special Master and the Court considered these alternate procedures in ruling on defendants' Motion for a Protective Order with respect to jurisdictional discovery and found that despite these alleged alternate procedures, there was insufficient evidence to establish the likelihood that these procedures would be effective. Considering the length of time this litigation has already taken and the pretrial schedule currently in place which requires extremely timely and efficient responses to discovery, the fact that the Hague Convention procedures, including defendants' suggested alternative procedures under Hague, are unlikely to result in the timely and efficient discovery required in this case, the Court finds that the Special Master's analysis under the third prong of *Aerospatiale* is justified.

*5 Finally, defendants urge the Court to be sensitive to issues of international comity in analyzing the second prong of the *Aerospatiale* test. To support their argument, defendants quote from a recent law journal commentary on this Court's previous jurisdictional discovery ruling with respect to Hague:

[T]he reluctance to employ the Hague Convention produces significant negative consequences both for U.S.-foreign relations and for the international system as a whole. To outsiders, the interest "balancing" conducted by the Vitamins court appears more like the assertion of primacy of United States interests in the guise of applying an international jurisdictional rule of reason. While it purports to be balanced and fair, the Vitamins court sends quite a different message to the outside world: In a world with no supreme sovereign, we will take sovereignty by judicial fiat and assert it fully whenever pragmatic concerns motivate us and our power over a defendant with property or interests in the United States allows us. The court's balancing insinuates that sovereignty matters only insofar as it is American sovereignty.

Case Note, *Sovereignty On Our Terms,* 110 Yale L.J. 885, 890-91 (March 2001). While the Court does not believe that this article presents an accurate picture of the Court's previous ruling on the Hague issue,[FN6] the article does highlight the importance of seriously weighing the comity concerns in cases such as this one. However, if there was ever a case where the foreign defendants should be required to comply with our discovery rules, it would appear to be this one. Most of these foreign defendants have pled guilty to criminal liability for these alleged antitrust violations; in addition, these defendants have allegedly fraudulently concealed and destroyed much of the evidence against them. Therefore, given the fact that liability has already been established for most of these defendants, that the discovery requests have been narrowed to make them as unburdensome as possible under the circumstances, and that plaintiffs here are struggling not only with the typical constraints of antitrust cases-that the evidence is always largely in the hands of the defendants-but also with alleged overt behavior on the part of the defendants to destroy evidence and to transfer it to their foreign affiliates in the hopes of keeping it out of plaintiffs' hands; the interest of the United States in effective and timely enforcement of its antitrust laws outweighs the foreign countries' sovereign interests in compelling discovery under the Hague procedures.[FN7] Therefore, the Special Master's recommendation that defendants be required to proceed with merits discovery under the Federal Rules will be upheld.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FN6. The Court did not merely pay lip service to foreign comity concerns and then proceed to elevate the interests of the United States over the interests of these foreign countries, as this article presumes. Instead, the Court analyzed the importance of the discovery to plaintiffs, as well as the United States' interest in enforcement of its antitrust laws, and weighed these interests against the burden and intrusiveness of the discovery requests on the foreign defendants.

FN7. In fact, the Court found this to be a much harder question when ruling on jurisdictional discovery than on merits discovery, because the Court was concerned with requiring intrusive discovery over defendants whose jurisdiction in this Court had not yet been conclusively established. Now that this Court's jurisdiction over these defendants is no longer at issue, and given the facts of this case, the Court does not find it unreasonable to require these defendants to submit to the Federal Rules for purposes of discovery, as long as the discovery requests are relevant and not overly burdensome or unduly intrusive.

Plaintiffs request that the Court set a date certain for the foreign defendants to provide merits discovery. Specifically, plaintiffs suggest that this date certain be 14 days from the entry of this Court's order with respect to the Foreign Defendants' Rule 53 Objections to the April 23, 2001 R & R or June 29, 2001, whichever is sooner. Given that merits discovery requests were served on these foreign defendants in September of 1999 and that as of yet few, if any, of such requests have been answered and given that these cases are scheduled to be ready for trial or remand by the spring of next year, the Court finds that a date certain for production of this merits discovery is warranted. However, the Court also agrees with defendants that such discovery could proceed on a rolling basis. Therefore, the Court will order defendants to commence production of merits discovery within 14 days of the date of this Order FN8 and proceed with such discovery as rapidly and efficiently as possible, on a rolling basis. Should plaintiffs find that they are not timely receiving such discovery, they may bring an appropriate motion to the Special Master.

FN8. Since defendants have admitted that the core conspiracy documents have already been compiled, the Court will require these documents to be produced by the two-week deadline for the beginning of production. These core conspiracy documents are necessary for plaintiffs in the taking of defendants' depositions, many of which have already been scheduled; therefore, the Court will tolerate no delay in the production of these documents.

B. Locations of Defendants' Search

**\*6** In his 4/23/01 R & R, the Special Master limited the locations of the search mandated by plaintiffs' discovery requests to: (1) files maintained by or for the persons (a) identified in response to Interrogatory No. 5(B) who either participated in or had contemporaneous knowledge of the conspiracy, or (b) with primary decision-making authority and those with oversight responsibility for the production, pricing, sale, marketing, or distribution of vitamins, raw materials, or intermediates; (2) files maintained for specific vitamins or by vitamin producers to the extent that such files are maintained either at their headquarters or at facilities maintained by or for regional or area managers; and (3) any other area where each foreign defendant or its counsel reasonably believes responsive documents are likely to be found. 4/23/01 R & R at 16-17. Defendants object to this three-part test because, even as limited by the Special Master, FN9 it requires them to search for documents at some of their non-U.S. affiliates. Defendants have produced affidavits to show that such worldwide searches would be extraordinarily burdensome and futile. *See, e.g.,* Heyl Decl. ¶¶ 2-5;

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Gervais Decl. ¶¶ 2-5; Uchiyama ¶¶ 2-6; Sykora Decl. ¶¶ 2-3; Walker Aff. ¶¶ 2-3 (Exh. D to Def's Obj's). For example, defendants explain that BASF has 94 affiliates located on six continents and in 71 countries, that many of these affiliates have multiple offices and production facilities, and that in addition to the travel and language burdens, defendants would have to expend considerable time explaining American legal procedures to these foreign affiliates and researching local disclosure laws to be sure that they do not intentionally violate any foreign laws in the process. Def's Obj. at 9. Moreover, defendants assert that the only additional documents that plaintiffs would be likely to receive from these third party non-U.S. affiliates would be those relating solely to foreign locales and thus irrelevant to plaintiffs' claims in this action. *Id.* at 10 (citing Heyl Decl. ¶¶ 3-4, Gervais Decl. ¶¶ 3-4, Uchiyama Decl. ¶¶ 5-6).

> FN9. Plaintiffs' proposed three-part test was more expansive than the Special Master's; plaintiffs' proposed prong 2 required defendants to search all "files maintained for specific vitamins or by vitamin producers" and did not include the Special Master's limitation that defendants need only search these files to the extent that they "are maintained either at their headquarters or at facilities maintained by or for regional or area managers." The Court agrees with the Special Master's refinement of the second prong and will adopt the Special Master's version of this part of the test.

While this Court does not wish to impose any additional burden on these foreign defendants with respect to discovery than is absolutely necessary; the Court is concerned, given the allegations in the complaints of defendants' fraudulent concealment and destruction of key conspiratorial documents, that these foreign defendants may have transferred key documents to their unnamed foreign affiliates to prevent plaintiffs' from discovering this information.FN10 Moreover, the Court cannot find that the first and second prongs of this test, as limited by the Special Master, will result in the production of irrelevant information. The fact that defendants contend that discovery from these affiliates would be cumulative is not dispositive. *See Westinghouse Elec. Corp. v. Rio Algam Ltd. (In re Uranium Litig.),* 480 F.Supp. 1138, 1155 (N.D.Ill.1979) ("Under the rules of United States Courts, a party is not required to accept the assurance of opposing counsel as to what has been made available. He is entitled to draw his own conclusions on examination of the papers").

> FN10. This concern was heightened at the June 14, 2001 hearing when plaintiffs produced to the Court a sealed document showing evidence that some documents at defendants' home offices have been destroyed.

**\*7** Defendants also argue that the third prong of the Special Master's proposed criteria for the scope of defendants' search is too vague and overbroad. Def's Obj's at 12. Plaintiffs contend that this third prong was intended to function as a limitation rather than an expansion of the scope of the search. However, the Special Master did not find it to be a limitation and this Court agrees. It is unclear how the third prong, which requires defendants to search "any other area where each foreign defendant or its counsel reasonably believes responsive documents are likely to be found"-would serve as a restriction on the locations of defendants' search. Given the specificity in the first two prongs, the third prong may be unnecessary. The Court can surmise that this prong was intended to target the concern that the foreign defendants may have moved documents to avoid discovery; to the extent that this is a legitimate concern, this catchall prong may be needed in order to ensure that plaintiffs get the desired documents. However, until plaintiffs receive discovery relating to the first two prongs, it is premature to determine whether or not discovery under this third prong will be necessary.

Therefore, at this point, the Court will limit the loc-

ations for defendants' search to the first two prongs of the Special Master's test, with the proviso that plaintiffs may later renew their motion to compel additional discovery relating to the third prong if they find defendants' production under the first two prongs to be inadequate.

C. Implications of German and Swiss Privacy Laws

The German and Swiss defendants objected on privacy grounds to document requests 5(c) and 9 and Interrogatories 5 and 6.[FN11] The Special Master rejected defendants' objections and recommended (1) that production in response to these requests would not violate German and Swiss privacy laws; and (2) that the Court order production of this information even if production would violate these laws because of the compelling United States interest in enforcement of its antitrust statutes.

> FN11. Briefly, these discovery requests seek information relating to the "discipline, discharge, suspension, termination, or retirement of individuals identified in Interrogatory 5(B)" [Document Request 5(c) ]; "all daytimers, diaries, appointment books, schedulers, calendars, credit card statements ..., and travel and expense logs and reports" for all persons identified in Interrogatory 5(B) [Document Request 9]; identification by name, position, time period, current employer, and/or last known address, business telephone and fax numbers and e-mail address of all current or former officers, directors, employees or agents who had primary decision-making authority or oversight responsibility for the production, pricing, sale, marketing, or distribution of vitamins for or to customers or potential customers in the United States who participated in and/or had knowledge gained during the course of, in connection with, or in furtherance of the conspiracy, of communications or meetings between or among vitamin manufacturers.... [Interrogatory 5]; and for each person identified in Interrogatory 5(B), whether the individual had a personal computer, telephone or fax machine which was used in connection with this conspiracy and whether defendants reimbursed the person for any computer, telephone, or fax costs or charges and if so produce documents to show the costs or charges reimbursed [Interrogatory 6].

A foreign party seeking protection from discovery on a contention that transmission of the data sought is prohibited by the party's state of domicile has the burden of showing that the foreign law actually bars the production at issue. *In re Sealed Case,* 825 F.2d 494 (D.C.Cir.1987). In support of their position, the German defendants have submitted two declarations prepared by Dr. Christoph Crisolli ("Cristolli") and Professor Paul Schwartz ("Schwartz"), along with an English translation of the German Federal Data Protection Act ("BDSG"). The Swiss defendants have submitted two affidavits of Dr. Felix Iselin ("Iselin").

*1. German Defendants*

Citing the opinions of their declarants, the German defendants contend that the four disputed discovery requests describe employee data within the protections of the German Constitution[FN12] and the BDSG and that disclosure is thus prohibited unless the individual employees whose data would be produced consent or one of the exemptions stated in § 28 of the BDSG applies, which defendants contend they do not. The first exception, § 28(1)2, permits communication of data "in so far as this is necessary to safeguard justified interests of the controller of the data file and there is no reason to assume that the data subject has an overriding legitimate interest in his data being excluded from processing or use." Dr. Cristolli states that this provision would permit disclosure by defendants only if that was within the intended purpose of the employees' employment contracts, for example in a labor court tri-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

al, but not in a United States court for defending against antitrust charges. The second exception, § 28(2)1(a)-(b) of the BDSG authorizes disclosure of otherwise protected data "in so far as this is necessary to safeguard justified interests of a third party or public interests ... if there is no reason to assume that the data subject has a legitimate interest in his data being excluded from communication."Defendants contend that this exception is applicable only when "there is no objectively acceptable alternative" to production of the data, and they contend that production is unnecessary here because the defendants have already pled guilty to charges relating to the general conduct alleged by plaintiffs and have not objected to substantial conspiracy discovery. Moreover, defendants contend that the employees have legitimate interests in withholding the data from the many attorneys and others who could see it despite this Court's Protective Order. On April 2, 2001, the Federal Republic of Germany ("FRG") submitted an *amicus curiae* brief [FN13] urging the Court to defer to Germany's privacy laws because they are central to its laws, policies and judicial procedures; the FRG also contends that to justify production of data, there must be a showing that the data are necessary for the transferee's purpose and not just useful. On April 6, 2001, Degussa filed a March 26, 2001 "Advisory Opinion" of the State Commissioner for Data Protection of Northrhine-Westphalia.[FN14] The Advisory Opinion states that the State Commissioner was visited by Degussa on March 20, 2001 and that Degussa provided him with plaintiffs' First Discovery Request dated January 23, 2001, the Cristolli declaration, and a single-page "overview" of the requested information. Given this information, the Advisory Opinion concludes that "Degussa AG is forbidden due to the data protection law to give the requested information in the present case."Moreover, violation of the BDSG is a criminal offense that may result in the imposition of substantial fines and/or jail terms. *See* Cristoli Decl. ¶ 19; BDSG ¶ 43.

   FN12. Although defendants rely more heavily on the BDSG to support their privacy arguments, defendants maintain that the German Constitution protects the right to "informational self determination," which provides individuals with the right to control the collection and dissemination of their personal data. *See* Cristoli Decl. ¶ 5. However, the evidence suggests that the BDSG codified the German constitutional right of self-determination. *See* Ehmann Decl. ¶ 27; Cristolli Decl. ¶ 7; Schwartz Decl. ¶ 12. Therefore, the discussion of the BDSG here encompasses the discussion of Germany's constitutional right to informational self-determination.

   FN13. In his 4/23/01 R & R, the Special Master granted the motion for leave to file the amicus brief, because it was preferable to allow the FRG the opportunity to express its views and because plaintiffs had already submitted a substantive response to the brief. However, the Special Master discredited the FRG's conclusions by noting that the FRG relied on an outdated version of the BDSG in which the exceptions were more narrowly drawn; and instead of presenting an official interpretation from the Federal Republic of Germany, FRG cites only defendants' two experts and the State Commissioner's Advisory Opinion for its conclusion that there is "a conflict between U.S. discovery provisions and German privacy law."*See*4/23/01 R & R at 38 n. 49.

   FN14. The Special Master granted Degussa's motion for leave to file and accepted the Advisory Opinion into the record. However, the Special Master distinguished this Advisory Opinion by noting that the materials presented to the Commissioner were incomplete and the reasons the Commissioner gave for rejecting transmission of the data requested by plaintiffs

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

were conclusory, unsupported, and grounded on an inadequate record. *See* 4/23/01 R & R at 38 n. 49.

**\*8** The Special Master interpreted BDSG § 3(2), as does plaintiffs' expert Prof. Ehmann, to provide that only personal files that can be analyzed by automated procedures or, if not automated, are "similarly structured" so that "they can be rearranged and evaluated by means of automated procedures" are within the BDSG's prohibitions on transmission.[FN15] The Special Master found that defendants had failed to meet their burden of establishing that the requested information are "data files" or "similarly structured" so as to be protected by the BDSG. In their Rule 53 Objections, defendants contend that "there is evidence in the record that most of the documents and other personal information requested by Plaintiffs in Document Requests 5(c) and 9 and Interrogatories 5 and 6 are kept in 'Electronic Databases' that may be accessed through 'Electronic' means." Def's Obj's at 17. Moreover, defendants point to the State Commissioner for Data Protection of Northrhine-Westphalia's statement that the relevant "person-specific data (BDSG § 3(1)) are obviously stored either in data files or are taken from them (BDSG § 27(1))." *See* Def's Exh. K (3/26/01 letter from State Commissioner for Data Protection of Northrhine-Westphalia to Data Protection Officer of Degussa AG) at 3.

> FN15. Although it was originally the subject of some dispute, at the June 14, 2001 hearing defendants conceded the accuracy of the Special Master's interpretation of the data file requirement in the BDSG.

However, even assuming that the requested information are stored in data files and thus within the protections of the BDSG, disclosure may still be warranted if plaintiffs can show (1) that the information at issue is "necessary" to protect public interests and/or the interests of plaintiffs; and (2) the data subjects have no "legitimate interest" in preventing disclosure of the information. Plaintiffs assert that the interrogatories are necessary to identify and question key conspirators and that the document requests are necessary to identify and elucidate the substance of meetings with competitors and to determine how defendants dealt with conspirator-employees. The Special Master accepted these explanations of necessity, and this Court is inclined to agree.[FN16] Defendants' argument that this information is superfluous because they have already pled guilty to the underlying charges is without merit. Despite their guilty pleas, defendants have attempted to avoid liability in this case from the very beginning, from their early attempts to argue against this Court's jurisdiction until today when they admit that they have not yet responded to most of plaintiffs' merits discovery requests. Under these circumstances, the Special Master is right to conclude that defendants' assertion that other discovery requests to which they have not yet responded will satisfy plaintiffs' needs is insufficient. "Under the rules of United States Courts a party is not required to accept the assurances of opposing counsel as to what has been made available. He is entitled to draw his own conclusions on examination of the papers." *Westinghouse Elec. Corp. v. Rio Algom Ltd. (In re Uranium Antitrust Litig.),* 480 F.Supp. 1138, 1155 (N.D.Ill.1979); *see also Advanced Internat'l Sys. Securities Litig.,* 1993 WL 331006, at \*2 (C.D.Cal. May 17, 1993) (Pl's Opp. Exh. 7) ("Defendants do not possess the authority to determine what Plaintiffs need to pursue their claims." Rather, the Federal Rules of Civil Procedure govern whether plaintiffs are entitled to discover the requested information).

> FN16. Defendants' expert, Schwartz, stated that "necessary" does not mean "absolutely necessary," and that the term as used in the companion exception § 28(1)2, "involves consideration of the reasonableness and commensurability of an intended use as compared to other possible means, if any, of safeguarding a justified interest." Schwartz Decl. ¶ 13.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*\*9* As discussed above, the Court is inclined to agree with the Special Master that the requested information may be necessary to plaintiffs' claims in this case. However, even if the information is necessary, the Court must also consider whether the individuals have a legitimate interest in preventing the disclosure of this information. The data sought is certainly personal-daytimers, diaries, appointment books, schedulers, calendars, credit card statements, travel and expense logs and reports, telephone billing records, records of incoming and outgoing fax transmissions, employee home addresses, former employees' new employer identities, e-mail addresses, and employee discharge, discipline, suspension, termination, and retirement records. As noted by defendants, individuals have a presumptively legitimate interest under German law in the nondisclosure of their personal information to residents of countries with non-equivalent personal data protection standards. *See* Cristolli Decl. ¶ 17. Therefore, the crucial question here is whether the Protective Order in this case is "equivalent" to the protections afforded by the German BDSG. Here, plaintiffs may run into a problem, because the Protective Order is concededly not absolutely equivalent to the protections afforded by the BDSG. There is some concern by this Court that defendants not be allowed to withhold information based upon minor inequivalencies between the Protective Order in this case and the BDSG. After all, the Protective Order was proposed to the Court jointly by plaintiffs and defendants and no effort has been made by defendants to amend it to address any "equivalency" problems they perceive. However, the Court is also aware that the information affected by these privacy laws is a small subset of the total discovery requested in this case. Given that the German defendants do appear to have some legitimate privacy law concerns and that the Protective Order in this case may not be sufficiently detailed to shield them for criminal liability in their own country, the Court is hesitant to order these defendants to violate their country's laws without a better understanding of exactly what information is protected and how necessary this small subset of information is to plaintiffs' claims in this case. Accordingly, the Court will allow defendants to file a privacy log detailing exactly what requested information would be covered by the German privacy laws. Plaintiffs may then determine whether that requested information is absolutely essential to their case and whether there is a way to amend the Protective Order to safeguard defendants from liability in the production of this information.

*2. Swiss Defendants*

The Swiss defendants similarly assert that the data at issue are protected by the right to privacy guaranteed by the Swiss Constitution and the nation's Federal Law on Data Protection ("FDPL") prohibition against transmission to the United States, where, according to defendants' affiant, data protection guarantees are not equivalent to those afforded by Swiss law. Specifically, Dr. Iselin concludes that transfer of the data at issue is "prohibited unless: (a) the protection provided to the personal data is equivalent to that provided under Swiss law (Art. 6, para.1);[FN17] or (b) the infringement of privacy is 'justified' (Art. 13)."[FN18] Iselin 3/20/01 Aff. ¶ 7.

> [FN17]. Article 6 of the FDPL provides: "No personal data may be transferred abroad if the data subject's personal privacy could be jeopardised, in cases where there is a failure to provide protection equivalent under Swiss law." Dr. Iselin states that "the [Court's] Protective Order does not rise to the level of protection afforded by the Swiss Data Protection Law" because it would not prevent a party from disclosing its own information and because personal data could be available to "the broad range of persons listed in paragraph 8." Iselin 3/20/01 Aff. ¶ 8.
>
> [FN18]. Article 13 of the FDPL provides: "An infringement of privacy is illegal unless it is justified by the consent of the victim, by an overriding public or private in-

terest or by the law."Dr. Iselin states that a discovery order would not be a "law" justifying production. Iselin Aff. ¶ 9. However, plaintiffs' expert, Dr. Peter, disagreed and stated that "[c]ompliance with a judicial order rendered by a competent court after regular procedure should, in my opinion, constitute a justifying motive to transfer personal data...." Peter Aff. ¶ 35.

***10** The Special Master found the Protective Order here to be adequate, but in their Rule 53 Objections defendants contest this finding and assert that the core principles of the FDPL are not guaranteed by the Protective Order. Def's Obj's at 22. Specifically, defendants state that the FDPL prohibits the transfer of data abroad and that no such guarantee is imposed by the Protective Order; [FN19] the FDPL also establishes parameters of data security which are not assured by the Protective Order; finally, the FDPL gives a right of access, as well as rights of accuracy and rights of correction, to the data subject and no such rights are assured by the Protective Order. As with the German defendants, the Court will allow the Swiss defendants to file a privacy log detailing exactly what requested information is covered by the Swiss privacy laws. The parties will then have the opportunity to litigate issues concerning this log if necessary. [FN20]

> [FN19]. To illustrate this point, defendants point to the pending motion of the Canadian plaintiffs to intervene in this case for access to certain discovery.

> [FN20]. The Court is aware that a federal court may order a party to comply with discovery, even if such compliance may violate another sovereign's law. *See, e.g. United State v. Vetco, Inc.,* 69 F.2d 1281, 1287 (9 th Cir.1981) (requiring party to comply with discovery because U.S. interest in tax collection outweighs Swiss privacy laws); *United States v. Field,* 532 F.2d 404, 407 (5 th Cir.1976); *United States v. First Nat'l City Bank,* 396 F.2d 897, 903 (2d Cir.1968) (requiring non-party to comply with discovery because importance of U.S. antitrust laws outweighs possible civil sanctions in Germany); *Alfadda v. Fenn,* 149 F.R.D. 28, 33 (S.D.N.Y.1993); *see also SEC v. Banca Della Svizzera Italiana,* 92 F.R.D. 111, 119 (S.D.N.Y.1981) ("It would be a travesty of justice to permit a foreign company to invade American markets, violate American laws ... withdraw profits and resist accountability for itself and its principals by claiming their anonymity under foreign law"). However, given the significant comity concerns of requiring disclosure of information that could conceivable violate foreign countries' privacy laws, the Court is wary of ordering such discovery until it is clear that the requested discovery is necessary.

D. Interrogatory 5(B)-Contemporaneous Knowledge Requirement

Defendants contend that Interrogatory 5(B) is inappropriate to the extent that it requires foreign defendants to identify all current and former officers, directors, employees, and agents with contemporaneous "knowledge" of the alleged conspiracy. Specifically, defendants argue that this Interrogatory's contemporaneous knowledge requirement is unlikely to lead to the discovery of any relevant information that would not be discovered through other discovery requests, is unduly burdensome, and is an improper topic for an interrogatory. Moreover, defendants argue that the question of whether a person has "knowledge" is subjective and requires defendants to draw a line that "simply cannot be drawn." Def's Obj's at 27. Defendants' arguments are without merit.

First, Fed.R.Civ.P. 26(b)(1) allows for discovery of "the identity and location of persons having knowledge of any discoverable matter."Defendants agree that "plaintiffs have the right to discover who has

information relevant to the lawsuit," Def's Obj's at 27, but they contend that this information is otherwise available to plaintiffs and that the true intent behind Interrogatory 5(B) is to have defendants "investigate and inculpate individuals who have nothing more than indirect hearsay 'knowledge' of the alleged conspiracy. Defendants provide no explanation or basis for this assumption and the Court finds it to be unfounded. As the Special Master noted in his 4/23/01 R & R, "[l]earning the identity of all individuals who had knowledge of the conspiracy, regardless of whether they attended a meeting or were named in an incriminating document, will allow plaintiffs to gain a greater understanding of the ways in which the entire conspiracy operated and to test the knowledge and statements of individuals who did take an active role."4/23/01 R & R at 18-19. For example, an individual in this category may have seen conspiracy documents that were subsequently destroyed. *Id.* at 19, n. 20. This information is especially relevant in this case because defendants allegedly took steps to ensure that the conspiracy documents were destroyed or were never created and went to great lengths to hide their activities and meetings from others; therefore, the fact that someone is not mentioned in any of the documents would not necessarily mean that he or she was not involved in the conspiracy and plaintiffs are entitled to be able to identify the players in this alleged conspiracy.[FN21] Defendants' argument that "knowledge" is a subjective term and requires them to draw a line they cannot draw is hardly worthy of a response. The term "knowledge" in this context is self-explanatory and the Court does not believe that defendants are unclear regarding its meaning.

> [FN21.] In fact, at the June 14, 2001 hearing, plaintiffs produced to the Court a deposition transcript of an individual who was not named in any conspiracy document and had not attended any meeting but who obviously had important knowledge of this conspiracy that would not be discoverable in the absence of this contemporaneous knowledge requirement.

E. Geographic Limitation

**\*11** Plaintiffs have filed an Objection to the Special Master's 4/23/01 R & R contesting the Special Master's geographic limitation on the scope of certain of plaintiffs' merits discovery. Specifically, the Special Master limited the scope of certain of plaintiffs' discovery requests seeking transactional data, information related to the alleged conspiracy, and information concerning bid prices and contracts, among other things, to require defendants to produce only "geographically relevant" material in response. In Definition 10 of the Appendix, the Special Master defined the term "geographically relevant" as follows:

"Geographically relevant" means documents or information, as appropriate, discussing or concerning the United States or a portion of the United States, the world as a whole, or any geographic region of which the United States or a portion of the United States is a part, or documents or information, as appropriate, of general applicability that do not reference a geographic area.

Plaintiffs request that the Court overrule this portion of the Special Master's R & R and order the foreign defendants to produce "(1) all the materials they already have compiled in connection with their own internal investigations or inquiries from law enforcement officials, including the Department of Justice, the European Commission and officials in Canada, Japan, Australia, and elsewhere, regarding their participation in a global conspiracy to allocate market shares, sales volumes, territories and customers and to rig bids and fix prices of vitamins;[FN22] and (2) the related transactional and financial data (limited to pre-existing data maintained electronically or pre-existing manual summaries) for their worldwide production and sale of vitamins."Pl's Obj's at 1. Plaintiffs contend that discovery of this information without any geographic limitation is necessary to show "the relationships among

the documents, the breadth of conspiratorial communications, and the scope of participation by each vitamin producer to develop the evidence-both direct and circumstantial-that they will present at trial concerning the conspiracy's existence, when it actually started, how it expanded to include virtually all vitamins and all major vitamins producers, how the conspiracy was enforced and infractions or disagreements resolved, the affirmative acts defendants took to conceal the conspiracy, how the conspiracy affected vitamin prices generally, and to quantify the overcharges plaintiffs paid on the vitamins they purchased."*Id.* at 1-2. In addition to asserting their right to discovery that is coextensive with the unprecedented size and complexity of this global conspiracy, plaintiffs also contest the Special Master's delegation to the foreign defendants of absolute and unreviewable discretion to determine which acts in furtherance of the conspiracy "concern" the United States.

> FN22. Plaintiffs refer to these as the "core conspiracy" documents.

The Special Master's geographic limitation assumes that most conduct in furtherance of the alleged global vitamins conspiracy is relevant but that there is a small subsection of the overall conduct in furtherance of the conspiracy-acts or communications in furtherance of the conspiracy that occurred wholly outside the United States-that is irrelevant for purposes of discovery in this case, because plaintiffs can only recover for injuries that occurred in United States commerce.FN23 However, there is a crucial difference between what is relevant for purposes of discovery and what actions will be admissible to prove damages at trial. It is well-established that parties are entitled to discover not only admissible evidence but also information that is "reasonably calculated to lead to the discovery of admissible evidence."Revised Rule 26(b)(1). Moreover, although defendants are correct that the revised Fed.R.Civ.P. 26(b)(1) attempts to further limit discovery by narrowing discovery to that related to the "claim or defense of any party" as opposed to the subject matter of the litigation, the amended rule does provide that "[f]or good cause shown, the court may order discovery of any matter relevant to the subject matter involved in the action."Here, plaintiffs have alleged a global conspiracy involving substantial fraudulent concealment and destruction of documents; given the nature of this case, the Court finds good cause for allowing discovery with respect to even the foreign actions that were taken in furtherance of this conspiracy. Although these actions may not be admissible to establish damages; because, as this Court has previously ruled, plaintiffs' claims are limited to those injuries with a sufficient United States nexus,FN24 the information would be relevant to show the breadth of the conspiracy, the role that each defendants' executives played in implementing, expanding, enforcing and concealing the conspiracy, and how the conspiracy was maintained for the length of time alleged. *See Continental Ore Corp. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699 (1962) (In antitrust conspiracy cases, "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each....[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole...."); *ES Development, Inc. v. RWM Enterprises, Inc.,* 939 F.2d 547, 553-554 (8 th.1991) ("[I]t is axiomatic that the typical conspiracy is rarely evidenced by explicit agreements, but must always be proved by 'inferences that may be drawn from the behavior of the alleged conspirators' ").FN25 It could also lead to the discovery of other admissible information by allowing plaintiffs to discover "the identity and location of persons having knowledge of any discoverable matter," which is explicitly authorized by Revised Fed.R.Civ.P. 26(b)(1). Furthermore, this information could be extremely relevant for purposes of impeaching defendants' trial witnesses. As explained in the Advisory Committee Note to Revised Rule 26(b)(1):

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FN23. As this Court has previously ruled, relevance determinations by the Special Master are reviewed *de novo.* *See* 11/22/00 Mem. Op. Re: Downstream Data at 2-3.

FN24. *See* 6/7/01 Mem. Op. Re: Joint Motion to Dismiss; *see also* 6/7/01 Mem. Op. in *Empagran, S.A., et al. v. F. Hoffman La-Roche, Ltd., et al.*

FN25. The Court agrees with the Special Master that *United States v. Andreas,* No. 96-CR-762, 1999 WL 299314 (N.D.Ill. May 5, 1999), does not significantly bolster plaintiffs' argument. First, *Andreas* involved sentencing issues arising out of a criminal conspiracy where the Court was concerned with "due process" and "fundamental fairness" and thus does not directly relate to the question of what is discoverable in a civil antitrust proceeding. Second, the court in *Andreas* did not have the international comity concerns facing this Court; that Court's decision was directed at the United States government, rather than at foreign companies. Thus, *Andreas* is not particularly instructive on the issue of the scope of discovery that can be compelled directly from foreign parties.

**\*12** "The dividing line between information relevant to the claims and defenses and that relevant only to the subject matter of the action cannot be defined with precision. A variety of types of information not directly pertinent to the incident could be relevant to the claims or defenses raised in a given action. For example, other incidents of the same type, or involving the same product, could be properly discoverable under the revised standard. Information about organizational arrangements or filing systems of a party could be discoverable if likely to yield or lead to the discovery of admissible information. Similarly, information that could be used to impeach a likely witness, although not otherwise relevant to the claims or defenses, might be properly discoverable. In each instance, the determination whether such information is discoverable because it is relevant to the claims or defenses depends on the circumstances of the pending action. Advisory Committee Note to 2000 Amendments to Fed.R.Civ.P. 26(b)(1). Therefore, the Court is satisfied as to the relevance of the core conspiracy documents, even those that do not mention the United States and purport to involve only foreign countries.

With respect to the transactional and financial data outside the geographic limitation, plaintiffs contend that they need discovery of this data outside the geographic limitation to establish: "(1) when the conspiracy actually began and terminated as to each vitamin; (2) the steps the Foreign Defendants took to affirmatively conceal their wrongdoing, by *inter alia,* falsely telling customers that price increases were the unavoidable response to international currency fluctuations, inflation, low profits, production cost increases or production capacity constraints; (3) the estimates of the prices plaintiff would have paid for vitamins "but for" the conspiracy; and (4) the fact that the Foreign Defendants could have sustained their operations at the "but for" price levels." Pls' Obj's at 20. The Court agrees. Unless defendants are willing to stipulate that their experts will not rely on this foreign transactional and financial data, which they thus far have been unwilling to do, restricting plaintiffs' access to this data could be unfairly prejudicial and could impact their ability to prosecute their cases. *See Hospital Bldg Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 746 (1976) (Where "the proof is largely in the hands of the alleged conspirators," antitrust plaintiffs must be given ample opportunity for discovery); *see also In re NASDAQ Market-Makers Antitrust Litig.,* 929 F.Supp. 723, 725 (S.D.N.Y.1996). Therefore, although the case for discovery of foreign financial and transactional data may be slightly weaker than for the core conspiracy documents, the Court cannot find that this information is irrelevant and unless defendants are willing to stipulate that they will not rely on this information, the Court will not bar plaintiffs from discovery of this data. *SeeAnti-*

*trust Law Developments (Fourth)* at 872-73 (Pl's Exh. 11) ("Courts are generally reluctant to limit discovery to a narrow geographic area: Where allegations of conspiracy to restrain trade and intent to monopolize are at issue, ... a broad scope of discovery is appropriate, because the conspiracy may involve actors outside of plaintiff's geographic market and the scheme of monopolization may involve an area larger than the plaintiff's own limited sphere of operations. In essence, the geographic range of discovery requests 'is subject only to a test of reasonableness.' Courts determine whether there are elements of regional, national, or international competition that would support discovery in a correspondingly broad geographic area rather than merely a local market").

**\*13** However, the fact that foreign core conspiracy and transactional and financial information is relevant to plaintiffs' claims does not end the matter. Given the Court's ruling that the foreign defendants will be compelled to produce this discovery in accordance with the Federal Rules rather than the Hague Convention, the Court must seriously consider the burden on defendants of responding to these discovery requests. The Special Master appeared to have been particularly concerned with the possibility that plaintiffs would use this discovery to bolster their claims in the *Empagran* case; since the foreign claims in that case have now been dismissed, this is no longer a problem. Defendants argue that plaintiffs may still be seeking this evidence for use in their foreign court proceedings, because discovery procedures in those countries will be more restrictive than the discovery available under the Federal Rules. However, there is no evidence that plaintiffs are seeking this discovery for that purpose; the foreign core conspiracy and transactional and financial documents are relevant to plaintiffs' conspiracy, global price-fixing, and fraudulent concealment claims here and could potentially lead to the discovery of other admissible evidence with regard to the specifics of this conspiracy and the affirmative acts of fraudulent concealment. Moreover, defendants' concern that production of these documents could expose them to additional civil suits and government prosecutions in foreign countries is also unwarranted, because the Protective Order governing these actions provides that the discovery produced in these cases can only be used for the prosecution or defense of the MDL 1285 actions. *See* 11/3/99 Protective Ord. ¶¶ 1, 17. Therefore, the Court will not bar this discovery based on the hypothetical concern of defendants that plaintiffs could conceivably attempt to use this discovery in their foreign proceedings; the Court trusts that all parties will abide by the Protective Order governing this case.

Moreover, defendants have not sufficiently explained how producing these foreign core conspiracy documents would unduly burden them. In fact, this Court is inclined to agree with plaintiffs that the process of reviewing each document to determine whether it falls within the geographic limitation and then redacting any portions of documents that fall outside the proposed geographic limitation would seem to require much more work and expense than merely producing all documents responsive to plaintiffs' requests. Additionally, it is problematic to give defendants absolute discretion to withhold or redact documents they label as not "concerning the United States." As noted by the Special Master, courts have expressed serious reservations about the problems posed by giving a party the type of discretion proposed here. *See, e.g., In re Medeva Sec. Litig.,* No. 93-4376-Kn, 1995 WL 943468, 1995 U.S. Dist. LEXIS 21895, at *8 (C.D.Cal. May 30, 1995) ("The Court does not welcome unilateral editing of documents by the producing party. Even when implemented with restraint and in good faith, the practice frequently gives rise to suspicion that relevant material harmful to the producing party has been obscured. It also tends to make documents confusing or difficult to use. All too often, the practice results in litigation of collateral issues and in camera review of documents by the Court, with the result that the time of both counsel and the Court is wasted").

**\*14** That being said, the Court must seriously consider the sovereign interests implicated by requiring this broader production on the part of the foreign defendants. The question is whether this information is so relevant and necessary to plaintiffs' cases that the prejudice in being restricted from these foreign conspiracy and financial and transactional documents would outweigh the encroachment on the foreign countries' sovereign interests in being required to respond to this discovery. *Aerospatiale* dictates that the burdensomeness and intrusiveness of discovery on foreign litigants is to be evaluated in the context of the court's "knowledge of the case and claims and interests of the parties and the governments whose statutes and policies they invoke." *Aerospatiale,* 482 U.S. at 546. Balancing the relevance and harm to plaintiffs in not having this information against the burden and intrusiveness on defendants of requiring this discovery, the Court finds that the geographic limitation is unwarranted and that plaintiffs are entitled to discovery of all requested core conspiracy and transactional and financial data. *See First American Corp. v. Price Waterhouse,* 988 F.Supp. 353, 364-66 (S.D.N.Y.1997), *aff'd,* 154 F.3d 16, 23 (2d Cir.1998) (ordering relevant discovery to proceed under Federal Rules rather than Hague Convention despite the fact that this discovery was admittedly burdensome, because the discovery was co-extensive with the "complicated misdoings" alleged in the complaint). Accordingly, the Court will decline to uphold the Special Master's geographic limitation on certain discovery and will order this relevant discovery to be produced without regard to any geographic limitation.

### III. CONCLUSION

In conclusion, the Special Master's 4/23/01 R & R will be affirmed in part. Specifically, the Court will (1) uphold the Special Master's ruling that merits discovery proceed under the Federal Rules, and additionally the Court will set a date certain for the start of production; (2) uphold the first two prongs of the Special Master's three-prong test establishing the locations for defendants' search and decline to order discovery based on the third prong at this time; (3) decline the Special Master's recommendation that the Court order immediate production of documents and responses to interrogatories which the German and Swiss defendants claim violate their privacy laws, and instead order defendants to produce a privacy log of these documents; (4) uphold the Special Master's contemporaneous knowledge requirement in Interrogatory 5(B); and (5) decline the Special Master's recommendation with regard to the geographic limitation. An order will accompany this Opinion.

### *ORDER Re: Merits Discovery*

In accordance with the accompanying Memorandum Opinion, it is hereby

ORDERED that the Special Master's April 23, 2001 Report and Recommendation will be AFFIRMED IN PART. Specifically, it is hereby

ORDERED that the Special Master's ruling that merits discovery proceed under the Federal Rules of Civil Procedure is affirmed. It is further hereby

**\*15** ORDERED that the foreign defendants will begin production of merits discovery in accordance with the Federal Rules of Civil Procedure, and will produce all core-conspiracy documents, within fourteen days of this Order. It is further hereby

ORDERED that defendants will abide by the first two prongs of the Special Master's three-prong test establishing the locations for defendants' search at this time; plaintiffs may renew their motion to compel discovery based on the third prong at a later date if they find the production under the first two prongs to be inadequate. It is further hereby

ORDERED that, within thirty days of this Order, the German and Swiss defendants produce a privacy log detailing what information requested in Document Requests 5(c) and 9 and Interrogatories 5 and 6 would be covered by the Swiss and German

Not Reported in F.Supp.2d  
Not Reported in F.Supp.2d, 2001 WL 1049433 (D.D.C.), 2001-2 Trade Cases P 73,338  
**(Cite as: 2001 WL 1049433 (D.D.C.))**

Page 18

privacy laws. It is further hereby

ORDERED that defendants produce the relevant discovery in response to the Special Master's contemporaneous knowledge requirement in Interrogatory 5(B). And it is further hereby

ORDERED that defendants produce the relevant conspiracy, financial and transactional documents in response to plaintiffs' discovery requests without regard to any geographic limitation.

D.D.C.,2001.  
In re Vitamins Antitrust Litigation  
Not Reported in F.Supp.2d, 2001 WL 1049433 (D.D.C.), 2001-2 Trade Cases P 73,338

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.