

LEXSEE 2005 U.S. DIST. LEXIS 8450

**CAIRO, INC., Plaintiff(s), v. CROSSMEDIA SERVICES, INC., Defendant(s).**

**No. C 04-04825 JW**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

*2005 U.S. Dist. LEXIS 8450*

**April 1, 2005, Decided
April 1, 2005, Filed**

**COUNSEL:** [*1] For Cairo Inc, Plaintiff: Ragesh K. Tangri, Brook Dooley, Mark A. Lemley, Keker & Van Nest LLP, San Francisco, CA.

For Crossmedia Services Incorporated, Defendant: Eric Evans, Cooley Godward LLP, Palo Alto, CA; Frank N. Gaeta, Rich May P.C., Boston, MA.

**JUDGES:** JAMES WARE, United States District Judge.

**OPINION BY:** JAMES WARE

**OPINION**

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**

**I. INTRODUCTION**

Plaintiff Cairo, Inc. ("Plaintiff" or "Cairo") has filed a complaint for declaratory relief against Defendant Crossmedia Services, Inc. ("Defendant" or "CMS") seeking a declaratory judgment from this Court that (1) its web site does not infringe any copyrightable material belonging to CMS; (2) its web site does not infringe any registered federal trademark held by CMS; (3) its web site does not infringe any California trademark held by CMS; (4) its web site does not constitute an unfair trade practice under federal or California law; (5) its conduct does not breach any enforceable contract with CMS; (6)

it has not committed trespass as to CMS's personal property; (7) it has not misappropriated property or assets belonging to CMS; and (8) it has not wrongfully interfered with CMS's business [*2] relationships. Defendant moves to dismiss Plaintiff's Complaint for improper venue, pursuant to *FED. R. CIV. P. 12(b)(3)*. On Tuesday, March 29, 2005, this Court held a hearing regarding Defendant's motion. Based upon counsels' comments at the hearing and upon all papers filed to date, this Court GRANTS CMS's motion to dismiss.

**II. BACKGROUND**

Cairo is a Delaware corporation with its principal place of business in San Ramon, California. (Complaint P 5.) CMS is a Delaware Corporation with its principal place of business in Chicago, Illinois. (Id.) Both parties operate web sites that allow users to search for products on sale at local retailers. (Complaint PP 1, 2.)

A. CMS's Business

CMS's business has two aspects: its SmartCircular Service and its ShopLocal Network. (Hand Declaration P 3.) The SmartCircular Service and ShopLocal Network enable CMS's retail customers to distribute their promotional information via the Internet to shoppers in local geographic markets and enable these shoppers to identify sales, specials, and promotions at local retailers. (Id.) CMS enters into agreements with retailers and other businesses [*3] to make their promotional materials available on CMS's web sites. (Hand Declaration P 4.)

Using its SmartCircular Service, which allegedly consists of proprietary processes and technology, CMS takes its customers' promotional materials and creates interactive electronic versions of those materials. (Id.) CMS hosts these materials on more than 250 web sites that it operates. (Id.) A shopper may access the interactive promotional materials created by CMS through CMS's ShopLocal Network or through the retailers' own web sites. (Hand Declaration P 5.) When a shopper clicks on a link on a retailer's web site to view the retailer's promotional materials, the shopper is directed to a web site hosted by CMS. (Id.)

CMS's ShopLocal Network provides shoppers with access to the interactive promotional materials that CMS has created for its customers with its SmartCircular Services technology. (Hand Declaration P 6.) A shopper can use the ShopLocal Network by visiting any one of a number of web sites, including CMS's shoplocal.com, saleshound.com, and realmalls.com; more than 140 local newspaper sites; and certain "portals" and "destination sites." (Id.)

When a shopper visits [*4] the web site of one of CMS's retail customers and clicks on a link for sales or specials, the shopper is directed to a CMS web page that asks her to enter her zip code, or city and state, to find the sales, specials, and promotions in her area. (Hand Declaration P 7.) Once the location information is entered, the shopper is directed to a page displaying CMS's customers' interactive promotional material. (Id.)

Except for the web pages that CMS operates for Target Corporation, every web page hosted by CMS displays the CMS name and logo and the following notice: "By continuing past this page and/or using this site, you agree to abide by the Terms of Use for this site, which prohibit commercial use of any information on this site." (Id.) "Terms of Use" appears in an underlined and highlighted format which signals in a common Internet convention that users can view the terms by clicking on the hyperlink. (Hand Declaration P 8.) Once a user clicks on the link, a user sees the full CMS Terms of Use. (Id.) The introductory provision of the Terms of Use reads as follows:

"These terms of use constitute a binding legal agreement (the "Agreement") between the user and CrossMedia [*5] Services, Inc. ("CrossMedia"), the owner and operator of the Website. If you do not accept the terms stated here, do not use the Website." (CMS's

Motion to Dismiss 6:24-25.)

CMS allows users to "view and download a single copy of content on [CrossMedia web sites] solely for lawful, non-commercial and personal use by users and other authorized users as expressly permitted by and subject to the restrictions" imposed by its Terms of Use. (Id. at 6:26-28.) CMS's Terms of Use prohibit users from deep-linking to CMS's web sites for any purpose unless specifically authorized by CMS. (Id. at 7:1-2.) They also bar users from accessing CMS web sites with "any robot, spider or other automatic device or process to monitor or copy any portion" of those sites. (Id. at 7:2-4.)

> CMS's Terms of Use contain a forum selection clause:
>
> Jurisdiction for any claims arising under this Agreement shall lie exclusively with the state or federal courts in Chicago, Illinois where CrossMedia has its principal place of business.

(Id. at 7:8-9.)

B. Cairo's Business

Cairo's web site allows a user to search its database of in-store sales information. (Moss Declaration [*6] P 6.) By entering her zip code, a user can search for products on sale at local retail stores by typing in a particular product in which she is interested, by selecting a product category prepared by Cairo, by selecting a retailer from a prepared list, or by selecting a specific brand from a list prepared by Cairo. (Id.) The user's search results include the name of the specific product on sale accompanied by a small image of the retailer's newspaper weekly circular. (Moss Declaration P 7.) If the user clicks on the name of the product, the user is directed to the retailer's web page with information about that particular product. (Id.) Alternatively, if the user clicks on the image of the circular, she is directed to the retailer's weekly circular web page. (Id.)

Cairo compiles information from retailers' weekly circular web pages, some of which are enabled by CMS. (Moss Declaration PP 3, 5.) Cairo collects sale information from retailers' web sites by means of computer programs variously referred to as "robots," "spiders," or "crawlers," which automatically visit retailers' web sites, record the relevant sales information

from the retailers' weekly circular web pages, **[\*7]** and then return that information to a database maintained by Cairo. (Moss Declaration P 3.)

Cairo's computer search programs cannot read the Terms of Use posted on a web site, and they do not report the presence of such Terms of Use back to Cairo. (Moss Declaration P 4.) On a day-to-day basis, Cairo does not actually know whether the web pages it searches contain Terms of Use, much less what the specific content of those Terms of Use is. (Id.)

C. The Dispute

Within days after Cairo launched its web site in October 2004, CMS discovered by reviewing its server logs and by reviewing the Cairo site that Cairo was copying promotional materials from CMS's SmartCircular web pages and posting a version of those materials on the Cairo site. (Hand Declaration P 10.) CMS alleges that Cairo's scraper program submits requests to the servers hosting CMS's web pages and in response, the servers provide a copy of the requested web pages to the scraper. (Id.) When users of the Cairo site search a particular product or brand, Cairo displays as the search results the promotional material it has copied from the CMS pages in the form of thumbnail images with accompanying text. (Id. **[\*8]** ) A user of the Cairo site who clicks on some of the thumbnail images or associated text links is connected to a CMS web page via a "deep link" where she will find a larger, searchable, interactive version of the image and text, created and displayed by CMS. (Id.)

On November 1, 2004, CMS's counsel sent a letter to the President and the Vice President of Products of Cairo informing Cairo that its conduct constituted a breach of the Terms of Use and demanding that Cairo cease such conduct. (Hand Declaration P 11.) Despite the November 1, 2004 letter, CMS alleges that Cairo has continued its scraping of and deep-linking to CMS's web pages. (Id.) CMS alleges that its records show that Cairo's scraper is accessing CMS's web pages many thousands of times per month. (Hand Declaration P 13.)

On November 12, 2004, Cairo filed a declaratory relief action against CMS in the United States District Court for the Northern District of California. On January 14, 2005, CMS filed a Motion to Dismiss for improper venue, alleging that the forum selection clause in CMS's Terms of Use requires Cairo to file lawsuits against CMS in the state and federal courts in Chicago, Illinois, rendering **[\*9]** venue in this Court improper. Cairo argues that no one at Cairo was aware of the forum selection clause in CMS's Terms of Use until CMS filed its Motion to Dismiss, and that no one at Cairo was aware of CMS's Terms of Use until immediately prior to CMS sending its letter threatening legal action on November 1, 2004. Further, Cairo argues that no agreement exists between the parties at all, and that Cairo has not assented to CMS's Terms of Use or the forum selection clause therein. Additionally, CMS argues that even if the Court finds that CMS's Terms of Use are binding on Cairo, CMS's forum selection clause does not apply to Cairo's federal copyright claim nor to its federal and state trademark claims.

## III. STANDARDS

The Ninth Circuit treats motions to dismiss pursuant to contractual forum selection clauses as motions under *Rule 12(b)(3)* for improper venue. See *Argueta v. Banco Mexicano, S.A., 87 F.3d 320, 324 (9th Cir. 1996).* Under the Supreme Court's standard for resolving motions to dismiss based on a forum selection clause, the pleadings are not accepted as true, as would be required under a *Rule 12(b)(6)* analysis, and the court may consider facts outside **[\*10]** the pleadings. Id. If there are contested facts bearing on the enforceability of the forum selection clause, the court is obligated to draw all reasonable inferences in favor of the non-moving party and resolve all factual conflicts in favor of the non-moving party. *Murphy v. Schneider National, Inc., 362 F.3d 1133, 1138 (9th Cir. 2004).* If the facts asserted by the non-moving party are sufficient to preclude enforcement of a forum selection clause, the non-moving party survives a *12(b)(3)* motion. Alternatively, if material facts are in dispute, the court may hold the motion in abeyance until a pre-trial evidentiary hearing resolves disputed facts. *Id. at 1139.*

## IV. DISCUSSION

The Supreme Court has held that forum selection clauses are "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be unreasonable' under the circumstances." *M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 10, 32 L. Ed. 2d 513, 92 S. Ct. 1907 (1972).* The party challenging the clause bears a "heavy burden of proof' and must "clearly show that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud **[\*11]**

or overreaching." *Id., at 15*. Although Bremen involved an international forum selection question, the Ninth Circuit has applied the principles announced in Bremen to the domestic context. See *Pelleport Investors, Inc. v. Budco Quality Theatres, Inc., 741 F.2d 273, 279 (9th Cir. 1984)*.

A. The Forum Selection Clause in CMS's Terms of Use is Enforceable as to Cairo

Cairo makes no allegations of fraud or overreaching underlying the forum selection clause that would render its enforcement unreasonable. Instead, the issue before the Court is whether Cairo is bound by CMS's Terms of Use in the first instance.

As a preliminary matter, Cairo asserts that the question of whether a contract exists to bind Cairo to CMS's terms should not be resolved on a pleadings motion because Cairo would be required to prove its case on the merits prior to conducting any discovery. The Court agrees that the merits of any potential contractual dispute between the parties should be reserved for and decided by the trial court that will eventually preside over this case. However, strictly for purposes of Defendant's Motion to Dismiss, this Court has before it all **[*12]** facts necessary to resolve the issue of whether Cairo is bound by CMS's terms.

Cairo asserts that since it never explicitly agreed to CMS's Terms of Use, it is not contractually bound by the forum selection provision. Further, Cairo denies being aware of CMS's forum selection clause at the time it filed this case. CMS correctly cites *Register.com, Inc. v. Verio, Inc., 356 F.3d 393 (2d Cir. 2004)* to counter Cairo's argument. In that case, the defendant Verio contended that it was never contractually bound to the conditions imposed by Register.com, a web site it was accessing via robot software. In response, the Second Circuit stated:

> While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract. It is standard contract doctrine that when a benefit is offered subject to stated conditions, and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the taking constitutes acceptance of the terms, which accordingly become binding on the offeree.

*Id. at 403* (citations omitted). Similar to the circumstance in Register.com, Cairo's **[*13]** visits to CMS's web sites with knowledge of CMS's Terms of Use constituted acceptance of the terms, which accordingly are binding on Cairo.

Cairo argues that forum selection clauses must be reasonably communicated for a party to be bound by its terms, seeking support from *Specht v. Netscape Communications Corp., 306 F.3d 17 (2d Cir. 2002)*. In that case, the Second Circuit ruled that users who downloaded Netscape's software from Netscape's web site were not bound by an agreement to arbitrate disputes with Netscape because users would not have seen Netscape's terms without scrolling down their computer screens, and there was no reason for them to do so. The evidence did not demonstrate that one who had downloaded Netscape's software had necessarily seen the terms of its offer. Unlike the circumstances in Specht, Cairo admits to actual knowledge of CMS's Terms as of at least "the day before CMS sent its letter threatening legal action on November 1, 2004." (Cairo's Opposition to CMS's Motion to Dismiss 10:1.) Moreover, Cairo's repeated and automated use of CMS's web pages can form the basis of imputing knowledge to Cairo of the terms on which CMS's services were **[*14]** offered even before Cairo's notice of CMS's cease and desist letter. See *Register.com, 356 F.3d at 401-02* (imputing knowledge of web site's terms of use to repeated user of Register.com's database). Thus, even accepting Cairo's allegation that it did not explicitly agree to CMS's Terms of Use, the Court finds that Cairo's use of CMS's web site under circumstances in which Cairo had actual or imputed knowledge of CMS's terms effectively binds Cairo to CMS's Terms of Use and the forum selection clause therein.

Cairo argues that if the Court finds that CMS's Terms of Use are binding on Cairo, the terms themselves are ambiguous as to where the litigation should take place and the Court should not decide the issue of the contract's interpretation on a *Rule 12(b)* motion. Cairo asserts that because some versions of CMS's terms include provisions requiring that all disputes be litigated in the state and federal courts in Chicago *and* be subjected to binding arbitration, the agreement is ambiguous as to the very question before the Court: whether or not to require that this dispute be litigated in Chicago. To the extent that ambiguity exists with regard to which of the **[*15]** two

contradictory provisions should govern, this Court declines to interpret which provision should be given effect. However, it is clear that neither provision allows for the resolution of disputes in the Northern District of California. Allowing the litigation to proceed in this Court would be contrary to any interpretation of the terms.

B. Cairo's Copyright and Trademark Claims are Dismissed as Encompassed by the Forum Selection Clause

Cairo argues that CMS's forum selection clause does not apply to Cairo's federal copyright claim nor to its federal and state trademark claims. Cairo is mistaken. Tort claims are covered by a forum selection clause if "resolution of the claims relates to interpretation of the contract." *Manetti-Farrow, Inc. v. Gucci America, Inc., 858 F.2d 509, 514 (9th Cir. 1988)*. The copyright and trademark claims are based on the same events as the other claims set forth in Cairo's Complaint, and relate to the central conflict over whether CMS's terms were binding on Cairo in the first instance. Thus, to avoid duplication of litigation of claims arising out of the same facts, the Court finds that Cairo's copyright and trademark claims **[*16]** are within the scope of the forum selection clause and must be dismissed.

**V. CONCLUSION**

For the reasons set forth above, Defendant's Motion to Dismiss is GRANTED. All findings in this Order are made for the limited purpose of assessing whether venue in this Court is proper. Nothing in this Order is intended to address the merits of any claim, contractual or otherwise.

Dated: April 1, 2005

JAMES WARE

United States District Judge