[CMS Hasche Sigle letterhead]


Cologne District Court [Landgericht]
Luxemburgerstrasse 101
50922 Cologne


**- 33 O 374/08 -**                                February 20, 2009


### Response to the Petition

In the matter of

**FACEBOOK Inc.,** 471 Emerson Street, Palo Alto, CA 94301-1605 USA

- Petitioner -


Counsel:     Heymann & Partner
             Taunusanlage 1, 60329 Frankfurt am Main

versus

**studiVZ Ltd.,** Saarbrücker Strasse 38, 10405 Berlin

- Respondent -


Counsel:     CMS Hasche Sigle, Attorneys at Law
             Schöttlestrasse 8, 70597 Stuttgart

In the name of and on behalf of the Respondent, we shall move in the oral arguments for the Court to rule as follows:

1.      That the petition be denied

2.      That the Petitioner bear the costs of the proceedings

3.      That the ruling be provisionally enforced with regard to the costs, against collateral.

4.      Alternately, if Respondent is found liable, that the Respondent be allowed to avert enforcement by providing collateral.

5.      That, if required, the Respondent be allowed to present as collateral an absolute, irrevocable, indefinite, and unconditional guaranty from a German credit institution allowed as a tariff and tax guarantor.

If the conditions recited in § 330 of the German Code of Civil Procedures [ZPO] are present, we request an immediate judgment by default.

For the record, we hereby declare that the Respondent shall henceforth be represented by Dr. Clemens Riedel, Markus Berger de León, Claas van Delden, Konstantin Urban, and Martin Weber.

<u>**Explanatory Statement**</u>

TABLE OF CONTENTS

Page

**I.**    **Preliminary Remarks**                                          5
**II.**   **Recitation of Facts**                                          5
1.    Regarding the Parties                                               6
2.    Petitioner's Network                                                6
3.    Regarding the "Look and Feel" of the Petitioner's Network           10
      a)    Three-Column Structure                                        10
      b)    Minimalistic Style                                            12
      c)    Unified and Discreet Color Scheme                             14
      d)    Limited Customization of Pages                                15
      e)    Same Structure of Subordinate Pages                           16
      f)    Conclusion: No Unique Features are Present                    17
4.    Respondent's Network                                                19
      a)    SNSs Predating Facebook                                       19
      b)    Graphic Design                                                20
      c)    Functions                                                     25
      d)    Prominence                                                    37
5.    Regarding the Success Story of the Petitioner's Products            38
6.    Regarding Plagiarism Accusations against the Respondent in          39
      the "Community"
7.    Regarding the Technical Documentation of the Disputed Web Sites     40
      a)    Petitioner's Private Expert Opinion                           40
      b)    Respondent's Private Expert Opinion                           41
8.    Regarding the Origin of studiVZ                                     42
9.    Derivative Use versus Brazen Copying                                44
10.   Alleged Theft of Source Code                                        46
      a)    Source Code                                                   46
      b)    PHP Source Code                                               47
      c)    HTML Code                                                     48
      d)    Style Sheets                                                  49
11.   Statements by the Founders of studiVZ                               53
12.   Alleged Market Confusion and Confusion of Origin                    54
13.   Alleged Damage to Petitioner's Good Reputation                      55
14.   Regarding Petitioner's Entry into the German Market                 55

**III.      Recitation of Law**                                                                          57

1.      Regarding Motion 1.a – Relief for Unlawful Imitation                          58

    a)      Regarding the Competitive Relationship                                 58

    b)      No Competitive Distinctness                                                  59

    c)      No Preventable Confusion of Origin                                      61

    d)      No Inappropriate Exploitation of or Damage to Reputation     64

    e)      No Dishonest Acquisition of Knowledge                               65

    f)      No Other Signs of Dishonesty                                             66

    g)      Regarding the Foundation of the Motion                             69

2.      Regarding Motion 1.b – Relief for Trademark Infringement              70

    a)      No Trademark Infringement due to Danger of Confusion         70

    b)      No Trademark Infringement due to Dishonest Exploitation and   74
        Damage to Value

    c)      Alternatively: Older Use Marks of the Respondent               75

3.      Regarding Motion 1.c – Relief for Copyright Infringement               76

    a)      No Infringement with Regard to PHP Code                          76

    b)      No Infringement with Regard to Style Sheets                      77

4.      Regarding Motion 2 – Damages                                                   78

5.      Regarding Motion 3 – Disclosure and Reporting                            78

6.      Alternatively: Enforcement Protection                                           78


## I.     Preliminary Remarks

It is undisputed that the Respondent has been operating a social networking site for university students on the Internet (studiVZ) since November 11, 2005. The Respondent expanded its products to include additional social networking sites for other user groups ("schuelerVZ" [for students age 12-21] since February 21, 2007 and "meinVZ" [general social networking site] since February 28, 2007). All three social networking sites are in German and therefore primarily addressed to users in Germany.

At the time of studiVZ's entry into the German market, the Petitioner was not active there – which is also undisputed – although the Petitioner does operate an English-language social networking site on the Internet ("Facebook"). However, this site was originally limited to the U.S. market and was not opened to users with e-mail addresses outside of North America until 2006. According to the Petitioner's own statements, Petitioner did not even enter the German market with a German-language version of Facebook until March 2008.

Therefore, the Respondent was active in the German market with a social networking site (SNS) on the Internet long before the Petitioner. The Respondent programmed this web site independently. The Respondent did not commit the "theft of source code" alleged by the Petitioner, nor did the Respondent, as the Petitioner alleges, "simply adapt and copy each of the changes initiated by the Petitioner – particularly with regard to new 'features'." Petitioner wrongly attempts to depict itself as the "inventor" of the functions of its web site and neglects to mention that all of these functions were already known from older SNSs.

In the following, the Respondent shall argue and prove that the realization of the business concept of an SNS in Germany was in no way unlawful.

## II.     Recitation of Facts

For purposes of clarity, the statements below essentially follow the outline of the petition.


1. <u>Regarding the Parties</u>

The Petitioner's statements regarding the parties are accurate. Additionally, it should be mentioned that the Samwer brothers, the founders of the "Jamba" ringtone platform, were also involved in the Respondent after its founding. They sold their shares in the course of the acquisition of the Respondent by the Holtzbrinck Group. Since the beginning of 2008, they now hold shares in the Petitioner. Therefore, one would assume that the Samwer brothers would be available to the Petitioner as witnesses and would be able to report any theft of code if such a theft had occurred. However, they have not been named as witnesses. One would further assume that the Petitioner would have refrained from selling its own shares to the Samwer brothers if, while they were shareholders in the Respondent, damages had actually occurred by unlawful means that had not yet been compensated at the time of the sale of the shares.

2. <u>Petitioner's Network</u>

The Petitioner's network was started up February 2004 in the U.S. As the Petitioner states, it was originally available only to Harvard students. This is explained by the fact that the founder of Facebook, Marc Zuckerberg, was himself a Harvard student. He came into contact with fellow students who wanted to establish an SNS called HarvardConnection (later: ConnectU) for Harvard students and asked for his help. However, after providing initial technical support to the project, Marc Zuckerberg quickly went his own way and established Facebook behind the backs of his classmates. Legal disputes in U.S. courts followed in which his former fellow students accused Marc Zuckerberg of having broken his non-disclosure agreement with them, copied their idea, and unlawfully used the source code of ConnectU for Facebook. Since that time, Marc Zuckerberg and his former classmates have been in a legal dispute. In order to settle the dispute, Marc Zuckerberg is said to have paid US$ 65 million to his former fellow students in 2008 to settle this dispute. This settlement received extensive coverage, among other places in the electronic editions of the *New York Times*, *Boston Globe*, and *The Guardian* and in German-language online news services.

**Evidence:**
Press reports in the online editions of *heise online* dated February 12, 2009, n-tv dated February 12, 2009, the *New York Times* dated June 13, 2008 and April 7, 2008, the *Boston Globe* dated June 27, 2008, *The Guardian* dated July 25, 2007, and *The Harvard Crimson* dated July 27, 2007, presented as


**- Exhibit Group B 1 -**

As the Petitioner states, beginning in March 2004, access to the platform was gradually opened to all university students in the U.S. and successively in Canada. Beginning in September 2005, the site was then opened to American secondary school students. Up to that point, use of Facebook was possible only for e-mail addresses defined by the Petitioner of U.S. or Canadian origin. Therefore, at the end of 2005, no opening of the platform to users outside of North America was discernible, even in a rudimentary sense.

It was not until months later, in September 2006, that, according to the Petitioner, the technical opening of the platform occurred for all users worldwide. The Petitioner thus does not dispute that, at the time of the introduction of the studiVZ network, users from Germany could have had absolutely **no access to Facebook** without an approved e-mail address.

Thus, for technical reasons, it was not possible for Facebook to even have users from Germany until September 2006, i.e., around ten months after the introduction of studiVZ onto the market. In any event, Facebook was initially available only in the English-language version for quite some time. The Petitioner did not make a German-language version available until March 2008. Therefore, we may assume that Facebook had an acceptance problem beginning in 2006 from the language-related difficultly of use, for which reason Facebook was used only very hesitantly by German users. According to the "Media Trend Report" by the company comScore Inc., which reports user numbers on the Internet, Facebook did not have sufficient users to even be counted until October 2006. The number of "unique visitors" in that month was 23,000 and grew to 177,000 in July 2007. "Unique visitors" are defined as users who access a given page at least once per month.

**<u>Evidence:</u>**
Media Trend Report by comScore Inc. dated October 10, 2007 – **Exhibit B 1a -** Expert opinion

In addition, it is obvious that the purely American user community on Facebook at the time of its opening would have had only little attraction for German users.

The "look and feel" of studiVZ could therefore not have been the cause of Facebook's market penetration problems. Even if studiVZ had had a different



"look and feel," there would generally have been no logical reason for a German user to register for an English-language network of American students rather than for a German-language network of German university students. Facebook's long-time lack of success in Germany was not caused by studiVZ, but rather by a poor product strategy.

The effects of that strategy were only intensified by a poor marketing strategy. Even after opening its platform for German users, the Petitioner did not seem to want to take care of those users. It had virtually no employees in Germany. On the other hand, the Respondent recognized early that it is important to the marketing success of an SNS to attain a "critical mass" of local users at the beginning who are part of a network in real life as well. It was decisive to the success of studiVZ that such active cores developed at the universities. studiVZ fostered this development through its concept of "campus captains." This term refers to students who promoted studiVZ at their schools on behalf of the Respondent and answered other students' questions about the web site. While the Respondent was acquiring business on site, the Petitioner neglected even to directly address German users. It was not until 2008 that the Petitioner started the campaign "Deutschland macht blau" ["Turn Germany Blue"]. Since that time, Petitioner has been seeking so-called "Facebook ambassadors" in German cities in conjunction with smaboo AG (Zurich/Berlin). Imitating the "campus captain" concept, the purpose is to send out "ambassadors" to attract members of existing, real-world networks through direct contact.

**Evidence:**
Screenshots of http://de-de.facebook.com/blau and
http://www.smaboo.de/facebook on February 18, 2009 – **Exhibit Group B 2 -**

The Petitioner's change in strategy showed prompt results: the German user numbers for Facebook have been increasing significantly since March 2008. According to Petitioner's statements on its "self-booking tool" for advertising customers, Facebook has had the following coverage, i.e., user numbers, in Germany since that time:

- April 7, 2008: 498,000
- April 28, 2008: 549,000
- September 4, 2008: 778,500
- November 20, 2008: 1,057,980
- December 21, 2008: 1,178,360
- January 20, 2009: 1,292,100


-        February 14, 2009: 1,596,540

According to these figures, the Petitioner more than tripled its number of users in Germany in about ten months.

We plead ignorance with regard to the Petitioner's assertion that it already had 120 million users worldwide in August 2008; however, it is also immaterial.

The trend reversal for Facebook beginning in March 2008 is also supported by the number of search queries on Google by German users for the search terms "studiVZ" and "Facebook." This is illustrated by the curve diagram shown below, which is accessible from Google's web site and presented as

**- Exhibit B 3 -**



The diagram shows the frequency of search queries for the terms "studiVZ" (upper curve) and "Facebook" (lower curve). The lower curve shows an unmistakable bend upwards around March 2008, which signifies a considerable increase in search queries beginning at this time. At the same time, the number of search queries for "studiVZ" decreased. By the end of 2008, the number of searches for "Facebook" even exceeded searches for "studiVZ" for the first time.

This shows very clearly that the Petitioner's success in Germany did not depend on the "look and feel" of studiVZ, but rather from the Petitioner's own marketing decisions.


3.    <u>Regarding the "Look and Feel" of the Petitioner's Network</u>

The Petitioner claims that the "look and feel" of its web site is innovative and unique. Along with the *Lampe* private expert opinion submitted by the Petitioner as Exhibit K 11, Petitioner cites the social networking site MySpace.com – in other words, the platform that is most removed from Facebook in terms of graphics – as a basis for comparison. Consideration of platforms whose layout comes closer to that of Facebook is too brief.

The Petitioner emphasizes its simple and especially accessible user interface, which the user is also unable to adapt individually. Under margin number 15, of the petition, the supposed distinct features of the user interface that allegedly characterize this "look and feel" are summarized. We will prove in the following that these features were and are anything but unique for web sites.

a)    *Three-Column Structure*

The three-column structure of web sites was already prior art when the Petitioner created its web site.

**<u>Evidence:</u>**
Expert opinion

Even the *Lampe* private expert opinion submitted by the Petitioner assumes this (Exhibit K 11, line 353). For its part, the Respondent has presented a private expert opinion by Prof. *Carle* Dr.-Ing. [Doctorate in Engineering], holder of the seat in "Network Architecture and Network Services" at the Computer Science Institute of the Technical University of Munich, presented as

**- Exhibit B 4 -**

This private expert opinion comes to the same conclusion in Section 4.1.

When studiVZ was designed, instructions on designing web sites discussing a three-column web site structure were available to anyone. The book excerpt discussing the production of a three-column layout using CSS (cascading style sheets) shown below is one example.



Figure 8.31. Three-column layouts are easily developed in CSS.

**Evidence:**

Excerpt from *Rachel Andrew,* The CSS Anthology – 101 Essential Tips, Tricks, and Hacks, copyright 2004 SitePoint Pty. Ltd., First Edition: November 2004 – **Exhibit B 5 -**

Instructions of this type are also easily accessible on the Internet, for example, as early as March 25, 2005 on the site http://de.selfHTML.org, which is very well known in web development circles.

**Evidence:**

Screenshots of the web site
http://aktuell.de.selfhtml.rog/archive/doku/8.1/css/layouts/anzeige/kopfundfuss.htm

**- Exhibit B 6 -**

Therefore, it is no surprise that SNSs that were already in existence at the time of Facebook's launch also had a three-column structure, such as, for example, the profile page of cyworld.com or the introductory pages to love.lycos.de or spraydate.spray.se.


**Evidence:**
Screenshots of:
cyworld.com on February 24, 2006 – **Exhibit B 7 -**
love.lycos.de on June 4, 2003 – **Exhibit B 8 -**
spraydate.spray.se on January 27, 2005 – **Exhibit B 9 -**
Expert opinion

Therefore, no particular imagination is required to assume that Marc Zuckerberg may have used any of these instructions.

In addition, the left column of the book excerpt shown above already shows a navigation bar. The book excerpt therefore confirms the statement by the *Lampe* private expert opinion submitted by the Petitioner that it is common to place navigation elements in the left column of a web site (Exhibit K 11, line 353 f.).

b)     *Minimalistic Style*

The Petitioner emphasizes that it deliberately keeps its web site simple and has an especially accessible user interface, with no pop-up ads and hardly any other graphics.

In contrast, the screenshots of the profile page and the "My Photos" page from October 2005 shown on pages 9 and 11 of the petition show that even at that time Facebook users were subject to advertisements, contrary to the Petitioner's statements. However, there is no advertising on the studiVZ pages at the same point in time, as is shown by Exhibit K 2.

Furthermore, a minimalistic web design style had already been demonstrated by well-known web sites such as Yahoo! (since 1994), Amazon (since 1995), or Google (since 1998).

**Evidence:**
Screenshot of Google on February 8, 2004 – **Exhibit B 10 -**
*Carle* private expert opinion, Section 4.1 – **Exhibit B 4 -**
Expert opinion

Google is one of the most commonly visited web sites in the world. As a trendsetter on the Internet, it served as a model for the designers of other


Internet platforms. Therefore, a minimalistic design is not a special accomplishment of Facebook.

**Evidence:**
Expert opinion

Moreover, a purist design with only a few graphics is not (only) the result of aesthetic considerations. Tangible technical reasons are behind such a decision as well. Websites with few graphics load more quickly and therefore allow a user to access the pages more quickly. A graphically reduced design therefore enhances user friendliness of the site.

**Evidence:**
Expert opinion

Among the SNSs existing at the time of Facebook's start in 2004, the platform OpenBC (today: Xing), which was accessible in Germany since November 2003, already had a sleek and minimalist design.

**Evidence:**
Screenshot of OpenBC on December 29, 2003 – **Exhibit B 11 -**
Expert opinion

Thus, the Petitioner was in no way the inventor of minimalist web design. Therefore, the *Carle* private expert opinion (Exhibit B 4, 4.1) does not see any level of design that would constitute copyright infringement in the simple design of its web site.

**Evidence:**
Expert opinion

In addition, the Petitioner gradually gave up its once-simple design. As numerous blog posts show, some of which are included as

**- Exhibit Group B 12 -**

the much-touted accessibility of the Petitioner's web site was at least lost due to functional additions. The users complained about the increasing inaccessibility of Facebook. Therefore, the Petitioner undertook a relaunch



of its web site in 2008, although it did not result in any greater accessibility.

c) *Unified and Discreet Color Scheme*

The Petitioner describes the color scheme chosen for its web site as being definitive for the design, novel, and unique. However, the screenshots submitted by the Petitioner as Exhibit K 7 already show that blue tones are also the definitive colors for all other social networking sites that the Petitioner cites for comparison. This is also the case for the time of Facebook's launch.

**Evidence:**
Screenshots of
mySpace.com on November 5, 2004 – **Exhibit B 13 -**
friendster.com on October 12, 2004 – **Exhibit B 14 -**
openBC.com on December 28, 2003 – **Exhibit B 11 -**
orkut.com on August 25. 2004 – **Exhibit B 15 -**

Only studiVZ is red, thus differentiating it as clearly as possible in terms of color.

Although it is true that the top banner of Facebook was kept in two different light blue shades in 2005 and later (darker above, lighter below), this was also the case for MySpace beginning in October 2004. So this characteristic was also not anything original.

**Evidence:**
Screenshot of the home pages of
mySpace.com on November 5, 2004 – **Exhibit B 13 -**
elsa-deutschland.com on June 23, 2003 – **Exhibit B 16 -**
studentenforum.net on November 11, 2003 – **Exhibit B 17 -**
orkut.com on August 25, 2004 – **Exhibit B 15 –**

In addition, the range of possibilities for the graphic design of web sites is quite limited, and was especially so at the end of 2005. Web sites must have the most unified appearance possible on a large number of browsers, operating systems and their various versions, with different hardware such as monitors, graphics cards, and different monitor sizes, and at the same time be quick to load. Under these conditions, obvious


design elements present themselves, such as the use of a simple background color in different brightnesses, with which a page may be designed and structured in a technically simple and visually appealing fashion using horizontal bars, which at the same time form a flexible frame for the various types of content.

Furthermore, the Petitioner abandoned its original color scheme after its relaunch in 2008. As shown by Exhibit K 4, the top banner on Facebook has been monochromatic blue since that time. As a result, the Petitioner cannot simply cite this in the future.

Contrary to the Petitioner's claims, a reflected color scheme in the center and right columns is not discernible on its web site. Rather, the headings there are highlighted in an even lighter blue and are only bordered on top by a dark blue line.

Nor is the unified color design of the subordinate pages of an Internet presentation a mark of uniqueness. Rather, the far older principle of "corporate design" is being employed here, which the Petitioner can hardly be claiming credit for here. Numerous web sites have been following this principle for a long time.

**Evidence:**
Expert opinion
Screenshots of Friendster.com on October 10, 2004 – **Exhibit B 18 –**
Screenshots of mySpace.com in October 2004 and November 2004 – **Exhibit B 19 -**

It is just as incomprehensible that the Petitioner considers it a distinct feature that the headings on its web page are shown in white letters on the blue stripes. As is shown in Exhibit K 7, white letters are used on all social networking web sites in which the letters are shown on a blue background. This is an issue of legibility and therefore user friendliness.

d)     *Limited Customization of Pages*

The Petitioner also seems to consider the fact that the user cannot individually adapt the graphic appearance of Facebook, as is possible on MySpace, to be a unique feature over other SNSs.



In consideration of the statements in the *Lampe* private expert opinion presented as Exhibit K 11 (lines 154 ff.), this claim is already nonsensical because, according to this expert opinion, Facebook only belongs to the <u>group</u> of SNSs that limit the user's ability to change its graphic interface to the greatest extent. The limitation of customization was therefore not a characteristic unique to Facebook. We <u>dispute</u> this claim by way of precaution. Rather, this situation corresponds to the normal case in SNSs, that users are unable to individually alter their graphics, because the customization of web sites requires programming of this additional functionality.

**Evidence:**
Expert opinion

e)    *Same Structure of Subordinate Pages*

Finally, the Petitioner points to the unified structure of the user interface on each subordinate page of its web site. Here, the Petitioner is presumably referring to the fact that the subordinate pages of Facebook all have a navigation bar on the left side, the blue double bar on top with the logo, and another line on the bottom with additional links and a copyright notice.

However, regarding the unified structure, the Petitioner is again addressing a self-evident point of user-friendly design. In fact, it would be strange if a web site had subordinate pages with a completely different structure.

Therefore, in 2004, other SNSs were also already characterized by their subordinate pages having a unified structure.

**Evidence:**
Expert opinion
Screenshots of Friendster.com on October 10, 2004 – **Exhibit B 18 -**
Screenshots of mySpace.com in October 2004 and November 2004 – **Exhibit B 19 -**
Screenshots of uni24.de in January 2004 and February 2004 – **Exhibit B 20 -**

As a result, we dispute that the Petitioner has a unique feature in this area.



f)      *Conclusion: No Unique Features are Present*

Therefore, the alleged unique features of Facebook analyzed above are not unique features at all. Rather, the founders of Facebook followed the design tendencies of Web 2.0 reflecting the tastes of the time and the need for user friendliness. In so doing, they did not distinguish themselves in any decisive way from any other SNS. The screenshots of other SNSs presented by Petitioner in Exhibit K 7 are therefore not suitable as proof to the contrary because, according to the Petitioner's statements, they originate from 2008. Therefore, we dispute overall that the features described by the Petitioner were unique features at the time of Facebook's launch. However, if the Petitioner attempts to prove this by a comparison with MySpace, it is important to note that MySpace is the SNS that was the absolute farthest from Facebook in terms of the layout of its user interface. This is a distorted comparison.

Moreover, ignoring the fact that unique features were not present at the time of Facebook's launch, the Petitioner has abandoned some of the allegedly unique features in the interim.

For example, the Petitioner has already considerably changed its "look and feel" by opening its site to applications, i.e., allowing users to implement their own applications on Facebook's platform.

In addition, it is undisputed that Facebook undertook a relaunch of its web site in September 2008. It abandoned the top banner design it had used up to that point. As evidenced by Exhibit K 4, the top banner no longer appears as a double bar, but rather as an arbitrary blue stripe in which "facebook" is written in white. This is in no way original and, for example, hardly distinguishes itself from the top banner on MySpace, as the screenshot presented as

**- Exhibit B 21 -**

shows. The same applies to the second-level headings on Facebook, which have a light blue background. MySpace uses such second-level headings as well. The Respondent therefore does not share the Petitioner's opinion that it only gingerly changed its "look and feel."

In fact, the "look and feel" of the current versions of studiVZ and Facebook is completely different, as may be seen from the comparison of home page screenshots from February 18, 2009:




**Evidence:**
Comparison of screenshots of the publically accessible pages of studiVZ
and Facebook on February 18, 2009 – **Exhibit B 22 -**

4.    Respondent's Network

Although the creators of studiVZ were inspired partially by Facebook, it was not
their only inspiration. At the time of Facebook's launch, there were already
numerous SNSs (see point a) below) which they – like the Petitioner – could
have also used as models. For this reason, contrary to the Petitioner's incorrect
assertions, the studiVZ user interface is not identical to Facebook except for its
color. This may be seen even from the web sites presented by the Petitioner
itself (Exhibit K 3). Understandably, on pages 19 to 30, the Petitioner emphasizes
only the graphical similarities and neglects to mention the obvious differences
(see b) below). In addition, the Petitioner gives the false impression that Marc
Zuckerberg is the inventor of SNSs, for which reason any similar functional
element from studiVZ could *only* have been taken from Facebook (see c) below).
In an environment containing multiple international SNSs, the Respondent
programmed its first SNS (studiVZ) completely independently and configured it
for user friendliness using Web 2.0 techniques. The Respondent's web site for
university students achieved a high degree of popularity before Facebook was
even technically accessible to German students, let alone in a German-language
version (see d) below).

a)    *SNSs Predating Facebook*

Upon the launch of Facebook, the following SNSs, among others, were
already in existence:

1997:  sixdegrees.com
1999:  LiveJournal.com, AsianAvenue.com, BlackPlanet.com
2000:  LunarStorm.se, MiGente.com
2001:  Cyworld.com, Ryze.com
2002:  Fotolog,com, Friendster.com, Skyblog.com
2003:  Couchsurfing.com, LinkedIn.com, Tribe.de, MySpace.com,
          OpenBC.com, Last.FM.de, Hi5.com
2004:  Orkut.com, Dogster.com, Flickr.com, Piczo.com, Mixi.jp
Then:  Facebook.com

**Evidence:**



Study "Social Network Sites: Definition, History, and Scholarship" by Danah M. Boyd and Nicole B. Ellison – **Exhibit B 23 -**
Expert opinion
*Carle* private expert opinion, Section 5.1 – **Exhibit B 4 -**

As will be shown in the following, the preexistence of these SNSs is relevant to the functional and graphic design of studiVZ. Some websites of these platforms from earlier dates may be researched on the Internet at the web site archive http://web.archive.org. Those that are available are presented below.

b)      *Graphic Design*

Exhibit K 3 shows very clearly which differences from Facebook existing at the launch of studiVZ the Petitioner fails to mention:

aa)     All subordinate pages of this exhibit show that the **left-side navigation bar** is structured completely differently on each of the two web sites. Ignoring the fact that the parties have used completely different logos in the upper left-hand corner, it is noticeable that the Respondent has also placed the technically necessary login and registration fields common to web sites with the greatest possible difference from their location on Facebook. On studiVZ, these two fields are not next to one another as they are on Facebook, but rather they are one above the other (see, for example, the Home, Information, and Privacy pages – Exhibit K 2 - ). In addition, the two fields are separated from one another by a line on studiVZ. Keeping in mind that these two fields must be placed either next to one another or one above the other, studiVZ has therefore maintained the greatest possible distance from Facebook.

bb)     The pages also show that all subordinate pages of studiVZ are also different with regard to the **color scheme**, which was emphasized by the Petitioner, but was at the time quite common. On the one hand, by using shades of red, studiVZ guaranteed a maximum difference from Facebook. The same cannot be said of Facebook in comparison to other SNSs because shades of blue were used in the design of other preexisting SNSs at the time of Facebook's launch (cf. Exhibit B 14 to B 19).



On the other hand, the color scheme on studiVZ is not limited as it is on Facebook to a double bar at the top of the page shown in different shades. Rather, the shifting shades concept on studiVZ continues on the lower edge of the page. There, a third color strip is found that is displayed in an even lighter tone and, along with the double stripe at the top edge, constitutes a triple-stage color scheme. On the color printouts presented as Exhibit K 3, this is not quite so clear as it would be on the screen itself due to the unsatisfactory print quality.

**<u>Evidence:</u>**
Visual notice of www.studiVZ.net
Expert opinion

cc)  Therefore, if one considers the **information pages** (Exhibit K 3) of studiVZ and Facebook, for example, absolutely no parallels may be found between the two sites. In addition to the differences mentioned above, it is also apparent that a two-column structure was selected for studiVZ while Facebook on the other hand selected a three-column structure. An additional navigation line is placed above the informational text on Facebook, while no such line exists on studiVZ.

dd)  Similarly significant differences may be found on the **start pages** of both services. While two additional blue boxes are arranged in the lower area on Facebook, no such boxes may be seen on studiVZ. And while Facebook also has a bar with seven navigation functions below these two boxes, there are only four links on the bottom margin of the page on studiVZ, as is quite common for web sites of any kind. In contrast to studiVZ, this bottom margin on Facebook also does not have another noticeable graphic with half-portraits of two people on the right-hand edge. Finally, the textual information on the two pages is different in scope. The Petitioner ignores this fact when it claims that the Respondent simply appropriated its points "Look up people at your school," "See how people know each other," and "Find people in your classes and groups" and translated them into German. The Respondent additionally added the phrase "Find fellow students for study and practice groups," which is not on the Petitioner's site. This is a good example of the



fact that the Respondent did not simply appropriate existing elements, but rather developed its own product independently. Finally, however, the parallels emphasized by the Petitioner are also unremarkable because the above phrases simply describe the basic functions of an SNS referred to by the Petitioner itself (see c) below) in an informal style adapted to students, who are the target group. By its intentionally informal, and even flip, style (e.g., "outta here" instead of "logout"), studiVZ already fundamentally differentiates itself from the tone of Facebook.

ee)    Considerable differences in design may also be found on the **profile page**. In this regard, the Petitioner presents a studiVZ page from November 2008 and a Facebook page from May 2006. These pages are already unhelpful because they do not show the relevant comparison at the time of studiVZ's launch in November 2005. Aside from this fact, the alleged appropriation emphasized by the Petitioner is not appropriation at all upon closer examination.

Insofar as the Petitioner cites the "virtually identical" font and font size, the Petitioner also admits that they are not, in fact, completely identical. The Petitioner uses, in the following order, the fonts Lucida Grande, Tahoma, Verdana, Arial, and Sans-Serif. The Respondent uses the same fonts with the exception of Lucida Grande, and additionally uses Helvetica. For reasons of legibility, the Respondent chose to use these common, sans-serif fonts, which are common for web sites. The choice of these fonts is technically advantageous because the selected font must be present on the user's computer, otherwise it is changed to a font not desired by the designer. The font Lucida Grande, which was prioritized by the Petitioner, is not contained in Windows XP or Office 2003; therefore, the Respondent did not use that font. The font size is configured according to Internet standards as well. Font sizes between ten and 12 points are perceived as pleasant by the user and are therefore the standard.

**<u>Evidence:</u>**
Expert opinion

As discussed above, the three-column web site structure is also standard. In structuring the layout of the studiVZ profile page, the



founders of studiVZ followed the web design instructions already presented as - Exhibit B 5 -, which represented the standard that was already in place upon the launch of Facebook. If one follows this principle, then some of the parallels highlighted by the Petitioner will almost automatically occur.

It is common to place the logo and main navigation area in a top corner of the web site. On many web sites, the main navigation area contains basic functions such as "Login," "About Us," or "Help." Therefore, these features are not unique on the parties' web sites. The Respondent also did not need to deviate from the conventional terms for these common functions. Nevertheless, this is in no way a German-language reproduction of the functions provided by Facebook. For example, the term "register" would be properly translated into German as "registrieren." Instead, the Respondent used the word "immatrikulieren" ("matriculate").

On virtually all web sites, navigation features are provided in the left-hand column. Because of general user habits, the user expects to see them there as well.

To the right is the space for the information. The information may have a single- or double-column design. A single-column design has the disadvantage of wasting space. Shorter entries lead to a line not being optimally exhausted and the page being "extended" thereby; the user must then continue to scroll downwards, which damages the "overview" of the page. In order to prevent this, it is obvious not to place the portrait photo of the respective user in the center of the information section, but rather to the side, i.e., to the upper left or the upper right, similar to job application letters. The space below the photo may be used for shorter entries. The web designer may therefore, when appropriate, combine entries having less width into their own column so as to still leave sufficient space in a third column for other information.

The founders of studiVZ also followed these principles, which are based on practical considerations and user friendliness. What they did not do is copy Facebook. If the Petitioner claims that the three-column structure of its profile page was copied up to the pixel width of the individual columns, we dispute such a claim. A purely visual


comparison of the two profile pages from studiVZ and Facebook shown on page 26 (page numbers not provided by the Petitioner) of the petition will show that this is not the case. It can be seen with the naked eye that the three columns there have different widths, which becomes particularly clear from the width of the respective photos and the entries located below them.

**Evidence:**
Expert opinion

Measured by the web design standards discussed above, the Petitioner's reference to the allegedly precisely identical positioning of the navigation buttons in the left-hand column is insignificant. As the Court may be aware, numerous web sites place navigation buttons in their left column. That is nothing special. Rather, users of web sites have long been accustomed to such placement. The Respondent also did not appropriate these buttons in an identical fashion. As the comparison on page 26 of the petition shows, the two web sites do have corresponding buttons, as necessitated by function, but these buttons are different as well. The "Start" navigation button from studiVZ is not present on Facebook and, vice versa, studiVZ has no button to correspond to the "My Events" button on Facebook. The "Photos" section on Facebook has no equivalent on studiVZ and, vice versa, in contrast to studiVZ, Facebook does not have the "Verbindungen" ["Connections"] section. Moreover, we can also see that the central column below the profile picture has a different structure.

ff)  In **conclusion**, we must content that some of the similarities emphasized by the Petitioner were part of the already prevalent web design standard in 2004, others were functionally necessary, and others are rooted in the attempt to create an aesthetic spatial division oriented at subjective user tastes. If the designer of an SNS follows these considerations, he will also consider the layout selected by the Respondent. Because the Respondent was not in a position in November 2005 of needing to distinguish itself from a current or prospective competing provider, it was not necessary for the Respondent to forcibly adopt a less advantageous design. studiVZ distinguishes itself from Facebook simply in terms of the red color scheme, the studiVZ logo placed in the upper left-hand



corner of all pages, and the name "studiVZ," which is used throughout.

c)    *Functions*

aa)    The Petitioner claims that the functions of an SNS also provide the "look and feel." Naturally, this is not the case. The fact that a product has certain functions does not automatically confer a "look and feel." Otherwise, the same would have to apply to any products, for example, to a navigation device, even if it has a completely different appearance from a comparable navigation device. This shows that functional overlaps between Facebook and studiVZ are *a priori* not suitable to prove an unlawful imitation.

bb)    The Petitioner presents an overview with **functional overlaps** between the parties' products as Exhibit K 9, which is meant to show that 13 essential features were appropriated from the Petitioner's web site for studiVZ. The Petitioner alleges that the Respondent waited each time for the Petitioner to introduce a given function and for that function to be accepted by the users. After the successful introduction of the feature, the Petitioner alleges, the Respondent then appropriated the feature in an identical or similar manner. This is not accurate.

The founders of studiVZ decided to embrace a product concept and implement it in Germany, as the Petitioner had done in the U.S. – and only in the U.S.! – based on the SNS connectU. This is permissible. The founders of studiVZ did not, in a technical sense, copy any functions from any other SNS in order to do so. Rather, all functions were programmed independently with considerable effort. In addition to co-founder Dennis Bemmann, numerous contracting outside programmers were involved in the programming as well. By the end of 2008, the Respondent had spent a total of almost € 5.5 million in development costs.

**<u>Evidence:</u>**
Testimony of Michael Brehm, to be called by the Respondent
Testimony of Karsten Butzke, to be called by the Respondent


As will be shown in the following, none of the functions listed by the Petitioner in Exhibit K 9 are "inventions" of the Petitioner; rather, they were already known from multiple SNSs before Facebook. This is also established in the *Carle* private expert opinion, Section 5.2.

**Evidence:**
Expert opinion
*Carle* private expert opinion – **Exhibit B 4 -**

The overview below will show which functions were already known before Facebook and which were already known at least before studiVZ:

| | Facebook.com | studiVZ.net | uboot.com | hskpage.de | mySpace.com | friendster.com | Cyworld.com | sprayadate.se | openBC / XING.com | orkut.com | flickr.com | connectU.com | SixDegrees.com | Club Nexus | Lunarstorm.se | Plentyoffish.com |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Profile | | | | | | | | | | | | | | | | |
| Friend search | | | | | | | | | | | | | | | | |
| Friend list | | | | | | | | | | | | | | | | |
| Videos/photos | | | | | | | | | | | | | | | | |
| Photo tagging | | | | | | | | | | | | | | | | |
| Messages | | | | | | | | | | | | | | | | |
| Chat | | | | | | | | | | | | | | | | |
| poke/gruscheln | | | | | | | | | | | | | | | | |
| Guestbook | | | | | | | | | | | | | | | | |
| Discussion groups | | | | | | | | | | | | | | | | |
| User status | | | | | | | | | | | | | | | | |
| Event planning | | | | | | | | | | | | | | | | |
| Classified ads | | | | | | | | | | | | | | | | |
| Newsfeed | | | | | | | | | | | | | | | | |
| Applications | | | | | | | | | | | | | | | | |

All of the fields on this chart marked in green show which SNSs had the function in question before that function was introduced by Facebook. The yellow fields show which SNSs did not have the function in question before its use by Facebook, but did have that



function before the launch of studiVZ. The fields marked in blue show which SNSs offer the function in question at least today. The Respondent has assembled an exhibit group for eleven of the SNSs listed in the table containing the sources (archived screenshots, blog posts, press reports) that serve as evidence of the function in question. At the beginning of each exhibit group is a list of the internet addresses for the sources. The internet addresses are sorted by the functions to be proven. The functions are numbered in the list. The numbers correspond to the numbers added to the sources by hand, thus allowing source and function to be aligned. We will refer to these exhibit groups in subsequent evidentiary motions.

Among others, an SNS has functions that are even considered basic functions by the *Lampe* private expert opinion presented by the Petitioner (Exhibit K 11, pages 4, 11). Such functions should therefore be standard and define the essence of an SNS. According to the *Lampe* private expert opinion, the construction of a user's own profile, a "friend list," and a "friend search" are such standard functions. These three functions, consequently the first three functions mentioned in Exhibit K 11, are therefore comparable to the four wheels of a motor vehicle: an SNS must have these features, which is easily possible without violating any special rights. Accordingly, these functions were also known from other SNSs before Facebook:

**Profile page:** SixDegrees.com (since 1997); uboot.com (since 2002); friendster.com (since 2002); mySpace (since 2003); also hskpage.de, spraydate.se, openBC.com.

**Friend search:** SixDegrees.com (since 1998); uboot.com (since 2002); friendster (since 2002); mySpace (since 2003); spraydate.se; OpenBC/XING.

**Friend list:** SixDegrees.com (since 1997); friendster.com (since 2002); mySpace (since 2003); spraydate.se; OpenBC/XING.

**<u>Evidence:</u>**
uboot.com – **Exhibit Group B 24 -**
hskpage.de – **Exhibit Group B 25 -**



mySpace.com – **Exhibit Group B 26 -**
friendster.com – **Exhibit Group B 27 -**
spraydate.se – **Exhibit Group B 29 -**
openBC.com – **Exhibit Group B 30 -**
SixDegrees.com – **Exhibit Group B 34 -**
Expert opinion
*Carle* private expert opinion, section 5.2 – **Exhibit Group B 4 -**

Therefore, it is impossible to make any *a priori* inferences from the correspondence of these functions.

As a result, no other statements apply to the other functions listed in Exhibit K 11. Although they are additional functions of an SNS that extend beyond the basic functions (the distinction is disputable, however), which an SNS may have but need not necessarily have, this fact in no way leads to any form right to these functions in favor of those parties who first implemented them, insofar as no special legal protection exists. It may be illuminating to continue with the example of the motor vehicle; we must remember that the first producer of a vehicle with a hatchback or sunroof must expect that other manufacturers will also equip their vehicles with such features. As the statements below will show, the Petitioner was not even a pioneer of the additional functions.

For example, the Petitioner's **"poke" function** had a model in the "send a smile" function on mySpace, which even according to the Petitioner's statements was until recently the most commonly used SNS worldwide. In a similar form, it was also possible as early as 2004 to send so-called "smilies" without additional text on so-called dating sites. These communications represent a greeting from the sender to the addressee without any additional message, as a way for the sender to attract attention to him- or herself. The "poke" function on Facebook is no different. The innovative service by Facebook claimed by the Petitioner did not lie in the function *per se*, but rather in the new name. However, it is undisputed that studiVZ did not appropriate this name.

**Evidence:**
mySpace – **Exhibit Group B 26 -**
Expert opinion


*Carle* private expert opinion, Section 5.2 – **Exhibit B 4 -**

In the Respondent's opinion, the **sending of messages to other users** (Exhibit K 9, line 5) is also a basic function of an SNS because the goal of an SNS, keeping up with contacts and creating new contacts, requires such a function. For this reason, other SNSs in addition to Facebook (e.g., ClubNexus (since 2001); uboot.com (since 2002); mySpace (since 2003); hskpage.de; friendster.com; spraydate,se; openBC/XING) have such a function as well. This function is therefore also not a creation of the Petitioner.

**Evidence:**
uboot.com – **Exhibit Group B 24 -**
hskpage.de – **Exhibit Group B 25 -**
mySpace.com – **Exhibit Group B 26 -**
friendster.com – **Exhibit Group B 27 -**
spraydate.se – **Exhibit Group B 29 -**
openBC.com – **Exhibit Group B 30 -**
Expert opinion
*Carle* private expert opinion, Section 5.2 – **Exhibit B 4 -**

The same applies to the **discussion groups** function (Exhibit K 9, line 6). The founding of discussion groups and joining such groups was already known before Facebook as a function of SNSs such as mySpace.com, friendster.com, and spraydate.se. Therefore, the Respondent was not the "inventor" of this function either. And a number of other SNSs implemented such a function after Facebook but before studiVZ (e.g., uboot.com; hskpage.de; cyworld.com; orkut.com; flickr.com). Obviously the discussion groups functionality was a product standard at the time of studiVZ's launch.

**Evidence:**
uboot.com – **Exhibit Group B 24 -**
hskpage.de – **Exhibit Group B 25 -**
mySpace.com – **Exhibit Group B 26 -**
friendster.com – **Exhibit Group B 27 -**
spraydate.se – **Exhibit Group B 29 -**
cyworld.com – **Exhibit Group B 28 -**
orkut.com – **Exhibit Group B 31 -**
flickr.com – **Exhibit Group B 32 -**


Expert opinion
*Carle* private expert opinion, Section 5.2 – **Exhibit B 4 -**

In addition to the functions mentioned above, at its launch Facebook only had the **guestbook** function (referred to as "wall" on Facebook and "bulletin board" on studiVZ, cf. Exhibit K 9, line 7); this may be because the founders of Facebook were following other SNSs that already had such a function at that time, for example, mySpace.com, friendster.com, and spraydate.se. Additional SNSs were added between the launch of Facebook and that of studiVZ, particularly LunarStorm (since 2002); hskpage.de; cyworld.com; orkut.com; flickr.com. So this function was also already known upon Facebook's launch and represented a product standard, at least by the time of studiVZ's launch.

**Evidence:**
hskpage.de – **Exhibit Group B 25 -**
mySpace.com – **Exhibit Group B 26 -**
friendster.com – **Exhibit Group B 27 -**
spraydate.se – **Exhibit Group B 29 -**
cyworld.com – **Exhibit Group B 28 -**
orkut.com – **Exhibit Group B 31 -**
flickr.com – **Exhibit Group B 32 -**
Expert opinion
*Carle* private expert opinion, Section 5.2 – **Exhibit B 4 -**

The situation is similar for the functions which were added to Facebook in the course of its further development. The **posting of photos** added in October 2005 was already known from other SNSs at that point such as uboot.com (since 2002); mySpace (since 2003); flickr (since February 2004); hskpage.de; spraydate.de. Friendster.com, cyworld.com, and flickr.com also had these functions before the launch of studiVZ. Therefore, we can refer to a product standard that studiVZ was following at its launch with regard to these functions as well. In any event, the appropriation of these features from Facebook may be refuted for chronological reasons. This function has existed on Facebook since October 2005 and was initiated on studiVZ one month later in November 2005. The Petitioner's claim that the Respondent supposedly always waited for the new developments to succeed



and appropriated them if they succeeded must already be false because the market observation and subsequent independent programming of this function would have been all but impossible.

**Evidence:**
uboot.com – **Exhibit Group B 24 -**
hskpage.de – **Exhibit Group B 25 -**
mySpace.com – **Exhibit Group B 26 -**
friendster.com – **Exhibit Group B 27 -**
spraydate.se – **Exhibit Group B 29 -**
cyworld.com – **Exhibit Group B 28 -**
flickr.com – **Exhibit Group B 32 -**
Expert opinion
*Carle* private expert opinion, Section 5.2 – **Exhibit B 4 -**

Also in October 2005, Facebook was expanded to include the function of **marking people in photos** (called "tagging" on Facebook, cf. Exhibit K 9, line 9). The SNSs hskpage.de and flickr.com (since 2004) already had such a function at that time. Later uboot.com added such a function as well. The existing range of products provided a sufficient number of examples for studiVZ in this regard as well.

**Evidence:**
hskpage.de – **Exhibit Group B 25 -**
flickr.com – **Exhibit Group B 32 -**
Expert opinion
*Carle* private expert opinion, Section 5.2 – **Exhibit B 4 -**

The **user status**, added by Facebook in April 2006 (Exhibit K 9, line 10), in which the user can make his or her current state (e.g., sick, sad, etc.) visible to others, was known from multiple SNSs at that time. At least spraydate.se (since 2000), mySpace (since 2003), twitter.de, and hskpage.de also already had such a function. The Respondent assumes that Facebook itself used twitter as a model with regard to this function. In any event, this feature is also not a unique feature of Facebook.

**Evidence:**
hskpage.de – **Exhibit Group B 25 -**



mySpace.com – **Exhibit Group B 26 -**
spraydate.se – **Exhibit Group B 29 -**
twitter.de – **Exhibit Group B 35 -**
Expert opinion
*Carle* private expert opinion, Section 5.2 – **Exhibit B 4 -**

Since May 2007, users of Facebook have been able to include
**applications from external developers** (Exhibit K 9, line 12). In
Web 2.0, this is viewed as an attempt to establish a universal "web
operating system," which is seen as a challenge by Google. Google
in turn is developing programming interfaces for applications on
web-based social networks under the designation "OpenSocial."
OpenSocial was published by Google on November 1, 2007.
Applications that up to now have used the interfaces developed by
Google, for example, the platforms mySpace and OpenBC/Xing,
are now interoperable with any other social networking site that
also supports these interfaces. Thus, for example, functions of
these pages on these platforms may be connected to one another.
If the Petitioner now refers to the fact that studiVZ entered the
OpenSocial initiative in October 2008, this obviously has nothing to
do with any sort of appropriation of functions that Facebook
developed; the Petitioner did not discuss this point further in any
case. In contrast to Facebook, studiVZ does not used interfaces it
developed itself for the connection of externally developed
applications; rather, it has joined an initiative started by Google and
joined by other SNSs. However, this expansion of functionality also
has not yet been implemented on studiVZ.

**Evidence:**

Printout from www.google.de – **Exhibit B 36 -**
Testimony of Michael Brehm, to be called by the Respondent
Expert opinion

Finally, the Petitioner alleges that, in October 2008, the
Respondent also appropriated the **chat function** from the
Petitioner (Exhibit K 9, line 13), which has been available on
Facebook since April 2008. This is also false. Long before the
function was publicized on Facebook, namely as early as the first
half of 2007, the Respondent was already planning its own chat
function. The launch of the function was originally planned for the



beginning of 2008, but was delayed. After lengthy preliminary negotiations, the Respondent signed a contract with the Dutch company Nimbuzz BV to develop this function. For reasons of confidentiality, we are presenting only excerpts of the contract.

**Evidence:**
Testimony of Michael Brehm, to be called by the Respondent
Excerpts of the contract between the Petitioner and the company
Nimbuzz BV – **Exhibit B 37 -**

In so doing, the Respondent adapted the chat technology developed in the 1990s for platforms such as ICQ, AOL, and IM, which, before Facebook, was already being used by SNSs such as spraydate.se (since 2000), uboot.com (since 2002), and plentyoffish.com (since 2005). The Petitioner did not invent chatting, nor does the Petitioner assert to have done so.

**Evidence:**
Expert opinion
*Carle* private expert opinion, Section 5.2 – **Exhibit B 4 -**

studiVZ's chat function also differentiates itself from that of Facebook in that it allows chatting with users of mobile telephones in addition to computer users.

**Evidence:**
Testimony of Michael Brehm, to be called by the Respondent
Excerpts of the contract between the Petitioner and the company
Nimbuzz BV – **Exhibit B 37 -**

**In summary,** we can therefore assert that the comparison of functions of Facebook and studiVZ made in Exhibit K 9 is meaningless. The Petitioner will likely refrain from making any more detailed statements in this regard if its fruitless assertion is ignored that the corresponding functions of studiVZ followed the corresponding functions on Facebook chronologically. The chronological delay is a necessary consequence of the fact that studiVZ was introduced almost two years after Facebook. A new SNS is started up when it has a few basic functions that make it sufficiently attractive to users. It then gradually adds additional


functions, which must of course first be programmed and tested. As may be seen from Exhibit K 9, this was also the case for Facebook, which also began with a few basic functions and then added additional functions over a period of four years.

cc)     While the Petitioner overvalues the similar functions of the two web sites, the Petitioner neglects to mention the numerous functional differences between the two web sites. In other words, there are **functions on Facebook that the Respondent's portals do not have.**

According to its own statements, the Petitioner gave Facebook users the ability to post **videos** on their pages. The Respondent has yet to place such a function on its SNSs.

**<u>Evidence:</u>**
Visual notice of the studiVZ.net, schuelerVZ.net, and meinVZ.net web sites
Expert opinion

The same applies to the **observation list** operated by Facebook since September 2006 under the designation "News Feed," which informs users of new developments in their circle of friends. studiVZ lacks this function as well. Nevertheless, this function existed before Facebook as well, for example, on OpenBC/Xing.

**<u>Evidence:</u>**
Visual notice of the studiVZ.net, schuelerVZ.net, and meinVZ.net web sites
Expert opinion

As may be seen from Exhibit K 8, Facebook has other functions that studiVZ lacks. These functions include the **event planning** ability, already known from hskpage.de (since 2004) – Exhibit B 25 -, and a **classified ad marketplace**, already known from spraydate.se (since 2003) – Exhibit B 29 -.

**<u>Evidence:</u>**
Visual notice of the studiVZ.net, schuelerVZ.net, and meinVZ.net web sites


Expert opinion

Therefore, based on these functional difference, it is not true that the Respondent is mimicking Facebook in terms of functionality.

dd)  Conversely, studiVZ has **functions that Facebook does not have or incorporated later than studiVZ did.**

This is the case for the so-called "**Left-Side Box,**" a small, black-outlined box below the main menu. This box is used to regularly send messages to users, for example, notices regarding groups, events, images, or funny or absurd sayings. This box is visible on virtually all subordinate pages of studiVZ, is followed very attentively by users, and has therefore become one of the defining features of studiVZ.

**Evidence:**
Screenshots of studiVZ.net – **Exhibit Group K 5 -**
Screenshots of Facebook – **Exhibit Group K 4 -**
Testimony of Michael Brehm and Malte Cherdron, both to be called by the Respondent
Expert opinion

At the end of 2005/beginning of 2006, the Respondent introduced the "**Kennst Du Schon**" ["Do You Know"] function, by means of which users may introduce users to other users which they have not yet "friended." In a slightly different version, the Petitioner introduced this version under the designation "Suggest Friends" in 2008.

**Evidence:**
Screenshot of http://bjou.homeunix.net/blot/2006/12/studivz-externe-super-suche – **Exhibit B 5** (page 2) -
Screenshot of http://www.insidefacebook.com/2008/02/06/facebook-to-suggest-friends – **Exhibit B 39 -**
Witness [N.N.]
Expert opinion


studiVZ also has the **"Boutique"** function, which is a section with commercial products. This function is currently switched off for reconception. Facebook does not have such a function.

**Evidence:**
Screenshot of studiVZ.net on February 19, 2009 – **Exhibit B 40 -** Testimony of Michael Brehm and Malte Chertron, both to be called by the Respondent
Expert opinion

studiVZ also has the **"Einstieg"** ["Job Market"] function. In this section, the user can find third-party job listings. Facebook has no comparable function.

**Evidence:**
Screenshot of studiVZ.net on February 19, 2009 – **Exhibit B 41 -** Testimony of Michael Brehm and Malte Chertron, both to be called by the Respondent
Expert opinion

Finally, we would like to mention the **"Lehrveranstaltungen"** ["Course Listings"] function. studiVZ maintains very extensive lists of concrete courses available at the students' own universities, allowing the students to network. In addition, the degree programs are always available in the form adapted to the German system, e.g., under the heading "VWL" [abbreviation for "macroeconomics"] instead of "Economics." Facebook has no comparable function.

**Evidence:**
Screenshot of studiVZ.net on February 19, 2009 – **Exhibit B 42 -** Testimony of Michael Brehm and Malte Chertron, both to be called by the Respondent
Expert opinion

ee) In the Respondent's opinion, notwithstanding the Petitioner's position, the target demographic of an SNS is not a question of functionality. However, since the Petitioner discusses this issue in its comparison of functionality, we would like to mention here that, in contrast to the Petitioner, the Respondent has divided its SNS products into **three platforms oriented toward a target**



**demographic** (studiVZ, schuelerVZ, meinVZ). The Petitioner, however, addresses the target demographics of secondary school students, university students, and other users all via the same platform. The division chosen by the Respondent allowed the Respondent to attain prominence and reach a "critical mass" of users more quickly in the respective user segments.

ff)     A functional comparison between the parties' SNS products therefore shows that **significant functional differences** exist. The Petitioner's argument that the Respondent is systematically mimicking the Petitioner with regard to functionality is not tenable.

d)     *Prominence*

The Respondent's web site, studiVZ, has been operated with a virtually unchanged graphic design since its launch in November 2005. In particular, the web site has contained a double bar in tones of red along the top margin of the screen from the very beginning.

**Evidence:**
Screen dumps of studiVZ from 2005 – Exhibit K 2
Screen dumps of studiVZ from 2008 – Exhibit K 5
Testimony of Michael Brehm, to be called by the Respondent

Within a very short period of time, the web site had become the largest SNS for university students in Germany. As may be seen from the Respondent's user database on December 11, 2006, the site had 1,212,698 users among German university students. For October 2006, i.e., during the period of time surrounding the application date for the disputed mark (October 18, 2006), the company comScore Inc. counted 1.4 million "unique visitors" (users who visit the site at least once per month) to studiVZ.net according to its "Media Trend Report."

**Evidence:**
Testimony of Michael Brehm, to be called by the Respondent
Media Trend Report by comScore Inc., dated October 10, 2007 – **Exhibit B 1a**
Expert opinion



The number of students at German universities fluctuated in the fall semesters of 2003-2004, 2004-2005, and 2005-2006 at around two million students each time.

**Evidence:**
Excerpt from the web site of the German Federal Office of Statistics [Statistischer Bundesamt] – **Exhibit B 43 -**

Therefore, at a time when Facebook first became even available to users of German Internet connections (September 2006), around half of the members of studiVZ's target group, i.e., university students in Germany, already used this platform. Therefore, we can easily assume that at least 50% of the members of the target demographic group were aware of this web site at that time.

**Evidence:**
Expert opinion using traffic surveys

This is absolutely the case when one considers that studiVZ is known not only to its actual users, but also to potential users and students who have decided not to use studiVZ.

Therefore, the possibility of individual cases in which multiple accounts are registered to the same user is irrelevant. Although, like the use of fictional names, this is prohibited by studiVZ's terms of use, it can occur, as is also the case for the Petitioner. In any event, it is still possible for a user to be present behind a profile with a false or fictional name that values anonymity and is using only one profile.

5.  <u>Regarding the Success Story of the Petitioner's Products</u>

On page 30 ff., the Petitioner describes Facebook's success story. We plead ignorance as to whether Facebook had over 120 million users worldwide at the time at which the petition was filed. In any event, when studiVZ was launched in Germany, Facebook was far away from here. The number of Facebook users worldwide is also irrelevant.

According to the Petitioner's own statements, at the time of studiVZ's launch, Facebook was only accessible to university students studying in the U.S. and Canada and to secondary school students in the U.S. Due to a lack of presence



in Germany at the time, the site was quite naturally not successful there. At the time of studiVZ's launch, it was not at all discernible that Facebook intended to broaden its reach outside of North America, and particularly wanted to extend into Germany. Rather, there were clear signs that Facebook would remain a purely North American SNS.

For this reason, it is not possible to say that the Respondent used the success of Facebook as a reason to bring a "1:1 copy" onto the German market. In any event, the Petitioner was not at that time successful outside of North America, and as was shown above, studiVZ is scarcely a "1:1 copy."

6. <u>Regarding Plagiarism Accusations against the Respondent in the "Community"</u>

On page 35 ff., the Petitioner discusses alleged "early accusations of plagiarism" against the Respondent.

However, the word "early" cannot be used here. It is notable that the blog commentaries supplied by the Petitioner were not made until the time at which Facebook had become accessible to German users. This is not surprising because, due to a lack of presence on the market, it was not possible earlier for Facebook to have been known in Germany or to have been the basis for accusations of plagiarism. At that time, studiVZ had already been online for ten months. The plagiarism accusations submitted by the Petitioner therefore were not made until the Petitioner had made its web site accessible to users in Germany as well. As we will show, they are irrelevant for this reason alone.

The plagiarism accusations submitted by the Petitioner also originated only from a small group of particularly interested parties who enjoy comparing notes with one another. This group is in no way representative.

The subject is also addressed in the *Spiegel* article dated July 11, 2006 cited by the Petitioner. The article was written at a time when Facebook was not yet accessible in Germany. If a comparison to Facebook is under discussion, then this article must concern only the Facebook page that is accessible in the U.S.. Because the article is written in English, it is obviously meant for an international audience. The statements contained in this article must therefore also be put into perspective. The statements are not about how the Respondent allegedly copied a web site that is accessible in Germany.



If the Petitioner asserts in this context that there are no technical or functional reasons that explain or justify the similarity it alleges, we would refute such assertions with the fact that, at the launch of studiVZ in Germany, there was no comparable page from which studiVZ would have to have stolen. The Respondent had no reason to refrain from using the structure and graphic design of its web site, which it considered to be appropriate and user friendly. Therefore, other structures may have been conceivable as well. The Respondent did not need to use those structures because Respondent felt that they were less suitable. This is particularly true for mySpace, which the Petitioner cites to its detriment as a comparable network. The Respondent had no need to approximate mySpace's busy appearance, which the Petitioner itself describes as "confusing" (petition, margin number 36). The Respondent cannot be forced to use a confusing graphic user interface domestically only because a foreign web site uses one that is not confusing.

Finally, if the Petitioner notes that the Respondent had latitude in selecting fields when creating the profile page, we refer to our statements above (II.4.c). There, we show that, on the one hand, the information fields on the profile pages of both SNSs are completely different and, on the other hand, practicalities and user expectations had to be taken into account here as well.

The Respondent was also in no way forced to tailor its web site to another target demographic group, as the Petitioner implies under margin number 39 of the petition. This absolutely reaches beyond a ban on a type of product. The Petitioner would not be able to succeed with such a ban even if it were the owner of relevant intellectual property rights.

7.    <u>Regarding the Technical Documentation of the Disputed Web Sites</u>

a)    *Petitioner's Private Expert Opinion*

In order to substantiate the technical similarities it alleges between the Respondent's and Petitioner's web sites, the Petitioner has submitted a private expert opinion by *Schrader* (Exhibit K 12). This expert opinion comes to the conclusion that there is an overlap between style sheet programming of the web sites of approximately 70 to 80%, an 80% overlap in terms of functionality, and an overlap in terms of graphic and typographical layout of 80 to 85%. However, the opinion does not provide coherent evidence for these numbers; for this reason, we dispute them.


In addition, these numbers are based on a comparison of the current versions of the Respondent's web pages in 2008 to the version of the Petitioner's web pages from the period of 2005-2006. The reader remains completely in the dark as to whether the version of Facebook used for comparison is taken from the time before or after the launch of studiVZ (November 2005). In view of the undisputed fact that the Respondent was the first to put its products on the market in Germany, it is also incomprehensible why the opinion goes on to use only current versions of studiVZ for its comparison rather than the original versions. Therefore, this expert opinion has little significance from the beginning.

The "finding" by the *Schrader* private expert opinion that the code of the style sheet has a high overlap rate of 70 to 80% is particularly poorly documented and a false conclusion. He supports this allegation on the one hand on the statements in Exhibit A 1 of his opinion. However, the formatting instructions provided there relate only to simple text elements, namely the font types and sizes common in Web 2.0 and the placement of headings. Moreover, only the instructions shown in bold type in Exhibit A 1 conform with one another; not all instructions do so. Compared to all formatting instructions, this documents only a very narrow correlation. On the other hand, *Schrader* supports his assertion on the – false – conclusion that parallels in the optical appearance must force us to conclude that the formatting instructions in the style sheets correspond as well. This is not the case, however. The same appearance on a web site may be due to very different formatting techniques. The visible result may be the same, but the formatting instructions behind the appearance may be completely different.

**Evidence:**
Expert opinion

Due to these obvious inadequacies of the *Schrader* private expert opinion, the Respondent considered itself forced to obtain its own private expert opinion.

b)  *Respondent's Private Expert Opinion*

The *Carle* private expert opinion obtained by the Respondent comes to a very different conclusion with regard to the allegedly high overlap between the **style sheet codes** of the two web sites; in contrast to the conclusion



drawn by the *Schrader* private expert opinion, its conclusion is also comprehensible.

The *Carle* private expert opinion compared style sheet data for the studiVZ and Facebook web sites from 2006 researched on the Internet archive service archive.org. This is a more significant basis for comparison than the comparison of web sites from different years, as we see in the *Schrader* expert opinion.

In Exhibit B of his expert opinion, *Carle* compared the formatting definitions in the researched style sheets to one another in alphabetical order. He put all similarities in bold type. This comparison shows at first glance that only a very few similarities may be found among the numerous formatting instructions; in addition, these similarities relate only to the simplest textual elements. In the expert's opinion, these textual elements showed no level of originality because they were based on obvious technical requirements for which few reasonable alternatives exist.

**Evidence:**
Expert opinion
*Carle* private expert opinion – **Exhibit B 4 -**

Regarding the overlap of **functions**, we refer to the statements of the expert in section 5 of *Carle*. He comes to the conclusion that overlapping functions were not based on any innovations by the Petitioner.

8.    Regarding the Origin of studiVZ

On page 47 f. of the petition, the Petitioner places the Respondent in a list of well-known portals such as Web.de, GMX (e-mail), MyVideo (videos), and OpenBC (business contacts), all portals that use a U.S. provider as a model and then independently developed their own portal in Germany. All of these portals have in common that, as is proven by their continued existence, they legally adopted a concept and redeveloped it for the German market. We dispute the assertion that these portals make it virtually impossible for the respective U.S. companies to enter the German market. The successful activities of the U.S. providers named by the Petitioner (Hotmail, YouTube, LinkedIn) on the German market provide evidence to the contrary.



Like the founders of the portals mentioned above, the founders of studiVZ did not indiscriminately appropriate the Petitioner's content for the German market.

The Petitioner fails to understand that its products developed for the U.S. cannot simply be transferred to the German market 1:1. The parameters are different here. This begins with the fact that German students have a completely different "campus life" than students in the U.S. Because the Petitioner had difficulties with this insight for quite some time, the Petitioner was also unable to experience the rapid growth to which it had become accustomed in the U.S. Facebook's development in Germany was just as slow as its development in Italy, even though Italy has no comparable site.

**Evidence:**
Expert opinion

The fact that successful competition with the Respondent in the German SNS market is still possible may be seen in the development of the SNS Wer-kennt-wen [Who-knows-who]. This SNS was started in Germany in October 2006, i.e., one month after Facebook, and according to its own information already had 5.5 million users on February 2, 2009.

**Evidence:**
Press release from wer-kennt-wen dated February 2, 2009 – **Exhibit B 44 -**
Expert opinion

As discussed above, the Petitioner has also been in an upward trend in Germany since spring 2008. On the one hand, this is due to the Petitioner's beginning to offer a German-language version at that time, which is a necessary and obvious precondition for success in German demographic groups. On the other hand, a deciding factor for the increase in users is the fact that the Petitioner is now using a user acquisition method with its "Deutschland macht blau" campaign, using a basic concept (directly addressing potential users via "ambassadors" or "campus captains" that previously proved successful for the Respondent as well.

As already discussed above, studiVZ, schuelerVZ, and meinVZ already differentiate themselves considerably from Facebook in a functional sense. They are not only three separate platforms aimed at three different target demographics; they also have not-insignificant functional differences from Facebook. The functions of Respondent's SNSs were all independently


programmed by the Respondent under the leadership of Respondent's co-founder Dennis Bemmann.

Therefore, it is purely polemical for the Petitioner feel the need to point out that Mr. Bemmann is described on Internet blogs as an "IT genius." The same applies to the Petitioner's assertion that the other co-founder, Ehssan Dariani described himself as the "inventor of gruscheln" [poking, see translator's note on page 26]. Mr. Dariani never claimed to have invented the "poke function" *per se*. Rather, this statement applied only to his neologism "gruscheln."

9.    <u>Derivative Use versus Blatant Copying</u>

On page 48 ff. of the petition, the Petitioner attempts to show that the Respondent has systematically mimicked the Petitioner's products. The Petitioner escalates its arguments to allege that the Respondent appropriated "everything" that the Petitioner successfully placed on the market, exploiting the Petitioner's innovations and investment in order to save on its own development costs. Because numerous attempts by the Petitioner to bring the Respondent to a peaceable solution have failed, the Petitioner claims, the courts were its only remaining recourse.

It is correct that the Petitioner has been sending repeated warnings to the Respondent regarding its SNS product. It is notable that the Petitioner always resorts to these methods after negotiations between the shareholders in the Petitioner and the Respondent regarding a potential acquisition of the Respondent by the Petitioner had broken down. The Petitioner first sent notice to the Respondent in a letter dated June 8, 2006 from the *Lovells* law firm (Exhibit K 15). Acquisition negotiations were then conducted. After those negotiations broke down, the Petitioner sent notice to the Respondent again in a letter dated January 3, 2007 from its newly hired counsel at the *Liechtenstein Körner* law firm (Exhibit K 17). Acquisition negotiations were then taken up again, but failed again as well. Thereupon the Petitioner sent notice to the Respondent for a third time, this time from its U.S. counsel *Orrick* in a letter dated July 9, 2008 (Exhibit K 17). It is quite obvious that the Petitioner is exploiting its alleged claims in order to further its acquisition interests. The Petitioner's ultimate goal is to overcome its competitive problems in Germany by absorbing the Respondent and its users as cheaply as possible. For this purpose, the Petitioner builds a screen of legal threats again and again that is in no way solid.



We have already responded above to the accusation of continuous appropriation of the Petitioner's "look and feel." We refer to that response here. We would only like to emphasize that the Petitioner significantly changed its "look and feel" in 2007-2008 (cf. Exhibit K 4). If the Petitioner's accusation were correct, the Respondent would have made this change as well. However, not even the Petitioner is making that assertion.

The comparison of functionalities, plus the launch date of each, between Facebook and studiVZ shown again on page 49 f. of the petition also does not serve as proof of the systematic appropriation of functions by the Respondent. We have refuted this claim above, and we refer to that refutation here. In summary, although it is correct that the Respondent's and Petitioner's SNSs share some of the same functionalities, some of these functionalities are (necessary) basic functionalities of any SNS as defined by the Petitioner itself. Others of these functionalities are practical functions that were already present on other SNSs before Facebook or at least before studiVZ. The Petitioner's comparison also neglects to mention that each of the parties' products also include a number of functions that the other product does not have. The Petitioner does not dispute only the "news feed" on Petitioner's site and opening the sites to applications from external developers. In this regard, however, it is worth noting that the Petitioner bases its allegations of mimicry even on functions that are undisputedly not present on the Respondent's web site but have in the meantime become standard functions of SNSs; studiVZ is one of the last social networking sites that do not offer these functions, and is regularly criticized for this reason.

It is equally incomprehensible that the Petitioner is trying to see mimicry in the extension of the Respondent's original product for university students to secondary school students and then to the general public. In so doing, the Petitioner is ignoring fundamental differences between Facebook and the Respondent's web sites.

While the Petitioner, with its Facebook site, offers one web site for everyone, the Respondent operates three web sites, each directed at different target audiences. However, in contrast to Facebook, even at its inception studiVZ had no technical limitations allowing only university students to join, in spite of its specific target demographic. Even studiVZ could be used by everyone. In this manner, the Respondent kept a variable strategy open for itself.

**<u>Evidence:</u>**



Testimony of Malte Chertron, to be called by the Respondent
Expert opinion

The fact that the Respondent was unable to immediately start out with three different web sites is simply due to the fact that the development and marketing of each of the three platforms involved significant effort and expense, which the Respondent was only able to muster successively. Part of the nature of marketing SNSs with their massive network effects is that one concentrates all of one's resources to a few market segments instead of having a little success in many different market segments. The chronology of the founding of the three web sites was directed at the different affinity of the respective target group for such a product. Similar considerations may have also led the Petitioner to only gradually open its product to different target groups.

The Respondent will not draw any conclusions as to the extent to which it should be ultimately important in the legal analysis of the three platforms operated by the Respondent in Germany by a German court whether the Respondent also operates foreign-language versions outside of the country. However, it is a fact that the Respondent no longer operates the national language versions cited by the Petitioner in France, Spain, Italy, or Poland.

**Evidence:**
Testimony of Michael Brehm and Malte Cherdron, to be called by the Respondent

Thus, the Respondent is not seeking to create a "plagiarized family," nor is its product following the Petitioner's "scrupulously." Blatant copying cannot be applied to this situation.

10. Alleged Theft of Source Code

a) *Source Code*

On page 52 f. of the petition, under the rather full-bodied heading "Theft of Source Code," the Petitioner lists alleged overlaps between the two SNSs on their code pages. In order to better understand these statements, let us explain briefly what the Petitioner seems to mean by "code pages." On the one hand, the Petitioner is addressing the computer program running on the site operator's (local or remote) web and database servers and generates the dynamic web sites of the SNS; because it is written in the



programming language PHP, we describe it as PHP code. On the other hand, the Petitioner mentions the HTML code, to be understood as the file generated by the PHP source code that contains the dynamically produced web site, including text, images, and formatting instructions in Hypertext Markup Language. General, commonly occurring formatting instructions are stored in separate files on the web server, in the so-called style sheets. After the web and database server dynamically generates a web site in response to a query from the user and sends the associated HTML code (content) and the style sheet (format) to the user's computer, the browser on the user's computer uses them to create the page that is visible on the user's screen.

b) *PHP Source Code*

On page 52 f., the Petitioner is now engaging in fully unsubstantiated speculation that the founders of studiVZ and/or the Respondent somehow gained access to the PHP source code stored on the Petitioner's servers and modified it for use on their own web sites. The Petitioner is not able to make any concrete statements in this regard, but claims that the signs of source code theft are "overall quite clear." However, the Petitioner does not even site this allegedly quite clear sign. The Respondent can only quite emphatically deny this accusation by the Petitioner, which cannot have been made in earnest, and dispute any such source code theft.

As the basis for its speculation, the Petitioner refers only to a security vulnerability on its web site that an unknown third party used in August 2007 to publish parts of the source code stored on the Petitioner's server on the Internet. The circumstances of this incident may be found in greater detail on various Internet sites. There, the Facebook employee *Brandee Barker* states in a blog that this incident was caused by an incorrect configuration of servers by the Petitioner itself. However, only a small portion of Facebook's special server-side software was disclosed in this incident.

**Evidence:**
Blog dated August 11, 2007 at
[http://www.techcrunch.com/2007/08/11/facebook-source-code-leaked/](http://www.techcrunch.com/2007/08/11/facebook-source-code-leaked/) -
**Exhibit K 13, page 132 -**


From a chronological standpoint alone, it is obvious that this incident did not cause the source code to be available during the development of studiVZ in 2005. On both sites, it was possible to access photos of users designated as "private" without being logged into the SNS in question. However, Facebook and studiVZ are not alone in having this security problem, as the Petitioner should well know. Rather, many large web sites are confronted with this problem that want its media content such as, for example, photos, to be quickly accessible to the user's browser without a long lag time. In order to achieve quick access to photos, the web site operator may either do so itself and optimize access speeds, or, as the Respondent has done for reasons of cost, it may contract with a third party service provider to deliver the content.

**Evidence:**
Testimony of Martin Münch, to be called by the Respondent

This service – known in Internet jargon as a "content delivery network" or CDN – is performed by specialized providers. However, these providers usually have the problem that media content may be accessed from their servers in a completely unsecured fashion because checking access rights would slow down delivery.

**Evidence:**
Expert opinion

This alone is the reason why it is possible to access photos on the Respondent's web site without being logged in there. This has nothing at all to do with an alleged programming overlap of server-side source code.

**Evidence:**
Expert opinion

c)      *HTML Code*

This applies even less to the HTML code for the Respondent's web site because the Petitioner does not even begin to show an appropriation of code, it is not necessary to discuss it in depth. The Petitioner merely refers to the string "poke.php," which appeared in the HTML code of studiVZ in 2006. It has not yet been possible to explain the precise reason for this designation. The English term "poke" could be translated into German as



"anstupsen" ["poke," "nudge"] and may refer to the functionality discussed above. If this is the case, it is merely a working designation. As is known, the Respondent has avoided using the term in the visible text of its web site because it is used be the petitioner to designate a function. On the other hand, the terms "peek" and "poke" are common terms among programmers; they played a role, for example, in programming the C64 computer and other BASIC systems and could have been used by programmers for that reason. The latter sense of the "poke" command is also described in Wikipedia, see

**- Exhibit B 45 -**

d)   *Style Sheets*

Regarding style sheets of the Respondent's SNSs, the petition states only that there are "programming equivalencies" to the Petitioner's style sheets. In this regard, the Petitioner refers to the *Schrader* private expert opinion (Exhibit K 12). As has already been stated, it is not possible to prove the high level of similarity alleged by this expert opinion. The *Carle* private expert opinion obtained by the Respondent comes to the conclusion under section 4.3 that the conclusions recited in the *Schrader* expert opinion are false. We quote:

> *"In Exhibit A 1 of Bernward Schrader's expert opinion, selected similarities of the style sheet information are emphasized. Measured by the absolute quantity of style sheet information existing on both platforms, it is easily to ascertain that overall only very few commonalities exist. This is shown in Exhibit B, in which the few commonalities are emphasized in bold type.*

> *"A precise analysis of these commonalities also shows that these commonalities are the simplest of textual elements that have only a very low level of originality. The expert witness considers the level of originality of these textual elements to be so low that they lie far below the threshold required for protection of the textual elements under copyright law.*

> *"Moreover, an analysis of the relevant common textual elements shows that the commonalities are*



*based on obvious technical requirements in situations where few reasonable alternatives exist; the resulting commonalities are therefore in no way to be viewed as problematic.*

*"The 14 px and 11 px font sizes used by Facebook and studiVZ are common sizes that are found very frequently on the Internet. The finding that no minimum distances are established for heading levels 1 to 5 ("margin: 0; padding: 0") also occurs very frequently and also corresponds to common recommendations for building web sites, such as, for example, in the book [Andrew05]. Nor is the mutual selection of the fonts Tahoma, Verdana, and Arial unusual."*

Due to the strong differences between the style sheet files found by the expert, he comes to the conclusion that the web sites of studiVZ and Facebook are **independently implemented and formatted** web sites. He further finds that it is impossible to conclude from the appearance of studiVZ and Facebook that source code from Facebook was unlawfully used to produce studiVZ.

This view is not opposed by the claim by the private expert *Schrader* contracted by the Petitioner that the Facebook style sheet from 2005-2006 could be applied to studiVZ and it would then take on the appearance of Facebook. The application of the outside style sheet to a studiVZ page could only lead to such a result if the designations of the HTML elements on both pages were the same. Although this is the case for standard HTML elements such as paragraph tags, HTML elements on more complex pages are designated by individual names and class names which may be freely selected. Because the studiVZ page was programmed independently of Facebook, the application of the Facebook style sheet cannot have any effect on the way the studiVZ page appears on the screen, except for any identical names that were coincidentally selected and the standard HTML elements. This is confirmed by a test we performed, which was not able to reproduce the result predicted by *Schrader*. Upon the application of multiple Facebook style sheets from 2005 researched using the web site web.archive.org mentioned above, there were no visible effects on the screen view of the studiVZ web page. Only the text color was changed to blue, which may be seen from the illustration below.


**<u>Evidence:</u>**

Screenshots of a studiVZ profile site in the original and then overwritten with a Facebook style sheet – **Exhibit B 46 -**
Expert opinion

The links to the style sheets upon which the test was based are considered a component of Exhibit B 46.

Original studiVZ style sheet:



Using Facebook style sheets from 2005:





We therefore dispute the findings in Exhibit 2.8 of the *Schrader* private expert opinion. In this context, we would like to point out that even the web site of Michael Bumann (blog.derbumi.com) does not support the Petitioner's allegation. There, Mr. Bumann explicitly states that

> *"**With a few changes** to the style sheet, you could very easily pack studiVZ into the original Facebook blue" (Emphasis added)*

Therefore, Mr. Bumann did not apply an unaltered Facebook style sheet to the studiVZ page, but rather an altered one. His insight is therefore insignificant.

The web community recognized this face. The following commentary by a user named "1.Rattapp" may be found at http://flickr.com/photos/16946748@N00/295775714, presented as

**- Exhibit B 47 -**

> *"Nonsense. You can change ANY web site with the right code. And where are the similarities (except for the color)? The menu is different, the links are different, the contents are different, the functions are different…"*

11.    <u>Statements by the Founders of studiVZ</u>

Due to this fact, of which the Petitioner is also aware, the Petitioner turns again on pages 53 to 54 of the petition to apparently significant press releases by the founders of studiVZ, which it then overinterprets. We will make our response to this short. The quoted statements of Mr. Dariani and Mr. Bemmann amount to no more than the following: during at stay in the U.S., Mr. Dariani became acquainted with the Petitioner's platform, which for its part only allowed users from universities in the U.S. He liked the product concept and believed that he could be successful with a similar concept in Germany; however, this was in no way certain due to a different mentality in Germany. In Dennis Bemmann he found a technically knowledgeable partner for the venture. In creating studiVZ, they did use Facebook as an inspiration, but they did the same with the many other SNSs existing throughout the world. For the reasons mentioned above, the appearance of the Facebook portal seemed more persuasive than mySpace, for



example. However, in order to clearly distinguish themselves from Facebook, in addition to selecting a different name and different logo, they also selected a completely different color scheme which, at the time, was rather unusual for SNSs; additional deviations in design are listed under 4.b above. In terms of functionality, except for the basic functions, many functions were omitted as compared to Facebook, but others were added (see 4.c above).

This resulted in an SNS that many users today consider to be better than Facebook.

12.  <u>Alleged Market Confusion and Confusion of Origin</u>

With regard to the blog commentaries cited by the Petitioner on pages 57 to 59 of the petition as evidence of alleged market confusion and confusion of origin, it is important to note that the Respondent has no way of discerning whether these commentaries are authentic or manipulated. We plead ignorance as to the authenticity of the commentaries. However, upon closer examination, they are in any case unproductive. Virtually all commentaries show that the writers clearly differentiated between Facebook and studiVZ and saw the two SNSs as two products distinct from one another.

However, two things are decisive:

The few blog commentaries presented by the Petitioner must be viewed in relation to the total number of users on studiVZ, which is currently 5.7 million. These writers represent a negligibly small share of the total target audience, which cannot even be expressed as a whole-number percentage.

Moreover, all of the comments listed were written at a time when Facebook was in the process of opening access to users from Germany. At this point in time, i.e., autumn 2006, studiVZ had existed in Germany for quite some time. No similar commentary exists from the time of studiVZ's launch, nor from 2007 or later, particularly not with regard to schuelerVZ or meinVZ. This is also obvious. During the launch period of studiVZ, Facebook did not have a presence in Germany, so for this reason alone there could be no comparison or market confusion. In recent times, the functional differences between the two SNSs and the high level of individual prominence of the Respondent's web sites prevents any market confusion.



13. <u>Alleged Damage to Petitioner's Good Reputation</u>

As shown by the evidence presented by the Petitioner, none of the circumstances listed by the Petitioner on pages 59 to 62 are connected to Facebook in even a rudimentary way. If they were, it would be surprising because the circumstances enumerated by the Petitioner essentially occurred in 2006 and 2007. However, the Petitioner admits on page 63 of the petition that it did not enter the German market with a German-language version of its web site until March 2008. Therefore, it may be that the private behavior of Mr. Dariani, actions by studiVZ users, and business decisions by the Respondent damaged the product studiVZ itself. However, the extent to which this extended to the detriment of the Respondent is not discernible and is disputed. At the time of the events in Germany recited by the Petitioner, the Petitioner simply did not have a reputation that could be damaged.

It should be noted in passing that, although the Federation of German Consumer Organizations [Bundesverband der Verbraucherzentralen], sent a written notice to the Respondent in 2008, after corresponding with the Respondent it also saw no reason to pursue such a notice any further.

Far more relevant to the issue of data privacy and damage to reputation is the business conduct of the Petitioner itself. As is reported on the web site www.tagesschau.de on February 18, 2009, Facebook altered its terms and conditions virtually without notice, thus causing outrage among its users and data privacy advocates. The Petitioner already had the "irrevocable" license to all data, photos, and videos published on its site. However, since last week, this license even applies after a user has deleted his or her account. Therefore, the Independent State Data Privacy Center [Unabhängige Landeszentrum für Datenschutz, ULD] in Kiel therefore warns against using Facebook and thus considers the service to be no longer usable, because it is not clear how data will continue to be used. For this reason, thousands of Facebook users formed Internet groups and called for collective deletion of their profiles.

**Evidence:**
Printout from www.tagesschau.de of February 18, 2009 – **Exhibit B 48 -**

14. <u>Regarding Petitioner's Entry into the German Market</u>

On page 63 f. of the petition, the Petitioner states that its entry into the German market was extremely sluggish and noticeably poorer than in other countries.



According to the Petitioner, this is because the Respondent had already occupied large portions of the German market with studiVZ by 2006.

In view of the fact that the Petitioner did not release a German-language version of its web site until March 2008 and was not even technically accessible to users from Germany before September 2006, this claim is completely disconnected from reality. The Petitioner did not bother to come onto the German market at all before September 2006, and until March 2008 it was on the German market only with a product that had acceptance problems for German users. The Petitioner entered the German market with an acceptable product far too late. Its market entry problems would not have been any smaller if studiVZ had started out with a different design. It is worth noting that the Respondent was not the only party active in the German market before the Petitioner. Other German SNSs such as "wer-kennt-wen" or "Lokalisten" were also present before the Petitioner.

**Evidence:**
Expert opinion

Therefore, no causal connection between the Petitioners problems entering the German market and studiVZ's design is even remotely discernible. In addition, the Petitioner operated for a long time without any employees in Germany. For this reason, the Petitioner lacked sufficient knowledge of the German market. Therefore, the Petitioner also neglected to undertake the extraordinarily important task of directly addressing potential users. In contrast, the Respondent did so successfully with its "campus captains" concept.

Now, however, the Petitioner is learning its lessons. A first step was providing a German-language version of its platform in March 2008. A second step is changing its customer acquisition concept using the "Deutschland macht blau" campaign, which involves the use of so-called "Facebook ambassadors." These were obviously successful decisions because, according to an interview with Marc Zuckerberg on January 27, 2009, Facebook had experienced an increase in the number of users in Germany by approximately 60% in the three preceding months to approximately two million users.

**Evidence:**
Interview with Marc Zuckerberg on January 27, 2009, published under
http://www.did-conference.com/2009/01/mark-zuckerberg-at-did-2-mn-ge.php –
**Exhibit B 49 -**



By its own count, Facebook has even tripled its number of users in the last ten months (see 2. above).

The frequency of search queries on Google for the search terms "studiVZ" and "Facebook" also shows that Facebook is competing better and better with studiVZ because search queries for Facebook have been increasing rapidly since around March 2008 and, beginning at the start of 2009, the number of queries for Facebook in Germany is greater than the number of queries for studiVZ, as is shown again by the graph below (red curve = studiVZ; blue curve = Facebook):



**Evidence:**
Expert opinion

At the same time, this refutes the Petitioner's assertion that a user is fundamentally a member of only one social networking site. To the contrary, it is becoming ever simpler for users to be members of multiple SNSs at the same time, as a WWW user analysis conducted by W3B. The willingness of users to switch is also no longer low.

**Evidence:**
Report "Community: lieber deutsch" ["Community: We'd rather have it in German"] in Internet World Business on June 23, 2008 – **Exhibit B 50 -**
*Carle* private expert opinion, page 14 – **Exhibit B 4 -**
Expert opinion

III.     **Recitation of Law**

The petition is without foundation.



1. <u>Regarding Motion 1.a – Relief for Unlawful Imitation</u>

The Petitioner has no claim pursuant to § 8 of the German Unfair Competition Act [Gesetz gegen den unlauteren Wettbewerb, UWG] in conjunction with §§ 3, 4, No. 9 UWG. At the relevant point in time, the parties were neither in a concrete competitive relationship (see a) below) nor did Facebook have any competitive distinctness (see b) below). Nor are any special circumstances present that would even provide a basis for unlawful conduct (see c) to f) below).

a) *Regarding the Competitive Relationship*

A precondition for this claim is the existence of a **concrete** competitive relationship between the parties (§ 2, No. 3 UWG). At issue here is the time at which the alleged infringing behavior began.

Neither party disputes that the Petitioner offered its social networking site in Germany for the first time in September 2006, specifically in an English-language version. It is also undisputed that the Respondent had already been active on the German market for ten months at that time. When the Respondent brought its product onto the German market, it was therefore not in an **actual** concrete competitive relationship with the Respondent. This should also be undisputed.

However, the Petitioner is of the opinion that it was already in a **potential** concrete competitive relationship with the Respondent at the time of studiVZ's launch. Although the literature considers such a competitive relationship sufficient for the assumption of a concrete competitive relationship (for another view, see Harte/Henning/*Keller,* UWG § 2, margin number 30), the prevailing opinion assumes a potential competitive situation only under certain preconditions. According to this view, the mere abstract possibility of entry into a market is not sufficient. Rather, the concrete probability of entry into a market must exist; the circumstances must therefore lead one to conclude that the claimant will extend its product into the infringer's market (Hefermehl/*Köhler*/Bornkamm, UWG, 26th edition, § 2, margin number 71; Munich Commentary on Unfair Competition [MünchKommUWG]/*Veil/Müller*, § 2, margin number 138; Eckey/Klippel/Kotthoff/*Meckel*/Plass, Unfair Competition Law [Wettbewerbsrecht], 2nd edition, § 2, margin number 25).



The **concrete probability** of the Petitioner's entry into the German market obviously did not exist at the time of studiVZ's launch. At that time, Facebook was a social networking site founded by a Harvard student for other students in the U.S. and Canada. It was possible to register for Facebook only with Internet addresses of the institutions in question. There was absolutely no sign that this network would become accessible to German students or even to all Germans. The Petitioner also makes no comment in this regard. On the contrary, the Petitioner's intentional technical limitation of its service to addresses from the U.S. and Canada was a clear indication that it did not wish its site to be open to other participants because it would have been quite simple for the Petitioner to open registration to users in Germany. The Petitioner would have needed only to not place a verification routine in its software that refused access to its product to addresses outside of the U.S. and Canada. In its product, the Petitioner took active measures to deliberately exclude users from its product. Like the Petitioner's latest successes, this shows that the Petitioner, coming from the U.S. market to other national markets, neither was nor is defenseless to competition. It is the Petitioner's own responsibility that, by its own decision, it was initially closed to other users and decided to expand only two and one half years later.

Therefore, no competitive relationship existed between the parties before September 2006.

b)     *No Competitive Distinctness*

aa)     The Petitioner's web site has no competitive distinctness. A determination of competitive distinctness depends only on the features that were allegedly appropriated and only on such design features that are externally recognizable (Federal Court of Justice Intellectual Property and Copyright Law [BGH GRUR] 2002, 820, 822, Brake Calipers [Bremszangen]). Also crucial is the **point in time** of studiVZ's introduction onto the market; a claim for injunctive relief would also require the continuation of competitive distinctness at the time of the last oral hearing (Harte/Henning/*Sambuc*, UWG § 4, margin number 61). The conditions prevailing on the **domestic** market at the time in question are relevant (*ibid.*, margin number 56).



At the time of studiVZ's introduction onto the market, however, the Petitioner did not have any products in Germany, let alone a competitively distinct product. Even if the Petitioner's web site had attained competitive distinctness after its entry into the German market (September 2006 at the earliest), the Petitioner would still be unable to derive any rights against the Respondent from this.

However, the Petitioner's web site also had no competitive distinctness even after its entry into the German market. The Petitioner incorrectly assumes competitive distinctness from the allegedly special visual and functional features of its web site, which it summarizes with the term "look and feel."

bb) The Petitioner's unique **visual** characteristics supposedly lie in the alleged unique features of the layout and graphic design of its user interface. As discussed above (III.3), however, these are not unique features. All features in which the Petitioner claims to see uniqueness were all already known from other social networking sites, and are common features in web site design.

In its opinion published in Multimedia and the Law [Multimedia und Recht, MMR] 2008, 65, 66 and cited by the Petitioner (Exhibit K 21), the Cologne District Court particularly referred to a web site's unusual color combination. In contrast, the Petitioner's web site does not have an unusual color combination. As the Petitioner's Exhibit K 7 shows, the Petitioner's web site is rather very much in line in terms of color with several other social networking sites, which also selected blue as their base color. In this regard, Facebook is scarcely to be beat in unoriginality, as the latest versions (Exhibits K 4 and B 22) show. This is even more valid when one considers that blue is the most popular color not only for social networking sites, but also for all kinds of Internet sites in general. In contrast, the colors of the Respondent's web site appear to have competitive distinctness in the realm of social networking sites because its red tones clearly distinguish themselves from the "blue monotony" of other social networking sites.

If, contrary to our opinion, one were instead to try to extrapolate uniqueness from the double bar used on Petitioner's web site, it must be assumed that the Petitioner no longer uses the double bar.


As may be seen from Exhibits K 4 and B 22, the Petitioner changed the design of its web site some time ago. Any distinctness bestowed by the double bar would therefore no longer apply in any event.

cc) The **functional** features of the Petitioner's web site also lack competitive distinctness.

If we already acknowledge that the design elements required to perform the functions of a product do not attain distinctness for legal reasons (BGH GRUR 2003, 820, 822 – Brake Caliper [Bremszangen]; 2002, 275, 276 – Dimpled Sheets [Noppenbahnen]), then the same certainly applies to the functions themselves.

Moreover, the functions of the Petitioner's web site, as discussed above (II.3), were all already known from other social networking sites.

In addition, many functions are irrelevant because they are not found on the Petitioner's web site.

c) *No Preventable Confusion of Origin (§ 4, No. 9, lit. a UWG)*

aa) A **confusion of origin** assumes that the alleged original has attained a certain level of prominence. The standard here is the consistent case law of the German Federal Court of Justice [Bundesgerichtshof]:

> *"prominence on the domestic market"*

(BGH GRUR 2009, 79, 83 – Press for Baked Goods [Gebäckpresse]; GRUR 2002, 275, 276 – Dimpled Sheets [Noppenbahnen]; also Harte/Henning/*Sambuc*, UWG § 4, margin number 66), which emphasizes the

> *"time at which the imitation was introduced onto the market"*

(BGH GRUR 2009, 79, 83 – Press for Baked Goods [Gebäckpresse]; GRUR 2007, 339, No. 39 – Stepladders



[Stufenleitern]). The Petitioner's opinion to the contrary, which wishes to deny the latter along the lines of "if it's not allowed, it doesn't happen," is in clear contradiction of the consistent case law of the Federal Court of Justice.

At the time of studiVZ's introduction onto the market in November 2005, it is not possible to discern even the smallest amount of prominence for Facebook in Germany because, as is known, Facebook was not accessible to users from Germany at that time. As a result, the Petitioner also had done no marketing for Facebook in Germany that could have contributed to its prominence there. Typically, therefore, in the case of products that are offered only on foreign markets, a lack of the necessary degree of prominence in the domestic market is assumed (Harte/Henning/*Sambuc*, UWG § 4, margin number 70). Finally, this point should be undisputed in any event because the Petitioner assumes that its product was unknown in Germany in November 2005.

The first comparisons between the two social networking sites were not made by Internet users until after the Petitioner made its product accessible to German users. The first isolated comments from the Internet community that the Petitioner has presented were made on August 28, 2006. If the beginning of a discussion between a few so-called bloggers did not begin until ten months after the launch of studiVZ, it is not possible to draw the conclusion suggested by the Petitioner that the Petitioner's product became known in Germany with a direct temporal connection to the introduction of studiVZ onto the market, i.e., that it became known in Germany at approximately the same time.

In addition, if one considers that Facebook is directed at everyone, i.e., at millions of potential users, the few comments presented by the Petitioner do not allow the conclusion to be drawn that Facebook had a sufficient level of prominence at this later point in time.

bb) Any confusion of origin would also be relevant under unfair competition law only if it were **preventable**.



The question of preventability with regard to the social networking sites under dispute cannot be answered by looking at their overlapping technical functions. These functions already lack competitive distinctness because they are necessary for fulfilling the desired product requirements. Even if we view them as technically caused rather than technically required and therefore considered to be fundamentally allowed to have distinctness, according to the consistent case law of the Federal Court of Justice, we must first verify whether such features are **generic.** This is the case

> *"when such features are appropriated that are considered generic prior art and – taking into account the intended purpose, the marketability of the products, and the consumer's expectation – are the appropriate means for achieving a technical end" (cf. only* BGH GRUR 2002, 275, 276 – Dimpled Sheets [Noppenbahnen]*).*

With regard to such functions of the Petitioner's web site being previously known (cf. II.4.c above), we must assume that they belong to prior art. Without question, they also represent an appropriate means for achieving a technical end; we wish to emphasize here that the Respondent performed its own programming.

As a result of independent verifications of generic nature of technical features, the examination of the preventability of confusion of origin concentrates on the sufficient application of different non-technical features, particularly colors (BGH GRUR 2002, 275, 276 – Dimpled Sheets [Noppenbahnen] and marks (BGH GRUR 1977, 666 – Built-In Lighting [Einbauleuchten]). As we have already emphasized in other contexts, the disputed web sites of the Respondent could not be more different from the "blue" Facebook in terms of color. The same applies to the logos and product designations used by the parties on their web sites, the latter being on the screen and in the respective Internet addresses. Therefore, it must be maintained that the Respondent – if, contrary to our opinion, this should become relevant – also took the necessary measures to prevent confusion of origin.



d) *No Inappropriate Exploitation of or Damage to Reputation (§ 4, lit. b UWG)*

aa) The Petitioner's assertion that another mark of unfair practices in addition to the confusion of origin is **exploitation of reputation**, i.e., a positive reliance on the Petitioner's product, is false. If the time of introduction onto the market of the alleged imitation is relevant to the issue of confusion of origin, the same must apply to exploitation of reputation.

Exploitation of reputation also presumes a certain degree of prominence upon which a reputation must first be built (Hefermehl/*Köhler*/Bornkamm, UWG, 26th edition, § 4, margin number 9.52). Such a reputation must also be based on the party's own business activities, particularly marketing efforts, which assert that reputation (*ibid,* margin number 9.53). The Petitioner certainly cannot demonstrate that Facebook had any prominence in Germany, let alone a sufficient level of prominence. In the absence of product presence or at least marketing introducing the product, this could not be the case. As a result, the transfer of value from Facebook to studiVZ (image transfer) could not have occurred. We plead ignorance regarding the Petitioner's assertion that it had 1.26 million users in Germany in March 2008, but in any event that is completely irrelevant.

Therefore, any statement as to whether an exploitation of reputation can even have occurred if the confusion of origin alleged by the Petitioner is present is completely moot (refuting Harte/Henning/*Sambuc*, UWG § 4, margin number 104).

However, it should be mentioned that the Respondent does not offer a product that is of lesser quality than that of the Petitioner. This typical case of exploitation of reputation is in no way present. Therefore, the Respondent's product did not even need an image transfer from Facebook.

bb) In the absence of prominence of Facebook in Germany upon studiVZ's entry into the market, the elements of a **damage to reputation** cannot be present.



In addition, although the facts recited by the Petitioner could damage the reputation of studiVZ, it is not discernible how this is supposed to have negatively influenced Facebook's reputation after its entry into the German market. The Petitioner merely drew negative attention to itself by its own glitches, particularly security problems, for example, by the incident the Petitioner mentions of parts of its source codes appearing on the Internet in 2007 or the recent massive outcry it caused upon the public learning of the changes to its terms of use regarding the use of user data.

cc)    The petition also in no way addresses the fact that, even if an exploitation of or damage to the Petitioner's reputation is present, such exploitation or damage would not be unlawful *per se*. According to § 4, No. 9, lit. b) UWG, only **inappropriate** exploitation of or damage to reputation is unlawful.  The inappropriateness is determined by the overall consideration of all circumstances of the individual case, taking into account all interests of the competitors involved, the consumers, and the public, and taking into account the principle of freedom of imitation (BGH GRUR 2005, 349, 352 – Interlocking Components III). We cannot see how a consideration of the facts based on these criteria could lead to an assessment of inappropriateness.

e)    *No Dishonest Acquisition of Knowledge (§ 4, No. 9, lit. c UWG)*

The Petitioner's statements regarding the alleged presence of this unlawful practice are absurd.

The Petitioner makes unsubstantiated allegations that the Respondent acquired the Petitioner's source code. However, the very question of where Respondent actually found this source code remains unclear. In the *Schrader* private expert opinion it presents, the Petitioner remains only in the realm of speculation. The Respondent has disputed that it took the Petitioner's source code. The Respondent programmed its own network independently.

The question of how the Respondent allegedly acquired the source code is also left open by the Petitioner. At the same time, the Petitioner believes it has come to the conclusion that the alleged acquisition was by dishonest means.



The Petitioner's unsubstantiated statements are not sufficient to prove the presence of this dishonest practice.

f) *No Other Signs of Dishonesty*

Nor are any particular signs of dishonesty present from the point of view of impedance.

aa) Under margin number 136, the Petitioner claims the existence of a principle of case law that states that a party is acting dishonestly that copies a product known up to that point only in foreign markets and then places that product on the domestic market. However, such a principle of "**foreign pioneer protection**" cannot be derived from the older decisions "oval powder jar" ["Ovalpuderdose"] and "injection-molded angel" ["Spritzgussengel"] cited by the Petitioner.

The "injection-molded angel" decision has nothing to do with circumstances in a foreign country and is irrelevant for that reason alone.

Although the "oval powder jar" decision did concern a foreign original seller and a German copier, the Federal Court of Justice emphasized the special circumstances of the case in its decision and in no way intended to state a general principle. The special circumstances lay in the fact that the concrete case concerned (1) and aesthetic though not technical product, (2) the German seller was selling a direct copy that it had produced without any additional independent work, (3) the original producer had its seat in France, i.e., in the Common Market of the European Union, (4) the original producer had placed its product on the market in other states of the European Union shortly after its introduction in France, and (5) the original producer was already in competition with the copier via a German subsidiary for distribution. Due to these special circumstances, the Federal Court of Justice felt that, based on general life experience, it was to be expected that the original producer would shortly place its product on the market in Germany as well. The copier must therefore not have waited even three months after the introduction of the original product on the French market to place the copy on the market in Germany.


None of these special circumstances apply to the present case. A social networking site is (1) not an aesthetic product, but rather a technical product based on hardware and software. The respondent (2) did not create a direct copy, but rather it created its own Internet platform at considerable financial expense, which is based completely on software that the Respondent developed itself and which has a user interface built in accordance with the criteria of user friendliness. The Petitioner (3) is not located in a member state of the European Union, and (4) the Petitioner has also not stated that it already occupied other European markets shortly after its introduction in the U.S.; rather, it is undisputed that the Petitioner initially intentionally made it technically impossible for Europeans to even access its product. Finally, the Petitioner (6) was also not a competitor of the Respondent before the introduction of its product in Germany; rather, it was not present in any market outside of Europe. According to life experience, therefore, it would not be expected that the Petitioner intended to extend its product to Germany. The Respondent therefore did not act dishonestly when it brought studiVZ onto the German market approximately one and one quarter years (!) after the launch of Facebook in the U.S.

In view of these circumstances, it is almost superfluous to point out that the Petitioner is attempting to claim an allegedly general "pioneer protection" without actually being a pioneer, as is shown by the numerous social networking sites preceding Facebook.

The Respondent did not impede the Petitioner in its entry into the German market. Indeed, for a long time, the Petitioner did not give any indications of extending its product to Germany. And once the Petitioner did so, it initially followed a mistaken product and marketing strategy because it offered only an English-language product and did not do any marketing for that product. The Petitioner's startup difficulties in the German market are therefore self-inflicted and not due to any dishonest behavior on the part of the Respondent. On the one hand, this may be seen from the lack of success by the Petitioner in Italy, where there were no competitors at all upon Facebook's launch. On the other hand, this may be seen from the increasing user numbers on Facebook since



the German-language version became available and the Petitioner began an intensive marketing campaign.

bb) Therefore, nor is the Petitioner being impeded by the Respondent from the standpoint of **systematic imitation**.

As has been shown (II.4.c above), the Respondent is not systematically imitating the Petitioner, nor is the Respondent doing so in order to save itself development costs, as the Petitioner claims in a wholly unsubstantiated fashion. The Respondent is merely continuously enhancing its social networking site, which it started with basic functions that are necessary – even in the Petitioner's opinion. However, the implementation of these functions requires a considerable development expense and effort from the Respondent. However, as we have shown, insofar as these enhancements are also present on Facebook, such presence does not constitute "inventions" by the Petitioner. The Petitioner did not even originate the idea of the "nudge" function (called "poke" on Facebook); Marc Zuckerberg used this idea on ConnectU. Rather, although the Respondent is following all of the developments in the social networking field, which is a completely normal marketing behavior, the Respondent is also incorporating its own ideas, as is shown, for example, by the fact that studiVZ has functions not provided by Facebook. Therefore, the Petitioner's allegation that the Respondent is leaving all the inventive risk to the Petitioner is incomprehensible This applies even less in light of the fact that eight of the eleven features implemented by the Respondent, which are the subject of the comparison in Exhibit K 9, were already available at the launch of studiVZ, i.e., at a time when the Petitioner was not even present on the German market. As a result, it was the Respondent who carried the inventive risk as to whether these functions would also be accepted by German users.

The Respondent is not sure why the Petitioner ultimately even claims an impediment by the Respondent with regard to the user groups of secondary school students and the general public. Facebook was open to these user groups as a platform open to everyone beginning at its entry into the German market, i.e., from September 2006 forward. The Respondent did not provide its special social networking sites for secondary school students and



the general public until later, namely in February 2007 (schuelerVZ) and February 2008 (meinVZ). If the Petitioner was less successful with these user groups, this may be due to the fact that there is insufficient acceptance among German secondary school students and the general German public for an English-language social networking site, due to deficiencies in foreign languages.

g) *Regarding the Foundation of the Motion*

Petition 1.a is vague.

aa) As the Respondent understands it, because the Petitioner formulated 1.a with an "in particular" subordinate clause, this means that the scope of the proscription in the primary clause is intended to extend beyond that of the "in particular" subordinate clause. The primary clause must therefore clearly show the scope of the proscription without the "in particular" subordinate clause, but it does not do so. The completely undefined term "look and feel" does not give the Respondent any clear instructions as to what actions it may take and what actions it must refrain from taking. The same applies the term "screen" ["Bildschirmoberfläche"], which apparently is intended to mean something other than "look and feel" because it would otherwise be superfluous. This also applies when one takes into account the Exhibits A 1 to A 4, which are referenced in the petition and which show different screens, because the Petitioner did not dispute all of the elements of the screen. The vagueness of the primary clause would be remedied if "in particular" were to be replaced by "namely."

bb) In the "in particular" subordinate clause, the Petitioner formulates a total of seven disputed individual elements of the Respondent's web sites, connecting them with "and/or." This means that the Petitioner is requesting the prohibition of each element in combination with the other elements as well as each element individually. In other words, as the Respondent understands it, the Petitioner wants the Respondent to be prohibited, for example, from using the standard fonts and font sizes according to Exhibits A 1, A 2, and A 3, completely independently of the design of the rest of the Respondent's web site. Such a petition would obviously be unfounded.



cc)    Some of the individual "in particular" petitions are unclear and therefore vague.

What does the Petitioner mean in petition 1.a.bb by "specific color scheme"?

The boundary between petition 1.a.cc (three-column web site structure) and 1.a.gg (information fields) is also unclear because of the interplay between the two elements.

1.a.ee is also unclear. 1.a.ee discusses a style sheet found in Exhibit A 1. However, Exhibit A 1 does not contain a style sheet. It is completely unclear what the Respondent should desist from doing here.

2.    <u>Regarding Motion 1.b – Relief for Trademark Infringement</u>

a)    *No Trademark Infringement due to Danger of Confusion (§ 14, paragraph 2 of the German Trademark Act [MarkenG])*

There is no danger of confusion between the disputed mark and the user interface of the Respondent's social networking sites. According to consistent case law, the danger of confusion must be determined while taking into account the distinctiveness of the disputed mark, the similarity of the two opposing marks (see aa) below), and the goods or services offered under such marks, as well as taking into account the interaction between these three criteria (see bb) below) (cf. Ströbele/Hacker, Trademark Act [Markengesetz], 8th edition, § 9, margin number 26).

aa)    **No similarity of marks**: It is generally acknowledged that a material similarity of marks cannot be established solely with overlaps in such design features that do not contribute to the protection of the mark. As a result, overlaps in non-distinctive or generic elements cannot constitute legally relevant danger of confusion and must therefore be ignored (cf., e.g., BGH GRUR 1992, 48, 51 – free oil [frei öl]). Distinctiveness may be assumed for product designs only when the market is disposed toward the relevant area due to the customs of design, a discrete designation function may be found in the design or in individual elements of the



overall appearance, or when the design has become known as a proof of origin of the holder of the mark (cf. BGH GRUR 2005, 414 – Russian meringue [Russisches Schaumgebäck]; BGH WRP 2003, 521, 523 – End cap [Abschlussstück]). The disputed mark is to be viewed as a product design because it obviously is intended to be parts of the web site's user interface. The Petitioner's considerations regarding case law for the packaging of goods are beside the point.

In the disputed mark, at most the header image in the upper left-hand corner has a **unique designation function**. The bar-shaped fields of the Petitioner's mark cannot have an origin-indicating function for the relevant services in the present case, such as the provision of an *online discussion forum for registered users*. An Internet user sees in these bars only the commonly used geometric shapes with a functional background. This is particularly true of elements such as the rectangular surfaces placed in pairs next to one another on the lower and left-hand edge of the mark, which are obviously intended to represent menu buttons. The longer double bars at the upper edge are understood as a menu bar related to the services relevant here; as is shown in particular by Exhibits B 13, 14, 16, and 17, double bars are frequently used on Internet sites, for which reason they lack the distinctiveness required to act as a proof of origin for an Internet site. It is not possible to see that, in the relevant market of social networking sites, there are special design customs that would cause the public to be accustomed to use the placement of individual input fields and function bars on a web site to distinguish the services of different providers from one another. The Petitioner also makes no statements to this effect. The public therefore recognizes only aesthetic or functional design elements of a web site, except for the header logo at the top left-hand corner, without using those elements to draw conclusions about the site's origin. These elements are therefore components of the product itself and do not have any individual designation function.

These mark components also have no distinctiveness of their own due to **prominence on the domestic market**. The Petitioner states in the preliminary remarks to its own petition that it has been trying to *"gain a foothold on the German market"* only since the beginning


of 2008. However, the Petitioner changed the design of its web site in September 2008. The layout that the Petitioner has been using since then has a completely different appearance (cf. Exhibits K 4 and B 22). Since that time, the disputed mark has not been used, at least in Germany. It cannot be possible that the Petitioner – in spite of its "difficulties entering the market" – has been able to acquire distinctiveness with regard to the user interface of its web site in only a few months. Therefore, it is also no surprise that the Petitioner does not make any statements – not substantiated, at least – regarding its acquisition of distinctiveness due to prominence. Here, the Petitioner refers overall to the exhibit group K 13 which, however, does not contain any information regarding use in Germany. The Petitioner appears to misunderstand that extensive use in other countries does not fundamentally lead to distinctiveness in Germany. Prominence in Germany is the only relevant standard in this proceeding (cf. *Ingerl/Rohnke* § 14, margin number 798).

Even if one were to impute distinctiveness to the upper double bar, due to the frequent use of this design element, such distinctiveness would have to be so low that the scope of protection of the mark would be limited to identical designs.

In addition, it is important to note that the special design of a web site may also be generic. As has been shown, the bar-shaped fields on the disputed mark are a typical combination of common elements that have a functional background to a large extent. The fact that designs of this sort, such as the menu buttons and other buttons, may be freely used and are not reserved to one company is particularly in the public interest. The acknowledgement of comprehensive trademark protection for such typical design elements would otherwise lead to considerable limitations in the design of every commercially used Internet site. In this context as well, the Petitioner's mark may be assigned only a very limited scope of protection, if any, such that even small deviations would exclude any infringement of such rights.

By this measure, the Respondent **does not have a similar mark**. The Petitioner is in error when it states that the Respondent uses an identical top banner (double bar) and appropriated the exact


selection and positioning of the other bar-like fields. studiVZ does not use and has never used buttons placed next to one another in pairs on the left-hand side; rather, the buttons on studiVZ are placed one below the other. The double bar in shades of red placed at the top edge of the Respondent's web site deviates from the appearance of the Petitioner's mark; the Respondent's double bar has different proportions than the Petitioner's mark, namely bars of different thicknesses, and moreover has a marked rounded corner in the upper right-hand corner. Furthermore, the bar design on studiVZ is partially continued at the lower edge of the site in a lighter shade of red (cf. Exhibit K 2), making the overall appearance of the site completely different. We would like to emphasize again here that differences between the marks are ultimately nut the issue because the design of the Petitioner's mark – as has been shown – is not distinctive or generic.

The only possibly distinctive element of the Petitioner's mark, specifically the header, has not been used and is not currently being used by the Respondent, neither in an identical form nor in a similar form. The Respondent's logo shown in the upper left-hand corner on studiVZ has no similarities to the header in the Petitioner's mark. In addition, it is simply false that the placement of the Respondent's logo corresponds precisely to the header of the disputed mark. Like the double bars, the Respondent's logo also has completely different proportions. In the Petitioner's mark, the header concludes with the first bar, while the Respondent's logo does not end until the second bar and, in addition, is also separated by an underline from the rest of the navigation bar. The Respondent's logo is therefore also considerably larger than the header.

In this context, we would like to clarify that, in evaluating the similarity of the marks, only the design of the registered mark is relevant; the manner in which these elements appear on the Petitioner's web site is completely irrelevant to any analysis under trademark law (cf. BGH WRP 2003, 521 – End cap [Abschlussstück]). The Petitioner appears to be mistaken in this regard as well when it states that the *"user interface of the Respondent's web site is very close to the user interface of the Petitioner's web site."*



In summary, therefore, it must be maintained that these are not similar marks.

bb) **No danger of confusion**: Therefore, in the absence of the required minimum condition of similarity of marks, the danger of confusion becomes impossible. Any deliberation taking into account similarity of services is no longer relevant.

The Petitioner's statements regarding alleged cases of actual confusion are also irrelevant. However, we must note in this context that no actual case of confusion may be found in Exhibit Group K 13. The reports, etc. discuss only certain similarities between the two web sites. As has also been shown, the assumption of similarity can also be related only to elements that are not protectable by law and therefore may be freely used by anyone. For this reason, the documentation presented has no informative value.

In addition, the Respondent does not use the double bar and the navigation buttons on the left-hand and lower edge of its web site for the purpose of distinctiveness, nor does the market understand said use as a **trademark-related** use. For this reason as well, there is no danger of confusion.

b) *No Trademark Infringement due to Dishonest Exploitation and Damage to Value (§ 14, paragraph 2, No. 3 MarkenG)*

Due to a lack of prominence, the Petitioner's mark is also not entitled to expanded protection pursuant to § 14, paragraph 2, No. 3 MarkenG. The disputed mark must be known "domestically." Prominence only outside of Germany is not sufficient for expanded protection under German trademark law (cf. *Ingerl/Rohnke* § 14, margin number 798). The petition lacks any substantive statement regarding the prominence of the Petitioner's mark in Germany. The fact that 120 million users worldwide use the Petitioner's portal does not allow any conclusions to be drawn about the German market. In addition, it is not relevant how prominent the mark "Facebook" or the Petitioner's portal is today. It is precisely the elements of the disputed mark that were used only up to September 2008



that must have a particular degree of prominence. With regard to the claim for injunctive relief, the relevant time is the last oral hearing.

In addition, as was shown above, all elements of the user interface on the web site that represent navigation elements (i.e., all but the header logo) are not understood by the market as a proof of origin, such that – even if these elements were known to the German market – they could not be protected as a known mark for this reason either.

c) *Alternatively: Older Use Marks of the Respondent (§ 4, No. 2 MarkenG)*

If the Court ascribes a distinctiveness function to the other elements of the disputed mark in addition to the header logo, the Respondent would have protection for the corresponding elements of its web site due to a use mark with an older priority. This older right of the Respondent precedes any trademark rights of the Petitioner and would even result in a claim for cancellation by the Respondent against the Petitioner. The Respondent reserves the right to assert such a claim.

The crucial issue is the application date for the disputed mark, i.e., October 18, 2006. At that time, the relevant design on studiVZ would have had secondary meaning within the participating market segments.

**Participating market segments** in the case of studiVZ refers to all university students. As the name of this social networking site implies, and as its content structure proves, studiVZ is primarily directed at German-speaking university students. As is known, the Respondent operates two other social networking sites (schuelerVZ and meinVZ) for other target groups. Therefore, it is not accurate for the Petitioner to assert without a clear foundation that the relevant market segments are all potential Internet users in Germany.

The Petitioner's assumption that the **necessary degree of correlation** for the presence of secondary meaning must not be significantly below 50% within the relevant market segment. The analogy drawn by the Petitioner to the packaging of goods in which the Frankfurt am Main Higher Regional Court [Oberlandesgericht, OLG] (and no one else) ruled that this degree of correlation was required is not comprehensible. If the Petitioner considers the user interface of a social networking site to be "packaging," that raises the question of what is the product. The product that is "tangible" to the



user him- or herself is the visible user interface, which cannot appear in any way other than in the print medium. Therefore, there is no cause to require of the Respondent's social networking site any higher degree of prominence that may apply to the packaging of goods  Rather, the degree of correlation of 20 to 25% generally required for simple secondary meaning applies in this case (Ströbele/*Hacker*, Markengesetz, 8th edition, § 4, margin number 35 ff.)

However, studiVZ would still even have a degree of prominence not significantly below 50% necessary for a qualified secondary meaning. At the relevant point in time (October 18, 2006), studiVZ had already been present on the Internet for approximately 11 months and already had over one million users among university students. Therefore, of the approximately two million university students in Germany, at least half were using studiVZ. As a result, we can assume that, on that date, the graphic elements of studiVZ serving as a designation of origin were known to and associated with the Respondent by at least 50% of the university students in Germany, because according to the statements made in the petition isolated comparisons between studiVZ and Facebook were not made until Facebook had been released to German users in September 2006.

Therefore, on the application date of the disputed mark, a degree of prominence had been attained in the relevant market segment that is sufficient one way or the other for assuming the necessary secondary meaning.

3. <u>Regarding Motion 1.c – Relief for Copyright Infringement</u>

The Petitioner's brief statement of facts accusing the Respondent of the alleged "theft of code" is as vague as its legal arguments regarding the alleged copyright infringement are unfounded.

a) *No Infringement with Regard to PHP Code*

The Petitioner substantiates its legal arguments regarding the accusation of copyright infringement by stating that the Respondent copied PHP scripts. As already stated above, PHP code is the computer program running on the web and database servers of a web site operator, which dynamically generates the web site. A computer program is a series of



commands that, after being placed on a machine-readable medium, are able to cause a machine with data processing abilities to perform, display, or achieve a certain function, task or result. As a computer program, PHP code can be subject to copyright protection. In the present case, however, the Petitioner has made no substantiated statements as to why this is the case for its PHP code. By virtue of the fact that computer programs are not subject to copyright protection *per se*, but rather only if they are a personal creative product, we would have at least expected some statements in this regard. In any case, as is known, it is impossible to draw any conclusions from the screen cited by the Petitioner regarding the quality of work of the code upon which it is based. Naturally, nor does the fact that Marc Zuckerberg and other programmers were involved in the programming make any statement regarding the presence of a personal creative product. The petition lacks any substantiated or admissible statements regarding the quality of work of the allegedly stolen computer program. Any such statements would also be superfluous, however, because the Respondent has at no time copied the Petitioner's PHP code and used said code on its own web site.

b)      *No Infringement with Regard to Style Sheets*

The Petitioner rightly refrains from basing its accusation of copyright infringement on the Respondent's alleged appropriation of style sheets because style sheets are formatting instructions retrieved from the HTML code, and therefore have the same legal standing. However, HTML code is denied the preconditions of a computer program (Düsseldorf Higher Regional Court, CR 2000, 1844 – Framing; Frankfurt Higher Regional Court, JurPC Web Doc., 92/2005, paragraph 28 ff.; also Wandtke/Bullinger/*Grützmacher*, Copyright Law [UrhR], 2nd edition, § 69a ff.; Möhring/Nicolini/Hoeren, UrhR, 2nd edition, § 69a, margin number 7; Dreier/Schulze/*Dreier*, UrhR, § 69a, margin number 12). The HTML code for the visible user interface is initially generated by running the PHP code and is therefore a product of the programming operation, but not a computer program in its own right. Therefore, the HTML code is a descriptive language and not a programming language.

Also by of precaution, we would therefore like to repeat that the Respondent has copied neither style sheets nor HTML code from the Petitioner.



The accusation of copyright infringement is therefore not founded.

4. <u>Regarding Motion 2 – Damages</u>

In the absence of any violation of competitive, trademark, or copyright law, the Petitioner has no legal claim to damages.

However, the Petitioner is also not entitled to any contractual damages. The Petitioner appears to believe that it is able to base said claims on §§ 280, paragraph 1, 249 of the German Civil Code [Bürgerliches Gesetzbuch, BGB] because the Respondent took user contacts from the Petitioner's site in violation of the Petitioner's terms of use for purposes of spying and, in so doing, copied page contents from Facebook. However, this assumption is false simply because the Respondent did not agree to the Petitioner's terms of use, nor has the Petitioner even claimed that any such agreement took place. Moreover, the Respondent did not copy any of the Petitioner's page contents.

Therefore, there is no possibility of any damages to the Petitioner having been caused or being caused in the future by unlawful conduct on the part of the Respondent. As a result, the Petitioner has no interest in the assessment of such damages.

Therefore, it is only by way of precaution that we note that the Respondent cannot be required, as Petitioner requests, to pay damages for its conduct from January 1, 2005 forward because the Respondent did not  make studiVZ accessible to users until November 11, 2005. Motion 2 is therefore inconclusive with regard to the period of damages.

5. <u>Regarding Motion 3 – Disclosure and Reporting</u>

Motion 3, which refers to Motion 2, is therefore also inconclusive with regard to the disclosure and reporting period. Moreover, no claim for disclosure and reporting can exist in the absence of unlawful conduct

6. <u>Alternatively: Enforcement Protection (§ 712 ZPO)</u>

The Respondent alternatively requests enforcement protection in accordance with § 712 ZPO. The enforcement of a judgment in favor of the Petitioner's demands would cause an irreparable disadvantage to the Respondent (§ 712,



paragraph 1 ZPO). This is not opposed by any overriding interest of the Petitioner (§ 712, paragraph 2 ZPO).

The enforcement of the petition for injunctive relief would cause an **irreparable disadvantage to the Respondent** because the Respondent would then be forced to block access to its web site for a long period of time in order to make the necessary technical changes. In contrast to the removal of an erroneous statement on a web site, changes extending into the structure and formatting of the web site cannot be made on a short-term basis. During the period of the outage, the Respondent would be in danger of losing users who, due to the lack of a social networking site from the Respondent, would turn to a competitor's products. As a result, the Respondent would be forced to expect a considerable loss in advertising revenues.

No **overriding interests of the Petitioner** oppose such an enforcement protection. The Respondent's web sites have been known for quite some time without being the subject of any court proceedings. Instead, the Petitioner has been trying since 2006 to convince the Respondent to sell its social networking site by a series of legal notices. In addition, the Petitioner's market entry problems were self-inflicted. The recent rise in user numbers shows that the Petitioner had merely made poor product and marketing decisions. Furthermore, the Petitioner has considerably changed the appearance of Facebook.

For reasons of diligence alone, the Respondent therefore alternatively requests an **appropriate implementation period** of six months with regard to Motion 1.

We have attached one certified copy and one simple copy. If the Court requires any further statement of facts, we request judicial notice of the same.


Attorney

[signature]
Dr. Ikas

# CERTIFICATION

I, Amy Lynn Menge, residing at

10205 Antietam Avenue
Fairfax, VA 22030

do hereby certify that, as a translator certified by the American Translators Association in German-to-English translation, I am conversant with both the German and English languages and that the attached English document is a true and accurate translation, to the best of my knowledge and ability, of the German document attached hereto.

_____
Amy L. Menge

March 18, 2009
Date