

LEXSEE 2000 U.S. DIST. LEXIS 12987

**TICKETMASTER CORP. v. TICKETS.COM, INC.**

**Case No. CV99-7654-HLH (BQRx)**

**UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA**

*2000 U.S. Dist. LEXIS 12987; Copy. L. Rep. (CCH) P28,146*

**August 10, 2000, Decided**
**August 10, 2000, Filed; August 11, 2000, Entered**

**DISPOSITION:** [*1] Preliminary injunction denied.

**COUNSEL:** For TICKETMASTER CORP, TICKETMASTER ONLIN-CITYSEARCH INC, plaintiffs: Daniel G Swanson, Chad S Hummel, Robert E Cooper, Steven E Sletten, William A Wargo, Gibson Dunn & Crutcher, Mark S Lee, Robert H Platt, Matthew P Kanny, Manatt Phelps & Phillips, Los Angeles, CA.

For TICKETMASTER CORP, TICKETMASTER ONLIN-CITYSEARCH INC, plaintiffs: Robert W Sacoff, Bradley L Cohn, Kathryn E Ross, Pattishall McAuliffe Newbury Hilliard & Geraldson, Chicago, IL.

For TICKETS COM INC, defendant: Mark E McKeen, Carla B Oakley, Franklin Brockway Gowdy, Brobeck Phleger & Harrison, Neil L Shapiro, McCutchen Doyle Brown & Enersen, San Francisco, CA.

For TICKETS COM INC, defendant: Jeannine Y Sano, Daniel R Harris, Brobeck Phleger & Harrison, Palo Alto, CA.

For TICKETS COM INC, counter-claimant: Mark E McKeen, Carla B Oakley, Franklin Brockway Gowdy, Brobeck Phleger & Harrison, Neil L Shapiro, McCutchen Doyle Brown & Enersen, Michelle D Kahn, Landels Ripley & Diamond, San Francisco, CA.

For TICKETS COM INC, counter-claimant: Jeannine Y Sano, Daniel R Harris, Brobeck Phleger & Harrison, Palo Alto, CA.

For TICKETMASTER CORP, TICKETMASTER ONLIN-CITYSEARCH INC, counter-defendants: Daniel [*2] G Swanson, Chad S Hummel, Robert E Cooper, Steven E Sletten, William A Wargo, Gibson Dunn & Crutcher, Los Angeles, CA. Mark S Lee, Robert H Platt, Matthew P Kanny, Manatt Phelps & Phillips, Los Angeles, CA. Robert W Sacoff, Bradley L Cohn, Kathryn E Ross, Pattishall McAuliffe Newbury Hilliard & Geraldson, Chicago, IL.

**JUDGES:** PRESENT HON. HARRY L. HUPP, JUDGE.

**OPINION BY:** HARRY L. HUPP

**OPINION**

*CIVIL MINUTES -- GENERAL*

**PROCEEDINGS: PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

ORDER (also, if applicable, findings and memorandum opinion):

This motion was argued and submitted on 7/31/00, at which time the court took it under submission to consider certain of the points made in oral argument. It is now decided as follows. The tentative ruling previously issued should be disregarded.

Page 2

2000 U.S. Dist. LEXIS 12987, *2; Copy. L. Rep. (CCH) P28,146

The motion of Ticketmaster Corporation and Ticketmaster Online-Search, Inc. (hereafter collectively Ticketmaster or TM) for preliminary injunction against Tickets.Com, Inc. (hereafter T.Com) is denied.

This matter has taken some significant turns since the matter was last here on the motion to dismiss on March 27, 2000. Some of those differences affect consideration of the motion for preliminary injunction. One significant difference is that since the motion to dismiss, TM devised technical methods of blocking direct access by "deep hyperlinking" to TM interior event pages. Thus, at the present time, when T.Com hyperlinks to TM, the reference is to [*3] the TM home page, where the public accessing TM by internet normally starts. However, this may soon change, as discussed below, because TM has now lost the technical means of preventing deep hyperlinking directly to the event web pages. A second major change is a legal development in the form of decision by Judge Whyte of the Northern District in *e EBay , Inc.v. Bidder's Edge 100 F. Supp. 2d 1058*. This has caused a revamping of the TM trespass theory to attempt to meet the circumstances which led Judge Whyte to issue a preliminary injunction in the *eBay* case. A third change which the court considers irrelevant to the items to be considered on this motion for preliminary injunction is the filing of an anti-trust counterclaim by T.Com, accompanied by a flurry of documents (mostly press releases) apparently designed to show that TM has been gobbling up competitors and has generally been giving T.Com a competitive hard time in operating at a profit. While these may become important issues at the anti-trust phase of the case, they do not affect the copyright, Lanham Act, or unfair competition issues presented on this injunction motion.

The facts governing this preliminary [*4] injunction motion have partly been stated in the minute order of March 27 and will not all be repeated here. (In this respect, the court does not intend this to be a published opinion, but rather a minute order announcing a result, and as a result has not written for publication with the usual citation of excess authorities and other attention to grammatical or literary detail. In addition, no pronouncements of legal significance are intended; those come from the Court of Appeals. While the court cannot prevent publication, such is not done with the permission or desire of the court--and also with the hope that any typos are corrected.)

The essential facts are that TM operates the largest ticket brokerage business in the country. It has exclusive arrangements to sell the tickets for many of the largest entertainment and athletic events in the country. It sells these tickets through a network of about 2900 retail ticket windows, over the telephone, and through the internet. The internet business is the focus of this case. TM maintains a "home" page (www.ticketmaster.Com) and has a separate "event" page for each separate event. The typical internet customer accesses the home page and [*5] is directed by a series of directories to the particular event page which lists in standardized fashion the basic information about the event (time, place, date, price, seating choices if relevant, and directions on how to order tickets by telephone or directly by interactive internet, presumably using credit cards and how to take delivery -- UPS, will-call, etc.). The internet business is an increasingly large portion of TM business; the latest figures show about 3,000,000 "hits" a day on the TM home page. TM has a large number of interior event pages which change with additions or modifications of about 35,000 pages per day. This is managed by a set of computers which assign each interior web page a unique electronic address (called a URL) which facilitates the user to reach the precise page for the event in which the user is interested. Aside from the revenue in selling tickets, TM also receives revenue from advertisers who pay based on the number of hits on the page where the advertisement is carried (this is apparently true both of the home page and the event page, since the examples attached show advertisements on both types of pages). The home and event pages carry TM logos, [*6] so that the customer cannot be confused by the business entity with which he or she is dealing. The home page contains a statement that the user agrees to the "terms and conditions" of use. One can scroll down to the terms and conditions, which provide, among other things, that use binds one to the terms and conditions, that any use is for the personal use of the user, and that no commercial use can be made of the information provided. However, unlike certain other interactive internet programs (see *eBay* for an example), the user is not required to check an "I agree" box before proceeding to the interior web page wherein is located the information about the particular event in which he or she is interested.

T.Com operates in very different fashion. They do, indeed, have certain events in which they directly sell tickets, although very small in number compared to TM. However, their main business appears to operate as a

Page 3

2000 U.S. Dist. LEXIS 12987, *6; Copy. L. Rep. (CCH) P28,146

clearing house to provide information as to where tickets to any event may be obtained. Thus, T.Com collects information on as many events as it can, providing its "customer" information on where the tickets may be purchased, whether from T.Com or another source. **[*7]** Where T.Com can sell the tickets itself, it does in a manner similar to TM (phone or internet). However, it also provides information on other sources from which tickets may be purchased. It maintains its own form of event page for each event, listing the basic information (price, date, time, etc.). For the vast number of TM events that it lists, it has a statement that tickets may only be purchased from another ticket broker (not naming TM), and provides a box to check which at the present time will take the user directly by hyperlink to the TM home web page. (At the time of the motion to dismiss, the hyperlink took the user directly to the interior web page of TM for the event in question. In the interim, TM found the technical means of preventing this, so the user is now referred directly to the TM home web page where he may start wending his way through the directories to the proper interior web page. However at oral argument, counsel inform the court that the technical method of blocking deep hyperlink reference directly to the TM event page is no longer applicable. T.com states that it may soon again start referring users directly to the TM event page by the use of deep hyperlinking. **[*8]** ) Any ticket sale is made by TM. The proceeds are not shared by T.Com. T.Com also provides references and a telephone number or hyperlink to brokers who sell the tickets, some of which are auction sellers and some of which are "premium" ticket brokers, pejoratively known as "scalpers." T.Com makes money from advertisers, both on its home page and event page and from whatever ticket business in has of its own. The record does not reveal if it also makes a commission on sales by brokers to whom it refers customers, but not, of course, from TM.

The vast amount of information provided by T.Com on TM events comes from TM's computers, monitored by T.Com's computers. Since TM's computer information is open to the public, it is also available to T.Com. However, T.Com does not obtain the information in the same way as does the public (that is, by opening up an interior web page and reading the information off the screen), but rather by a sophisticated computer method of monitoring the thousands of interior TM web pages electronically by the use of a mysterious (to the court) devices know as a "webcrawlers" or "spiders"). The T.Com computers enter the TM computers electronically

through the **[*9]** home page and make note of the URL's (electronic addresses) of the interior web pages. They then methodically extract the electronic information from the event page (containing the URL (electronic address of the event web page) price, time, date, place, etc.) and copy it temporarily (for 10-15 seconds) on its own computers. The T.Com programs then extract the purely factual information from the copied TM web pages and place the factual information in the T.Com format on its own web pages, using its own method of expression and format for its own web pages. Except for the URL (discussed below), the copied TM web page (or, rather, the electronic signals which, if projected on the screen, would make up what the viewer sees on the screen) are then discarded and not used or retained for any other purpose. Thus, the viewer of the T.Com event web pages sees only the T.Com version of the facts. The source of the facts are, of course, the TM event web pages.

Now, to approach analysis of these facts from the standpoint of a preliminary injunction: The primary star in the copyright sky for this case is that purely factual information may not be copyrighted. (*Feist Publications* '91 *499 U.S. 340, 113 L. Ed. 2d 358, 111 S. Ct. 1282*.) **[*10]** Thus, the time, place, venue, price, etc., of public events are not protected by copyright even if great care and expense is expended in gathering the information (see the possibility of the "hot news" exception discussed below). Thus, unfair as it may seem to TM, the basic facts that it gathers and publishes cannot be protected from copying. To be sure, the manner of expression and format of presenting those facts is protectable, but T.Com has taken great care not to use the TM format and expression in publishing the facts that it takes from TM. This all goes back to a fundamental concept of copyright law that ideas and knowledge may not become the property of any one person even when that person has developed the idea or knowledge. What is protectable is the manner in which the idea or knowledge is expressed. Thus, Longfellow was free to take the famous facts of the ride of Paul Revere and tell the story in his own incomparable words—no one can copy the words, but anyone may tell the story in his own words (if not as well). The major difficulty with many of plaintiff's theories and concepts is that it is attempting to find a way to protect its expensively developed basic information **[*11]** from what it considers a competitor and it cannot do so.

In the court's opinion, there are two of TM's theories

Page 4

2000 U.S. Dist. LEXIS 12987, *11; Copy. L. Rep. (CCH) P28,146

which demand serious consideration on this motion for preliminary injunction and which may well prove decisive at trial although the court does not now consider them sufficient for a preliminary injunction. They are the copyright and the trespass theories.

As to copyright, there is undeniably copying of the electronic bits which make up the TM event pages when projected on the screen. Except for the URL, the copying is transitory and temporary and is not used directly in competition with TM, but it is copying and it would violate the Copyright Act if not justified. The fact that irreparable injury is hard to see even with a magnifying glass would not prevent an injunction because of the doctrine that irreparable injury is presumed if there is copying. The copying is intentional and done for commercial purposes even if the copied material is not sold as that of the copier. The copying, as summarized above, takes place as a part of the process of taking the (unprotectable) facts from TM's web sites so as to turn those facts into facts published by T.Com in its own format. [*12] At oral argument, counsel explained that by the nature of the way computers work, it is necessary to copy the electronic signals temporarily on the copying computer's RAM in order to extract the factual data present thereon. It is, therefore, a necessary part of the process by which T. Com efficiently takes basic facts from the TM websites, retains the electronic signals from TM on its computer for a few seconds, during which T.Com's own computer programs strips the signals of the basic facts, and then discards the copied electronic signals of TM as of no further use (except for the URL, discussed below). What prevents the issuance of a preliminary injunction on these facts is the "fair use" doctrine as recognized by the Ninth Circuit in *Sony Computer Entertainment v. Connectix Corp. 203 F.3d 596* (9th, 200) and certain prior cases. *Connectix* holds that copying for reverse engineering to obtain non-protectable information is permitted by the fair use doctrine in certain circumstances (see also *Acuff-Rose Music, Inc. 510 U.S. 569, 127 L. Ed. 2d 500, 114 S. Ct. 1164).* Reverse engineering to get at unprotected functional elements is not the same process as used here but the analogy seems [*13] to apply. The copy is not used competitively. It is destroyed after its limited function is done. It is used only to facilitate obtaining non-protectable data--here the basic factual data. It may not be the only way of obtaining that data (i.e, a thousand scriveners with pencil and paper could do the job given time), but it is the most efficient way, not held to be an

impediment in *Connectix*. TM makes the point that copying the URL (the electronic address to the web pages) which is not destroyed, but retained and used, is copying protected material. The court doubts that the material is protectable because the URL appears to contain functional and factual elements only and not original material. It appears likely to the court that plaintiff's odds on prevailing on the fair use doctrine at trial are sufficiently low that a preliminary injunction should not be granted even with the presumption of irreparable injury which goes with copyright infringement.

The other point dealing with copyright is the so-called "hot news" exception. As a basic exception to the rule that factual information is not protectable, an exception developed in the case of competing news organizations selling [*14] news to customers (newspapers) in competition with one another. Certain protections were allowed to prevent wholesale thievery of news by one organization from another. Here, it is suggested that at least some of the event news is "hot" -- that is, the event is sold out within hours or minutes of the tickets becoming available. This exception is not made out here. Even if such a hot event occurs (the court is informally informed that this is not rare) in a TM controlled event, the reference for ticket sales will be to TM, who sells the tickets in any event. Second, there is no showing that this situation occurs often enough to be of commercial significance. Accordingly, a preliminary injunction will not be issued on the copyright aspects of the case. There could be a difference at trial, and the difference could depend on the necessity of downloading the TM electronic signals onto the T.Com computers for purposes of extracting the unprotected factual information.

The trespass aspects of the case have taken on new significance in the light of Judge Whyte's opinion in *eBay* on May 24, which was immediately followed by a deluge of additional papers in this court. It must be said that [*15] the trespass question presented and decided in *eBay* bore no resemblance to the trespass question considered by this court on the motion to dismiss last March. What this court decided (at least, what it thought it decided) was that the taking of factual information from a public source was not a trespass, and if taking the information from a publically available computer was a state law trespass, it fell afoul of the preemption aspects of the Copyright Act. However, no question of invasion

Page 5

2000 U.S. Dist. LEXIS 12987, *15; Copy. L. Rep. (CCH) P28,146

of the computer by spiders, and possible consequent damage to the computer was presented to this court--at least no such question was decided. So, defendant's argument that it has already been decided and is law of the case and plaintiff's argument that the court can always reconsider a wrong decision have no place--it is a new one to this court. The court is impressed by the original and resourceful thinking of Judge Whyte; it is always difficult to attempt to apply established law to brand new facts with other established policies tugging and pulling one in various directions. Not only that, the court agrees with much of what Judge Whyte says. The computer is a piece of tangible personal property. **[*16]** It is operated by mysterious electronic impulses which did not exist when the law of trespass to chattels was developed, but the principles should not be too different. If the electronic impulses can do damage to the computer or to its function in a comparable way to taking a hammer to a piece of machinery, then it is no stretch to recognize that damage as trespass to chattels and provide a legal remedy for it. Judge Whyte in *eBay* found the damage in the occupation of a portion of the capacity of the computer to handle routine business and conjectured that approval of that use would bring many more parasitic like copies of the defendant feeding the computer to a clogged level upon the information expensively developed by eBay, the net result likely being severe damage to the function of the computer and thus the business of eBay. Thus, the injunction was issued to prevent the use of the spiders by the defendant in that case. It is noted that the harm to the equipment foreseen was to its intended function, not the physical characteristics of the computer. A basic element of trespass to chattels must be physical harm to the chattel (not present here) or some obstruction of its basic **[*17]** function (in the court's opinion not sufficiently shown here). TM has presented statistics showing an estimate of the number of hits by T.Com spiders in its own computers and has presented rough comparisons with the total use of the computers by all users of the computers. The comparative use by T.Com appears very small and there is no showing that the use interferes to any extent with the regular business of TM. If it did, an injunction might well issue, but should not with a showing of lack of harm or foreseeable harm. Nor here is the specter of dozens or more parasites joining the fray,

the cumulative total of which could affect the operation of TM's business. Further, the showing here is that the effect of T.Com's taking of factual data from TM is not to operate in direct competition with TM--it is not selling the data or the tickets. While TM sees some detriment in T.Com's operation (possibly in the loss of advertising revenue), there is also a beneficial effect in the referral of customers looking for tickets to TM events directly to TM. (In fact, other companies, who presumably pay a fee, are allowed to refer customers directly to the internal web pages of TM, presumably leading **[*18]** to sale of TM tickets despite hypothetical loss of advertising revenue by not going through the TM home web page.) Accordingly, while the trespass theory has some merit, there is insufficient proof of its elements in this case to justify a preliminary injunction. Further, there appears to be a lack of irreparable injury (required for this theory).

The remaining contentions may be disposed of with fewer words.

The contract theory lacks sufficient proof of agreement by defendant to be taken seriously as a ground for preliminary injunction. Besides, a preliminary injunction to prevent a breach of contract is an almost unheard of thing, being the equivalent of specific enforcement by preliminary injunction. There is insufficient irreparable injury to even consider such a proposition.

The various Lanham Act theories lack sufficient facts to support them. T.Com does not pass itself off as TM. In fact, it carefully says that it cannot sell the tickets but will refer the buyer to another broker (here, read TM) who can. The customer ends up on the TM home web page filed with TM logos. The customer is unlikely to be misled. Neither is there evidence of reverse palming off. T.Com in no way **[*19]** pretends that it is TM or acting for it. The false advertising claim is supported by a few mistakes in phone numbers, etc., which appear to be stray errors. This is not worth an injunction.

The other claims appear to have no basis worthy of an injunction. Preliminary injunction denied.