Price v. Facebook, Inc.



Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
UNIVERSAL TRADING & INVESTMENT CO.,
Plaintiff
v.
Petro Mikolayevich KIRITCHENKO, et al., De-
fendants.
**No. C-99-3073 MMC.**
**Docket Nos. 843, 1028, 1043, 1196.**

Sept. 7, 2007.

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT RE: STANDING; GRANTING PLAINTIFFS' MOTIONS TO SUPPLEMENT RECORD

MAXINE M. CHESNEY, United States District Judge.

*\*1* Before the Court is the motion for summary judgment filed by defendants Peter Kiritchenko, Izabella Kiritchenko, and Ludmilla Kiritchenko (collectively, "Kiritchenko"), by which motion Kiritchenko contends plaintiff Universal Trading & Investment Co. ("UTI" or "UTICo") lacks standing to bring the instant action. Defendants Brancross U.S. Holdings, Inc., BRC Property Holdings LLC, Xanadu Property Holdings, LLC, ABS Trading, Inc., and Michael Menko, collectively, have filed a joinder in Kiritchenko's motion. Separate joinders have been filed by, respectively, defendant Eurofed Bank Limited; defendants Alex Liverant and Torq Development Corporation; and defendants Pavel Lazarenko and Tamara Lazarenko (collectively, "Lazarenko"). UTI has filed opposition to the motion, to which Kiritchenko has replied. With permission of the Court, UTI has supplemented its opposition with three previously-filed declarations on Ukrainian law; Kiritchenko, with the Court's permission, has filed a surreply addressing such de-

clarations.

Also before the Court are three motions filed by UTI seeking permission to further supplement the record. With respect to each such motion, Kiritchenko has filed opposition and UTI has filed a reply.

Having reviewed the papers filed in support of and in opposition to the motions, the Court rules as follows.

### BACKGROUND

The instant action was filed June 24, 1999, and is based on the allegation that defendants were participants in "a criminal organization and enterprise designed to steal large sums of money from the Government of Ukraine[.]" (*See* Second Amended Complaint ¶ 32.) UTI alleges the Prosecutor General of Ukraine has "assigned, for consideration, the right of recovery of damages and/or assets for the claims" to UTI. (*See id.* ¶ 1.) Thus, UTI claims standing as an assignee of Ukraine's claims.

The purported assignment is a document dated August 11, 1999, on letterhead of the Prosecutor General's Office of Ukraine ("PGOU"), which document is addressed to U.A. Lambert ("Lambert"), president of UTI, and signed by M.S. Obykhod, "Deputy Prosecutor General of Ukraine" ("Obykhod"). (*See* Clements Supp. Decl. Ex. A.) FN1 The document provides:

> FN1. The text of all Ukrainian documents quoted in this order are English translations of the original documents. In light of the declaration of Mariam Nayiny, president of IDEM Translations, Inc., attesting to the accuracy of the translations, and defendants' failure to submit evidence that any of the translations quoted herein are materially inaccurate, defendants' objections to such translations are overruled.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 2669841 (N.D.Cal.)
**(Cite as: 2007 WL 2669841 (N.D.Cal.))**

Page 2

Taking into consideration the scope of work performed and support provided by your company, as well as civil action by UTIC with regard to real estate located in the United States which may belong to Ukrainian citizens P.M. Kyrychenko,[FN2] his family members, P.I. Lazarenko, and four Californian companies controlled thereby, i.e., Dugsbery Inc., Brancross U.S. Holdings Inc., Property Holdings, LLC, and Xanadu Property Ho[l]dings, LLC, we hereby confirm our agreement that the Ukrainian party will assign to UTIC material claims with regard to the above-mentioned real estate to the extent that you can prove in your Federal Court the unlawful ownership of such real estate, provided that the sum thereof will be credited, in future, to the amount of payment to be made by the Ukrainian party for your services, not exceeding 12% of all funds to be returned to Ukraine from abroad with the assistance of UTIC as provided by Letter No. 12-01379-97 dated May 15, 1998, and Letter No. 12-11015-97 dated October 2, 1998, of the Office of the Prosecutor General of Ukraine.

> FN2. To the extent the spelling of any name contained in a quotation from a translated document differs from the spelling used in the complaint or other document referenced herein, the Court has retained the spelling used by the translator of such document.

**\*2** (*See* Clements Supp. Decl. Ex. A.) Lambert testified at his deposition that the August 11, 1999 assignment reduced to writing a prior oral assignment. (*See* Clements Decl. Ex. B (Lambert Dep.) at 89:4-14.) Obykhod attests, however, that "[p]rior to August 11, 1999, there were no written or oral assignments of claims from the Office of the Prosecutor General or the government of Ukraine to UTI ."(*See* Roman Decl. Ex. 1 (Obykhod Decl.) ¶ 5.)

The validity of the August 11, 1999 assignment to UTI has been litigated in Ukrainian courts in two separate actions.

## A. Kiritchenko Ukrainian Lawsuit

Kiritchenko filed suit against the PGOU and "third person" UTI in the Pechersk regional court in the city of Kiev ("Pechersk court"), seeking to invalidate the assignment and a prior power of attorney.[FN3] (*See* Romanova Decl., filed June 2, 2006, Ex. A at 1.) On March 4, 2003, the Pechersk court issued a written decision holding that the PGOU "had no legal basis to issue the Power of Attorney to the foreign firm UTI ... to conduct the case concerning the Defendant P.M. Kyrychenko, and to entrust it with the right of representation of the material claims of Ukraine[.]" (*See id.* at 3.)[FN4] The Pechersk court also rejected the assignment on the ground that "there are no references to the laws which would give the General Prosecutor's Office of Ukraine grounds to transfer to UTI Co unrestricted authorities on concession of the material claims concerning property[.]" (*See id.*)The Pechersk court nonetheless rejected Kiritchenko's claim on the ground that it was time-barred under the applicable three-year statute of limitations. (*See id.*)

> FN3. A document titled "Power of Attorney," dated April 30, 1999, provides:
>
> By virtue of this Power of Attorney, I. Mykhailo Olexiovych Potebenko, Prosecutor General of Ukraine with reference to our outgoing document # 12-11015-97 of 13.04.99, empower UTICo., U.S. federal I.D. # 04-3181148, at: 33 Almont Street, Winthrop-Boston, MA 02152, USA, on the basis of collected information about the property in the USA of citizens of Ukraine Petro Mikolaievich Kiritchenko and Pavlo Ivanovich Lazarenko, acquired by them for proceeds of crime, in view that they are charged with crimes including misappropriation of the State and public property of Ukraine in especially large scale, to organize and to implement in the USA the legal work, seeking judgment on attaching such assets, including

the real estate property held by the above Ukrainian citizens in the names of Dugsbery Inc., Brancross U.S. Holdings, Inc., BRC Property Holdings, LLC, Xanadu Property Holdings, LLC., and for further representing for Ukraine the material claims of Ukraine upon such assets, in accordance with the Ukrainian laws and in accordance with the judicial decisions and judicial proceedings in Ukraine. In particular UTICo. is empowered to involve in the necessary judicial proceedings in USA and for accomplishing designated juridical tasks in presenting Ukraine's material claims the law firms and lawyers, selected by UTICo., including but not limited to: Hale and Door, 60 State Street, Boston, MA 02109; Law Offices of Robert D. Carrow, 1 Embarcadero Center, Suite 880, San Francisco, CA 94111; Law Offices of Philip R. Boncore L.L.P., 1140 Saratoga St., Boston, MA 02128, and to relieve those from such juridical tasks.

The present Power of Attorney is valid for one year from the date of its issuance. If judicial procedures are initiated outside of Ukraine in respect of the above-mentioned assets, then this Power of Attorney will be prolonged for the whole term of such judicial procedures.

This Power of Attorney is executed in the name of the Prosecutor General Office of Ukraine by myself, Mykhailo Olexiovych Potebenko, Prosecutor General of Ukraine, which I confirm by my personal signature.

(*See* Lambert Decl. in Opposition to Motion to Expunge and in Support of Injunctive Relief, filed August 2, 1999, Ex. A.)

FN4. Each of the Ukrainian court decisions

issued in the Kiritchenko matter has been authenticated pursuant to the requirements of Rule 44(a)(2) of the Federal Rules of Civil Procedure and the Hague Convention Abolishing the Requirement of Legalization for Foreign Public Documents. (*See* Romanova Decl., filed June 2, 2006, ¶¶ 3-5 and Exs. A-E.)

The PGOU appealed, arguing that although the trial court was correct in rejecting Kiritchenko's suit as untimely, it erred in finding the assignment and power of attorney invalid. (*See* Clements Decl. Ex. M.) Kiritchenko also appealed, apparently arguing that the trial court erred in dismissing his claim as time-barred.[FN5] (*See id.*Ex. O.) On May 29, 2003, the "Judicial Chamber on Civil Cases of the Court of Appeal of the City of Kyiv" affirmed the decision of the Pechersk court. (*See* Romanova Decl. Ex. B.)[FN6]

FN5. A copy of Kiritchenko's appeal has not been filed with this Court.

FN6. Petro Konstantinovich Ryabenko, a Ukrainian attorney, relying on Article 317 of the Civil Code of Ukraine, attests: "Although the Ukrainian courts ... held that Mr. Kiritchenko failed to file his action within the three-year statute of limitations, under Ukrainian law, this does not transform the court's findings regarding the legal validity of the Assignment and Power of Attorney into 'dicta.' Every finding made by the Kiev Regional Court and affirmed and adopted by the Kiev Court of Appeal has legal force and effect."(*See* Clements Decl. Ex. FF (Ryabenko Decl.) ¶¶ 9-10.)

Kiritchenko filed an appeal with the Supreme Court on June 27, 2003, but thereafter withdrew his appeal. (*See* Lambert Decl., filed September 8, 2006, Ex. F.) There is no evidence before this Court that the PGOU appealed the decision of the appellate court to the Ukraine Supreme Court.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 2669841 (N.D.Cal.)
**(Cite as: 2007 WL 2669841 (N.D.Cal.))**

Page 4

On October 17, 2003, however, the PGOU filed a "petition for review" with the Pechersk court, arguing that the Cabinet of Ministers of the Ukraine, on July 19, 2003, "agreed to the proposal of the Ukrainian Ministry of Justice to appoint the Ukrainian Prosecutor General's Office as authority responsible for the *organization* and *continuation* of any activities intended to protect the state's property interests in cases related to the returning of P.M. Kiritchenko's and P.I. Lazarenko's property to the Ukraine."(*See* Clements Decl. Ex. Q at 2 (emphases in original).) The PGOU argued that said "assignment by the Ukrainian Cabinet of Ministers confirms and approves" the prior agreements between the PGOU and UTI.[FN7] (*See id.*)

> FN7. Although the PGOU was appointed as of July 19, 2003 "to be the responsible body and organization for the continuation of the actions aimed at protecting the material interests of the State in the matters regarding ... repatriating to Ukraine the assets of Kiritchenko P.M. and Lazarenko P.I.," (*see* Thomson Decl., filed Jan. 20, 2006, Exs. 20-21) there is no suggestion in the appointment documents that such appointment retroactively validated any actions taken by the PGOU prior to that date.

**\*3** Thereafter, on February 20, 2004, the PGOU filed an "additional petition for review," in which it argued that UTI, on December 10, 2003, had notified the PGOU that UTI "had received no notification as to the time, date, or venue of the case proceedings in question" due to court error in addressing notices to UTI. (*See id.*Ex. R at 2.) The PGOU further argued that the court's notices to UTI were "in violation of the procedures determined by the Hague Convention" on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Hague Convention"). (*See id.*)

On March 11, 2004, the Pechersk court denied the PGOU's petitions for review. (*See* Romanova Decl. Ex. C.) The Pechersk court stated that the approval of the Cabinet of Ministers "cannot be accepted by

the court as discovery of new facts because the [PGOU] is a state body obligated, *inter alia,* to protect the interests of the State and act on the State's behalf where so determined by law."(*See id.* at 2.) The Pechersk court held that the PGOU had "failed to demonstrate to the court any essential facts that were not and could not be known to the court and are material to the case and that the [PGOU]'s petition must therefore be declined." (*See id.* at 2.) Although the Pechersk court noted the PGOU's argument that UTI was not given notice of the suit, it did not address the issue. (*See id.* at 1.)

On March 25, 2004, the PGOU appealed. (*See* Clements Decl. Ex. T.) On May 7, 2004, the appellate court denied the appeal. (*See* Romanova Decl. Ex. D.) The appellate court noted that it had previously affirmed the Pechersk court's March 4, 2003 decision and that the PGOU had not appealed the appellate court's ruling. (*See id.* at 2.) The court further held that the Pechersk court had made a "correct and justified conclusion" that the July 19, 2003 approval of the Cabinet of Ministers "could not be accepted by the court as a newly discovered fact," and that "the fact that the court had sent notifications to the third party to an incorrect address was also inessential and immaterial to the case."(*See id* . at 3.)

On June 4, 2004, the PGOU filed an appeal with the Supreme Court of Ukraine. (*See* Clements Decl. Ex. V.) On June 10, 2004, according to the Supreme Court, the Pechersk court held that the appeal would be "left without action due to the inconsistency of both its form and content with the requirements of civil process laws" and ordered the flaws to be corrected by June 20, 2004. (*See* Romanova Decl. Ex. E at 1.)[FN8] When the PGOU failed to correct the flaws in the execution of its appeal, the Pechersk court, in a judgment issued June 24, 2004, deemed the appeal unfiled and returned it to the PGOU. (*See id.* at 2.) The appellate court affirmed that decision on October 5, 2004. (*See id.*)The PGOU thereafter appealed the June 24, 2004 and October 5, 2004 rulings to the Supreme Court,

which denied the appeal in a decision dated February 3, 2005.[FN9] (*See id.*)

>    FN8. The above quotation is from the February 3, 2005 opinion of the Supreme Court of Ukraine.

>    FN9. Contrary to Kiritchenko's assertion, it does not appear that the Supreme Court of Ukraine ruled on the merits of the PGOU's appeal, but rather ruled only that the lower courts did not err in finding the PGOU's appeal on the merits to be improperly filed. Nonetheless, the Supreme Court did not purport to alter the appellate court's opinion affirming the trial court's conclusions that the PGOU lacks authority to assign claims of Ukraine and that Kiritchenko's lawsuit was untimely.

## B. Lazarenko Ukrainian Lawsuit

*\*4* Lazarenko filed a separate lawsuit against the PGOU in the Pechersk court, likewise seeking to invalidate the PGOU's power of attorney and assignment to UTI. The case was not assigned to the same judge who heard Kiritchenko's case. On September 3, 2003, the Pechersk court issued a written decision in Lazarenko's favor.[FN10] (*See* Clements Decl. Ex. X.)[FN11] The Pechersk court held that "neither a public prosecutor's office nor any public prosecutors have any legal grounds to issue a power of attorney to anyone, including the foreign firm UTICo, since they do not act as a party to the legal proceedings or have any personal interest therein or claims thereunder-which proves that neither the power of attorney nor any acts performed by said firm as attorney in fact under the power of attorney conform with the law."(*See id.* at 2.) The Pechersk court further found the PGOU "had no grounds to grant a power of attorney to a foreign firm in the conduct of proceedings with respect to Respondent P.I. Lazarenko, to say nothing about the right of reassignment, and it is for this reason that UTICo was entitled [to] act neither on

behalf of the Ukraine nor on behalf of the [PGOU]." (*See id.* at 3.) The Pechersk court additionally held that the PGOU "has no right under applicable Ukrainian laws to delegate any representation functions for protecting the interests of the state to any other body."(*See id.* at 3.) Finally, the Pechersk court invalidated both the power of attorney and the PGOU's assignment to UTI. (*See id.* at 5.)

>    FN10. The court noted that "third paorthe" UTI had not appeared, "even though notice has been duly given of the time and place proceedings."(*See id.* at 1.) The court concluded that "the case could be examined in absence of the third party representative based on the existing evidence on file as provided by Article 172 of the Ukrainian Civil Procedure Code."(*See id.*)

>    FN11. Each of the Ukrainian court decisions issued in the Lazarenko matter has been authenticated pursuant to the requirements of Rule 44(a)(2) of the Federal Rules of Civil Procedure and the Hague Convention Abolishing the Requirement of Legalization for Foreign Public Documents. (*See* Logosha Decl., filed June 2, 2006, ¶¶ 3-5 and Exs. A-E.)

The PGOU appealed, and the civil division of the appellate court of Kiev, in an opinion issued November 27, 2003, reversed, finding that the Pechersk court's conclusions "involved a gross violation of the rules of both material and process law."(*See id.*Ex. Y at 2.) The appellate court held that the Pechersk court, having concluded that the PGOU had violated Lazarenko's rights by making an unlawful assignment to UTI, erred by failing "to clarify the nature of legal relations and legal grounds for the claims so made as required by Article 137 of the Ukrainian Civil Process Code."(*See id.* at 3.) The appellate court further held that the Pechersk court erred by failing "to make provisions for bringing to trial the UTICo firm as co-defendants."(*See id.* at 4.) The appellate court re-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

manded the action to the trial court for further proceedings.

Lazarenko appealed to the Supreme Court of Ukraine. In an opinion dated March 17, 2005, the Supreme Court reversed the appellate court, holding that the decision of the appellate court was "based on an incorrect application of the norms of procedural law."(*See id.*Ex. AA at 3.) With respect to the appellate court's ruling on the merits of the appeal, the Supreme Court held that, pursuant to rules of Ukrainian civil procedure, the appellate court should have decided the case "on its merits rather than ordering a retrial by the original trial court," and remanded the case to the appellate court. (*See id.* at 4.) With respect to the appellate court's holding that the Pechersk court erred by not bringing UTI to trial as a co-defendant, the Supreme Court also reversed, noting that the Pechersk court had properly named UTI as a third party in accordance with Ukrainian rules of civil procedure. (*See id.*)

**\*5** On July 7, 2005, the appellate court issued a decision affirming the Pechersk court's original decision invalidating the assignment.[FN12] (*See id.*Ex. BB.) The appellate court held that, under Ukrainian law, "offices of public prosecutors and prosecutors, not being a party of a case and not having personal interests or claims, do not have legal grounds for issuing powers of attorneys to any party[.]" (*See id.* at 4.) Additionally, under Ukrainian law, the assignment is invalid because "only the owner of the property has the right to dispose of it," and the PGOU is not "the owner of the property" at issue in the assignment and does not have "direct rights and powers regarding disposal of the property."(*See id.* at 5.) The appellate court denied the PGOU's appeal and left "the Decision of Pechersk District Court of City of Kyiv of September 3, 2003 without changes."(*See id.* at 6.)

> FN12. A handwritten copy of the decision submitted to this Court appears to be missing text on the right side, as a result of the copying process; a similar copy appears to

have been submitted to the translator, as the translation submitted to the Court contains question marks and notations that text has been "cut off" and that text is "missing." (*See id.*)Nevertheless, the translator was able to translate the bulk of the opinion, and the ruling is clear. Although defendants later submitted an authenticated printed version of the opinion, and an English translation thereof, the Court has not considered such translation because defendants did not submit a declaration from the translator with respect thereto. The Court notes, however, that such translation is consistent with the translation of the handwritten copy.

On August 5, 2005, the PGOU appealed the appellate court's decision to the Supreme Court of Ukraine. (*See* Clements Decl. Ex. CC.) To date, the Supreme Court of Ukraine has not taken action on the appeal.[FN13]

> FN13. Although the July 8, 2005 appellate court decision has been appealed to the Supreme Court of Ukraine, it "has full legal force and effect" under Ukrainian law unless and until the Supreme Court "revoke[s] the legal force and effect of the Court of Appeal ruling ."(*See* Clements Decl. Ex. FF (Ryabenko Decl.) ¶ 10.)

## LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment as to "all or any part" of a claim "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."*See*Fed.R.Civ.P. 56(b), (c). Material facts are those that may affect the outcome of the case. *See Anderson v.. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute as

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 2669841 (N.D.Cal.)
**(Cite as: 2007 WL 2669841 (N.D.Cal.))**

Page 7

to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*The court may not weigh the evidence. *See id.* at 255.Rather, the non-moving party's evidence must be believed and "all justifiable inferences must be drawn in [the non-movant's] favor."*See United Steelworkers of Am. v. Phelps Dodge Corp.,* 865 F.2d 1539, 1542 (9th Cir.1989) (en banc) (citing *Liberty Lobby,* 477 U.S. at 255).

The moving party bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, interrogatory answers, admissions and affidavits, if any, that it contends demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the nonmoving party will bear the burden of proof at trial, the moving party's burden is discharged when it shows the court there is an absence of evidence to support the nonmoving party's case. *See id.* at 325.

Where the moving party "bears the burden of proof at trial, he must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial," and "establish the absence of a genuine issue of fact on each issue material to his [claim]."*See Houghton v. South,* 965 F.2d 1532, 1536-37 (9th Cir.1992) (citations omitted).

**\*6** A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of [that] party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial."*See*Fed.R.Civ.P. 56(e); *see also Liberty Lobby,* 477 U.S. at 250. The opposing party need not show the issue will be resolved conclusively in its favor. *See Liberty Lobby,* 477 U.S. at 248-49. All that is necessary is submission of sufficient evidence to create a material factual dispute, thereby requiring a jury or judge to resolve the parties' differing versions at trial. *See id.*

The district court is not required to search the record *sua sponte* for some genuine issue of material fact. *See Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir.1996) ("It is not our task, or that of the district court to scour the record in search of a genuine issue of triable fact. We rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment."); *see also Carmen v. San Francisco Unified School District,* 237 F.3d 1026, 1031 (9th Cir.2001) ("The district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found.").

### DISCUSSION

As an initial matter, the Court has before it three motions by UTI to supplement the record with additional evidence. Although, as Kiritchenko points out, much of the evidence UTI seeks to submit is inadmissible hearsay, without foundation, repetitious, or irrelevant to the issue of the validity of the assignment, the Court nonetheless will GRANT the motions to supplement the record, and will consider below the new evidence to the extent it is both admissible and relevant.

The Court next turns to the merits of defendants' motion. Defendants move for summary judgment on the ground that UTI lacks standing to assert any claims belonging to Ukraine. Rule 17(a) of the Federal Rules of Civil Procedure provides that "[e]very action shall be prosecuted in the name of the real party in interest."*See*Fed.R.Civ.P. 17(a). If a claim has been assigned, the assignee becomes the real-party-in-interest and can maintain suit in its own name. *See Klamath-Lake Pharmaceutical Ass'n v. Klamath Medical Service Bureau,* 701 F.2d 1276, 1282 (9th Cir.1983). The burden of proving the validity of an assignment lies with the purported assignee. *See Britton v. Co-op Banking Group,* 4 F.3d 742, 746 (9th Cir.1993).

## A. Timing of Assignment

Defendants argue that even if the August 11, 1999 assignment from the PGOU to UTI is valid, it does not operate to cure UTI's lack of standing to assert the instant action at the time the complaint was filed on June 24, 1999.

Assuming, *arguendo,* UTI lacked standing to assert its initial complaint, however, an amended complaint was filed October 8, 1999, after the assignment was executed. Where a plaintiff obtains an assignment after the filing of his initial complaint, and thereafter files a timely amended complaint, dismissal for lack of standing is not warranted.[FN14] *See, e.g., Kilbourn v. Western Surety Co.,* 187 F.2d 567, 571 (10th Cir.1951) (rejecting contention plaintiff's claim subject to summary judgment where plaintiff obtained assignment after filing initial complaint but before filing amended complaint).

> FN14. Defendants do not argue that the statute of limitations expired on any claim during the three-and-one-half-month period between the date of the initial complaint and the date the amended complaint was filed. *See, e.g., United States ex. rel. Wulff v. CMA, Inc.,* 890 F.2d 1070, 1073-75 (9th Cir.1989) (affirming summary judgment in favor of defendants where statute of limitations ran after initial complaint filed but before plaintiffs obtained assignment).

*\*7* Accordingly, defendants have not demonstrated that the execution of the assignment after the filing of the initial complaint entitles them to summary judgment.

## B. Act of State Doctrine

UTI next argues that the act of state doctrine bars the Court from examining the legality of the PGOU's assignment to UTI.

"The act of state doctrine in its traditional formula-tion precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 401 (1964); *see also Underhill v. Hernandez,* 168 U.S. 250, 252 (1897) ("Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory."). The doctrine "has its roots, not in the Constitution, but in the notion of comity between independent sovereigns," as well as "judicial deference to the exclusive power of the Executive over conduct of relations with other sovereign powers and the power of the Senate to advise and consent on the making of treaties."*See First National City Bank v. Banco National de Cuba,* 406 U.S. 759, 765 (1972)."[T]he act of state doctrine justifies its existence primarily on the basis that juridical review of acts of state of a foreign power could embarrass the conduct of foreign relations by the political branches of the government." *Id. at* 765."The doctrine, today, is a flexible one designed to prevent judicial pronouncements on the legality of the acts of foreign states which could embarrass the Executive Branch in the conduct of foreign affairs." *Liu v. Republic of China,* 892 F.2d 1419, 1432 (9th Cir.1989)."The 'touchstone' or 'crucial element' is the potential for interference with our foreign relations."*Id.*

Thus, the doctrine does not apply where, for example, the executive branch "expressly represents to the Court that application of the act of state doctrine would not advance the interests of American foreign policy,"*see First National City Bank v. Banco National de Cuba,* 406 U.S. at 768, or where the foreign government concedes the unlawfulness of the act in question, *see Republic of the Philippines v. Marcos,* 862 F.2d 1355, 1360 (9th Cir.1988) (en banc) (holding act of state doctrine "is not a promise to the ruler of any foreign country that his conduct, if challenged by his own country after his fall, may not become the subject of scru-

tiny in our courts").

Here, the assignment at issue has been declared invalid by the Ukrainian courts. As the Ukrainian government, by its courts, has invalidated the very assignment at issue, the Court is not barred by the act of state doctrine from examining the validity of said assignment for purposes of determining whether UTI has standing to assert the instant action. *See, e.g., id.* at 1360.

**\*8** Moreover, as defendants point out, the act of state doctrine has no application here because the act of state in question cannot be considered to have been committed entirely in Ukraine. The assignment was given by the PGOU to UTI, a Massachusetts corporation, for the express purpose of filing suit on Ukraine's behalf in the United States courts. (*See* Clement Decl. Ex. A.) As noted, the act of state doctrine only precludes inquiry into acts of a foreign government committed within its own territory. *See Sabbatino,* 376 U.S. at 401;*see also Underhill,* 168 U.S. at 252. The act of state doctrine ordinarily does not preclude judicial review of the extraterritorial effects of acts of state. *See, e.g., Liu,* 892 F.2d at 1433 (finding act of state doctrine not applicable to state-ordered murder planned in foreign country and carried out in California); *Maltina Corp. v. Cawy Bottling Co.,* 462 F.2d 1021, 1025 (5th Cir.1972) (finding act of state doctrine did not bar former owners of Cuban corporation confiscated by Cuban government from suing third party in United States to preserve right to use United States trademark registered in name of confiscated corporation; declining to give " 'extra-territorial effect' to a confiscatory decree of a foreign state"); *Tabacalera Severiano Jorge v. Standard Cigar Co.,* 392 F.2d 706, 715-16 (5th Cir.1968) (finding act of state doctrine did not bar former owners of Cuban corporation confiscated by Cuban government from suing Florida corporation for money owed prior to confiscation; holding "acts are to be recognized under the Act of State Doctrine only insofar as they were able to come to complete fruition within the dominion of the Cuban government"); *Republic of*

*Iraq v. First National Bank,* 353 F.2d 47, 51 (2nd Cir.1965) (finding act of state doctrine did not bar judicial review of Iraqi confiscation of assets located in United States; noting, "when property confiscated is within the United States at the time of the attempted confiscation, our courts will give effect to acts of state only if they are consistent with the policy and law of the United States.") (internal quotation and citation omitted); *but see In re Philippine National Bank,* 397 F.3d at 773 (finding "extraordinary circumstances" requiring application of act of state doctrine to preclude district court's interference with Philippine Supreme Court order requiring transfer of assets from Singapore to Republic of Philippines). Here, because the assignment at issue was purportedly made for the express purpose of permitting UTI to file suit in United States courts to recover assets located in the United States, the Court finds the act in question was not committed entirely within Ukraine, and, accordingly, the act of state doctrine does not bar this Court from reviewing the validity of said assignment.

For the reasons set forth above, the Court finds the act of state doctrine does not bar the Court from examining the legality of the PGOU's assignment to UTI.

## C. Fugitive Disentitlement Doctrine

**\*9** UTI argues that Kiritchenko and Lazarenko are fugitives from justice with respect to various Ukrainian criminal charges and, consequently, are barred by the fugitive disentitlement doctrine from seeking enforcement of the Ukrainian judgments in this Court. Assuming, *arguendo,* that Kiritchenko and Lazarenko are fugitives with respect to criminal charges in Ukraine, however, the fugitive disentitlement doctrine, for the reasons set forth below, does not bar them from seeking to enforce the Ukrainian judgments in this Court.

The fugitive disentitlement doctrine authorizes a court to "dismiss an appeal or writ in a criminal

matter when the party seeking relief becomes a fugitive" during the pendency of his appeal. *See De-gen v. United States,* 517 U.S. 820, 823 (1996); *Ortega-Rodriguez v. United States,* 507 U.S. 234, 239 (1993). The purposes of the doctrine are "to avoid making decisions that could not be enforced, to deter flight, to assure an effective adversary process, and to serve the interest in efficient, dignified appellate practice."*See United States v. Gonzalez,* 300 F.3d 1048, 1051 (9th Cir.2002) (internal quotation and citation omitted).

Here, neither Kiritchenko nor Lazarenko is seeking relief with respect to the criminal matters in Ukraine from which they are alleged to have become fugitives. As the Second Circuit has noted, there are no cases "in which the doctrine was applied by a court of the jurisdiction to which, rather than from which, the alleged fugitive had fled."*See Bano v. Union Carbide Corp.,* 273 F.3d 120, 125 (2nd Cir.2001). As the Second Circuit explained:

That is not surprising. Because the purpose of the doctrine is to allow courts to protect their proceedings and judgments, a court will ordinarily employ it only to ensure the enforceability of *its* decisions; to discourage flouting *its* process; to discourage flights from *its* administration of justice; or to avoid prejudice to the other side affecting litigation that is or may be before *it.*

*Id.* at 125-26 (emphases in original). The doctrine applies only where there is "some connection between a defendant's fugitive status and his appeal."*See Ortega-Rodriguez,* 507 U.S. at 249. In *Bano,* for example, the Second Circuit found the fugitive disentitlement doctrine inapplicable to district court proceedings wherein the defendants were fugitives from court proceedings in India, holding "[i]t is the courts of India ..., not the United States District Court for the Southern District of New York, that would have the authority ... to defend their own dignity by sanctioning the defendants' alleged acts of defiance, which occurred solely within their domain."*See Bano,* 273 F.3d at 127.

Similarly, in the instant action, because Kiritchenko and Lazarenko are alleged to be fugitives from Ukraine, the fugitive disentitlement doctrine does not preclude them from seeking enforcement of Ukrainian judgments in this Court.

## D. Enforcement of Ukrainian Judgments Against UTI

**\*10** As discussed above, the Ukrainian courts, in two different lawsuits, have found the PGOU's assignment to UTI invalid on the ground the PGOU lacks authority under Ukrainian law to assign any claims held by the state of Ukraine to anyone. (*See* Romanova Decl. Exs. A, B; Clements Decl. Exs. X, BB.) UTI argues the Ukrainian court decisions cannot be enforced against UTI.

### 1. Standard for Recognition of Foreign Judgments

Federal jurisdiction over the instant action is based on both diversity and the existence of a federal question. (*See* SAC ¶¶ 27-28.) As set forth below, the same standard applies to recognition of foreign judgments irrespective of whether jurisdiction is based on diversity or a federal question.

"There is currently no federal statute governing recognition of foreign judgments in the federal courts." *Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme,* 433 F.3d 1199, 1212 (9th Cir.2006) (en banc) (opinion of Fletcher, J.)."In diversity cases, enforceability of judgments of courts of other countries is generally governed by the law of the state in which enforcement is sought." *Id.* at 1213.[FN15]Although UTI contends the enforceability of the Ukrainian judgments is determined by California's Uniform Foreign Money-Judgments Recognition Act, that Act applies only to a " 'judgment of a foreign state granting or denying recovery of a sum of money.' " *See id.*(quoting Cal.Code Civ. Proc. § 1713.1(2)). As discussed above, the Ukrainian courts did not award damages, but rather, addressed the issue of whether the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

PGOU validly assigned Ukraine's claims to UTI. Thus, the Uniform Foreign Money-Judgments Recognition Act has no application; rather, the Court must "look to general principles of comity followed by the California courts" as embodied in the Restatement of the Foreign Relations Law of the United States. *See id.* at 1213.Likewise, in federal question cases, courts look to the Restatement of the Foreign Relations Law of the United States. *See Bank Melli Iran v. Pahlavi,* 58 F.3d 1406, 1410 (9th Cir.1995) (citing *Hilton v. Guyot,* 159 U.S. 113, 205-06 (1895) and Restatement (Third) of the Foreign Relations Law of the United States § 482) (noting "[i]t has long been the law of the United States that a foreign judgment cannot be enforced if it was obtained in a manner that did not accord with due process").

> FN15. Although the cited section of Judge Fletcher's opinion is joined by only two other judges on the en banc panel, the opinion authored by Judge Fisher concurring in part and dissenting in part is in agreement with Judge Fletcher that, in a diversity action, the enforcement of a foreign judgment is a question of the law of the state in which enforcement is sought. *See id.* at 1239 n. 4 (Fisher, J., concurring in part and dissenting in part.) Because Judge Fletcher's opinion on this issue is joined by two other judges, and Judge Fisher's opinion is joined by four other judges, a majority decision of the en banc panel exists on this issue.

Section 482 of the Restatement (Third) of the Foreign Relations Law of the United States sets forth the circumstances under which a United States court shall not recognize a foreign judgment, and the circumstances under which such a court need not recognize a foreign judgment. "A court in the United States may not recognize a judgment of the court of a foreign state if "(a) the judgment was rendered under a judicial system that does not provide impartial tribunals or procedures compat-

ible with due process of law; or (b) the court that rendered the judgment did not have jurisdiction over the defendant in accordance with the law of the rendering state and with the rules set forth in § 421."FN16 *See*Restatement (Third) of the Foreign Relations Law of the United States § 482(1). A court "need not" recognize a foreign judgment if, *inter alia,*"the defendant did not receive notice of the proceedings in sufficient time to enable him to defend," or "the judgment was obtained by fraud," or "the cause of action on which the judgment was based, or the judgment itself, is repugnant to the public policy of the United States or of the State where recognition is sought."*See id.* § 482(2)(b), (c), (d).

> FN16. Section 421 sets forth various factors to be considered in determining whether "the relationship of the state to the person or thing is such as to make the exercise of jurisdiction reasonable."*See id.* § 421.

## 2. Lack of Due Process

**\*11** Although UTI asserts numerous grounds in support of its argument that the Ukrainian courts' decisions cannot be enforced against UTI, the Court need not address all of them; the Court agrees with UTI that the Ukrainian court decisions are not enforceable against UTI consistent with due process because service of process was never effected upon UTI in the Ukrainian actions. Roman A. Plyamovaty, a member of UTI's board of directors, attests that UTI "has never been served with any summons or pleadings from Ukrainian courts, under the Hague Convention or otherwise,"FN17 (*see* Plyamovaty Decl., filed Jan. 20, 2006, ¶ 3), and there is no evidence to the contrary.

> FN17. Ukraine, like the United States, is a party to the Hague Convention.

Defendants do not argue that UTI was served in the Ukrainian actions, but contend UTI eventually re-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 2669841 (N.D.Cal.)
**(Cite as: 2007 WL 2669841 (N.D.Cal.))**

Page 12

ceived informal notice of the actions. In support thereof, defendants submit UTI's declaration attesting to lack of service, dated December 2, 2003, and filed by the PGOU in the Kiritchenko Ukrainian litigation, thus arguably demonstrating UTI was at least aware of the Kiritchenko Ukrainian litigation before that litigation concluded. (*See* Clements Decl. Ex. R.)

A "due process 'principle of general application in Anglo-American jurisprudence," however, is that "one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process.' " *See Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 846 (1999) (quoting *Hansberry v. Lee,* 311 U.S. 32, 40 (1940)). Consistent therewith, the Courts of Appeals have held, with respect to foreign litigation, that any judgment entered in such foreign litigation cannot be enforced in United States courts against any party not properly served therein. *See Norex Petroleum Ltd. v. Access Industries, Inc.,* 416 F.3d 146, 161-62 (2d Cir.2005) (internal quotation and citation omitted) (holding Russian default judgment could not be given preclusive effect by United States court without affording defendant opportunity to challenge in United States action whether such defendant was properly served in Russian action); *Koster v. Automark Industries, Inc.,* 640 F.2d 77, 81 n. 3 (7th Cir.1981) (holding Dutch default judgment not enforceable in United States courts because service on defendant pursuant to Dutch law failed to "comport with American due process requirements"); *see also Arco Electronics Control Ltd. v. Core Int'l,* 794 F.Supp. 1144, 1146 (S.D.Fla.1992) (refusing to enforce Israeli judgment against Florida corporation where Florida corporation was not served in Israeli litigation pursuant to requirements of Hague Convention); *Mata v. American Life Ins. Co.,* 771 F.Supp. 1375, 1390 (D.Del.1991) (refusing to recognize Bolivian judgment where purported service on defendant failed to "comport with United States notions of constitutional due process"). Accordingly, this Court finds any informal notice UTI re-

ceived with respect to the Ukrainian litigation does not suffice for purposes of compliance with due process.

**\*12** In sum, because there is no evidence UTI was ever served in the Ukrainian actions, the Court finds the Ukrainian courts' decisions are not enforceable against UTI.[FN18]

> FN18. In light of such ruling, the Court need not determine whether, pursuant to § 482(1), it cannot enforce the Ukrainian courts' decisions against UTI because the Ukrainian courts lacked jurisdiction over UTI, or whether, pursuant to § 482(2), it "need not" enforce such decisions on the grounds that UTI failed to receive notice of the proceedings in sufficient time to defend or that the judgment is repugnant to the public policy of the United States or California.

### E. Ukrainian Judgments as Evidence of Foreign Law

Defendants argue that even if the Ukrainian judgments are not directly enforceable against UTI, the Court should defer to the Ukrainian judgments as evidence of Ukrainian law on the issue of the PGOU's authority to assign claims held by Ukraine.

#### 1. Choice of Law

UTI argues that the Ukrainian judgments are irrelevant because the Court should apply California law, not Ukrainian law, to determine the validity of the assignment from the PGOU to UTI.

Where, as here, jurisdiction is based on the existence of a federal question, (*see* SAC ¶ 28), "federal common law applies to the choice of law rule determination."*See Schoenberg v. Exportadora de Sal,* 930 F.2d 777, 782 (9th Cir.1991). Federal common law "follows the approach of the Restatement (Second) of Conflict of Laws[.]"*See id.*As defend-

ants point out, the validity of an assignment is "determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the assignment and the parties."*See* Restatement (Second) of Conflicts of Laws § 209.[FN19] The comments to § 209 expressly state that § 209 applies to the issue of "the capacity of the assignor to make an effective assignment."*See id.* cmt. a. Ukraine unquestionably has the most significant relationship, both to the assignment and the parties, with respect to the issue of whether the PGOU has the capacity to assign claims held by Ukraine. California and the United States have no interest in determining the scope of authority of Ukrainian prosecutors, or the circumstances under which the government of Ukraine may assign its claims to others.

> FN19. Although § 209 refers to the assignment of contractual rights, the Restatement's introductory note to the topic states § 209 "probabl[y]" is "also applicable to assignments of rights of action in tort."*See* Restatement (Second) Conflicts of Law, introductory note to Chapter 8, Topic 2, "Assignment of Contractual Rights." The Court is aware of no authority to the contrary.

As noted, UTI also relies on diversity as a basis for jurisdiction over the instant action. (*See* SAC ¶ 27.) "A district court in a diversity case must apply the same choice of law analysis that would be applied by state courts in the jurisdiction in which the district court is situated."*See Liew v. Official Receiver and Liquidator (Hong Kong),* 685 F.2d 1192, 1195 (9th Cir.1982) (citing *Klaxon Co. v. Stentor Electric Mfg. Co., Inc.,* 313 U.S. 487, 496 (1941)). In *Liew,* in determining the validity of an assignment, the Ninth Circuit applied California's "governmental interest" analysis. *See id.* Under such analysis, where there is a conflict between the laws of two jurisdictions, but only one of the jurisdictions has an interest in having its laws applied to the issue in question, the court applies the law of

that jurisdiction. *See id.* at 1196. Here, as noted, only Ukraine has an interest in determining the scope of authority of Ukrainian prosecutors, or the circumstances under which the government of Ukraine may assign its claims to others.[FN20]

> FN20. UTI argues that, under California choice of law rules, questions affecting the title to real property are to be determined by the law of the jurisdiction in which the property is located. (*See* Opp. at 18 (citing *Cummings v. Bullock,* 367 F.3d 182, 183 (9th Cir.1966).) Although plaintiff, in the instant action, seeks title to certain real property located in California, the threshold issue here is the validity of the assignment to UTI, not a question concerning the title to real property.

**\*13** Thus, regardless of whether the Court applies federal or California choice of law rules, the Court must apply Ukrainian law to determine the validity of the assignment from the PGOU to UTI.

**2. Determination of Foreign Law; Ukrainian Court Decisions As Evidence Thereof**

Pursuant to Rule 44.1 of the Federal Rules of Civil Procedure, a district court, "in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."*See* Fed.R.Civ.P. 44.1. In particular, courts may rely on foreign case law. *See Pazcoguin v. Radcliffe,* 292 F .3d at 1214 (discussing Philippine case law in determining issue of Philippine law).

The determination of foreign law is a question of law. *See Pazcoguin v. Radcliffe,* 292 F.3d 1209, 1216 (9th Cir.2002); *see also* Fed.R.Civ.P. 44.1 ("The court's determination [of foreign law] shall be treated as a ruling on a question of law.")."Even differences of opinion on the content, applicability, or interpretation of the foreign provision may not

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 2669841 (N.D.Cal.)
**(Cite as: 2007 WL 2669841 (N.D.Cal.))**

Page 14

be characterized as a 'genuine issue as to any material fact' under Rule 56." *Banco de Credito Industrial, S.A. v. Tesoreria General de la Seguridad Social de Espana,* 990 F.2d 827, 838 (5th Cir.1993) (internal quotation and citation omitted).

As discussed above, the Ukrainian courts, in two different lawsuits, have found the PGOU's assignment to UTI invalid on the ground the PGOU lacks authority under Ukrainian law to assign the claims of Ukraine to anyone. (*See* Romanova Decl. Exs. A, B; Clements Decl. Exs. X, BB.) Defendants offer the above-referenced Ukrainian court decisions "under Rule 44.1 as a statement of the law of Ukraine regarding the validity of the assignment."(*See* Reply at 7-8.)

UTI argues that, pursuant to Comment "i" to § 482 of the Restatement (Third) of Foreign Relations Law, the Ukrainian opinions are not admissible as evidence for any purpose. Comment "i" provides:

If a foreign judgment is refused recognition on grounds of unfairness of the judicial system, unfair procedures, fraud, or lack of jurisdiction, it may not be admitted for any purpose in the United States. Judgments refused recognition on other grounds-for instance, under Subsection 2(d), (e), or (f),[FN21] or because of lack of reciprocity, ...-may be admitted as evidence of the matters litigated or determined, but will not be binding on the court or preclude the opposing party from introducing contrary evidence.

> FN21. Pursuant to §§ 2(d), (e), and (f), a court "need not recognize a judgment of the court of a foreign state if ... (d) the cause of action on which the judgment was based, or the judgment itself, is repugnant to the public policy of the United States or of the State where recognition is sought; (e) the judgment conflicts with another final judgment that is entitled to recognition; or (f) the proceeding in the foreign court was contrary to an agreement between the

parties to submit the controversy on which the judgment is based to another forum."*See* Restatement (Third) of Foreign Relations Law § 482(2)(d), (e), (f).

*See* Restatement (Third) of Foreign Relations Law § 482, cmt. i .[FN22]

> FN22. The parties have cited no case law interpreting comment "i," and this Court has located none.

**a. Asserted Lack of Impartial Judicial System/Unfair Procedures**

UTI argues, relying in large part on United States Department of State Country Reports on Human Rights Practices ("Country Reports") for Ukraine, that the Court should not consider the Ukrainian judgments because Ukrainian courts are not impartial tribunals and do not provide procedures compatible with due process of law.

**\*14** The Country Reports, while recognizing that the Constitution of Ukraine provides for an independent judiciary, nonetheless express some concern about past incidents of corruption in the Ukrainian court system. (*See, e.g.,* Country Reports on Human Rights Practices, Ukraine, 2002 § 1(e);[FN23] Country Reports on Human Rights Practices, Ukraine, 2003 § 1(e);[FN24] Country Reports on Human Rights Practices, Ukraine, 2004 § 1(e);[FN25] Country Reports on Human Rights Practices, Ukraine, 2005 § 1(e)[FN26].) The Country Reports also include positive statements about Ukrainian courts, however, suggesting that the Ukrainian judicial system has been improving. For example, the 2004 Country Report for Ukraine notes that "the Supreme Court continued to show increasing independence during the course of the year"; that the "Constitution includes procedural provisions intended to ensure a fair trial," although remnants of a "Soviet era criminal justice system" limited those rights pending enactment of additional legislation; that Ukrainian law "provides for broad use of jur-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 2669841 (N.D.Cal.)
**(Cite as: 2007 WL 2669841 (N.D.Cal.))**

Page 15

ies," albeit, to date, juries had been used in only a limited number of cases; and that a new Judicial Academy "trains new judges and continues the education of sitting judges ... [and] graduated its first groups of judges in April 2003."(*See* Country Reports on Human Rights Practices, Ukraine, 2004 § 1(e).) The 2005 Country Report observes that although the head of the Ukraine Supreme Court had stated that, during the previous administration, he had received calls from senior administration officials and had been given instructions how to rule in specific cases, he had received "no such calls under the [current] Yuschenko administration."(*See* Country Reports on Human Rights Practices, Ukraine, 2005 § 1(e).) Moreover, "[i]n contrast to 2004, there were no credible reports that the government sought to dismiss politically unsympathetic judges," and "[h]uman rights groups, the media, and legal watchdog organizations noted that the court continued to show independence during the course of the year."(*See id.*)

> FN23. The 2002 Country Report on Human Rights Practices, Ukraine, is available at http://www.state.gov/g/drl/rls/hrrpt/2002/18398.htm.

> FN24. The 2003 Country Report on Human Rights Practices, Ukraine, is available at http://www.state.gov/g/drl/rls/hrrpt/2003/27871.htm.

> FN25. The 2004 Country Report on Human Rights Practices, Ukraine, is available at http://www.state.gov/g/drl/rls/hrrpt/2004/41715.htm.

> FN26. The 2005 Country Report on Human Rights Practices, Ukraine, is available at http://www.state.gov/g/drl/rls/hrrpt/2005/61682.htm.

Likewise, although a 2004 report from the United States Department of State titled, "Doing Business in Ukraine: A Country Commercial Guide for U.S. Companies" ("Commercial Guide"), (*see* Motion to Supplement Record, filed June 16, 2006, Ex. 2), also relied on by UTI, notes that "[m]ost U.S. businesses consider the local and national court systems unpredictable and try to avoid them," (*see id.* at 117), the Commercial Guide also states that a 2003 law created "an independent judicial department to manage the court system," which "increases the independence of the judiciary," (*see id.* at 117), and further notes "an encouraging trend toward conforming Ukraine's legal system to international norms."(*See id.*)

Here, the court decisions in the Kiritchenko Ukrainian litigation were issued in 2003, 2004, and 2005; the decisions in the Lazarenko Ukrainian litigation were issued in 2003 and 2005. Although the trial court decisions in each action were issued in 2003, the most recent appellate decisions in each action were issued in 2005, by which time the Ukrainian court system had made substantial progress, and found no error in the trial court decisions. Moreover, the issue decided by the Ukrainian courts-whether the PGOU has authority to assign claims to UTI, or, indeed, to anyone-is, in essence, a question of law; consequently, any deficiencies at the time the earlier proceedings were conducted are unlikely to have had any impact on the independent legal analysis thereafter conducted by the higher courts. Finally, as discussed further below, the legal analyses set forth in the Ukrainian court decisions are consistent with each other and are based on the same constitutional provisions and statutes identified by the parties' experts herein as relevant, thus suggesting that any deficiencies in the Ukrainian court system did not impact the legal reasoning in the actions at issue herein.

**\*15** Accordingly, the Court finds UTI has not demonstrated that the Ukrainian courts are so lacking in impartiality, due process, or procedural fairness that the United States courts should disregard

all Ukrainian court decisions as a matter of course, or the particular decisions at issue herein. *See, e.g., In the Matter of the Arbitration Between Monegasque de Reassurances S.A.M. v. NAK Naftogaz of Ukraine,* 311 F.3d 488, 499 (2d Cir.2002) (rejecting argument that asserted corruption rendered Ukraine inadequate "alternate forum" for purposes of forum non conveniens analysis; finding no showing that Ukraine "is characterized by a complete absence of due process or an inability of the forum to provide substantial justice to the parties").

**b. Asserted Fraud**

UTI further argues that the Court should not consider the Ukrainian judgments because they were obtained by fraud. UTI contends that various asserted irregularities in the manner in which the Kiritchenko and Lazarenko Ukrainian actions were conducted are evidence of fraud.[FN27] Assuming, *arguendo,* the existence of any such irregularities, however, the Court, having reviewed the evidence upon which UTI relies, and for the reasons set forth by defendants, finds UTI has failed to raise a triable issue that any such irregularities are the result of fraud. Moreover, UTI has submitted no evidence that any such irregularities resulted in any failure by the Ukrainian courts to reasonably apply the relevant law to what are essentially the undisputed relevant facts. UTI has submitted no evidence that the analyses in which the Ukrainian courts engaged are at odds with Ukrainian law.

> FN27. In particular, with respect to the Kiritchenko Ukrainian litigation, UTI argues that (1) the March 4, 2003 judgment of the Pechersk court was issued only 19 days after the case was filed; (2) the Ukrainian judge mailed a summons to UTI only six days before the March 4, 2003 judgment; (3) the March 4, 2003 hearing, which led to issuance of the March 4, 2003 judgment, was conducted within two hours, without witnesses or experts, and generated no transcripts; (4) the March 4,

2003 judgment included dicta; (5) the May 29, 2003 appellate hearing took only ten minutes; (6) Kiritchenko initially produced, in the instant litigation, an illegible copy of a receipt purporting to indicate an attempt to serve UTI in the Kiritchenko Ukrainian litigation; and (7) Kiritchenko submitted to the Ukrainian court an illegible copy of the August 11, 1999 assignment. With respect to the Lazarenko Ukrainian litigation, UTI argues that (1) the summons to UTI was sent to the wrong address only ten days before the September 3, 2003 hearing in the Pechersk court; (2) the September 3, 2003 judgment was unusually lengthy; (3) an unsigned copy of the September 3, 2003 opinion in the Lazarenko Ukrainian action was obtained by Kiritchenko; (4) the July 7, 2005 opinion is sloppily handwritten; and (5) Judge Strizhevska, the judge who issued the September 3, 2003 decision of the Pechersk court has been under investigation for tampering with judicial proceedings in other cases.

**c. Failure to Serve UTI**

UTI further argues that the Court should not consider the Ukrainian judgments for any purpose because UTI was not served in either of the Ukrainian actions. As discussed above, the Ukrainian judgments are not enforceable against UTI because UTI was never served in those actions. Nothing in § 482 of the Restatement (Third) of Foreign Relations Law, however, expressly precludes a foreign judgment, under such circumstances, from being considered as persuasive authority with respect to the determination of an issue of foreign law. The absence of any such discussion is not surprising; determination of foreign law is expressly governed by Rule 44.1 of the Federal Rules of Civil Procedure, which expressly permits district courts, in determining foreign law, to "consider any relevant material or source, ...*whether or not ... admissible* under

the Federal Rules of Evidence."*See*Fed.R.Civ.P. 44.1 (emphasis added). Moreover, the Ukrainian actions were actively litigated by the PGOU, who, as UTI's purported assignor, was aligned in interest with UTI, and there is no contention that the Ukrainian courts lacked jurisdiction over the PGOU, let alone over the subject matter of the action.

Accordingly, the Court finds the lack of service on UTI does not preclude the Court from considering the Ukrainian courts' decisions with respect to the issue of the PGOU's authority to assign claims of Ukraine, and the Court will consider the Ukrainian courts' decisions as evidence of Ukrainian law, in addition to the parties' other evidence of Ukrainian law relevant to such issue.

### 3. Analysis of Ukrainian Law

**\*16** Defendants argue that the Constitution and laws of Ukraine grant the PGOU specific enumerated powers, and that the authority to assign claims on behalf of the state is not included therein.

As defendants observe, Article 19 of the Ukraine Constitution provides: "Bodies of state power ... and their officials are obliged to act only on the grounds, within the limits of authority and in the manner envisaged by the Constitution and laws of Ukraine."(*See* Clements Decl. ¶ 6 and Ex. E.) The Commentary to Article 19 explains that such entities "must act exclusively within limits determined by laws and regulations," and that "[t]heir activities must be completely and accurately defined, controlled, and regulated to the maximum extent possible in order to prevent any acts which may be detrimental to the individual, the society or the state for any reasons whatsoever."(*See id.*)

Article 92, subsection 14, of the Ukraine Constitution further provides that "the organization and operation of the procuracy"FN28 is "determined exclusively by the laws of Ukraine."(*See id.* ¶ 7 and Ex. F.) Article 121 of the Ukraine Constitution

defines the authority of the PGOU, as follows:

> FN28. The parties agree that references to the "procuracy" refer to the PGOU.

The Procuracy of Ukraine constitutes a unified system which is entrusted with:

(1) prosecution in court on behalf of the State;

(2) representation of the interests of a citizen or of the State in court in cases determined by law;

(3) supervision of the observance of laws by bodies that conduct detective and search activity, inquiry and pre-trial investigation;

(4) supervision of the observance of laws in the execution of judicial decisions in criminal cases, and also in the application of other measures of coercion related to the restraint of personal liberty of citizens.

(*See id.* ¶ 8 and Ex. G.)

Ukraine's Code of Civil Procedure further defines the scope of the authority of the PGOU. In particular, Article 13 provides that "[t]he scope and limits of the public procurator's powers during the hearing of a case shall be defined by this Code."(*See id.* ¶ 10 and Ex. I.) Article 120 provides that "[a] public procurator shall be a participant in civil proceedings in the court ... [and] shall exercise the rights specified in Article 99," (*see id* . ¶ 11 and Ex. J); Article 99 grants all individuals participating in a case the following rights:

the right to review the case materials and make transcripts thereof; obtain copies of decisions, determinations, decrees, or any other documents related to the case; participate in court hearings; present evidence and participate in investigation of evidence; file petitions or exceptions; give oral or written explanations to the court; present his or her arguments, considerations, or objections; appeal any court decision or determination; and exercise any other procedural rights accorded

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 2669841 (N.D.Cal.)
**(Cite as: 2007 WL 2669841 (N.D.Cal.))**

Page 18

thereto by law.

(*See id.* ¶ 12 and Ex. K.) Article 120 grants a public procurator the additional rights to:

**\*17** (1) Affirm or alter declarations made by him before the court in defense of the rights and lawful interests of individuals and the state or waive such declarations;

(2) Submit cassation or separate appeals with regard to, respectively, the decision or ruling of the court of the first instance in cases or regarding matters in the hearing of which the procurator participated.

(*See id.* ¶ 11 and Ex. J.) [FN29] As defendants point out, none of the above-referenced provisions provide that the PGOU is authorized to assign to third parties claims belonging to Ukraine.

> FN29. Additionally, the authority of the PGOU is further defined by statute and, in particular, by a 1991 law referred to as both the "Law of Ukraine 'On Procuracy' " and the "Law of Ukraine: On General Prosecutor's Office" (hereafter, "1991 law"). (*See id.*Ex. G (Commentary to Article 121; noting "[a]ctivities of all procurators are regulated by the Law of Ukraine "On Procuracy" dated November 5, 1991, as amended"); *see also* The Law of Ukraine: On General Prosecutor's Office, No. 1789-XII (1991) (Ukraine) (summary of statute provided by Ukrainian Parliament), *available at* http://zakon.rada.gov.ua/cgi-bin/laws/anot.cgi?nreg =1789-12 & p=1181578107055724.) Although no party has submitted a copy of such statute, the Court notes that the above-referenced summary thereof provides that the PGOU "shall supervise observance and correct application of laws by the Cabinet of Ministers of Ukraine, ministries and departments, bodies of state and economic management and control, local councils, their

executive bodies, military units, all legal entities and natural persons," and that the "[b]asic functions of the General Prosecutor's Office shall be support of state accusation in court and representation of interests of citizen or state in court in cases inscribed by law." *See id.*There is no suggestion therein that the PGOU has authority to assign to third parties claims belonging to Ukraine.

Defendants submit a declaration from Aleksandr Romanovich Mikhailenko ("Mikhailenko"), professor and head of the Department of Procedural Law, Institute of Advocateship, at Taras Shevchenko National University of Kiev, dated March 7, 2000. Relying on Articles 19 and 121 of the Ukraine Constitution, Mikhailenko opines that the PGOU "may act only within the scope of authority and by such means as provided by the Constitution of Ukraine and Ukrainian laws."(*See* Clements Surreply Decl. Ex. A (Mikhailenko Decl.) ¶ 8.) Mikhailenko further opines, relying on Article 102 of the Ukraine Constitution, that an assignment of Ukraine's claims by the PGOU "to anyone, including a private foreign firm, for the purpose of protecting the interests of Ukraine, is not based on law" and that "only the President of Ukraine as head of state may act on behalf of the state of Ukraine."(*See id.* ¶ 12;*see also* Pechota Decl. Ex. B (English translation of Ukraine Constitution) Art. 102 (providing, "The president of Ukraine is the head of state and acts in the name of the state.")). Relying further on Article 121 and the 1991 law, Mikhailenko opines that "if the state of Ukraine has sustained material damage, the [PGOU] may indeed represent the state in court," but that no law authorizes the PGOU "to delegate any of its constitutional representative functions to uphold the interests of the state to any other authority."(*See* Clements Surreply Decl. Ex. A (Mikhailenko Decl.) ¶¶ 17, 24.) Mikhailenko further opines that the PGOU "may act to assign material claims on behalf of the state of Ukraine only to the extent provided by the Constitution or laws of Ukraine," and that "neither the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Constitution of Ukraine nor any law of Ukraine provides for any officer of the [PGOU] to be vested with such powers ."(*See* Clements Surreply Decl. Ex. A (Mikhailenko Decl.) ¶ 27(b).) Accordingly, Mikhailenko concludes, the PGOU has "no right to act in such manner."(*See id.*)

UTI relies on the declarations of Valery Ivanovich Kuznetsov ("Kuznetsov"), dated April 4, 2000; Viktor Fedorovich Pogorelko ("Pogorelko"), dated April 4, 2000; and Vratislav Pechota ("Pechota"), dated April 6, 2000. Kuznetsov is the Chairman of the Department of International Law at the Academy of Diplomacy of the Ministry of Foreign Affairs of Russia. (*See* Kuznetsov Decl. at 4:11-13.) Kuznetsov attests he was asked to opine on the issue of whether the PGOU, "within the framework of investigating its criminal cases, has the right to enter into contractual relations with foreign legal entities and to contract them to locate, identify and assist in repatriation to Ukraine of assets illegally withdrawn from Ukraine."(*See* Kuznetsov Decl. at 5:25-6:3.) Relying on the language in Article 121 of the Ukraine Constitution providing that the PGOU "is entrusted with ... representation of the interests ... of the State in court in cases determined by law," Kuznetsov concludes that the PGOU "has the power to enter into contractual relations with foreign legal entities if the protection of rights and interests of citizens and of the State requires so."(*See* Kuznetsov Decl. at 7:2-5.) Kuznetsov offers no opinion, however, as to whether the PGOU has the authority to assign to third parties claims belonging to Ukraine.

**\*18** Pogorelko is the Head of the Department of Constitutional Law and Local Self-Government at the V.M. Koretsky Institute of State and Law at the National Academy of Science of Ukraine. (*See* Pogorelko Decl. at 5:17-20.) Relying on Article 121, Pogorelko opines that the PGOU "has the entirety of the authority to represent the interests of the Ukrainian State in the judicial bodies."(*See id.* ¶ 1.) Pogorelko further opines that the PGOU has the authority to seek confiscation of the property of the

accused in criminal cases and has "the power to take corresponding decisions in regard to civil suits outside of Ukraine."(*See id.* ¶¶ 3-4.)Although, according to Pogorelko, the PGOU "is not yet prepared to effectively implement civil litigation functions in the civil courts outside of Ukraine," the PGOU, "by right, has the grounds to enter into the contractual relations with private legal entities who are specifically engaged in the location, determination and repatriation of assets."(*See id.* ¶ 6.) Pogorelko further attests that "[t]here exists no legislative act that would prohibit to the Prosecutor General's Office such contractual actions outside of Ukraine."(*See id.* ¶ 14.)Pogorelko cites no statute or law that expressly empowers the Prosecutor General to assign claims to third parties, however.

Pechota is a Senior Research Scholar and Adjunct Professor of Law (retired) at Columbia University School of Law and a member of the faculty of the Harriman Institute for the Study of Russia and Eastern Europe at Columbia University. (*See* Pechota Decl. ¶ 1 .) Pechota attests that, under Ukrainian law, the PGOU "has been granted wide powers," some of which "are strictly defined, others are outlined in general terms, and still others are implied (that is, they follow from the express authority given to the [PGOU] though such powers are not manifested by explicit and direct definition."(*See id.* ¶ 10.)Pechota concedes that because the PGOU traditionally "was concerned with matters that arose in the context of Ukrainian domestic affairs," the 1991 law "contains only a passing reference to international aspects of the [PGOU's] functions," and provides only that the PGOU "deals with matters arising from international treaties concluded by Ukraine and from the generally recognized rules of international law."(*See id.* ¶ 11 and n. 4.) According to Pechota, the PGOU, in order to give substance to such "passing reference," issued, on December 25, 1995, "an instruction entitled 'On the Procedure of Interaction Between the Organs of the Ukrainian Procuracy and Institutions of Foreign Countries,' " which, Pechota attests, provides for involvement of the PGOU in matters such as

"repatriation of stolen property and illegally appropriated objects and values" and "obtaining information regarding the movement of money in bank accounts and their arrest." [FN30](*See id.*)Although Pechota attests that such "instruction" has the force of law, (*see id.* ¶ 11), Pechota does not contend that it authorizes the PGOU to assign claims of the Ukraine to third parties.

> [FN30.](https://example.com) A copy of such document has not been provided to the Court and the internet link contained in Pechota's declaration is not functional.

**\*19** Pechota does state, however, that because Article 121 of the Ukraine Constitution entrusts the PGOU with representing the interests of the state in court proceedings, it is his "firm opinion" that the PGOU has the implied authority to assign claims. (*See id.* ¶¶ 7, 14.)In Pechota's opinion, it should be implied, from the PGOU's authority to pursue restoration of state property by means of cases brought outside Ukraine, that the PGOU "acts on behalf of the Ukrainian state and can do anything that the state under Ukrainian and international law could do."(*See id.* ¶ 16.)Pechota opines that "the absence of explicit provisions authorizing the [PGOU] to entrust particular acts to be undertaken abroad to private companies and/or to assign claims does not necessarily mean that the [PGOU] is prevented from exercising such options," and concludes that if the PGOU "interprets [its] authority to entrust [its] particular functions exercised abroad to private companies and/or to assign claims, ... [it] has the power to take actions in the interest of the state which do not contradict express limitations of [its] authority."(*See id.* ¶ 16.)

As noted, Article 19 of the Ukrainian constitution requires state officials to "act only on the grounds, within the limits of authority and in the manner envisaged by the Constitution and laws of Ukraine."(*See* Clements Decl. ¶ 6 and Ex. E (Art. 19 and Commentary).) Such language is intended to be restrictive; "bodies of state power and bodies of local self-government and their officials must act

exclusively within limits determined by laws and regulations."(*See id.,* Commentary.) "Their activities must be completely and accurately defined, controlled, and regulated to the maximum extent possible in order to prevent any acts which may be detrimental to the individual, the society or the state for any reason whatsoever."(*See id.*)Article 121, which expressly defines the authority of the PGOU, contains no suggestion that the PGOU has the authority to assign claims belonging to Ukraine. (*See id.* ¶ 8 and Ex. G.) Although Article 121 and the 1991 law do provide that the PGOU may represent the State's interests in court, such circumscribed authority cannot be read to encompass an implied right to unilaterally assign its client's claims to a third party, and there is no evidence of any express authorization, whether statutory or otherwise, to do so. Having read and considered the applicable statutes, constitutional provisions, and expert opinions, the Court finds, even without consideration of the Ukrainian court decisions, that the PGOU lacked the authority to assign claims of Ukraine to UTI.

The Ukrainian court decisions are in accord with this Court's finding and provide further support therefor. The dispute between the parties' experts herein centers primarily on whether it is appropriate to imply, from various provisions in the Ukrainian Constitution and other law delineating the authority of the PGOU, a right in the PGOU to assign to third parties claims belonging to Ukraine.[FN31]The Ukrainian court decisions ultimately relied on many of the same provisions of law cited herein by the parties' various experts, and concluded that the PGOU has no such authority. (*See* Romanova Decl. Exs. A, B; Clements Decl. Exs. X, BB.)

> [FN31.](https://example.com) All of the parties' expert declarations on the issue of Ukrainian law predate the Ukrainian court decisions at issue, and, accordingly, do not address the analyses set forth therein.

**\*20** Specifically, the Pechersk court, in its March 4, 2003 decision in the Kiritchenko litigation, held, relying, *inter alia,* on Articles 19 and 121 and the

1991 law, that Ukrainian law does not provide "for transfer by public prosecutors of their authorities to other persons, entities, or corporations."(*See* Romanova Decl. A at 3.) The Pechersk court further held that because the PGOU has no personal interest in any claims belonging to Ukraine, it has no legal right "to entrust [UTI] with the right of representation of the material claims on behalf of Ukraine, moreover with the right to transfer the powers" and, therefore, UTI could "act neither on behalf of Ukraine, nor on behalf of the [PGOU]." (*See id.* at 2.) Likewise, the appellate court, in its May 29, 2003 opinion in the Kiritchenko litigation, held, relying on the same provisions of Ukrainian law, that the Pechersk court "correctly came to the conclusion that the indicated norms of the law were violated" by the PGOU's attempted assignment to UTI of claims belonging to Ukraine, and denied the PGOU's appeal. (*See id.*Ex. B at 3.)

Similarly, in the Lazarenko Ukrainian litigation, the Pechersk court, in its September 3, 2003 opinion, held, relying, *inter alia,* on Article 121 and the 1991 law, that the PGOU "had no grounds to grant a power of attorney to a foreign firm in the conduct of proceedings with respect to Respondent P.I. Lazarenko, to say nothing about the right of reassignment, and it is for this reason that UTICo was entitled to act neither on behalf of Ukraine nor on behalf of the [PGOU]." (*See* Clements Decl. Ex. X at 3.) Consequently, the court held the purported assignment invalid. (*See id.* at 5.) Although the appellate court initially reversed the trial court on procedural grounds, that ruling was, in turn, reversed by the Supreme Court; on remand, the appellate court affirmed the decision of the Pechersk court. (*See* Clements Decl. Ex. BB at 5-6.)

In sum, the Court concludes that the PGOU's assignment to UTI is invalid under Ukrainian law, and, accordingly, that UTI lacks standing, based on such assignment, to bring the instant action.

**F. Other Possible Bases for Standing**

UTI argues that even if the August 11, 1999 assignment from the PGOU to UTI is invalid, other bases for UTI's standing to bring the instant action exist.

**1. May 1998 Agreement and Other Powers of Attorney**

UTI's chairman of the board, W. Scott Thompson ("Thompson"), attests that, in May 1998, UTI obtained a power of attorney from the PGOU, and reached "an agreement with Ukraine on a complex of assistance in recovery of assets ... with a 12% interest, a 'finder's fee' and assistance in all related work on freezing assets towards their recovery."(*See* Thompson Decl. ¶¶ 12, 14.) In the power of attorney, dated May 14, 1998, the PGOU authorized two of UTI's attorneys to represent the PGOU in "various legal matters outside of Ukraine."(*See id.*Ex. 5.) On the following date, May 15, 1998, the PGOU sent a letter to UTI stating that the PGOU "agreed that [UTI] will be attributed a commission of 12 (twelve) percent" on any "assets to be returned to Ukraine, in connection with the Power of Attorney of the Prosecutor General's Office of May 14, 1998."(*See id.*Ex. 4.) UTI additionally notes it has been granted a total of "about 12 Powers of Attorney" from the PGOU. (*See* Plyomavaty Aff., filed Jan. 5, 2007, ¶¶ 8, 28 and Exs. 4, 7, 10-11, 15-16.)

**\*21** "The grant of a power of attorney ... is not the equivalent of an assignment of ownership" and "does not enable the grantee to bring suit in his own name."*See Advanced Magnetics, Inc. v. Bayfront Partners, Inc.,* 106 F.3d 11, 17-18 (2nd Cir.1997). Accordingly, the May 14, 1998 power of attorney, the May 15, 1998 letter granting UTI a contingency fee pursuant to the May 14, 1998 power of attorney, and any other powers of attorney granted to UTI do not constitute an assignment of ownership of Ukraine's claims sufficient to permit UTI to assert such claims in its own name.

**2. UESU judgment**

UTI also contends it has standing to bring the instant action as a judgment creditor; specifically, UTI presents evidence that, on July 7, 2005, it was awarded an $18.3 million default judgment on its counterclaims against United Energy Systems of Ukraine ("UESU") in *UESU v. UTI,* Case No. 97CV12180EFH, in the United States District Court for the District of Massachusetts ("UESU judgment"). (*See* Thompson Decl. Ex. 27.) UTI asserts that UESU is "a major instrumentality of kick-backs of Lazarenko."(*See* Opp. at 3.)

The UESU judgment was entered on counterclaims asserted by UTI on its own behalf, however, arising out of a business dispute between UTI and UESU. (*See* Plaintiff's Request for Judicial Notice in Support of Plaintiff's Opposition to Defendants Kiritchenkos' Motion to Strike Registration of Judgment from Another District, filed March 31, 2006, RJN3-6.) In the instant action, by contrast, UTI asserts claims solely on behalf of Ukraine. (*See* Verified Second Amended Complaint, filed January 10, 2000, ¶¶ 195-96, 198, 202, 204-06, 209-11, 216-17, 221-23, 227-28, 230, 233, 239-40, 245-46, 251.) Regardless of whether UTI may be able to enforce the UESU judgment against Lazarenko in a separate action, the UESU judgment provides no basis for UTI to assert claims on behalf of Ukraine in the instant action.

## CONCLUSION

For the reasons set forth above,

1. Plaintiffs' motions to supplement the record are hereby GRANTED.

2. Defendants' motion for summary judgment is hereby GRANTED.

The Clerk shall close the file.

**IT IS SO ORDERED.**

N.D.Cal.,2007.
Universal Trading & Inv. Co. v. Kiritchenko

Not Reported in F.Supp.2d, 2007 WL 2669841 (N.D.Cal.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.