# EXHIBIT A

Dockets.Justia.com

[emblem]

# COLOGNE STATE COURT

## IN THE NAME OF THE PEOPLE

## JUDGMENT

**Pronounced on 6/16/2009**

**as document official of the
Office of the Clerk**

**- 33 O 374/08 -**

In the matter of

Facebook Inc., represented by Board members Mark Zuckerberg, Jim Breyer, Peter Thiel and Marc Andreessen, 471 Emerson Street, 1605 Palo Alto, CA, United States,

Plaintiff

Legal representatives:     Heymann & Partners, attorneys at law, Taunusanlage 1, 60329 Frankfurt am Main,

v.

StudiVZ Ltd., represented by general manager Markus Berger-de Léon, Claas van Delden, Konstantin Urban, Martin Weber, Dr. Clemens Riedl, Saarbrücker Str. 36, 10405 Berlin,

Defendant

| | |
|---|---|
| Legal representatives: | CMS Hasche Sigle Eschenlohr Peltzer Schäfer, attorneys at law, Schöttlestrasse 8, 70597 Stuttgart, |

the 33rd Civil Department of the Cologne State Court,
acting through State Court Judge Dr. Schwitanski,
State Court Judge Wuttke and
State Court Judge Chang-Herrmann,

**HELD as follows**

following the oral hearing of 4/28/2009:

      I.      The complaint is dismissed.

      II.     The Plaintiff shall bear the costs of the lawsuit.

      III.    The judgment is provisionally enforceable in exchange for the posting of security in the amount of 110% of the enforceable sum.

## STATEMENT OF FACTS

The two parties are operators of Internet social networks. The Plaintiff has been in the market in the USA with its "facebook" social network since 2/4/2004. The Plaintiff's network was initially aimed solely at students of Harvard University. It was gradually expanded to all university students and younger students in the USA and later Canada. Access to facebook from e-mail addresses that do not originate from North America has officially been possible since September 2006 in any case. Dispute exists between the parties concerning the extent to which access for German users was already possible in 2005. Facebook has also existed in a German-language version in the German market since the beginning of 2008.

The Plaintiff is the holder of a German figurative mark, register no. 30663271.3 (p. 174 of the record). Concerning the design of the figurative mark, reference is made to the reproduction on p. 73 of the complaint dated 11/19/2008 (p. 73 of the record).

The Defendant has been on the German market with its "StudiVZ" network since 11/11/2005, with "SchülerVZ" since 2/21/2007 and with "meinVZ" since 2/28/2008.

The Plaintiff contends that the Defendant imitated the design and the so-called "Look & Feel" of its web page. According to the Plaintiff, a comparison of the pages from the initial period of the Defendant's network demonstrates that the web pages differ only marginally from the Plaintiff's web pages from 2005/2006 from a visual standpoint. According to the Plaintiff, the Defendant merely selected a different base color and used its own logo. Otherwise, the Plaintiff contends, the appearance of the pages is so similar in terms of design, typeface and functionalities that a danger of confusion exists and the Plaintiff's good reputation is threatened. The Plaintiff contends that these dangers have already been realized, in part, as various blog posts and articles containing accusations of plagiarism demonstrate. In the Plaintiff's view, the style sheets are virtually identical, such that they are interchangeable with one another. Concerning the details with respect to the "Look & Feel" of the Plaintiff's web page, reference is made to pp. 13-16 of the complaint (pp. 13-16 of the record). Concerning the accusations of plagiarism, reference is made to the Exhibit Set K 13 (pp. 267-397 of the record). Concerning the details with respect to the areas of identicalness, particularly those of the parties' style sheets, the Plaintiff refers to the statements by private expert Schrader (Exhibit K 12, pp. 226-266 of the record). With respect to damage to reputation, reference is made to the statements in pp. 59-62 of the complaint (pp. 59-62 of the record).

The Plaintiff contends that it was, in any case, already a potential competitor and known in the German market in October 2005. Starting at that point in time, according to the Plaintiff, it began to expand its network to international schools and universities. The Plaintiff points out that access was also possible for German users either by way of an invitation or as an exchange student. According to the Plaintiff, approximately 14,000 users from Germany had already used the Plaintiff's network as of the end of 2005. Concerning the further presentation in this regard, reference is made to pp. 9-12 of the pleading dated 4/6/2009 (pp. 991-994 of the record).

In addition, the Plaintiff also believes that unfair imitation is involved, because the Defendant has for years systematically adopted (and continues to adopted) - on a time-shifted basis - the important technical functions that the Plaintiff offers on its web page.

For example, the Plaintiff states, the core functions of its web page, the poke function, the wall function and the groups function have been adopted. Concerning the further statements in this regard, reference is made to pp. 12-15 of the pleading dated 3/13/2009 (pp. 752-755 of the record). Most recently, according to the Plaintiff, the ahead-type function and the friend list function can be cited. Concerning the details of the adoptions of functions, the Plaintiff refers to pp. 15-17 of the private expert opinion by the Streitz expert office (pp. 801-803 of the record). In addition, reference is made to pp. 11-16 of the pleading dated 3/13/2009 (pp. 751-756 of the record).

According to the Plaintiff, the Defendant obtained the knowledge for imitating the Plaintiff's page in an unfair manner.

The Plaintiff further claims that, through the introduction of the Defendant's imitation, the Defendant impaired the Plaintiff's market introduction with its "original network." The Plaintiff points out that, as a result of the peculiarities of the market for social networks, the first social network on the market will also remain the largest on a long-term basis. Concerning the Plaintiff's further presentation in this regard, reference is made to the complaint (p. 71 of the record).

In addition, the Plaintiff sees the use of the appearance of the pages as an infringement of its rights to its trademark. Concerning the details in this regard, reference is made to pp. 72-79 of the complaint (pp. 72-79 of the record).

Finally, the Plaintiff contends that the Defendant has not only imitated the appearance and the "Look & Feel" of the Plaintiff's web pages, but that the Defendant used the Plaintiff's PHP source code on an unauthorized basis. The Plaintiff indicates the following as evidence of this:
- the visual identicalness of the web pages,
- the identical functional scope,
- the appearance of texts that were identical, merely translated into German,
- the identical flow of the dialogue sequences,
- the identicalness of the style sheets,
- the identicalness in the case of PHP and HTML file names,
- the identicalness of the design and structure (document content tree) of the web pages,
- the commenting out in the HTML code
- the letter-exact and byte-size-exact identicalness in the HTML text completely unnecessary for an imitation.

An adoption of the PHP source code located on the Plaintiff's server also cannot be ruled out, the Plaintiff contends, since security holes can occur time and time again, as happened in 2007, for example. In addition, the Plaintiff bases its contention on the fact that one of the co-founders of StudiVZ studied the Plaintiff's page in detail during his period of residence in America and succeeded in putting the StudiVZ page on the market within a few months after his return. In addition to handling the other tasks, such as financing and promotion of the network, there could not - according to the Plaintiff - have been sufficient time left for independent programming. The Plaintiff believes that an adequate degree of likelihood of a breach of copyright has been demonstrated. Concerning the presentation in this regard, reference is made to the pleading dated 4/6/2009 (pp. 983 ff. of the record).

Since, the Plaintiff contends, the Defendant acted in a culpable manner, the Plaintiff is entitled to both an informational claim and a compensatory damage claim. According to the Plaintiff, the compensatory damage claim also arises from the breach of ancillary contractual obligations. The Plaintiff states that, in contravention of its Standard Contract Terms, a founder of the Defendant obtained the information concerning the appearance and functionalities, among other things, within the framework of his membership in facebook. However, the Plaintiff points out, the Plaintiff's Standard Contract Terms contains a clause (p. 81 of the record) that states that it is not permissible to exploit the content of pages.

The Plaintiff moves

> that the Defendant be found liable and ordered to refrain from

> 1)    a) using or causing the use of a screen interface as shown in Exhibits A1 through A4 in business dealings for purposes of competition in connection with the offering of a social network,
> b)    using the Plaintiff's figurative mark, register number 30663271.3, as seen in Exhibit A5, in business dealings, particularly offering or rendering services under the mark, as occurred in Exhibit Set K 5,
> c)    duplicating or causing the duplication of the source code as seen on the DVD in Exhibit K22 or adaptations thereof;

> 2)    that the declaratory finding be made that, due to the acts set forth in prayer for relief no. 1, the Defendant is obligated to pay the Plaintiff compensatory damages for the damage that has occurred, or will occur in the future, as a result;

3)      that the Defendant be found liable and ordered - in relation to the time period named in 2) - to provide the Plaintiff with written information and an accounting concerning points in time and the scope of acts within the meaning of prayer for relief no. 1), as well as the amount of the revenues the Defendant earned as a result of the acts within the meaning of prayer for relief no. 1), in particular - but not limited to - revenues arising from advertising and cooperation arrangements with other enterprises, and the amount of the overhead costs on the other side of the ledger from such revenues;

4)      that it be ordered that an expert, who shall be appointed by the court, conduct an inspection of

a) the source code of all versions of the software that the Defendant developed for its www.studiVZ/de/net, www.schuelervz.net and www.meinvz.net Internet page, particularly, but not exclusively, the "about.php," "announce.php," "contact.php," "login.php," help.php," "jobs.php," "policy.php," "register.php," "reset.php," "terms.php," "poke.php," "groups.php," "wall.php," "myfb.css" and "studivz.js" program functionalities;

b) and the Defendant's source code, in the versions used by the Defendant after the points in time set forth in the table listed on pp. 742 f. of the record, particularly, but not exclusively, with respect to the aforementioned functions;

c) technical documentation  directly in connection with the source code, such as printouts of the source code, flow charts, structural overviews, rough and fine-tuned concepts, mechanisms for the connection of program modules, existing data structures, handbooks and technical descriptions;

5)      that the expert be engaged to then examine the software programmed and/or used by the Defendant, as found in sec. 4a, particularly, but not exclusively, the "about.php," "announce.php," "contact.php," "login.php," help.php," "jobs.php," "policy.php," "register.php," "reset.php," "terms.php," "poke,php," "groups.php," "wall.php," "myfb.css" and "studivz.js" scripts - particularly from the time period at the end of August 2005/beginning of 2006, but also later versions and adaptations for the StudiVZ, SchülerVZ and

> MeinVZ pages - and documents in connection therewith, in order to determine whether they were created in a manner involving the use of the Plaintiff's source code delivered in Exhibit A6/K22 or portions thereof or in a manner involving the use of resources of the Plaintiff as described in sec. 4 c.

The Defendant moves

> that the complaint be dismissed.

The Defendant disputes the Plaintiff's competitor status at the time of the market introduction of the StudiVZ page at the end of 2005. In any case, according to the Defendant, the Plaintiff's page was unknown in Germany at that point in time, such that neither deception as to origin nor exploitation of reputation is possible. Concerning the details, reference is made to pp. 62-66 of the answer to the complaint (pp. 501-505 of the record) and pp. 3-5 of the pleading dated 4/24/2009 (pp. 1105-1107 of the record).

Likewise, the Defendant states, the Defendant did not impair the Plaintiff's market entry. According to the Defendant, the initial difficulties were solely attributable to the Plaintiff's lack of an introduction concept. The Defendant points out that the Plaintiff has in the interim introduced a German-language version and changed its concept, which is having an effect. Concerning the further details of the Defendant's presentation in this regard, reference is made to pp. 8-10 and 57-58 of the answer to the complaint dated 2/20/2009 (pp. 447-449, 496-498 of the record).

The Defendant does concede that it used the Plaintiff's network - along with other social networks - as a model. However, the Defendant argues that the designs and functions that were adopted were not unique from the standpoint of competition law. Instead, according to the Defendant, they were in conformity with the state of the art of technology at that point in time. Concerning the specific details with respect to the absence of unique of the Look & Feel of facebook from the standpoint of competition law, reference is made to pp. 10-34 of the answer to the complaint (pp. 449-473 of the record).

The Defendant further disputes the contention that a systematic imitation of the functionalities exists.

The Defendant takes the position that the Plaintiff cannot derive any claim from the trademark, since the figurative mark has no labeling power, the Defendant is not using the design of the page as a trademark and the minimum prerequisite of mark similarity is not met. Concerning the further presentation, reference is made to pp. 73-76 of the answer to the complaint (pp. 513-515 of the record). Alternatively, the Defendant invokes the assertion that it is entitled to the older trademark acquired by use (pp. 515-517 of the record).

Finally, the Defendant disputes the contention that it adopted the Plaintiff's PHP code. According to the Defendant, this is, first of all, scarcely possible, since the PHP source code is the computer program that runs on the web and database services of the operator of the web page. For this reason, the Defendant argues, the code is located solely on the Plaintiff's server at its headquarters in the USA, to which the Defendant has not yet had any access. Secondly, according to the Defendant, an inspection claim must be denied because the Plaintiff has not made a presentation concerning the protectability of its program under copyright law, and the evidence that it sets forth does not permit one to draw the conclusion that an adoption of PHP source code has taken place. Concerning the further presentation by the Defendant as to why the evidence presented by the Plaintiff does not permit one to draw the conclusion that an adoption of PHP source code has taken place, reference is made to pp. 2-8 of the pleading dated 4/22/2009 (pp. 1078-1084 of the record) and the Carle private expert opinion dated 4/19/2009 (pp. 1093-1097 of the record).

Concerning the further details of the facts and issues of the case, reference is made to the pleadings, along with exhibits, exchanged between the parties.

## GROUNDS OF DECISION

The action as a whole is without merit.

I. The plaintiff is not entitled to claim injunctive relief prohibiting the use of the screen interfaces as they appear in Exhibits A1-A4. Specifically, no such claim exists under UWG §§ 3, 4 no. 9, 8.

1. Even if the correspondences and similarities in terms of the graphic and functional design of the screen interfaces of the parties' networks cannot be overlooked, there is still a lack of unfairness of imitation within the meaning of UWG § 4 no. 9 a). Based on the doctrine of freedom of imitation as the point of departure, an imitation is not anti-competitive unless and until special circumstances exist in the context of which the imitation appears unfair.

Under § 4 no. 9 a), it is unfair to sell goods or services that are an imitation of a competitor's goods or services and that cause avoidable deception of the consumer as to commercial origin. The risk of deception as to the commercial origin of an imitated product

– where the original and the imitation are not sold side by side so that consumers can directly compare the two products – presupposes that the imitated product has attained a certain degree or popularity among not insubstantial portions of the relevant consumer populations. The product must have attained such a degree of popularity among not insubstantial portions of the relevant consumer populations that the risk of deception arises to a relevant extent when imitations are marketed (BGH GRUR 2007, 984 Tz 34 – *Gartenliege*). The time at which the imitation is launched on the market is critical (BGH decision dated 9 October 2008, I ZR 126/06 – *Gebäckpresse* Tz 35 and notes therein).

The present case lacks the requisite popularity level on the German market for deception as to source. It is undisputed that facebook was accessible only to Harvard students when it started in 2004. It opened up gradually, first to college and high school students in North America and then officially worldwide in September 2006. Given the fact that StudiVZ was available on the German market as early as November 2005, the crucial issue is whether facebook had already attained a certain level of popularity on the German market by that time – November 2005. Evidently it had not. Until September 2006 the plaintiff's network was exclusively in the English language and was aimed at North American college and high school students exclusively. German students were not purposely targeted and did not represent the relevant consumer populations.

When the plaintiff argues that approximately 14,000 German users were members of facebook even before the official global opening in 2005, and international schools in some European countries were also connected, it does not create the requisite popularity on the German market. Exchange students did not encounter facebook as consumers on the German market; rather, they were able to register with facebook during their stays abroad on the American market or another international market. Thus, they were targeted as American Internet users, not German ones. Therefore, the fact that facebook may have been known to exchange students even before it opened globally in September 2006 does not substantiate a popularity among not insubstantial portions of a relevant targeted consumer populations on the German market.

The plaintiff also cannot benefit from the possibility of popularity in other European countries. One may leave aside the question of whether some international schools in Europe were already linked up with facebook in 2005.

It may be true that the foreign competitor enjoys equal treatment; however, that changes nothing about the fact that it must also satisfy the requisite elements under municipal law (ibid. BGH – *Gebäckpresse* Tz. 35). In the absence of popularity on the German market as of the time when StudiVZ was launched, the avoidable deception element of unfairness does not come into play.

The argument that German college and high school students could register with facebook even before its official opening through invitations is – as far as popularity on the German market is concerned –insufficiently substantiated. Nothing was pleaded regarding how many German users who were not exchange students and had not been accepted at international schools or universities that were already connected were registered with facebook as of autumn of 2005 on the basis of invitations. Incidentally, the ability to register was not an offer aimed at the German market, but an offer to the American market that had been expanded by some individual German members.

2. A claim for negative injunctive relief under UWG § 4 no. 9 b) is also out of the question. Under UWG § 4 no. 9 b) an imitation is also unfair where the imitator "unreasonably exploits or impairs the appreciation [*Wertschätzung*] for the imitated good or service." This presupposes that the original product enjoys a certain "appreciation". This in turn presupposes a certain popularity, which – as explained above – cannot be found in this case.

3. Unfairness based on the dishonest acquisition of information or documents within the meaning of UWG § 4 no. 9 c) has not been substantiated.

a) When the plaintiff asserts that the defendant acquired its PHP source code by illegal means, these allegations constitute mere surmises. The plaintiff was not able to substantiate how the defendant supposedly acquired the secret PGP source code located solely on the plaintiff's web server and database server. The general reference to the difficulties of guarding against hackers and other illegal access and the reference to security gaps such as those stemming from the year 2007 do not suffice for charging the defendant with the dishonest acquisition of information.

b) The plaintiff is also not entitled to a claim under UWG §§ 3, 4 no. 9c) with respect to the web sites and the viewable contents. The plaintiff bases its claim on one of the defendant's founders having been a

member of facebook during his stay in America as an intern, during which time he supposedly obtained the information about facebook.

Under UWG § 4 no. 9 c) it constitutes unfair conduct to acquire the information or documents needed for the imitation by dishonest means. The notion of dishonesty embraces first and foremost all forms of criminal acquisition of information and documents (BGH GRUR 2003, 356, 357 – *Präzisionsmessgeräte*). That includes the elements of UWG §§ 17, 18, with which other offenses can compete (Hefermehl/Köhler/Bornkamm, <u>UWG</u>, 27th ed., § 9 no. 9.61). Given the fact that the web sites that are accessible to any registered facebook user are neither trade secrets, nor master copies or technical specifications transferred in confidence in the course of business, the elements of UWG §§ 17, 18 are not satisfied.

Information or documents are also dishonestly acquired where their transfer or reproduction is effected through deception, or [they] are improperly exploited in breach of trust for purposes of imitation (Hefermehl(Kohler/Bornkamm, ibid. § 9 no. 9.62). These elements are not satisfied either.

First, as a general matter, the defendant's founder was allowed to register as a facebook member. The fact that he did so as an intern for a business partner during his stay in the USA changes nothing about the fact that he was a simple member of facebook. He came into the information about the appearance, the functionalities, etc., in connection with his legitimate membership, so there is no dishonest appropriation. As to the issue of breach of trust, one must always ask whether the information or documents which were otherwise not readily available which were made available for the production and marketing of the product specifically by reason of the fiduciary relationship (Hefermehl/Köhler/Bornkamm, ibid. § 4 no. 9.62). But the plaintiff's web sites were available to all students in the USA, since registration alone was sufficient. Therefore, this is not a case of "information or documents not readily available". The plaintiff does not plead that special information would have been made available to the founder of facebook [sic] via facebook in his capacity as the intern of facebook's business partner specifically by virtue of the business relationship.

4. The claim for negative injunctive relief based on dishonest obstruction under UWG § 4 no. 9 is also without merit.

a) Indeed, the plaintiff alleges that it was obstructed by the launching of the imitation on the market. Unfair obstruction is deemed to exist where the creator of the original loses the opportunity to market its product in a reasonable time because of the sale of the imitation (Hefermehl/Köhler/Bonkamm, <u>UWG</u>, 27th ed. 2009, § 4 no. 9.64).

Even if the growth of facebook in Germany proceeded especially slowly, there is still no apparent obstruction by the defendant. It must be taken into consideration that the plaintiff initially launched only an English version on the German market in September 2006. The German version of facebook did not exist until March 2008. Its strong growth recently shows that facebook has now become established on the German market too. It has not been adequately substantiated that the initial difficulties were due to the existence of the defendant with its imitation design as opposed to linguistic or cultural barriers.

Even assuming as the plaintiff does that the average German high school or college student has a good command of the English language, a social network is still a facility that involves communicating personal information and ideas and finding new and old friends. It seems less plausible that German users have such a good command of the English language that they are disposed to using English for the kinds of communications that typically take place on a social network. Even for communication that is not challenging from a linguistic standpoint, it seems that one still has to feel comfortable in a language and be able to communicate in a relaxed and informal manner. One may not readily presume that this is the case for the average German high school or college student. The plaintiff was unable to adduce coherent evidence to support its assertion to the contrary.

Finally, a network that was initially addressed only to North American high school and college students was also of little interest to German users in terms of finding new, and especially old, friends. In light of these facts, the plaintiff's pleadings regarding obstruction by StudiVZ are insufficiently substantiated.

b) There is also no obstruction based on the systematic imitation of a number of products. The plaintiff alleges that the defendant gradually adopted almost all of the functionalities of facebook systematically over a number of years.

Generally speaking, systematic reverse engineering can be obstructive (see BGH GRUR 1996, 210 et seq. – *Vakuumpumpen*). However, the BGH case involved technical products whose technical-functional design elements were freely selectable. The case here involves not the imitation of a number of products but the imitation of a number of defined functionalities of a social network. These functions are freely selectable; however, ultimately this is about the idea of a certain function. UWG § 4 no. 9 does not protect ideas. The protection against imitation afforded by the legal prohibition of dishonest conduct always relates only to the specific design of a product, not the abstract idea behind it. The same is true of other general ideas or technical teachings, e.g. a certain style or a certain technique or method (Hefermehl/Köhler/Bornkamm, UWG, 27th ed. § 4 no. 9.23 and notes therein).

II. There is also no basis for a right to negative injunctive relief under MarkenG § 14 subs. 5 para. 1. Although the plaintiff's trademark consisting of the image of graphic elements of its web site is essentially distinctive, the defendant is not using the plaintiff's trademark as a trademark.

The concept of use as a trademark is described in the case law as having to be broadly defined on principle in the interest of comprehensive trademark protection. It is sufficient for there to be an objective, not entirely remote possibility that the relevant consumers perceive an indication of origin (Ingerl/Rohnke, MarkenG, 2nd ed. § 14 no. 102 and notes therein). It is implausible that the relevant consumers see an indication of origin in the layout of the defendant's web site in spite of, which is to say next to, the visible "StudiVZ" logo. The relevant consumers generally do not expect the graphic display of a web site to represent an indication of the origin of the service. To the relevant consumers the appearance and design of a web site are based on stylistic or aesthetic reasons along with functional ones. The notion that the set-up and appearance of an Internet site represent an indication of origin would only come into play if the design was especially conspicuous in some way.

The graphic design of the trademark and screen interface of StudiVZ do not exhibit any conspicuous features; rather, they are as plain as possible and oriented toward the site's functionalities. Admittedly, in principle a plain appearance can also be conspicuous and therefore an indication of origin. But in this case – where the relevant consumers do not expect an origin-indicating function and a logo is placed in view –

the plainness of the design is insufficient for affirming use as a trademark.

III. The plaintiff is not entitled to a claim under UrhG §§ 97 subs. 1, 69a either. Its pleadings regarding the alleged taking of PHP source code proves to be inadequately substantiated. For that reason, the plaintiff has also submitted a demand for an inspection pursuant to UrhG § 101a subs. 1 sentence 1.

However, there are no grounds to support a right to inspection either. The plaintiff has not substantiated a sufficient likelihood that the source code was appropriated – as is required under UrhG § 101a subs. 1 sentence 1. Under that provision, you can sue another person for inspection of an object where there is a sufficient likelihood that the person is illegally violating your copyright. The indicia submitted by the plaintiff prove to be surmises; they do not indicate a sufficient likelihood of an illegal appropriation of source code. Most of the indicia, such as the external similarities, the identity of the functions, correspondences in the HTML text, and the names of files do not lead to the conclusion that the PHP source code was appropriated; rather, these correspondences and identities can also be due to the fact that the defendant's founder – and this is undisputed – knew the plaintiff's web pages and duplicated them, or had them duplicated, with the aid of the viewable information on the basis of the plaintiff's page.

The plaintiff itself assumed as much for years, having been aware of the similarities in the set-up, appearance and functions. Its present belief that not only duplication but the appropriation of PHP source code must have occurred is not based on any new indicia; rather, the plaintiff supports this belief mainly with the results of the private expert opinions it commissioned in 2008. They come to the conclusion that source code appropriation is likely because – as it is stated in the opinions in detail – besides the correspondences in appearance, set-up and functionalities, identical file names, identical file sequences, and nearly identical style sheets were also used, among other things, and especially, the HTML code has been commented out. There is still no external evidence such as a transfer of employees.

The plaintiff's private expert opinions, however, do not address the situation of a programmer who is assigned the task of using the plaintiff's web site that is accessible in the USA to program a corresponding German-language web site. Assuming that situation,

the similarities and correspondences in the set-up, appearance and functions are not surprising; they are the obvious outcome. When a programmer is assigned the task of using the plaintiff's page and its publicly accessible HTML texts and style sheets to create an identical page but in German, it would be implausible for the programmer to forgo using the viewable parts and instead reinvent all the file names and sequences. The flaw in the plaintiff's private expert opinions is that they only take two possibilities into account. They assume on one hand the situation of a programmer who recreates a social network without any instructions and without knowledge of facebook, and on the other hand the situation of a programmer who has the PHP source code at his disposal. The opinions do not take into consideration, and therefore do not take a position on, what happens when a programmer working for the defendant has been specifically assigned the job of duplication, perhaps using the plaintiff's web pages, HTML texts, and style sheets. Such an assignment would explain the correspondences between names, appearance, and functions. It would also explain the use of the term "poke" and the file name "fakebook".

Even the fact that the HTML text is commented out does not lead to the conclusion that the PHP source code is stolen. Assuming the duplication of the programming with the aid of all publicly available information concerning facebook, it is plausible that certain functions that the plaintiff had integrated were not supposed to be offered by the defendant at first. The commenting could have been done if the defendant initially wanted to reserve its option to postpone the application of the duplicated functions that existed on the plaintiff's end until later instead of offering them. The expert Carle acknowledges that this may be an explanation for the presence of comments in the HTML code, and the expert Streitz does not rule it out.

In contrast to the case decided by the BGH (GRUR 2002, 1046-1049 – *Faxkarte*), besides the similarities related to the program itself, there is no further evidence of source code appropriation beyond the program. In the case cited above, the BGH held that a certain likelihood was sufficiently established for purposes of BGB § 809 by numerous correspondences between the programs in conjunction with the possibility that the program came into the possession of the violator through a former employee of the injured party. Therefore, correspondences between the programs by themselves cannot be sufficient. But that is the extent of the plaintiff's assertions. With respect to the defendant's ability to obtain information, the plaintiff

confines itself to mere surmises, such as general gaps in security, without stating in detail whether it knew of specific security gaps, particularly ones that recurred over a number of years. Given the plaintiff's own assertion that new functionalities were repeatedly appropriated over the years, its PHP code would have had to be repeatedly accessed over the years. But the plaintiff has not pleaded anything as to how it was supposedly possible to appropriate the source text that was on its server alone, and which security measures it put in place which the defendant was able to overcome continually.

The similarities between the viewable parts of the programs and the comments by themselves, which can also be the result of duplication, do not establish a sufficient likelihood of source code appropriation in and of themselves.

IV.
A further reason why the request for the acknowledgment of a special damages claim under BGB § 280 based on the breach of the terms and conditions of facebook by one of the defendant's founders is without merit is that the defendant itself was never the plaintiff's contractual partner.

V.
The procedural auxiliary rulings are based on ZPO §§ 91 subs. 1, 709 sentence 1, 2.

Amount in controversy: 1,000,000 €

Dr. Schwitanski          Wuttke                              Chang-Herrmann
                         unable to sign due to vacation